## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN)  PRODUCTS LIABILITY LITIGATION | * MDL NO. 2592 |
| | * SECTION L |
| | * |
| | * JUDGE ELDON E. FALLON |
| | * |
| | * MAG. JUDGE SHUSHAN |
| ************************************************ | * |

THIS DOCUMENT RELATES TO: ALL CASES

### PRETRIAL ORDER #1
**Setting Initial Conference**

It appearing that civil actions listed on Schedule A, attached hereto, which were transferred to this Court by order of the Judicial Panel on Multi District Litigation pursuant to its order of December 12, 2014 merit special attention as complex litigation, the following Order is issued:

1. INTRODUCTION—It is not yet known how many attorneys will eventually join this litigation, but we can assume it will be a large number.  The attorneys involved in a multi-district case, such as this, will probably be laboring together for some time in the future with work progressively becoming more complicated and exacting.  Some will know each other and some will be complete strangers.  Undoubtedly each has a different style and personality.  It is likely that during the course of this litigation their working relationship will occasionally be strained, communication derailed, and mutual trust questioned.  The just and efficient resolution of this litigation will depend in large measure on the way the attorneys comport themselves and overcome the temptations and trepidations inherent in a case of this magnitude. The Manual for Complex Litigation recognizes that judicial involvement in managing complex litigation does not lessen the duties and responsibilities of the attorneys.  To the contrary, the added demands

and burdens of this type of litigation place a premium on professionalism and require counsel to fulfill their obligations as advocates in a manner that will foster and sustain good working relations among fellow counsel and the Court.  The Court expects, indeed insists, that professionalism and courteous cooperation permeate this proceeding from now until this litigation is concluded.  The court record should never be the repository of ill- chosen words arising out of a sense of frustration over real or imagined issues.  Because of the high level of competence and experience of attorneys who are generally involved in multi-district litigation, this Court is confident that this objective will be achieved without judicial intervention.

2. APPLICABILITY OF ORDER—Prior to the initial pretrial conference and entry of a comprehensive order governing all further proceedings in this case, the provisions of this Order shall govern the practice and procedure in those actions that were transferred to this Court by the Judicial Panel on Multi District Litigation pursuant to its order of December 12, 2014 listed on Schedule A.  This Order also applies to all related cases filed in all sections of the Eastern District of Louisiana and will also apply to any "tag-along actions" later filed in, removed to, or transferred to this Court.

3. CONSOLIDATION—The civil actions listed on Schedule A are consolidated for pretrial purposes.  Any "tag-along actions" later filed in, removed to or transferred to this Court, or directly filed in the Eastern District of Louisiana, will automatically be consolidated with this action without the necessity of future motions or orders.   This consolidation, however, does not constitute a determination that the actions should be consolidated for trial, nor does it have the

effect of making any entity a party to any action in which he, she or it has not been named, served or added in accordance with the Federal Rules of Civil Procedure.

4. DATE OF INITIAL CONFERENCE AND AGENDA FOR CONFERENCE—Matters relating to pretrial and discovery proceedings in these cases will be addressed at an initial pretrial conference to be held on January 29, 2015 at 9:00 a.m. in Judge Eldon E. Fallon's courtroom, Room C- 468, United States Courthouse, 500 Poydras Street, New Orleans, Louisiana.  Counsel are expected to familiarize themselves with the Manual for Complex Litigation, Fourth ("MCL 4th") and be prepared at the conference to suggest procedures that will facilitate the expeditious, economical, and just resolution of this litigation.  The items listed in MCL 4th Sections 22.6, 22.61, 22.62, and 22.63 shall, to the extent applicable, constitute a tentative agenda for the conference.  Counsel shall confer and seek consensus to the extent possible with respect to the items on the agenda, including a proposed discovery plan, amendment of pleadings, consideration of any class action allegations and motions, and be prepared to discuss the mode of trial.  If the parties have any suggestions as to any case management orders or additional agenda items, these shall be faxed to (504) 589-6966 or otherwise submitted to the Court on or before January 27, 2015.

5. POSITION STATEMENT—Plaintiffs and defendants shall submit to the Court on or before January 20, 2015 a brief written statement indicating their preliminary understanding of the facts involved in the litigation and the critical factual and legal issues.  These statements will not be filed with the Clerk, will not be binding, will not waive claims or defenses, and may not be offered in evidence against a party in later proceedings.  The parties' statements shall list all

pending motions, as well as all related cases pending in state or federal court, together with their current status, including any discovery taken to date, to the extent known.  The parties shall be limited to one such submission for all plaintiffs and one such submission for all defendants.

6. APPEARANCE AT INITIAL CONFERENCE—Each party represented by counsel shall appear at the initial pretrial conference through their  attorney who will have primary responsibility for the party's  interest in this litigation.  Parties not represented by counsel may appear in person or through an authorized and responsible agent.  To minimize costs and facilitate a manageable conference, parties with similar interests may agree, to the extent practicable, to have an attending attorney represent their interest at the conference.  A party, by designating an attorney to represent the party's interest at this initial conference, will not be precluded from personally participating or selecting other representation during the future course of this litigation, nor will attendance at the conference waive objections to jurisdiction, venue or service.

7. SERVICE—Prior to the initial conference, service of all papers shall be made on each of the attorneys on the Panel Attorney Service List attached hereto and designated as Schedule B. Counsel on this list are requested to forward a copy of this order to other attorneys who should be notified of the conference.  Any attorney who wishes to have his/her name added to or deleted from such Panel Attorney Service List may do so upon request to the Clerk of this Court and notice to all other persons on such service list.  Parties who are not named as parties in this litigation but may later be joined as parties or who are parties in related litigation pending in other federal or state courts are invited to attend in person or through counsel.  Liaison counsel

[4]

for the parties, if appointed before the conference, shall present to the Court at the initial

conference a list of attorneys and their office addresses, phone and fax numbers, and E-mail

addresses.

8. EXTENSION AND STAY—Each defendant is granted an extension of time for

responding by motion or answer to the complaint(s) until a date to be set by this Court.  Pending

the initial conference and further orders of this Court, all outstanding discovery proceedings are

stayed, and no further discovery shall be initiated.  Moreover, all pending motions must be

renoticed for resolution on a motion day or days after the Court's initial conference herein.

9. MASTER DOCKET FILE—Any pleading or document which is to be filed in any of

these actions shall be filed with the Clerk of this Court and not in the transferor court.  The Clerk

of this Court will maintain a master docket case file under the style "In Re: XARELTO

(RIVAROXABAN) PRODUCTS LIABILITY LITIGATION" and the identification "MDL No.

2592."  When a pleading is intended to be applicable to all actions, this shall be indicated by the

words: "This Document Relates to All Cases."  When a pleading is intended to apply to less than

all cases, this Court's docket number for each individual case to which the document number

relates shall appear immediately after the words "This Document Relates to."  The following is a

sample of the pleading style:

IN RE: XARELTO (RIVAROXABAN)                 MDL No. 2592
PRODUCTS LIABILITY LITIGATION

                                                                 SECTION: L
                                                                  JUDGE FALLON
                                                                  MAG. JUDGE SHUSHAN

THIS DOCUMENT RELATES TO:

[5]

10. FILING—All documents filed in this Court must be filed electronically pursuant to Local Rule 5.7 E and this Court's Administrative Procedures for Electronic Filing.  Attorneys may register for electronic filing at

www.laed.uscourts.gov/case-information/cmecf/e-file-registration.  An attorney who, due to exceptional circumstances, is unable to comply with the requirements of electronic filing, may apply to the Court for an order granting an exemption.  The application shall be in writing, filed with the Clerk of Court, and shall state the reason for the attorney's inability to comply.

*Pro se* litigants who have not been authorized to file electronically shall continue to file their pleadings with the Clerk of this Court in the traditional manner, on paper.

The Clerk of Court is directed to make all entries on the master docket sheet with a notation listing the cases to which the document applies, except that a document closing a case will also be entered on the individual docket sheet.  All documents shall be filed in the master file.


11. DOCKETING—When an action that properly belongs as part of *In Re: Xarelto (Rivaroxaban) Products Liability Litigation* is hereinafter filed in the Eastern District of Louisiana or transferred here from another court, the Clerk of this Court shall:

   a.  File a copy of this Order in the separate file for such action;

   b.  Make an appropriate entry on the master docket sheet;

   c.  Forward to the attorneys for the plaintiff in the newly filed or transferred case a copy of this Order;

   d.  Upon the first appearance of any new defendant, forward to the attorneys for the defendant in such newly filed or transferred cases a copy of this Order.

[6]

12. APPEARANCES IN LITIGATION—Counsel who appeared in a transferor court prior to transfer need not enter an additional appearance before this Court.  Moreover, attorneys admitted to practice and in good standing in any United States District Court are admitted pro hac vice in this litigation, and the requirements of Local Rules 83.2.6E  and 83.2.7 are waived. Association of local counsel is not required.

13. PRESERVATION OF EVIDENCE—All parties and their counsel are directed to preserve evidence that may be relevant to this action.  The duty extends to documents, data, and tangible things in possession, custody and control of the parties to this action, and any employees, agents, contractors, carriers, bailees, or other nonparties who possess materials reasonably anticipated to be subject to discovery in this action.  "Documents, data, and tangible things" is to be interpreted broadly to include writings, records, files, correspondence, reports, memoranda, calendars, diaries, minutes, electronic messages, voice mail, E-mail, telephone message records or logs, computer and network activity logs, hard drives, backup data, removable computer storage media such as tapes, discs and cards, printouts, document image files, Web pages, databases, spreadsheets, software, books, ledgers, journals, orders, invoices, bills,  vouchers,  checks statements, worksheets, summaries,  compilations, computations, charts, diagrams,  graphic presentations,  drawings,  films,  charts, digital or chemical process photographs, video, phonographic, tape or digital recordings or transcripts thereof, drafts, jottings and notes, studies or drafts of studies or other similar such material.  Information that serves to identify, locate, or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition.   Preservation includes the obligation not to alter any such thing as to its form, content or manner of filing.  Until the parties reach an agreement on a

[7]

preservation plan or the Court orders otherwise, each party shall take reasonable steps to preserve all documents, data and tangible things containing information potentially relevant to the subject matter of this litigation. Each counsel is under an obligation to the Court to exercise all reasonable efforts to identify and notify parties and nonparties, including employees of corporate or institutional parties of the contents of this paragraph.  Failure to comply may lead to dismissal of claims, striking of defenses, imposition of adverse inferences or other dire consequences.

Before any devices, tangible things, documents, and other records which are reasonably calculated to lead to admissible evidence are destroyed, altered, or erased, counsel shall confer to resolve questions as to whether the information should be preserved.  If counsel are unable to agree, any party may apply to this Court for clarification or relief from this Order upon reasonable notice.

14. FILING OF DISCOVERY REQUESTS—In accordance with Rule 5(d) of the Federal Rules of Civil Procedure, discovery requests and responses are <u>not to be filed with the Clerk nor sent to the Judge's Chambers</u>, except when specifically ordered by the Court to the extent needed in connection with a motion.

15. LIAISON COUNSEL—It is the intent of the Court to appoint liaison counsel for the parties.  Liaison counsel shall be authorized to receive orders and notices from the Court on behalf of all parties within their liaison group, and pending further orders of the Court, shall be responsible for the preparation and transmittal of copies of such orders and notices to the parties in their liaison group and perform other tasks determined by the Court.  Liaison counsel shall be

required to maintain complete files with copies of all documents served upon them and shall make such files available to parties within their liaison group upon request.  Liaison counsel are also authorized to receive orders and notices from the Judicial Panel on Multi District Litigation pursuant to Rule 5.2(e) of the Panel's Rules of Procedure or from the transferee court on behalf of all parties within their liaison group and shall be responsible for the preparation and transmittal of copies of such orders and notices to the parties in their liaison group.  Plaintiffs' liaison counsel shall coordinate the establishment of a document depository, real or virtual, to be available to all participating plaintiffs' counsel. The expenses incurred in performing the services of liaison counsel shall be shared equally by all members of the liaison's group in a manner agreeable to the parties or set by the Court failing such agreement.  Applications/nominations for the designation of liaison must be filed with the Eastern District of Louisiana's Clerk's Office either electronically or on paper (original and one copy) on or before January 15, 2015.  The applications and nominations must also be served upon counsel named in Schedule B on the day of filing.  No submissions longer than three (3) pages will be considered.  Appointment of liaison counsel shall be made by the Court after full consideration of the proposals.  At the initial conference, liaison counsel and/or the parties should be prepared to discuss any additional needs for an organizational structure or any additional matters consistent with the efficient handling of this matter.  Henceforth, liaison counsel for all parties shall meet and confer prior to the Court conferences; prepare agendas for the conferences and submit them to the Court three days before the conference; and report at the conference regarding the status of the case.

16. PLAINITFFS' STEERING COMMITTEE—It is also the Court's intent to appoint a Plaintiffs' Steering Committee ("PSC") to conduct and coordinate the discovery stage of this

litigation with the defendant's representatives or committee.  Applications/nominations for the PSC positions must be filed with the Eastern District of Louisiana's Clerk's Office either electronically or on paper (original and one copy) on or before February 2, 2015.  The applications and nominations must also be served upon counsel named in Schedule B on the day of filing.  The main criteria for membership in the PSC will be: (a) willingness and availability to commit to a time-consuming project; (b) ability to work cooperatively with others; and (c) professional experience in this type of litigation (d) willingness to commit the necessary resources to pursue this matter. Applications/nominations should succinctly address each of the above criteria as well as any other relevant matters.  No submissions longer than four (4) pages will be considered.  The Court will only consider attorneys who have filed a civil action in this litigation, and the application/nomination should include a list of cases in which the attorney appears as counsel.

Objections may be made to the appointment of a proposed applicant/nominee. Nevertheless, the Court will entertain only written objections to any application/nomination. These must be filed with the Clerk of Court either electronically or on paper (original and one copy) on or before February 5, 2015.  The objections, if there be any, must be short, yet thorough, and must be supported by necessary documentation.  As with the application/nomination, any objection must be served on all counsel appearing on the attached list on the day of filing.

The PSC will have the following responsibilities:

Discovery

1. Initiate, coordinate, and conduct all pretrial discovery on behalf of plaintiffs in all actions which are consolidated with the instant multidistrict litigation.

2. Develop and propose to the Court schedules for the commencement, execution, and completion of all discovery on behalf of all plaintiffs.

3. Cause to be issued in the name of all plaintiffs the necessary discovery requests, motions, and subpoenas pertaining to any witnesses and documents needed to properly prepare for the pretrial discovery of relevant issue found in the pleadings of this litigation.  Similar requests, notices, and subpoenas may be caused to be issued by the PSC upon written request by an individual attorney in order to assist him/her in the preparation of the pretrial stages of his/her client's particular claims.

4. Conduct all discovery in a coordinated, efficient, and consolidated manner on behalf and for the benefit of all plaintiffs.   No attorney for a plaintiff may be excluded from attending the examination of witnesses and other proceedings.  Such attorney may suggest questions to be posed to deponents through the designated PSC members provided that such questions are not repetitious.

Hearings and Meeting

1. Call meetings of counsel for plaintiffs for any appropriate purpose, including coordinating responses to questions of other parties or of the

Court.  Initiate proposals, suggestions, schedules, or joint briefs, and any other appropriate matter(s) pertaining to pretrial proceedings.

2.  Examine witnesses and introduce evidence at hearings on behalf of plaintiffs.

3.  Act as spokesperson for all plaintiffs at pretrial proceedings and in response to any inquiries by the Court, subject of course to the right of any plaintiff's counsel to present non-repetitive individual or different positions.

Miscellaneous

1.  Submit and argue any verbal or written motions presented to the Court or Magistrate on behalf of the PSC as well as oppose when necessary any motions submitted by the defendant or other parties which involve matters within the sphere of the responsibilities of the PSC.

2.  Negotiate and enter into stipulations with Defendants regarding this litigation.  All stipulations entered into by the PSC, except for strictly administrative details such as scheduling, must be submitted for Court approval and will not be binding until the Court has ratified the stipulation.  Any attorney not in agreement with a non-administrative stipulation shall file with the Court a written objection thereto within ten (10) days after he/she knows or should have reasonably become aware of the stipulation.  Failure to object within the term allowed shall be deemed a waiver and the stipulation will automatically be binding on that party.

3.  Explore, develop, and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation.

4.  Maintain adequate files of all pretrial matters and have them  available, under reasonable terms and conditions, for examination by plaintiffs or their attorneys.

5.  Prepare periodic status reports summarizing the PSC's work and progress.  These reports shall be submitted to the Plaintiffs' Liaison Counsel who will promptly distribute copies to the other plaintiffs' attorneys.

6.  Perform any task necessary and proper for the PSC to accomplish its responsibilities as defined by the Court's orders.

7.  Perform such other functions as may be expressly authorized by further orders of this Court.

8.  Reimbursement for costs and/or fees for services will be set at a time and in a manner established by the Court after due notice to all counsel and after a hearing.

17. DEFENDANT(S) STEERING COMMITTEE—The Court will consider the recommendations of the defendant(s) for membership on the defendant(s) steering committee. Defendant(s) Steering Committee will have the duties and responsibilities described in Paragraph 16 of this order as it pertains to this respective group.

18. MDL 2592 WEBSITE—A website particular to MDL 2592 has been created and can be accessed by going to this Court's website located at www.laed.uscourts.gov and clicking on "MDL & Mass/Class Action," and then clicking on the link to "Xarelto (Rivaroxaban) Products Liability Litigation, 14-MD-2592 (Hon. Eldon E. Fallon)" located under the" Multi-District Litigation (MDL) Cases" heading.  The MDL 2592 website may also be accessed directly by going to www.laed.uscourts.gov/xarelto.  The website will contain forms, court orders, minute entries, a calendar of upcoming events, and other relevant information.

19. COMMUNICATION WITH THE COURT—Unless otherwise ordered by this Court, all substantive communications with the Court shall be in writing, with copies to opposing counsel.  Nevertheless, the Court recognizes that cooperation by and among plaintiffs' counsel and by and among defendant's counsel is essential for the orderly and expeditious resolution of this litigation.  The communication of information among and between plaintiffs' counsel and among and between defendant's counsel shall not be deemed a waiver of the attorney-client privilege or the protection afforded attorney's work product, and cooperative efforts contemplated above shall in no way be used against any plaintiff by any defendant or against any defendant by any plaintiff.  Nothing contained in this provision shall be construed to limit the rights of any party or counsel to assert the attorney-client privilege or attorney work product doctrine.

New Orleans, Louisiana this 17th day of December, 2014.

UNITED STATES DISTRICT JUDGE

Attachments

[14]

IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION                         MDL No. 2592


## SCHEDULE A


Northern District of Florida

NICHOLSON v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 5:14-00173


Southern District of Florida

PACKARD v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 0:14-61448


Southern District of Illinois

LEMP, ET AL. v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 3:14-00987
HANEY v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 3:14-00988
LEACH v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 3:14-00989
RUCKER v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 3:14-01026
PENNELL, ET AL. v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 3:14-01040
MCMUNN v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 3:14-01042
BIVEN v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 3:14-01050
MULRONEY v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 3:14-01073


Eastern District of Kentucky

BOLTON, ET AL. v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 0:14-00146


Western District of Kentucky

COX v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
   C.A. No. 3:14-00579

- A2 -

Eastern District of Louisiana

BRASWELL v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
    C.A. No. 2:14-02258

Eastern District of New York

JEFFCOAT v. JANSSEN REASEARCH & DEVELOPMENT LLC, ET AL.,
    C.A. No. 1:14-04524
GRIGGS, ET AL. v. JANSSEN RESEARCH & DEVELPMENT LLC, ET AL.,
    C.A. No. 1:14-04841
BOYNTON, ET AL. v. JANSSEN RESEARCH & DEVELPMENT LLC, ET AL.,
    C.A. No. 1:14-05133
USELTON v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
    C.A. No. 1:14-05728
GREEN, ET AL. v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
    C.A. No. 1:14-05871

District of Utah

ARMSTRONG, ET AL. v. JANSSEN RESEARCH & DEVELOPMENT, ET AL.,
    C.A. No. 2:14-00599

District of Vermont

MCGOWAN v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET AL.,
    C.A. No. 2:14-00159

Southern District of West Virginia

DALRYMPLE v. JANSSEN RESEARCH & DEVELOPMENT LLC, ET. AL.,
    C.A. No. 5:14-25893

**SCHEDULE B**

**Plaintiffs' Counsel**

Neil E. McWilliams, Jr.
LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Tel: (850) 435-7059
Fax: (850) 435-7020
nmcwilliams@levinlaw.com
**Plaintiffs**: Ruth E. McGowan as the Executrix for and on behalf of the heirs of the estate of Thomas C. Dunkley, Edwin Nicholson, Sharon Rucker as the Administrator for and on behalf of the heirs of the Estate of Marion Rucker, Jr.

Michael London
DOUGLAS AND LONDON
59 Maiden Lane, 6th Floor
New York, NY 10038
Tel: (212) 566-7500
mlondon@douglasandlondon.com
**Plaintiffs**: Shirley Boynton & James Boynton, Harry Griggs and Joseph Griggs, on behalf of the Estate of Charles Griggs, deceased, and Harry Griggs and Joseph Griggs, Individually, Julia Green and Arthur Green, Carolyn Uselton, Jeanne Jeffcoat

Daniel J. Carr
Joseph C. Peiffer
PEIFFER, ROSCA, WOLF, ABDULLAH, CARR & KANE, LLP
201 St. Charles Ave., Suite 4610
New Orleans, LA 70170
Tel: (504) 586-5270
Fax: (504) 523-2464
dcarr@prwlegal.com
jpeiffer@prwlegal.com
**Plaintiff**: Michael Mulroney

Michael B. Lynch, Esq.
THE MICHAEL BRADY LYNCH FIRM
127 West Fairbanks Ave. #528
Winter Park, Florida 32789
Tel: (877) 513-9517
Fax: (321) 972-3568
Cell: (321) 239-8026
michael@mblynchfirm.com
**Plaintiff**: Michael Mulroney

Aaron L. Harrah
James C. Peterson
HILL PETERSON CARPER BEE & DEITZLER
North Gate Business Park
500 Tracy Way
Charleston, WV 25311-1555
Tel: (304) 345-5667
Fax: (304) 345-1519
aaron@hpcbd.com
jcpeterson@hpcbd.com
**Plaintiff**: Ronald Dalrymple

Melissa Mendoza
BERNSTEIN LIEBHARD LLP
10 East 40th Street, 22nd Floor
 New York, NY 10016
Tel:  (212) 779-1414
Fax: (212) 779-3218
Mmendoza@bernlieb.com
**Plaintiff**:  Alice Rentrop

Neil D. Overholtz
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502-5998
Tel:  (850) 202-1010
Fax:  (850) 916-7449
noverholtz@awkolaw.com
**Plaintiffs**:  Scott Lindsey individually and as successor-in-interest and proposed estate
representative of the Estate of Donald G. Lindsey, deceased, Nancy Packard, Individually and as
Personal Representative of the Estate of William N. Packard, Jr.

David Cleary
CLEARY SHAHI & AICHER, P.C.
110 Merchants Row
P.O. Box 6740
Rutland, VT 05702-6740
Tel: (802) 775-8909
Fax: (802) 775-8809
dlc@clearyshahi.com
**Plaintiffs**: Ruth E. McGowan as the Executrix for and on behalf of the heirs of the estate of
Thomas C. Dunkley

Bruce Kingsdorf
Dawn Barrios
Zachary Logan Wool
BARRIOS, KINGSDORF & CASTEIX, LLP
One Shell Square
701 Poydras Street, Suite 3650
New Orleans, LA 70139-3650
Tel: (504) 524-3300
kingsdorf@bkc-law.com
barrios@bkc-law.com
zwool@bkc-law.com
**Plaintiff**: Christopher Braswell

Roger C. Denton
Kristine K. Kraft
Ashley Brittain Landers
SCHLICHTER, BOGARD & DENTON, LLP
100 South 4th Street, Suite 900
St. Louis, MO 63102
Tel: (314) 621-6115
Fax: (314) 621-7151
rdenton@uselaws.com
kkraft@uselaws.com
abrittain@uselaws.com
**Plaintiffs**: Christopher Braswell, Dorothy Leach, William F. Haney, Mary K. Lemp and Charles Lemp, Jr., Stanley Pennell and Nancy Pennell, Michael Mulroney

Nancy A. Mismash
ROBERT J. DEBRY & ASSOCIATES
4252 S. 700 E
Salt Lake City, UT 84107
Tel: (801) 262-8915
nmismash@robertdebry.com
**Plaintiffs**: Dale Armstrong, Karen Cimino, Clifford Armstrong and Douglas Armstrong, heirs, Individually and on behalf of Margaret Armstrong, deceased

Lawrence L Jones, II
JONES WARD, PCL
312 S. Fourth Street, 6th Floor
Louisville, KY 40202
Tel: (502) 882-6000
Fax: (502) 587-2007
larry@jonesward.com
**Plaintiff**: Marilynne A. Cox, Jeanette and Charles Bolton

[3]

Diane M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Tel: (215) 923-9300  Fax: (215) 923-9302
dnast@nastlaw.com
**Plaintiffs**: Richard Newman, Donald Norword and Carol Hines

Robert C. Hilliard
Catherine Tobin
T. Christopher Pinedo
Marion Reilly
HILLIARD MUNOZ GONZALES LLP
719 S. Shoreline, Suite 500
Corpus Christi, Texas 78401
Tel: (361) 882-1612
Fax: (361) 882-3015
bob@hmglawfirm.com
catherine@hmglawfirm.com cpinedo@hmglawfirm.com
marion@hmglawfirm.com
**Plaintiff**: Tatyana Tonyan

Andrew Childers
CHILDERS, SCHLUETER & SMITH, LLC
1932 N. Druid Hills Road
Suite 100
Atlanta, Georgia 30319
**Plaintiff**: Kimberly West

Michael K. Johnson
JOHNSON BECKER, PLLC
33 South Sixth Street, Suite 4530
Minneapolis, MN 55402
Tel: (612) 436-1800
Fax: (612) 436-1801
MJohnson@johnsonbecker.com
**Plaintiff**: Martha McMunn

D. Todd Mathews
GORI, JULIAN & ASSOCIATES, PC
156 N. Main Street
Edwardsville, IL 62025
Tel: 618-659-9833
Fax: 618-659-9834
todd@gorijulianlaw.com
**Plaintiff**: Robert Biven

[4]

Scott R. Bickford, T.A.
Lawrence J. Centola, III
Jason Z. Landry
MARTZELL & BICKFORD
338 Lafayette Street
New Orleans, LA 70130
**Plaintiffs**: Joann Varnado and Christian Varnado, individually and on behalf of decedent Gerald
Varnado

Eve S. Reardon, Esq.
THE KEATING LAW FIRM, LLC
3714 Airline Drive
Metairie, LA 70001
**Plaintiffs**: Joann Varnado and Christian Varnado, individually and on behalf of decedent Gerald
Varnado

Morris Bart
Daniel B. Snellings
Mekel Alvarez
MORRIS BART, LLC
909 Poydras Street, 20th Floor
New Orleans, LA 70112
**Plaintiffs**: James J. Brien Sr. and Dolly S. Brien, Linda Randazzo, individually, and on behalf of
Lawrence Randazzo, Samantha Davis, Claudette Brown, Patricia Ferguson, Douglas and Shirley
Silvey, Lionel St. Amand

Galen M. Hair, T.A.
Benjamin C. Varadi
VARADI, HAIR & CHECKI, LLC
650 Poydras St., Ste. 1550
New Orleans, LA 70130
**Plaintiffs**: Estate of Cornelius McLain Goodwin III, Rose Marie Goodwin, Steven Wayne
Goodwin, Craig McLain Goodwin, Liza Ann Gatson and Cornelius McLain Goodwin IV

Ronald E. Johnson, Jr.
Sarah N. Lynch
SCHACHTER, HENDY & JOHNSON, PSC
909 Wright's Summit Parkway #210
Ft. Wright, KY 41011
**Plaintiffs**: Tony Mathena and Karen Mathena

Amy M. Carter
SIMON GREENSTONE PANATIER BARTLETT, P.C.
3232 McKinney Avenue, Suite 610
Dallas, TX 75204
**Plaintiff**:  Marilyn S. Haney, as the Executrix for and on Behalf of the Heirs of the Estate of
Bobby N. Haney

Russell Wills Buss
BARON & BUDD, P.C.
3102 Oaklawn Avenue, Suite 1100
Dallas, TX 75219
Tel: (214) 521-3605
Fax: (214) 520-1181
sblackburn@baronbudd.com
**Plaintiff**: Sara Jean Jonas

Steven Davis
TORHOERMAN LAW LLC
101 W. Vandalia St., Ste. 350
Edwardsville, IL 62025
Tel: (618) 656-4400
Fax: (618) 656-4401
sdavis@torhoermanlaw.com
**Plaintiff**: Theodore Van Dorn, Jr.; Howard Mize

M. Elizabeth Graham
GRANT & EISENHOFER P.A.
123 Justison Street. 7th Floor
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 722-7001
egraham@gelaw.com
**Plaintiff**: William Sandusky

Jay F. Hirsch
POPE, MCGLAMRY, KILPATRICK, MORRISON & NORWOOD, P.C.
Lenox Overlook, Suite 300
3391 Peachtree Road, N.E.
Atlanta, GA 303026
Tel: (404) 523-7706
Fax (404) 524-1648
efile@pmkm.com
**Plaintiff**: Randolph Sinclair

Seth A. Katz
BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C.
40 Inverness Drive East
Englewood, CO 80112
Tel: (303) 792-5595
Fax: (303) 708-0527
**Plaintiff**: Henry Harding and Mary Jane Harding

Kristian Rasmussen
CORY WATSON CROWDER & DeGARIS, P.C.
2131 Magnolia Avenue
Birmingham, AL, 35205
Tel: (205) 328-2200
Fax: (205) 324-7896
krasmussen@cwcd.com
**Plaintiff**: Annie Banks

Melissa Mendoza
BERNSTEIN LIEBHARD LLP
10 East 40th Street, 22nd Floor
New York, NY 10016
Phone: (212) 779-1414
Fax: (212) 779-3218
Email: mmendoza@bernlieb.com
**Plaintiff**: Claire Browning

Chad Joseph Primeaux
Douglas Robert Plymale
James Dugan
Lanson Leon Bordelon
THE DUGAN LAW FIRM, APLC
One Canal Place, Suite 1000
365 Canal Street
New Orleans, LA 70130
Tel: (504) 648-0180
Fax: (504) 648-0181
cprimeaux@dugan-lawfirm.com
drplymale@plymalelawfirm.com
jdugan@dugan-lawfirm.com
lbordelon@duganlawfirm.com
**Plaintiff**: William Heffker

[7]

Frank Jacob D'Amico , Jr.
FRANK J. D'AMICO, APLC
622 Baronne Street, 2nd Floor
New Orleans, LA 70113
Tel: (504) 525-7272
Fax: (504) 525-1167
frank@damicolaw.net
**Plaintiff**: William Heffker

**Defendants' Counsel**

F.M. (Tripp) Haston, III
BRADLEY ARANT BOULT CUMMINGS LLP 1819 Fifth Avenue North
Birmingham, AL 35203
Phone: (205) 521-8303
Fax: (205) 488-6303
Email: thaston@babc.com
**Defendants:** Bayer HealthCare Pharmaceuticals Inc., Bayer HealthCare LLC,
Bayer Corporation

Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Phone: (973) 549-7000
Fax: (973) 360-9831
Email: susan.sharko@dbr.com
**Defendants:** Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, Janssen
Ortho LLC, Johnson & Johnson

Bayer Pharma, AG
Mullerstrasse 178
D-13353
Berlin, Germany

Bayer Healthcare AG
CHEMPARK Leverkusen
Zentraler Besucherempfang
Kaiser-Wilheml-Allee
D-51368 Leverkusen

Bayer AG1
Leverkusen
North Rhine-Westphalia, Germany

[8]

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)  PRODUCTS   *  **MDL NO. 2592**
LIABILITY LITIGATION

                                                 *  **SECTION L**
                                                 *
                                                 *  **JUDGE ELDON E. FALLON**
                                                 *
                                                 *  **MAG. JUDGE NORTH**

**************************************************  *

**THIS DOCUMENT RELATES TO ALL CASES**

<u>**PRETRIAL ORDER #2**</u>

Pursuant to Pretrial Order #1, issued by this Court on December 17, 2014, the Court has received applications for the position of Plaintiffs' Liaison Counsel and finds that Gerald E. Meunier and Leonard A. Davis are well qualified to carry out the duties and responsibilities of the position.  Accordingly, the Court hereby appoints Gerald E. Meunier, 2800 Energy Centre, 1100 Poydras St., New Orleans, LA 70163, and Leonard A. Davis, 820 O'Keefe Ave., New Orleans, Louisiana 70113, to serve as Co-Plaintiffs' Liaison Counsel.

The responsibilities of Co-Plaintiffs' Liaison Counsel shall be the following:

1. to serve as the recipient for all Court orders on behalf of all of the plaintiffs;

2. to coordinate service and filings for all plaintiffs whether presently included or subsequently added;

3. to maintain and distribute to co-counsel and to Defendants' Liaison Counsel an up-to-date service list;

4. to receive and distribute pleadings, orders, and motions by overnight courier service and/or telecopier within two days after receipt, unless such service has been waived, in writing, by a receiving counsel (until some program for electronic service can be arranged and agreed upon);

5. to coordinate the establishment of a document depository, real or virtual, to be available to all participating plaintiffs' counsel;

6.  to maintain and make available to all participating plaintiffs' counsel of record at reasonable hours a complete file of all documents served by or upon each party (except such documents as may be available at a document depository);

7.  to prepare agendas for court conferences and periodically report regarding the status of the case; and

8.  to carry out such other duties as the Court may order.

Liaison counsel shall be entitled to seek reimbursement for costs expended at the time

and in a manner approved by the Court.

New Orleans, Louisiana this 16th day of January, 2015.

_____
UNITED STATES DISTRICT JUDGE

[2]

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)  PRODUCTS      * MDL NO. 2592
LIABILITY LITIGATION

                                               * SECTION L
                                               *
                                               * JUDGE ELDON E. FALLON
                                               *
                                               * MAG. JUDGE NORTH

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*   *

**THIS DOCUMENT RELATES TO ALL CASES**

## PRETRIAL ORDER #3

Pursuant to Pretrial Order #1, issued by this Court on December 17, 2014, Defendants have informed the Court that they have selected James B. Irwin as Defendants' Liaison Counsel. Accordingly, the Court designates James B. Irwin, 400 Poydras St., Suite 2700, New Orleans, Louisiana 70130, to be Defendants' Liaison Counsel.

The responsibilities of Defendants' Liaison Counsel shall be the following:

1. to serve as the recipient for all Court orders on behalf of all of all defendants;

2. to coordinate service and filings for all defendants whether presently included or subsequently added;

3. to receive and distribute pleadings, orders, and motions by overnight courier service and telecopier within two days after receipt, unless such service has been waived, in writing, by a receiving counsel (until some program for electronic service can be arranged and agreed upon); and

4. to carry out such other duties as the Court may order.

Liaison counsel shall be entitled to seek reimbursement for costs expended at the time and in a manner approved by the Court.

New Orleans, Louisiana this 16th day of January, 2015.

_____
UNITED STATES DISTRICT JUDGE

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)  PRODUCTS    *   **MDL NO. 2592**
LIABILITY LITIGATION

    *   **SECTION L**
    *
    *   **JUDGE ELDON E. FALLON**
    *
    *   **MAG. JUDGE NORTH**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***   *

**THIS DOCUMENT RELATES TO ALL CASES**

### <u>PRETRIAL ORDER #4</u>

     The Court has appointed the following persons to serve as Liaison Counsel in this matter:

<u>For the Plaintiffs</u>:                  <u>For the Defendants</u>:

Gerald E. Meunier                        James B. Irwin
Gainsburgh Benjamin David Meunier &       Irwin Fritchie Urquhart & Moore LLC
Warshauer, LLC                         400 Poydras Street, Suite 2700
2800 Energy Centre                     New Orleans, LA 70130
1100 Poydras Street                     Telephone: 504-310-2100
New Orleans, Louisiana 70130         Fax: (504) 310-2120
Phone: 504-522-2304                    Email: jirwin@irwinllc.com
Fax: 504-528-9973
Email: gmeunier@gainsben.com

Leonard A. Davis
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: 504-581-4892
Fax: 504- 561-6024
Email:  ldavis@hhklawfirm.com

     **IT IS ORDERED** that all counsel within 5 days of receipt of this order shall provide to

the appropriate Liaison Counsel updated contact information to be used for service.  Henceforth,

service of all papers by the Court will be made on Liaison Counsel only.  It shall then be the

responsibility of Liaison Counsel to serve said papers on each of the attorneys or parties with

whom that Liaison Counsel is affiliated.  Accordingly, **IT IS FURTHER ORDERED** that Paragraph 7 of Pretrial Order #1 regarding SERVICE is hereby **AMENDED** to reflect this change.

**IT IS FURTHER ORDERED** that Liaison Counsel shall meet and confer and prepare a proposed agenda for the upcoming meeting and submit it to the Court three days (3) before the meeting.

**IT IS FURTHER ORDERED** that Paragraph 11 of Pretrial Order #1 regarding DOCKETING is hereby **AMENDED** to read as follows:

DOCKETING---When an action that properly belongs as a part of *In Re: Xarelto (Rivaroxaban) Products Liability Litigation* is hereinafter filed in the Eastern District of Louisiana or transferred here from another court, the Clerk of this Court shall:

    a.  Place a copy of this Order (Pretrial Order #4) in the separate file for such action;

    b.  Make an appropriate entry on the master docket sheet;

    c.  Forward to all counsel in the newly filed or transferred case a copy of this Order.

New Orleans, Louisiana this 26th day of January, 2015.

_____
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)  PRODUCTS        *  **MDL NO. 2592**
LIABILITY LITIGATION

                                                                              *  **SECTION L**
                                                                              *
                                                                              *  **JUDGE ELDON E. FALLON**
                                                                              *
                                                                              *  **MAG. JUDGE NORTH**
**************************************************  *

**THIS DOCUMENT RELATES TO ALL CASES**


**PRETRIAL ORDER #4A**

All counsel shall provide to the appropriate Liaison Counsel their contact information using the MDL 2592 Counsel Contact Information form attached hereto.  The information set forth in this form shall be updated as necessary so that the information made available to Liaison Counsel remains current and accurate on an ongoing basis.  The contact information shall be used for service, and Liaison Counsel shall be entitled to rely on the information when distributing or circulating information in these proceedings.  The obligation to provide accurate and updated information in the MDL 2592 Counsel Contact Information form rests solely on the part of counsel providing the information.  Liaison Counsel is relieved of any responsibility for serving materials on, or distributing information to, any counsel failing to provide current and accurate information in a MDL 2592 Counsel Contact Information form.


The Clerk of Court shall transmit a copy of this Order to all listed counsel of record herein.  When an action is hereafter transferred into or consolidated with this MDL, the Clerk of

Court shall: (i) file a copy of this Order in any such action; and (ii) forward a copy of this Order

to counsel  for the plaintiff(s) in the newly-filed or transferred action.

New Orleans, Louisiana this 26th day of January, 2015.

ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

# IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION

**MDL 2592**        **Section L**        **Judge Eldon Fallon**

| **MDL 2592 Counsel Contact Information (Form PTO-4)** |
|---|
| **Please print or type below.** |

## ATTORNEY INFORMATION

| Check One: | ☐ Plaintiff Counsel | ☐ Defense Counsel | ☐ Third Party Defense Counsel |
|---|---|---|---|

| Last Name | First Name | Middle Name/Maiden | Suffix: |
|---|---|---|---|
| | | | |

| Address |
|---|
| |

| City | State | Zip |
|---|---|---|
| | | |

| Phone | Fax |
|---|---|
| | |

| Direct Dial No. | Cell Phone |
|---|---|
| | |

| State/ Bar No. | Email Address |
|---|---|
| | |

| Party Representing |
|---|
| |

| Other Members of Firm Involved in this Litigation |
|---|
| |

| Assistant Name | Paralegal Name |
|---|---|
| | |

## Choose One Option Below:

| ☐ | I elect to have Liaison Counsel transmit documents to me via email and consent on an ongoing basis to notify Liaison Counsel of any changes in the above information. |
|---|---|
| ☐ | I do not want to receive orders or other documents form Liaison Counsel. |

_____     _____

**Signed**                                   **Date**

**Print Name:**_____

**Please remit form to: Plaintiffs' Liaison Counsel - Leonard Davis, Herman, Herman & Katz, 820 O'Keefe Ave., New Orleans, LA 70113/Gerald Meunier, Gainsburgh Benjamin, 2800 Energy Centre, 1100 Poydras St., New Orleans, LA 70113 to PLC@MDL2592.com; and Defendants' Liaison Counsel - James Irwin, Irwin Fritchie, 400 Poydras St., Suite 2700, New Orleans, LA 70130 to jirwin@irwinllc.com.**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)  PRODUCTS
LIABILITY LITIGATION

\* MDL NO. 2592

\* SECTION L
\*
\* JUDGE ELDON E. FALLON
\*
\* MAG. JUDGE NORTH

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***   \*

**THIS DOCUMENT RELATES TO ALL CASES**

<u>**PRETRIAL ORDER #5A**</u>

**IT IS ORDERED** that Pretrial Order #5 is **AMENDED** as follows:

Upon receipt of a certified copy of a transfer order from the clerk of the transferee district

court and an email, the clerk of the transferor court shall retain the entire original file and

electronically transfer the case to the clerk of the transferee court via the CM/ECF Civil Case

Extraction Tool. This action satisfies Rule 1.6(a), and the clerk of the transferor court shall mark

the case closed upon transfer to the transferee court.  Following the receipt of the transferred case

in the transferee court, any papers to be filed regarding any civil action covered by that transfer

order are to be filed in the transferee court.

New Orleans, Louisiana this 3rd day of February, 2015.

_____

UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)  PRODUCTS    * MDL NO. 2592
LIABILITY LITIGATION

                                                     * SECTION L
                                                     *
                                                     * JUDGE ELDON E. FALLON
                                                     *
                                                     * MAG. JUDGE NORTH
**************************************************    *

THIS DOCUMENT RELATES TO ALL CASES

<u>**PRETRIAL ORDER #6**</u>

    The Court hereby appoints the following persons to serve as Co-Lead Defense Counsel:

Susan M. Sharko
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, New Jersey 07932-1047
Tel:  (973) 549-7350
Fax: (973) 360-9831

Steven Glickstein
Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-7910
Tel:  (212) 836-8485
Fax: (212) 836-6485

      New Orleans, Louisiana this 3rd day of February, 2015.

                                              _____

                                            UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN) PRODUCTS     *  MDL NO. 2592
LIABILITY LITIGATION

                                                          *  SECTION L
                                                          *
                                                          *  JUDGE ELDON E. FALLON
                                                          *
                                                          *  MAG. JUDGE NORTH

**************************************************  *

**THIS DOCUMENT RELATES TO ALL CASES**

## PRETRIAL ORDER #7

Numerous applications/nominations for the Plaintiffs' Steering Committee (PSC)

positions have been filed in accordance with the procedures set forth in Pretrial Order #1.  The

Court, after having reviewed the applications and carefully considered the matter, hereby

appoints the following members to the PSC:

Andy D. Birchfield, Jr. (Co-Lead Counsel)
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax:     (334) 954-7555
Email: Andy.Birchfield@BeasleyAllen.com

Dr. Mark Alan Hoffman
1650 Market Street, Suite 3450
Philadelphia, PA 19103
Phone: (215) 574-2000
Fax:     (215) 574-3080
Email:  mhoffman@rossfellercasey.com

Brian H. Barr (Co-Lead Counsel)
316 Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7045
Fax:     (850) 436-6044
Email: bbarr@levinlaw.com

Bradley D. Honnold
11150 Overbrook Rd., Ste. 200
Leawood, KS 66211
Phone: (913) 266-2300
Fax:     (913) 266-2366
Email:  bhonnold@bflawfirm.com

Russell T. Abney
2100 RiverEdge Parkway,
Suite 720
Atlanta, Georgia  30328
Email: rabney@lawyerworks.com

Frederick Longer
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax:     (215-592-4663
Email: flonger@lfsblaw.com

Sindhu S. Daniel
550 Broad Street, Suite 920
Newark, NJ 07102
Phone: (973) 639-9100
Fax:     (973) 639-9393
Email:  sdaniel@seegerweiss.com

Roger C. Denton
100 S. 4th Street
St. Louis, MO 63102
Phone: (314) 621-6115
Email:  rdenton@uselaws.com

Michael Goetz
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Phone: (813) 221-6581
Fax:     (813) 222-4737
Email: MGoetz@ForThePeople.com

Dianne M. Nast
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Phone: (215) 923-9300
Email: dnast@nastlaw.com

Neil D. Overholtz
17 E. Main Street , Suite 200
Pensacola, Florida 32501
Phone: (850) 916-7450
Fax:     (850) 916-7449
Email:  noverholtz@awkolaw.com

Ellen Relkin
700 Broadway
New York, New York 10003
Phone: (212) 558-5500
Fax:     (212) 344-5461
Email:  Erelkin@weitzlux.com

The Court appoints Co-Plaintiffs' Liaison Counsel, Leonard Davis and Gerald Meunier, and Co-Lead Counsel, Andy Birchfield and Brian Barr, to comprise the PSC Executive Committee.  It shall be the Executive Committee's duty to coordinate the responsibilities of the PSC, schedule PSC meetings, keep minutes or transcripts of these meetings, appear at periodic court noticed status conferences, perform other necessary administrative or logistic functions of the PSC, and carry out any other duty as the Court may order.

Additionally, the Court appoints Dawn Barrios to serve as Chair of the State Liaison Committee, in which capacity she will serve as an *ex-officio* member of the PSC Committee. The Court will appoint additional members to the State Liaison Committee in the future.

The appointment to the PSC is of a personal nature.  Accordingly, the above appointees cannot be substituted by other attorneys, including members of the appointee's law firm, to perform the PSC's exclusive functions, such as committee meetings and court appearances,

[2]

except with prior approval of the Court.  Furthermore, the appointment to the PSC is for one year

from the date of this Order.  Appointees may apply to be reappointed when their term expires.  If

or when they apply, their application should contain references to the nature and scope of their

work on the PSC, including the time and resources expended during the past term.

The PSC will have the following responsibilities:

<u>Discovery</u>
   (1) Initiate, coordinate, and conduct all pretrial discovery on behalf of plaintiffs in
      all actions which are consolidated with the instant multi district litigation.

   (2) Develop and propose to the Court schedules for the commencement,
      execution, and completion  of all discovery on behalf of all plaintiffs.

   (3) Cause to be issued in the name of all plaintiffs the necessary discovery
        a.  requests, motions, and subpoenas pertaining to any witnesses and
           documents needed to properly prepare for the pretrial of relevant
           issues
        b.  found in the pleadings of this litigation.  Similar requests, notices,
           and
        c.  subpoenas may be caused to be issued by the PSC upon written
           request
        d.  by an individual attorney in order to assist him/her in the
           preparation of the pretrial stages of his/her client's particular
           claims.

   (4) Conduct all discovery in a coordinated and consolidated manner on behalf
        e.  and for the benefit of all plaintiffs.

<u>Hearings and Meetings</u>

   (1) Call meetings of counsel for plaintiffs for any appropriate purpose, including
      coordinating responses to questions of other parties or of the Court.  Initiate
      proposals, suggestions, schedules, or joint briefs, and any other appropriate
      matter(s) pertaining to pretrial proceedings.

   (2) Examine witnesses and introduce evidence at hearings on behalf of plaintiffs.

(3) Act as spokesperson for all plaintiffs at pretrial proceedings and in response to any inquiries by the Court, subject of course to the right of any plaintiff's counsel to present non-repetitive individual or different positions.

Trial

(1) Coordinate trial team(s)' selection, management, and presentation of any common issue, "bellweather" and/or "test" case trial(s).

(2) Assemble and prepare "trial packages" that can be utilized in future cases, including cases that are remanded to transferor courts for trial.

Miscellaneous

(1) Submit and argue any verbal or written motions presented to the Court or Magistrate on behalf of the PSC as well as oppose when necessary any motions submitted by the defendant or other parties which involve matters within the sphere of the responsibilities of the PSC.

(2) Negotiate and enter into stipulations with Defendants regarding this litigation. All stipulations entered into by the PSC, except for strictly administrative details such as scheduling, must be submitted for Court approval and will not be binding until the Court has ratified the stipulation. Any attorney not in agreement with a non-administrative stipulation shall file with the Court a written objection thereto within five (5) days after he/she knows or should have reasonably become aware of the stipulation. Failure to object within the term allowed shall be deemed a waiver and the stipulation will automatically be binding on that party.

(3) Explore, develop, and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation.

(4) Maintain adequate files of all pretrial matters, including establishing and maintaining a document or exhibit depository, in either real or virtual format, and having those documents available, under reasonable terms and conditions, for examination by all MDL Plaintiffs or their attorneys.

(5) Perform any task necessary and proper for the PSC to accomplish its responsibilities as defined by the Court's orders, including organizing sub-committees comprised of plaintiffs' attorneys not on the PSC and assigning them tasks consistent with the duties of the PSC.

[4]

(6) Keep counsel of all plaintiffs advised of all pertinent developments in the MDL.

(7) Perform such other functions as may be expressly authorized by further orders of this Court.

New Orleans, Louisiana this 9th day of February, 2015.

_____
UNITED STATES DISTRICT JUDGE

[5]

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)  PRODUCTS     * MDL NO. 2592
LIABILITY LITIGATION

* SECTION L
*
* JUDGE ELDON E. FALLON
*
* MAG. JUDGE NORTH
**********************************************     *

**THIS DOCUMENT RELATES TO ALL CASES**

<u>**PRETRIAL ORDER #7A**</u>

The Court hereby appoints Michael Weinkowitz, Daniel Gallucci, and Gibson Vance to

serve on the State Liaison Committee.

New Orleans, Louisiana this 24th day of April, 2015.

_____
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL NO. 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | |
| | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAG. JUDGE NORTH |

* * * * * * * * * * * * * * * * * * * * * *

THIS DOCUMENT RELATES TO ALL CASES

## PRE TRIAL ORDER NO. 8
## (ESTABLISHING STANDARDS AND PROCEDURES FOR COUNSEL SEEKING REIMBURSEMENT FOR COMMON BENEFIT FEES AND COSTS)

### I.   SCOPE OF ORDER

This Order is entered to provide standards and procedures for the fair and equitable

sharing among plaintiffs, and their counsel, of the burden of services performed and expenses

incurred by attorneys acting for the common benefit of all plaintiffs in this complex litigation.

#### A.   Governing Principles and the Common Benefit Doctrine

The governing principles are derived from the United States Supreme Court's common

benefit doctrine, as established in *Trustees v. Greenough*, 105 U.S. 527 (1881); refined in, *inter*

*alia*, *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1884); *Sprague v. Ticonic*

*National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970);

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); and approved and implemented in the MDL

context, in *inter alia*, *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549

F.2d 1006, 1019-21 (5th Cir. 1977); *In re MGM Grand Hotel Fire Litigation*, 660 F.Supp. 522,

1

525-29 (D. Nev. 1987); *In re Zyprexa Prods. Liab.*, 594 F.3d 113 (2d Cir. 2010); *In re Vioxx*

*Prods. Liab. Litig.*, MDL No 1657 (E.D. La Aug. 4, 2005), *available at*

http://www.laed.uscourts.gov/vioxx/Orders/Orders.htm (follow "Pretrial Order No. 19 link).

Common benefit work product includes all work performed for the benefit of all plaintiffs,

including pre-trial matters, discovery, trial preparation, trial, a potential settlement process, and

all other work that advances this litigation to conclusion.

> **B.** **Application of this Order**

This Order applies to all cases now pending, as well as to any case later filed in,

transferred to, or removed to this Court and treated as part of the coordinated proceeding known

as *In Re: Xarelto (Rivaroxaban) Products Liability Litigation*, MDL 2592. This Order further

applies to each attorney who represents a plaintiff with a case now pending in or later filed in,

transferred to, or removed to this Court; and to each attorney who represents a plaintiff with a

case filed in a state court who benefits from common benefit work prepared in this litigation.

> **C.** **Establishing a Common Benefit fee and Cost Fund**

At the appropriate time the Court will establish a mechanism for creating funds for

reimbursing counsel for common benefit costs and fees. The following standards and procedures

are to be utilized by any counsel seeking reimbursement for common benefit fees or costs.

**II.** **PLAINTIFFS' COUNSEL'S TIME AND EXPENSE SUBMISSIONS**

Reimbursement for costs and/or fees for services of all plaintiffs' counsel performing

functions in accordance with this order will be set at a time and in a manner established by the

Court after due notice to all counsel and after a hearing. The following standards and procedures

are to be utilized by any counsel seeking fees and/or expense reimbursement.

### A.    General Standards

(1)    All time and expenses submitted must be incurred only for work authorized in advance by the PSC Executive Committee or known to Co-Plaintiffs' Liaison counsel and approved by the Court.

(2)    These Time and Expense Guidelines are intended for all activities performed and expenses incurred by counsel that relate to matters common to all claimants in MDL 2592. Further, any claimants' counsel that may at a later date, seek reimbursement or compensation for common benefit time and expenses (including any state court counsel) shall comply with these guidelines and any submission by such counsel shall be in accordance with this Pre-Trial Order.

(3)    Co-Plaintiffs' Liaison Counsel has retained and the Court approves the retention of Philip Garrett, CPA ("PG"), to assist and provide accounting services to Co-Plaintiffs' Liaison Counsel, the Plaintiff's Steering Committee, and the Court in MDL 2592. PG will be assisting in compiling submissions and will provide reports to Plaintiffs' Liaison Counsel who shall submit them to the Court on a monthly basis. These reports will include both time and expenses and will summarize, with back-up detail, the submissions of all firms. Submission of time and expense records to PG and the Court shall be considered as if submitted under seal.  P.G. shall periodically submit to Co-Plaintiffs' Liaison Counsel detailed bills for all of his services in connection with this litigation.  These bills shall be considered a shared cost, and P.G.'s bills shall be paid upon approval by the Court.  *See supra* Paragraphs II(C) & (D).

(4)    Time and expense submissions must be submitted timely, on a monthly basis, to PG electronically at the website set up to handle time/billing submissions "http://Xarelto.GarrettCo-CCMS.com". It is essential that each firm, on a monthly basis, timely submit its records for the preceding month. All submissions shall be certified by a senior partner in each firm attesting to the accuracy and correctness of the submission.

(5)    The first submission is due on March 15, 2015 and should include all time and expense through February 28, 2015. Thereafter, time and expense records shall be submitted on the 15th of each month and shall cover the time period through the end of the preceding month. Any time or expense records submitted more than two (2) months in arrears may not be considered or included in any compilation of time or expense calculation and shall be disallowed, except for good cause shown and with Court approval.

### B.    Time Reporting

3

(1)     Only time spent on matters common to all claimants in MDL 2592 will be considered in determining fees. <u>No time spent on developing or processing any case for an individual client (claimant) will be considered or should be submitted</u>.

(2)     All time must be accurately and contemporaneously maintained. Time shall be kept according to these guidelines and specifically in accordance with the Case Cost Management System Task Codes, as outlined in Attachment "A". All counsel shall keep a daily record of their time spent in connection with common benefit work of this litigation, indicating with specificity the hours, location and particular activity (such as "conduct of deposition of A.B." or "trial and hearing attendance"). The failure to maintain such records, as well as insufficient description of the activity, may result in a forfeiture of fees.

(3)     All time for each firm shall be maintained in one tenth of an hour increments. Failure to do so may result in time being disallowed.

(4)     All time records shall be submitted to the PG website, together with a summary report of the total member firm time broken down by each timekeeper and Task Code, reflecting the time spent during the preceding month and the accumulated total of all time incurred by the firm during the particular reporting period. The summary report is located on the PG website.

(5)     The summary report form shall be certified by a senior partner of the submitting firm each month attesting to the accuracy and correctness of the monthly submission.

## C.    Expense Reporting

(1)     Advanced costs will be deemed as either "Shared" or "Held." Both Shared and Held Costs are those incurred for the common benefit of the MDL as a whole; no individual client-related costs will be considered as Share or Held Costs.

    a.      Until the Court establishes a Common Benefit Cost Fund, Shared Costs will be paid out of a separate Plaintiffs' Steering Committee MDL 2592 Fund account to be established by Plaintiffs' Liaison Counsel and to be funded by all members of the PSC and others as determined by the PSC. The Plaintiffs' Steering Committee MDL 2592 Fund account will be administered by Gainsburgh, Benjamin, David, Meunier, & Warshauer and monitored by PG.

    b.      Held Costs are those that will be carried by each attorney in MDL 2592 and reimbursed as and when determined by the Court.

4

(2)     Each member of the PSC and any others as set forth in section (1) above will contribute to the Plaintiffs' Steering Committee MDL 2592 Fund at times and in amounts sufficient to cover the administration of the MDL. The timing and amount of each assessment will be determined by the PSC.

**D**.     **Shared Costs**

(1)     Shared Costs are costs incurred for the common benefit of the MDL as a whole. No individual client-related costs can be considered as Shared Costs. All costs of a substantial nature that are for the common benefit of the MDL and fall under the following categories shall be considered Shared Costs and qualify to be submitted and paid directly from the Plaintiffs' Steering Committee MDL 2592 Fund account, until the Court establishes a Common Benefit Cost Fund. All Shared Costs must be approved by Co-Plaintiffs' Liaison Counsel prior to being incurred and prior to payment or known to Co-Plaintiffs' Liaison Counsel and approved by the Court. Shared Costs include:

a.     Court, filing and service costs;
b.     Deposition and court reporter costs;
c.     Document Depository: creation, operation, staffing, equipment and administration;
d.     Co-Plaintiffs' Liaison Counsel administrative matters (e.g., expenses for equipment, technology, courier services, long distance, conference calls,     telecopier, electronic service, postage, meeting expenses, travel for administrative matters, photocopy and printing, secretarial/temporary staff, etc.);
e.     PSC group administration matters such as meetings and conference calls;
f.     Legal and accountant fees;
g.     Expert witness and consultant fees and expenses;
h.     Printing, copying, coding, shipping, scanning (both in and out of house or extraordinary firm cost);
i.     Research by outside third party vendors/consultants/attorneys;
j.     Common witness expenses including travel;
k.     Translation costs;
l.     Bank or financial institution charges;
m.     Investigative services;
n.     Claims Administrator charges;
o.     Special Master charges;
p.     CPA's charges.

(2)     Co-Plaintiffs' Liaison Counsel shall prepare and be responsible for

5

distributing to the appropriate plaintiffs' counsel and the PSC reimbursement procedures and the forms associated therewith. Request for payments should include sufficient information to allow Co-Plaintiffs' Liaison Counsel and the CPA to account properly for costs and to provide adequate detail to the Court.

**E**.    **Held Costs**

    (1)    Held Costs are costs incurred for the global benefit of the MDL. Held costs are those that do not fall into the above Shared Costs categories but are incurred for the benefit of all plaintiffs in general. No specific client-related costs can be considered as Held Costs. All costs of a substantial nature that are for the common benefit and fall under the following categories shall be considered Held Costs and qualify to be submitted for consideration by the PSC and the Court for future reimbursement.

        a.      Telefax charges
        b.      Postage, shipping, courier, certified mail
        c.      Printing and photocopying (in-house)
        d.      Computerized research - Lexis/Westlaw
        e.      Telephone - long distance (actual charges only)
        f.      Travel - pursuant to Travel Limitations set forth below, including travel for counsel to attend depositions, court or legislative matters.
                i.      Airfare
                ii.      Reasonable ground transportation
                iii.      Hotel
                iv.      Reasonable meals and entertainment
                v.      Reasonable other (parking)
                vi.      Car rental, cabs, etc.

**F**.    **Travel Limitations**

Except in extraordinary circumstances approved by Co-Plaintiffs' Liaison Counsel or the

PSC, all travel reimbursements are subject to the following limitations:

    (1)    <u>Airfare</u>. Only the lowest-price available coach airfare at time of booking (either at restricted coach rates or rates which allow the reservation to be rebooked without surcharge and other agency fees) for a reasonable itinerary will be reimbursed. Notwithstanding the foregoing, first class airfare shall be allowed for cross-country flights that exceed four hours non-stop flight time or international flights. Airfare expense submissions must be supported by an invoice or receipt for airfare that shows class of airfare purchased, name of traveler, and destination. If an invoice or

6

receipt is not available, a canceled check or credit card statement may be submitted provided an Affidavit from the traveler is also submitted stating that the expense was for coach airfare, within the limitations of this Pre-Trial Order, and that the trip was for common benefit. If first class if flown and only coach fare is reimbursable, proof of applicable coach fare shall be submitted.

(2)     Hotel.  Hotel room charges will be reimbursed up to the greater of (a) $300 per night excluding taxes, or (b) the average available room rate of the Hyatt, Hilton, and Marriott hotels (or comparable) in that city. Hotel expense submissions must be supported by a hotel issued receipt.

(3)     Meals. Meal expenses must be reasonable. Meal expense submissions must be supported by receipts or credit card statements that reflect the date and those partaking in the meal.

(4)     Cash Expenses. Miscellaneous cash expenses for which receipts generally are not available (tips, luggage handling, pay telephone, etc.) will be reimbursed up to $50.00 per trip, as long as the expenses are properly itemized.

(5)     Rental Automobiles. Luxury automobile or limousine rentals will not be fully reimbursed. If luxury automobiles or Limos are selected, then the difference between the luxury and non-luxury vehicle rates must be shown on the travel reimbursement form, and only the non-luxury rate may be claimed. Rental automobile expense submissions must be supported by receipts or credit card statements. Such rentals shall be limited for purposes of traveling to or from meetings, hotel, court appearances and airport. The use of hired limousines is discouraged.

(6)     Mileage. Mileage claims must be documented by stating origination point, destination, total actual miles for each trip, and the rate per mile paid by the member's firm. The maximum allowable rate will be the maximum rate allowed by the IRS (currently 57.55 cents per mile).

**G**.     **Non-Travel Limitations**

The following apply:

(1)     Long Distance and Cellular Telephone: Long distance and cellular telephone charges must be documented. Copies of the telephone bills must be submitted with notations as to which charges relate to this litigation.

(2)     Shipping, Courier, and Delivery Charges: All claimed expenses must be documented with bills showing the sender, origin of the package, recipient, and destination of the package.

(3)    <u>Postage Charges</u>: A contemporaneous postage log or other supporting documentation must be maintained and submitted. Postage charges are to be reported at actual cost.

(4)    <u>Telefax Charges</u>: Contemporaneous records should be maintained and submitted showing faxes sent and received. The per-fax charge shall not exceed $1.00 per page.

(5)    <u>In-House Photocopy</u>: A contemporaneous photocopy log or other supporting documentation must be maintained and submitted. The maximum copy charge is 25¢ per page.

(6)    <u>Computerized Research - Lexis/Westlaw</u>: Claims for Lexis, Westlaw, and other computerized legal research expenses should be in the exact amount charged to the firm for these research services.  If any bulk rate or reduced rates are applicable, the lowest cost incurred by the firm shall be charged.  All such computerized legal research must be approved by Co-Plaintiffs' Liaison Counsel in advance and before submission.

## III.  **PROCEDURES TO BE ESTABLISHED BY CO-PLAINTIFFS' LIAISON COUNSEL**

Co-Plaintiffs' Liaison Counsel or the CPA may establish forms and procedures to implement and carry out the time and expense submissions required by the Court and necessary to compile and maintain the records. These forms shall be made available by Co-Plaintiffs' Liaison Counsel or from the Court's website.

Questions regarding the guidelines or procedures or the completion of any forms should be directed to Co-Plaintiffs' Liaison Counsel: Leonard A. Davis, Herman, Herman & Katz, LLC, 820 O'Keefe Avenue, New Orleans, LA 70113, Phone: (504) 581-4892, Fax: (504) 561-6024, or Gerald Meunier, Gainsburgh, Benjamin, David, Meunier, & Warshauer, 2800 Energy Center, 1100 Poydras St., New Orleans, LA 70113, Phone: (504) 522-2304, Fax: (504) 528-9973; or to CPA: Garett and Company CPA's, 156 Bald Eagle Dr. Abita Springs, La. 70420, Phone: (985) 635-1500, E- Mail: philipgarrettsr@yahoo.com; or the Court.

New Orleans, Louisiana, this 13th day February, 2015.

_____

ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

ATTACHMENT "A"

# Case Cost Management System
# Task Codes

The Case Cost Management System Task Codes are intended for use in the *In re: Xarelto (Rivaroxaban) Products Liability Litigation*, MDL No. 2592. The numbers below refer to Task Codes. Counsel shall use the following Task Codes when submitting their time reporting, as outlined in paragraph II(B)(2) of the preceding pretrial order. The following definitions elaborate on the intended scope of each phase and task and should guide attorneys in coding time. All time should be accurately and contemporaneously maintained for work performed on common benefit matters.

1.    <u>**Case Administration and Monitoring**</u>

Administration tasks of the case, as well as monitoring emails and motions filed.

**110 Fact Investigation/Development**

All actions to investigate and understand the facts of a matter. Covers interviews of potential common benefit witnesses, potential class representatives, or potential "bellwether" or "test case" plaintiffs, review of documents to learn the facts of the case (but not for document production, Task Code 320), work with an investigator, and all related communications and correspondence.

**130 Experts/Consultants**

Identifying and interviewing common benefit experts and consultants (testifying or non-testifying), working with them, and developing expert reports. Does not include preparing for expert depositions (Task Code 340) or trial (Task Code 420).

**140 Document/File Management**

A narrowly defined task that comprises only the processes of creating and populating document and other databases or filing systems. Includes the planning, design, and overall management of this process. Work of outside vendors in building common benefit litigation support databases should be a Shared Expense.

**150 Budgeting**

Covers developing, negotiating, and revising the budget for a matter.

**190 Other Case Assessment, Development and Administration**

Time not attributable to any other overall task. Specific use in a given matter often may be pre-determined jointly by Co-Liaison or Lead Counsel or the Court.

**195 Travel**

Travel time for attendance at a meeting, hearing or status conference where such attendance is not required by the Court nor requested by Co-Liaison or Lead Counsel. If other work in this litigation is being completed during travel time, then the time spent on the other work should be classified appropriately for that work.

**196 Status Conferences and Hearings**

# Case Cost Management System
# Task Codes

Attendance at hearings or status conferences where you are not required to attend by the Court. If your attendance is required, then you would use Task Code 230 (status conference), Task Code 240 (dispositive motion) or Task Code 450 (trial).

**2.   Pre-Trial Pleadings and Motions**

Covers all pleadings and all pretrial motions and procedures other than discovery.

**210 Pleadings**
Developing (researching, drafting, editing, filing) and reviewing complaints, answers, counter-claims and third party complaints. Also embraces motions directed at pleadings such as motions to dismiss, motions to strike, and jurisdictional motions.
**220 Preliminary Injunctions/Provisional Remedies**
Developing and discussing strategy for these remedies, preparing motions, affidavits and briefs, reviewing opponent's papers, preparing for and attending court hearing, preparing witnesses for the hearing, and effectuating the remedy.
**230 Court Mandated Conferences**
Preparing for and attending hearings and conferences required by court order or procedural rules (including Rule 16 sessions) other than settlement conferences.
**240 Dispositive Motions**
Developing and discussing strategy for or opposing motions for judgment on the pleadings and motions for complete or partial summary judgment, preparing papers, reviewing opponent's papers, defensive motions (e.g., motion to strike affidavit testimony, Rule 56(f) motion), and preparing for and attending the hearing.
**250 Other Written Motions/Submissions**
Developing, responding to, and arguing all motions other than dispositive (Task Code 240), pleadings (Task Code 210), and discovery (Task Code 350), such as motions to consolidate, to bifurcate, to remand, to stay, to compel arbitration, for MDL treatment and for change of venue.
**260 Class Action Certification and Notice**
Proceedings unique to class action litigation and derivative suits such as class certification and notice.

**3.   Discovery**

Includes all work pertaining to discovery according to court or agency rules.

**310 Written Discovery**
Developing, responding to, objecting to, and negotiating interrogatories and requests to admit. Includes mandatory meet-and-confer sessions. Also covers mandatory written disclosures as under Rule 26(a) and negotiation and compilation of fact sheets.

# Case Cost Management System
# Task Codes

**320 Document Production**

Developing, responding to, objecting to, and negotiating document requests, including the mandatory meet-and-confer sessions to resolve objections. Includes identifying documents for production, reviewing documents for privilege, effecting production, and preparing requested privilege lists. (While a general review of documents produced by other parties falls under this task, coding and entering produced documents into a database is Task Code 140 and reviewing documents primarily to understand the facts is Task Code 110.)

**330 Depositions**

All work concerning depositions, including determining the deponents and the timing and sequence of depositions, preparing deposition notices and subpoenas, communicating with opposing or other party's counsel on scheduling and logistics, planning for and preparing to take the depositions, discussing deposition strategy, preparing witnesses, reviewing documents for deposition preparation, attending depositions, and drafting any deposition summaries.

**340 Expert Discovery**

Same as Task Code 330, but for expert witnesses.

**350 Discovery Motions**

Developing, responding to, and arguing all motions that arise out of the discovery process. Includes the protective order process.

**390 Other Discovery**

Less frequently used forms of discovery, such as medical examinations and on-site inspections.

**4.      Trial Preparation and Trial**

Commences when Co-Liaison or Lead Counsel or the Court determine that trial is sufficiently likely and imminent so that the process of actually preparing for trial begins. It continues through the trial and post-trial proceedings in the trial court. Once trial begins, lawyers who appear in court presumptively should bill their court time to Task Code 450 Trial and Hearing Attendance. Litigation work outside the courtroom during this phase (e.g., evenings, weekends and the time of other attorneys and support personnel), should continue to be classified using other 400 Task Codes.

**410 Fact Witnesses**

Preparing for examination and cross-examination of non-expert witnesses.

**420 Expert Witnesses**

Preparing for examination and cross-examination of expert witnesses.

**430 Written Motions/Submissions**

Developing, responding to and arguing written motions during preparation for trial and trial, such as motions in limine and motions to strike proposed evidence. Also includes

3

# Case Cost Management System
# Task Codes

developing other written pre-trial and trial filings, such as jury instructions, witness lists, proposed findings of fact and conclusions of law, and trial briefs.

**440 Other Trial Preparation and Support**

All other time spent in preparing for and supporting a trial, including developing overall trial strategy, preparing opening and closing arguments, establishing an off-site support office, identifying documents for use at trial, preparing demonstrative materials, etc.

**450 Trial and Hearing Attendance**

Appearing at trial, at hearings and at court-mandated conferences, including the pre-trial conferences to prepare for trial. For scheduling conferences that are denominated as "Pre-Trial Conferences", but not directed toward conduct of the trial, use Task Code 230.

**460 Post-Trial Motions and Submissions**

Developing, responding to and arguing all post-verdict matters in the trial court, such as motions for new trial or j.n.o.v., for stay pending appeal, bills of costs, and requests for attorney's fees.

**470 Enforcement**

All work performed in enforcing and collecting judgments and asserting or addressing defenses thereto.

**475 Appeal**

Covers all work on appeal or before a reviewing body.

**485 Appellate Motions and Submissions**

Developing, responding to and arguing motions and other filings before a reviewing body, such as motions and other filings for stay pending appeal.

**495 Appellate Briefs**

Preparing and reviewing appellate briefs.

**498 Oral Argument**

Preparing for and arguing an appeal before a reviewing body.

**5.** <u>**Analysis and Strategizing**</u>

**501 Analysis/Strategy**

Targeted for Co-Liaison and/or Lead Counsel, committee chairs and committee members that are doing common benefit work at the highest level. The thinking, strategizing, and planning for a case, including discussions, writing, and meetings on case strategy. Also includes initial legal research for case assessment purposes and legal research for developing a basic case strategy. Most legal research will be under the primary task for which the research is conducted, such as research for a summary judgment motion (Task Code 240). Once concrete trial preparation begins, use Task Code 440 for trial strategy and planning.

# Case Cost Management System
# Task Codes

**6.**     **Settlement/Non-Binding ADR**

**601 Settlement/Non-Binding ADR**
        All activities directed specifically to settlement. Encompasses planning for and
        participating in settlement discussions, conferences, and hearings and
        implementing a settlement. Covers pursuing and participating in mediation and
        other non-binding Alternative Dispute Resolution (ADR) procedures. Also
        includes pre-litigation demand letters and ensuing discussions.

## In summary, the Task Codes are:

1. **Case Administration and Monitoring;**
2. **Pre-Trial Pleadings and Motions;**
3. **Discovery;**
4. **Trial Preparation and Trial;**
5. **Analysis and Strategizing; and**
6. **Settlement/Non-Binding ADR.**

NOTE:  WHEN LOGGED INTO THE CASE COST MANAGEMENT SYSTEM YOU WOULD USE THE
NUMBER ACCOMPANYING THE APPLICABLE TASK CODE AND THE PROGRAM WILL
AUTOMATICALLY TALLY IT INTO THE APPROPRIATE BUCKET (OF THE 6 BUCKETS). THE EXACT
TASK CODE AND THE DESCRIPTION OF YOUR SERVICES WILL BE IN THE SYSTEM BUT THE
SUMMARY WILL JUST SHOW THE 6 MAIN CATEGORIES.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * | MDL NO. 2592 |
| | * | SECTION L |
| | * | JUDGE ELDON E. FALLON |
| | * | MAG. JUDGE NORTH |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**THIS DOCUMENT RELATES TO ALL CASES**

**PRE-TRIAL ORDER NO. 9**
**(Direct Filing - Stipulated)**

## I.      SCOPE OF THE ORDER

This Stipulated Order shall govern (1) cases transferred to this Court by the Judicial Panel on Multidistrict Litigation, pursuant to its Order of December 12, 2014; (2) any tag-along actions subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation pursuant to Rule 7.1 of the Rules of Procedure of that Panel; and (3) all related cases originally filed in this Court or transferred or removed to this Court.   The Order only applies to claims brought by a U.S. citizen or resident based on usage or purchase of Xarelto in the United States.

## II.      DIRECT FILING OF CASES INTO MDL NO. 2592

A.      In order to eliminate delays associated with the transfer to this Court of cases filed in or removed to other federal district courts and to promote judicial efficiency, any plaintiff whose case would be subject to transfer to MDL No. 2592 may file his or her complaint against all Defendants directly in MDL No. 2592 in the Eastern District of Louisiana.

B.      All Defendants stipulate and agree that they will not assert any objection of improper venue pursuant to Fed. R. Civ. P. 12(b) as to any Xarelto-related cases filed directly in the Eastern District of Louisiana that emanate from districts outside the Eastern District of Louisiana and that are filed in this multidistrict litigation proceeding.

C.      Each case filed directly in MDL No. 2592 that emanates from a district outside the Eastern District of Louisiana will be filed in MDL No. 2592 for pretrial proceedings only, consistent with the Judicial Panel on Multidistrict Litigation's December 12, 2014, Transfer Order.  (Doc. No. 1.)

D.      Upon completion of all pretrial proceedings applicable to a case directly before this Court, pursuant to this Order, this Court, pursuant to 28 U.S.C. § 1404(a), will transfer that case to the federal district court in the district where the plaintiff allegedly was injured or where plaintiff resided at the time of his or her alleged injury, after giving the parties an opportunity to meet and confer and be heard on the issue.   All Defendants stipulate and agree that they will not assert any objection of improper venue pursuant to FRCP 12(b) upon transfer consistent with the provisions in this paragraph and this Order.

E.      Nothing contained in this Order shall preclude the parties from agreeing, at a future date, to try cases filed pursuant to this Order in this District.

F.      The inclusion of any action in *In re: Xarelto (Rivaroxaban) Products Liability Litigation*, MDL No. 2592, whether such action was or will be filed originally or directly in the Eastern District of Louisiana, shall not constitute a determination by this Court that venue is proper in this district.

G.      All Parties stipulate and agree that a case that was filed directly in MDL No. 2592 pursuant to this Order will have no impact on choice of law that otherwise would apply to an

individual case had it been originally filed in another district court and transferred to this Court

pursuant to 28 U.S.C. § 1407.

      H.     All  Defendants stipulate and agree that the filing of a complaint directly in MDL

No. 2592 pursuant to this Order shall stop the running of any statute of limitations or prescriptive

or peremptive period as if the complaint had been filed in an appropriate venue.

      I.     The references to "all defendants" herein shall not constitute an appearance by or

for any Defendant not properly served.

      J.     The caption for any complaint that is directly filed in MDL No. 2592 before this

Court shall bear the following caption:

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | ) | MDL No. 2592 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | SECTION:  L |
| | ) | JUDGE FALLON |
| | ) | MAG. JUDGE NORTH |
| _____ | ) | |
| _____, | ) | |
| | ) | COMPLAINT AND JURY DEMAND |
|       Plaintiff, | ) | |
| | ) | Civil Action No.:_____ |
| vs. | ) | |
| _____ | ) | |
| _____, | ) | |
| | ) | |
|       Defendants. | ) | |

---

New Orleans, Louisiana, this 24th day of March, 2015.

                           _____
                           Hon. Eldon E. Fallon
                           United States District Judge

3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)     *     MDL NO. 2592
PRODUCTS LIABILITY LITIGATION

                                 *     SECTION L

                                 *     JUDGE ELDON E. FALLON

                                 *     MAG. JUDGE NORTH

**********************************************
THIS DOCUMENT RELATES TO ALL CASES

**PRE-TRIAL ORDER NO. 10**
**(Streamlined Service on Certain Bayer Defendants)**

## I.     SCOPE OF THE ORDER

This Stipulated Order shall govern (1) cases transferred to this Court by the Judicial Panel

on Multidistrict Litigation, pursuant to its Order of December 12, 2014; (2) any tag-along actions

subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation pursuant

to Rule 7.1 of the Rules of Procedure of that Panel; and (3) all related cases originally filed in

this Court or transferred or removed to this Court.  The Order only applies to claims brought by a

U.S. citizen or resident based on usage or purchase of Xarelto® in the United States.

## II.     STREAMLINED SERVICE OF PROCESS FOR CERTAIN BAYER
           DEFENDANTS

A.     Bayer Pharma AG and Bayer Healthcare Pharmaceuticals Inc. (BHCP) agree to

waive formal service of process under Federal Rule of Civil Procedure 4 and to accept service of

Xarelto cases that are properly commenced in, removed to, or transferred to this MDL.  By

waiving formal service of process, Bayer Pharma AG and BHCP do not waive any defenses

available to them.

B.     These procedures for informal service of process are not available in cases in which the plaintiff seeks remand to state court unless and until remand is denied.  For plaintiffs seeking remand, all deadlines set forth in this Order run from the date on which remand is denied.

C.     Plaintiffs whose Complaints are not subject to Paragraph B above and who have not already served Bayer Pharma AG or BHCP shall have 60 days to serve the Complaint with a Summons.  For plaintiffs whose cases already have been docketed in this MDL, the 60 days shall run from entry of this Order.   Other plaintiffs shall have 60 days from docketing of the Complaint in the MDL.  The Complaint and a Summons shall be served as follows:

1.     By **CERTIFIED** Mail, Return Receipt Requested, upon the following representative of BHCP:

SOP Department
Corporation Service Company
Suite 400
2711 Centerville Road
Wilmington, DE 19808

2.     By **REGISTERED** Mail, Return Receipt Requested, upon the following representative of Bayer Pharma AG:

Bayer Pharma AG
Attn: Eva Gardyan-Eisenlohr
General Counsel
Muellerstrasse 178
13353 Berlin
GERMANY

Contemporaneous with mailing the Bayer Pharma AG pleading, plaintiffs shall provide, by electronic mail, notice of service, including a copy of the complaint, to the following address:

xareltocomplaints@babc.com.

D.     Service will be effective only if addressed as above (including the notice of

service provided via electronic mail).  General mailing or use of other methods of transmission, including but not limited to Federal Express or email, will not be sufficient to effect service. Service will be effective ten (10) days after the date of delivery.  Defendants who have consented to streamlined service under this procedure agree to provide 30 days notice before moving to dismiss for a technical defect in the service process described in this section.  Failure to serve a Complaint within 60 days will be subject to the standards governing Fed. R. Civ. P. 4(m).  Other than those based on formal service of process, defendants reserve all other rights and defenses available to them under federal or state law and under applicable treaties and conventions.

E.      Certain other Bayer entities have been or may be named as defendants in these proceedings.  The term "other Bayer entities" as used in this Order includes but is not limited to Bayer HealthCare, LLC; Bayer Corporation; Bayer HealthCare AG; and Bayer AG.   The other Bayer entities have not agreed to streamlined service and are relieved of any obligation to answer complaints until further order of this Court.

F.      By entry of this Order, plaintiffs have not waived their rights to pursue discovery against the other Bayer entities.  If plaintiffs seek discovery from one or more of the other Bayer entities and/or seek to pursue one or more of the other Bayer entities as defendants, plaintiffs shall meet and confer with defendants concerning (a) whether the discovery can be obtained through BHCP or Bayer Pharma AG, (b) the scope of any discovery directed to the other Bayer entities, and (c) compliance with foreign data protection laws.  If no agreement is reached, the parties shall seek the Court's guidance before plaintiffs commence any such discovery.

G.      For cases in which plaintiffs have served BHCP or Bayer Pharma AG, any applicable limitations in Fed. R. Civ. P. 4(m) are extended such that plaintiffs need not serve the other Bayer entities until further order of the Court after a meet and confer of the parties.

3

Further, neither Bayer Pharma AG, BHCP, nor the other Bayer entities shall move to dismiss a complaint under Fed. R. Civ. P. 4(m) as to an unserved Bayer entity until further order of the Court after a meet and confer of the parties.

New Orleans, Louisiana, this 24th day of March, 2015.

_____
    Hon. Eldon E. Fallon
    United States District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **IN RE: XARELTO (RIVAROXABAN)** | * | **MDL NO. 2592** |
| **PRODUCTS LIABILITY LITIGATION** | * | |
| | * | **SECTION L** |
| | * | |
| | * | **JUDGE ELDON E. FALLON** |
| | * | |
| | * | **MAG. JUDGE NORTH** |

* * * * * * * * * * * * * * * * * * * * *
**THIS DOCUMENT RELATES TO ALL CASES**

**PRE-TRIAL ORDER NO. 11**
**(Bundling of Complaints and Answers)**

The Court hereby Orders as follows[1]:

1. **Bundling of Complaints.**

    a. In an effort to minimize the expenses of all parties, and to promote judicial efficiency, the Court hereby authorizes claims of more than one plaintiff, and up to one hundred (100) plaintiffs, to be filed in a single Complaint with one filing fee for the Lead Plaintiff at the time of filing. The joined plaintiffs' (plaintiffs named in the Joint Complaint other than the Lead Plaintiff) responsibility for a filing fee will be suspended until the resolution of their respective claims, at which time the fee must be paid before the case can be dismissed and closed, unless otherwise ordered by the Court. This process shall henceforth be referred to as "Joint Complaints" or the filing of "Joint Complaints." The Plaintiff Fact Sheet ("PFS") obligations of

---

[1] Certain other Bayer entities have been named or may be named as defendants in these proceedings. These other Bayer entities include Bayer Healthcare, LLC; Bayer Corporation; Bayer HealthCare AG; and Bayer AG. Specific provisions relieving these other Bayer entities from answering are found at paragraph 8(c) pursuant to Pretrial Order No. 10. Possible discovery from these entities is also governed by Pretrial Order No. 10 until further Order of this Court.

plaintiffs named in a "Joint Complaint" begin to run from the time the "Joint Complaint" is filed.

b. In the section of the Joint Complaint entitled "Plaintiff Specific Allegations," each individual plaintiff shall be listed alphabetically and in consecutively numbered paragraphs, and each paragraph shall include subsections containing case-specific allegations for each plaintiff.  The case-specific allegations shall include the county and state of citizenship of the Plaintiff.

c. Once a Joint Complaint is filed, this Court will, *sua sponte*, issue an order severing the individual plaintiffs listed in the Plaintiff Specific Allegations (the "Severance Order").  Plaintiffs' counsel shall then file separate short form Complaints for each case, attaching the Severance Order as Attachment 1, and a list of the individual case captions for the plaintiffs named in the Joint Complaint as Attachment 2. Individual Civil Action Numbers and case captions will then be assigned for each individual case.  Civil Cover Sheets will not be required for the severed civil actions.  Instructions for filing individual severed Xarelto cases are attached to this Order.

d. Joint Complaints may be filed directly in this Court pursuant to this Court's previously entered Direct Filing Order.

e. Service of the Joint Complaint, together with a copy of the applicable Severance Order and a list of the individual cases and their civil action numbers, shall be sufficient to effectuate service of process for each of the individual cases associated with the Joint Complaint.

2. **Answers and Responsive Pleadings.**

a. Within forty-five (45) days from this Order, Defendants shall file an Omnibus Answer that shall be deemed as a denial of all allegations in any Complaint pending in the MDL prior to the filing of the Omnibus Answer.  The Omnibus Answer shall also set out Defendants' Affirmative Defenses.

b. The Omnibus Answer shall not constitute an appearance as to any defendant that has not been served and shall be deemed as the answer with respect to a previously un-served defendant thirty (30) days after service on that defendant.

c. For each case filed in or transferred to the MDL after the filing of the Omnibus Answer, the Omnibus Answer shall be deemed as the operative Answer in each such case thirty (30) days after the case is docketed if an individual Answer is not filed prior to that time.  Once the answer has been deemed as the operative answer, the requirements of Fed. R. Civ. P 15 shall attach for any amendments of the complaint and the requirements of Fed. R. Civ. P. 41(a) for a voluntary dismissal such that any dismissal shall occur only upon a stipulation of dismissal signed by all parties who have appeared or by Court Order after a properly noticed motion.

d. Certain other Bayer entities have been named or may be named as defendants in these proceedings.  The term "other Bayer entities" as used in this Order includes but is not limited to Bayer Healthcare, LLC; Bayer Corporation; Bayer HealthCare AG; and Bayer AG.  The "other Bayer entities" are relieved of any obligation to answer complaints pursuant to Pretrial Order No. 10 (Streamlined Service on Certain Bayer Defendants) (Rec. Doc. 357) until further order of this Court.

e. Other than the Omnibus Answer set out above, the Defendants' obligation to file any responsive pleading to a Complaint that is filed in or transferred to this

3

proceeding is hereby stayed until further Order of the Court. The Court is specifically preserving the Defendants' right to file any motion pursuant to Fed. R. Civ. P. 12.

f.  Thirty (30) days after the bellwether discovery pool is selected, the Defendants' shall file individual Answers for each discovery pool plaintiff that will supersede and substitute for the Omnibus Answer and may file Rule 12 motions against any of the discovery pool plaintiffs.

g.  The individual plaintiffs will have thirty (30) days to file any response in opposition.

h.  After such period, the Court will decide whether oral argument is necessary.


New Orleans, Louisiana this 4th day of May, 2015.


_____
UNITED STATES DISTRICT JUDGE

**Filing Individual Severed Xarelto Cases**

## Documents Needed

Have the following PDFs available before starting the severed civil case opening process:

- Short Form Complaint
- Severance Order
- List of the individual case captions for all plaintiffs named in the Joint Complaint

Note:  A civil cover sheet is not required

## Opening the Individual Severed Cases

Login to CMECF and select Civil on the main menu bar, then under Open a Case, click on the link **CIVIL CASE**.

- In the "Other Court Name" field enter "EDLA"
- In "Other court number" field enter the original case number of the Joint Complaint
- Jurisdiction is "4" (Diversity)
- For most cases, Cause of action is:  28:1332pl (Diversity - Personal Injury) .  If the case alleges "wrongful death", use Cause of Action: 28:1332wd (Wrongful Death)
- Nature of suit: 367 (Personal Injury: Health Care/Pharmaceutical Personal Injury Product Liability)
- Citizenship of 1st named pla: either 1-Citizen This State, or 2-Citizen Other State
- Citizenship of 1st named defendant: 5 - Incorporated/Principal Business Other State
- Jury demand "p" for plaintiff, no Class Action, no $ demand
- County is the Louisiana parish of residence for the 1st named plaintiff, or "Out of State", or "Out of Country"
- Add individual plaintiffs as listed in the Short Form Complaint
- Add defendants as listed in the Short Form Complaint

## Docketing the Lead Event/Individual Severed Complaint

- Select the link "Docket Lead Event", select the event "Complaint"
- Select the plaintiff(s) as the filer
- Create the attorney/party association
- Select the defendant(s) that this filing is against

The Short Form Complaint will be the **Main document** with  **Attachments** of:

- Severance Order
- List of the individual case captions for all plaintiffs named in the Joint Complaint

At the prompt for electronic payment of the fee,  select  "Prepayment of fee not required pursuant to 28:1916."  The clerk's office will modify the docket text to "Prepayment of fee not required pursuant to Pre-Trial Order No. 11."

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN) )  MDL No. 2592
PRODUCTS LIABILITY LITIGATION )
              )  SECTION:  L
_____)
              )  JUDGE FALLON
THIS DOCUMENT RELATES TO:  )  MAG. JUDGE NORTH
ALL ACTIONS         )
_____)

**PRE-TRIAL ORDER NO. 12**
**(STIPULATED PROTECTIVE ORDER)**

    Plaintiffs and Defendants before this Court in MDL No. 2592 (sometimes hereinafter referred to as "Plaintiffs" and/or "Defendants," or collectively, the "Parties") have advised the Court that they hereby stipulate and agree, through their respective attorneys of record as follows:

    1. The Parties, by and through their counsel, stipulate and agree that this Stipulated Protective Order – and any designation of a document, material or information (whether written, graphic, or electronic) as being a "PROTECTED DOCUMENT" subject to this Stipulated Protective Order – is intended solely to facilitate prompt discovery and the preparation for trial in the above-captioned action.

    2. This Stipulated Protective Order shall govern all hard copy and electronic materials, the information contained therein, and all other information including all copies, excerpts, summaries, or compilations thereof, whether revealed in a document, deposition, other testimony, discovery response or otherwise, produced or disclosed by any party to this proceeding (the "Supplying Party") to any other party (the "Receiving Party").  This Stipulated Protective Order is binding upon all Parties at the time it is entered including their respective corporate parents, subsidiaries, and affiliates and their respective attorneys, principals, experts, consultants, representatives, directors, officers, employees, and others as set forth in this Order.

If additional parties are added other than parents, subsidiaries or affiliates of current parties to this litigation, then their ability to receive "PROTECTED INFORMATION" as set forth in this Stipulated Protective Order will be subject to them being bound, by agreement or Court Order, to this Stipulated Protective Order.  Third Parties who so elect may avail themselves of, and agree to be bound by, the terms and conditions of this Stipulated Protective Order and thereby become a Supplying Party and/or Receiving Party for purposes of this Stipulated Protective Order.

3.   Nothing herein shall be construed to affect or restrict in any manner the use or admissibility at trial or any other court proceeding of any document, testimony, or other evidence.

4.   The entry of this Protective Order does not prevent any party from seeking a further order of this Court pursuant to Fed. R. Civ. P. 26(c).

5.   This Protective Order does not confer blanket protections on all documents, disclosures, or responses to discovery and the protection it affords extends only to specific information or as set forth herein.

6.   A Supplying party may designate as "PROTECTED INFORMATION" any documents, things and information, it produces in this litigation to a Receiving Party if such Supplying Party or counsel for such Supplying party believes in good faith that such PROTECTED INFORMATION is subject to protection under Fed. R. Civ. P. 26(c)(1)(G) or other applicable law.  Plaintiffs shall be permitted to designate materials that contain personal information as "PROTECTED INFORMATION' pursuant to this Order.

7.   A Supplying Party may also designate as "PROTECTED INFORMATION – HIGHLY PROTECTED " any document or information which, if potentially disclosed to a competitor or the general public, could result in substantial business harm.  Nonexclusive

examples include materials that may reveal trade secrets, manufacturing processes, proprietary

design, drug formulation, drug development, sequencing, chemical stability and characteristics,

analytical methods used in manufacturing, quality control processes, CMC information

exchanged with the FDA and not the subject of a patent, source and specifications for drug

components and raw materials, manufacturing plans, unpublished patent applications, strategic

intellectual property plans, notices of invention, including but not limited to confidential

intellectual property and patentable data, information, products or processes, strategic plans,

marketing plans, brand plans, documents setting forth marketing and sales tactics and strategies,

sales data, and documents revealing pricing or other contractual data so long as the material is

also protected under Fed. R. Civ. P. 26(c)(1)(G).  In designating discovery materials as

"PROTECTED INFORMATION – HIGHLY PROTECTED ", the Supplying Party shall do so

in good faith consistent with the provisions of this Protective Order and rulings of the Court.

Paragraphs 19 and 20 herein set forth the terms regarding disclosure of discovery material

designated as "PROTECTED INFORMATION" or "PROTECTED INFORMATION –

HIGHLY PROTECTED."

Additionally, certain information that may be designated as "PROTECTED

INFORMATION - DEFENDANT RESTRICTED", such as protected internal financial data

from the Janssen defendants or Bayer defendants, is not and would not be shared or disclosed as

between the respective defendants for legal and other reasons.  To the extent such information is

required to be produced in this matter, if a Receiving Party proposes to disclose such information

to a co-defendant, the Receiving Party and Supplying Party shall meet and confer prior to any

such disclosure, and the Supplying Party shall have the right to seek an Order that the disclosure

not be made.  It is the obligation of the Supplying Party to notify the Receiving Party at the time

of production and identify with specificity any documents that the Supplying Party contends should not be disclosed to a co-defendant.  This paragraph does not restrict and will not delay the production of such materials to Plaintiffs.

8.   Any entity organized under the laws of the Federal Republic of Germany that becomes a party to this litigation may designate as "PROTECTED INFORMATION" those documents (including electronic or paper form) containing "personal data" within the meaning of the German Federal Data Protection Act, which is protected under German law.  "Personal data" consists of any and all data that concerns an identified person or a person who is identifiable with recourse to additional information available to the data processor (*e.g.,* reference to an individual by his/her title or position with the company whose identity is specified in other available sources of information). In particular, this provision applies to the following documents:

a.   any correspondence (electronic or paper form) that identifies or through recourse to other source of information available to the data processor allows identification of its author(s)/sender(s) and/or its addressees/recipients, (e.g., all email correspondence, letters and faxes, including transmission reports);

b.   any document, such as memoranda, notes and presentations, if it identifies or allows identification of its author/sender and/or its addressee/recipient through recourse to other information available to the data processor;

c.   minutes of internal or external meetings as far as they include information which individual(s) did or did not attend the meeting;

d.   personnel records and information; and

e.   any document containing private medical information.

9.   No items or information, including but not limited to summaries of items or information designated as "PROTECTED INFORMATION" shall be produced or disseminated orally, or by any other means, except as permitted by this Stipulated Protective Order.  As used in all following paragraphs, the phrase "PROTECTED INFORMATION" also includes the PROTECTED INFORMATION – HIGHLY PROTECTED" and "PROTECTED INFORMATION - DEFENDANT RESTRICTED" designations unless the specific paragraph contains additional or different provisions for the latter designations.

10.  Any designation of "PROTECTED INFORMATION" under this Stipulated Protective Order shall not be construed as an admission or an agreement by any party that any document, material or information, or any portion thereof,   constitutes competent, material, relevant, or admissible evidence in this case.

11.  Documents not designated as "PROTECTED INFORMATION" are not protected as that term is used herein.

12.  This Protective Order shall not be construed to protect from production or to permit the designation as "PROTECTED INFORMATION" of any document or other material that (a) the party has not made reasonable efforts to keep confidential, or (b) is at the time of production or disclosure, or subsequently becomes, through no wrongful act on the part of the Receiving Party, generally available to the public through publication or otherwise.

13.  This Stipulated Protective Order shall not be construed as a waiver by any party of the right to contest the designation of "PROTECTED INFORMATION" under this Stipulated Protective Order.  Any party desiring to contest the designation of specific "PROTECTED INFORMATION" may do so at any time and shall give the Supplying Party notice in writing (a letter to liaison counsel delivered by email shall be sufficient), including the listing of any such

information or document(s) or the Bates ranges for the information or document(s), and shall

provide a brief explanation of the basis for contesting the "PROTECTED INFORMATION"

designation (the "Notice").  If the same document in the Notice appears in the production at

other Bates numbers, the Notice shall be deemed to be sufficient for all such documents and

information.  The Notice shall be sufficient if it identifies documents being challenged and states

the basis for the challenge.  If the Parties cannot stipulate to the designation as "PROTECTED

INFORMATION" within fourteen (14) days of the Supplying Party's receipt of such written

notice, then the Supplying Party has the burden of making an application to the Court for an

order directing that the contested document(s) or information is entitled to protection under

applicable law. The Supplying shall have thirty (30) days to file and serve an application unless

the parties agree to a shorter time or the Court orders a different time period. If no such

application is filed within the requisite time period, the information shall not be afforded

protected status, unless the Court subsequently orders otherwise.    All references in motions or

briefs seeking to confirm the confidentiality designation "PROTECTED INFORMATION" shall

be filed under seal to the extent permitted by applicable Court rules and procedure as set forth

herein below in paragraphs 25 and 26.  Pending a Court determination, no document or

information designated as "PROTECTED INFORMATION" under this Order shall be

disseminated other than as provided by this Order unless otherwise ordered by the Court or as

stipulated by the Parties.

   14.  The fact that the Parties have agreed to this Protective Order shall not be used

against either party in any subsequent challenge to the designation of material as protected

information.  The challenge shall be decided on the merits pursuant to the applicable law.

15.   Pursuant to the terms and requirements of this Stipulated Order, the Supplying Party may designate as "PROTECTED INFORMATION" all or any part of documents or information produced by it in the course of litigation or in response to various interrogatories and requests for production of documents, as well as documents, electronic files and data compilations, and deposition transcripts, or portions thereof, that contain or constitute protected information.

16.   The designation of information shall be made by placing or affixing on the material in a manner that will not interfere with its legibility the words "PROTECTED INFORMATION.  SUBJECT TO PROTECTIVE ORDER" as long as the designation is conspicuously placed on produced documents, media or information in a uniform manner.  The designation shall be made prior to, or contemporaneously with, production or disclosure of that material.

17.   Information disclosed at a deposition taken in connection with this action may be designated as Protected Information by designating the portions of the transcript in a letter to be sent to the court reporter and Liaison Counsel within fifteen (15)  days of the date the court reporter makes the transcript available for the Producing Party's review.  The letter shall direct the court reporter to indicate the portions designated as Protected Information and segregate them as appropriate.  Designations of transcripts will apply to audio, video, or other recordings of testimony.  The court reporter shall clearly mark any transcript released prior to the expiration of the fifteen (15) day period as "Protected – Subject to Further Protective Review."  Such transcripts will be treated as Protected Information and shall be fully subject to this Protective Order, until after the expiration of the fifteen (15) days after the transcript was made available by the court reporter.  If the Producing Party does not send a designation letter within the fifteen

(15)  day period, then the transcript will be not be treated as "PROTECTED INFORMATION" unless upon application to the Court, the Court orders otherwise.  The parties may agree to a reasonable extension of the fifteen (15) day period or may seek an extension from the Court for sending the designation letter.

18.  A party may not file in the public record in this action any "PROTECTED INFORMATION" without written permission from the Supplying Party or a court order secured after appropriate notice to the parties.  Material or information designated as "PROTECTED INFORMATION" under this Stipulated Protective Order shall not be used or disclosed by any party, or their counsel or any person acting on his/her behalf to any other persons except as provided for hereinafter, and shall not be used for any business or competitive purpose, or for any other purposes whatsoever, other than the preparation and trial of this action and any appeal in connection with this action.

19. In the absence of written permission from the Supplying Party or an order of the Court, material or information designated as "PROTECTED INFORMATION"  under this Stipulated Protective Order may only be shown and delivered to the following people:

    a.  Counsel for the Parties, including in-house for Defendants, and all employees of such counsel who have responsibility for assisting in the preparation and trial of this action or any appeal herein;

    b.  Any attorney of record for plaintiffs in other pending U.S. litigation alleging personal injury or economic loss arising from the alleged use, purchase, or payment of Xarelto for use in such other Xarelto action, provided that the proposed recipient is: (a) already operating under a Protective or Confidentiality Order in another jurisdiction where the

Xarelto action is pending; or (b) agrees to be bound by this Order and executes the Acknowledgment that is attached hereto as Exhibit A;

c. The Parties to the extent required for assisting in the preparation and trial of the case or any appeal herein. To the extent such disclosure is made, such Party shall be advised of, shall become subject to, and shall agree in advance of disclosure to, the provisions of this Stipulated Protective Order;

d. The Court, any Special Master appointed by the Court and court personnel (including the court having jurisdiction over any appeal);

e. Court reporters used in connection with the litigation;

f. Any person who (i) wrote or received a copy of the document before it was furnished in this litigation, or (ii) was present or participated in a meeting or discussion of the protected information before it was furnished in this litigation;

g. Any mediators, secretaries, paraprofessional assistants, and other employees of such mediators who are actively engaged in assisting the mediators in connection with this matter;

h. Employees of outside copying, document imaging, litigation and trial support, and facsimile services;

i. Experts and consultants retained by a party to this proceeding or the party's counsel for purposes of assisting the party and its attorneys of record in the preparation and/or presentation of its claims or defenses (including undisclosed consulting experts), provided that the proposed

recipient executes the attestation attached as Exhibit A.  A copy of each

executed acknowledgement shall be maintained for Plaintiff's consultants

or experts by Plaintiff's Liaison Counsel and for Defendants' consultants

or experts by Counsel for Defendants during the course of the litigation.

At the conclusion of the litigation, counsel for Receiving Party shall

confirm in writing with counsel for Supplying Party that it will have any

documents designated as "PROTECTED INFORMATION" or "HIGHLY

PROTECTED INFORMATION" that were provided to consultants or

experts returned to counsel for the Receiving Party.

j.   To the extent the Defendants desire that any former employee whose

deposition is to be taken in this matter execute the Acknowledgement

attached as Exhibit A, it shall be the Defendants' burden to obtain such an

agreement prior to the deposition.  If a former employee refuses to execute

the Acknowledgment, the parties will meet and confer on the issue.  If the

parties cannot reach an agreement and the Defendants continue to desire to

preclude the former employee from receiving "PROTECTED

INFORMATION" at his or her deposition, the Defendants shall move for

a protective order in a timely fashion so that the issue may be resolved by

the Court prior to the deposition.  Without such an additional protective

order, nothing in this Order shall prevent Plaintiffs' Counsel from showing

"PROTECTED INFORMATION" to the witness at the deposition of any

former employee of Defendants who currently works for a company that

may otherwise preclude the receipt of "PROTECTED INFORMATION"

by that witness had he or she had not been formerly employed by

Defendants.  If the Receiving Party intends on disclosing "PROTECTED

INFORMATION" to a former employee outside of a deposition, trial or

other formal proceeding under oath, the former employee must execute the

Acknowledgment attached as Exhibit A prior to disclosure.

k.  Disclosure may be made to witnesses or deponents in the course of this

litigation if such person or persons execute the Acknowledgement that is

attached as Exhibit A.

l.  The Parties will continue to meet and confer regarding the disclosures to

plaintiffs' prescribing and treating physicians, nurse practitioners, or other

medical professionals who treated plaintiffs (and their respective staffs)

and the conditions upon which those disclosures may be made outside of a

deposition.

20.  In addition to the persons and entities identified above, material or information

designated as "PROTECTED INFORMATION – HIGHLY PROTECTED" under this Stipulated

Protective Order may only be disclosed to the following individuals in the manner set forth

below:

a.  As used herein, a "competitor" shall be defined as any pharmaceutical company

that manufactures or has as one of its products a new oral anticoagulant

("NOAC") indicated for the treatment of reducing the risk of stroke and systemic

embolism in patients with nonvalvular atrial fibrillation, treatment of DVT,

treatment of PE, reduction in the risk of recurrence of DVT and/or PE following

initial 6 months treatment for DVT and/or PE, or prophylaxis of DVT, which may lead to PE, in patients undergoing knee or hip replacement surgery.

b.   Subject to Paragraph 19(j) above, prior to disclosure to anyone who is, independent of this litigation a current director, officer, employee of, or counsel for a competitor, or anyone who at the time of disclosure is pursuing an opportunity to become an employee, officer, or director of any competitor of Defendants;

c.   the Receiving Party shall identify the Bates range of documents that may be provided to such person without disclosing the identity of the person.  Within fourteen (14) days of the disclosure of the Bates range of documents, any party in good faith may deem any document in the above Bates range as a document that may not be disclosed to such person if that party considers the document to contain information that if potentially disclosed to a competitor of Defendants, such disclosure would cause Defendants significant competitive harm.  If such a designation is not made within fourteen (14) days, the documents in the Bates range may be provided to the individual pursuant to this Stipulated Protective Order so long as Exhibit A is signed as set forth above.  A party may object to the designation of non-disclosure above within fourteen (14) days of the designation.

21.   All counsel shall keep all material or information designated as "PROTECTED INFORMATION" which is received under this Stipulated Protective Order within its exclusive possession and control, except as provided in paragraphs 19 and 20, and shall take reasonable steps to maintain such material in a secure manner.

22. Any person having access to material or information designated as a "PROTECTED DOCUMENT" under this Stipulated Protective Order, including consultants and experts, are permitted to make copies, extracts, summaries, or descriptions of the material or information or any portion thereof as necessary for the preparation and trial of this litigation.

23. Pursuant to 21 C.F.R. §§ 314.430(e) & (f) and 20.63(f), the names of any person or persons reporting adverse experiences of patients and the names of any patients that are not redacted shall be protected, regardless of whether the document containing such names is designated as "PROTECTED INFORMATION". No such person shall be contacted, either directly or indirectly, based on the information so disclosed without the express written permission of the Supplying Party.

24. This Protective Order does not address the offering of Protected Information in evidence at trial or any court hearing, but nothing contained in this Protective Order shall preclude any party from moving the Court at an appropriate time for an order that evidence be received *in camera* or under other conditions to prevent unnecessary disclosure.

25. The Parties will use the following procedure for submitting to the Court papers consisting of, relating to, containing, incorporating, reflecting, describing or attaching Protected Information: any such material shall be filed in a sealed envelope, labeled with the case name, case number, the motion to which the documents relate, and a listing of the titles of the documents in the envelope, and shall bear the legend: THIS DOCUMENT CONTAINS PROTECTED INFORMATION COVERED BY A PROTECTIVE ORDER OF THE COURT AND IS SUBMITTED UNDER SEAL PURSUANT TO THAT PROTECTIVE ORDER. THE PROTECTED CONTENTS OF THIS DOCUMENT MAY NOT BE DISCLOSED WITHOUT EXPRESS ORDER OF THE COURT. Such material shall be kept under seal until further order

of the Court; however, such materials shall only be available to the Court and counsel of record, and to all persons entitled to receive such information under the terms of this Order.  When serving such material, the parties shall select the "Sealed, electronic" option to ensure that on-line access is restricted as contemplated by this Order.  That parties shall take reasonable steps to minimize such sealing.

26. Within seven (7) days of the submission of any material under seal, the parties shall confer to determine if the Producing Party objects to the filing of the Protected Information in unsealed form.  To the extent of the parties' agreement concerning the treatment of the Protected Information, the filing party may file the subject materials in unsealed form.  To the extent the parties are unable to reach agreement, either party may file a motion to address the appropriate treatment of the subject materials.  On such motion, the Supplying Party shall have the burden of proving the material is Protected Information.  The material shall remain sealed unless the Court orders otherwise.

27. When submitting deposition testimony pursuant to the previous Paragraph that has been designated as Protected Information, the submitting party shall submit, to the extent reasonably possible, only those pages of the deposition transcript that are cited, referred to, or relied on by the submitting party.

28. If another court or an administrative agency subpoenas or otherwise orders production of "PROTECTED INFORMATION" obtained under this Stipulated Protective Order, the person to whom the subpoena or other process is directed shall promptly notify liaison counsel for the designating party in writing via electronic and overnight delivery of all of the following: (1) the "PROTECTED INFORMATION" that is requested by the subpoena; (2) the date on which compliance with the subpoena is requested; (3) the location at which compliance

with the subpoena is requested; (4) the identity of the party serving the subpoena; and (5) the

case name, jurisdiction and index, docket, complaint, charge, civil action or other identification

number or other designation identifying the litigation, administrative proceeding or other

proceeding in which the subpoena or other process has been issued.  In no event shall

"PROTECTED INFORMATION" be produced before the expiration of fifteen business days

after written notice to counsel for the designating party unless required to do so by the order

seeking the documents.  Furthermore, the person receiving the subpoena or other process shall

cooperate with the producing party in any proceeding related thereto.

      29. If any party learns of any unauthorized disclosure of documents or information

designated as "PROTECTED INFORMATION" by Parties or counsel in this litigation, it shall

immediately inform the Court in writing of all pertinent facts relating to such disclosure.

      30. Inadvertent production of any document or information without a designation of

"PROTECTED INFORMATION" will not be deemed to waive a later claim to its protected

nature or preclude a party from designating said document or information as "PROTECTED

INFORMATION" pursuant to this Order at a later date.  Any party may designate as

"PROTECTED INFORMATION" or withdraw "PROTECTED INFORMATION" designation

from any material that it has produced, provided, however, that such re-designation shall be

effective only as of the date of such re-designation.  A party must treat such documents and

things with the noticed level of protection from the date such notice is received.  Such re-

designation shall be accomplished by notifying counsel for each party in writing of such re-

designation and providing replacement images bearing the appropriate description.  Upon receipt

of any re-designation and replacement image that designates material as "PROTECTED

INFORMATION," all Parties shall (1) treat such material in accordance with this Order; (2) take

reasonable steps to notify any persons known to have possession of any such material of such re-designation under this Stipulated Protective Order; and (3) promptly endeavor to procure all copies of such material from any persons known to have possession of such material who are not entitled to receipt under this Stipulated Protective Order .

      31. Inadvertent production of documents or information (hereinafter "Inadvertently Produced Documents") subject to work-product immunity, the attorney-client privilege, or other legal privilege protecting information from discovery shall not constitute a waiver of the immunity or privilege, provided that the party producing the documents shall notify all Parties in writing within a reasonable period of time from the discovery of the inadvertent production.  If such notification is made, such Inadvertently Produced Documents and all copies thereof shall, upon request, be returned to the party making the inadvertent production, all notes or other work product of the Receiving Party reflecting the contents of such materials shall be destroyed, and such returned or destroyed material shall be deleted from any litigation-support or other database.  If the party receiving the production disputes in writing the claim of privilege or the claim of inadvertence they may retain possession of the Inadvertently Produced Documents as well as any notes or other work product of the Receiving Party reflecting the contents of such materials pending the resolution by the Court of the motion below.  The party receiving such Inadvertently Produced Documents may, after receipt of the notice of inadvertent production, move the Court to oppose the request for return of the subject materials.  If the Receiving Party's motion is denied, the Receiving Party shall promptly comply with the immediately preceding provisions of this paragraph or such other directives as may be issued by the Court.  No use shall be made of such Inadvertently Produced Documents during depositions or at trial, nor shall they

be disclosed to anyone who was not given access to them prior to the request to return or destroy them.

32. Upon final termination of this action, whether by judgment, settlement or otherwise, counsel for the Receiving party shall destroy or return to counsel for the Designating party all "PROTECTED INFORMATION" in their possession or subject to their control (including but not limited to materials furnished to consultants and/or experts), and execute an affidavit or declaration affirming based on personal knowledge that all such "PROTECTED INFORMATION", including copies upon which any notes have been made, have been destroyed or returned.

33. The terms of this Stipulated Protective Order shall survive and remain in effect after the termination of this lawsuit. To the extent permitted by local rules and governing law, counsel for the designating party shall be entitled to contact the Court to claim and retrieve documents containing "PROTECTED INFORMATION" that were submitted to the Court.

34. Any party for good cause shown may apply to the Court for modification of this Stipulated Protective Order, or the Order may be modified by consent of the Parties in writing. This Stipulated Protective Order shall remain in full force and effect and each person subject to this Order shall continue to be subject to the jurisdiction of this Court, for the purposes of this Order, in perpetuity, and the Court shall not be divested of jurisdiction of any person or of the subject matter of this Order by the occurrence of conclusion of this case, or by the filing of a notice of appeal, or other pleading which would have the effect of divesting this Court of jurisdiction of this matter generally.

The Court approves the aforestated stipulations and memorializes them in this Court order.

New Orleans, Louisiana this 4th day of May, 2015.


_____

United States District Judge

EXHIBIT A TO PRE-TRIAL ORDER NO. 12 (STIPULATED PROTECTIVE ORDER)

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE: XARELTO (RIVAROXABAN)** | * | **MDL NO. 2592** |
| **PRODUCTS LIABILITY LITIGATION** | * | |
| | * | **SECTION L** |
| | * | |
| | * | **JUDGE ELDON E. FALLON** |
| | * | |
| | * | **MAG. JUDGE NORTH** |

* * * * * * * * * * * * * * * * * * * * *

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND
BY PROTECTIVE ORDER

**The undersigned agrees:**

I declare under penalty of perjury that I have read in its entirety and understand the Protective Order that was issued by the United States District Court for the Eastern District of Louisiana on _____, 2015 in *IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION,*(MDL No. 2592).

I agree to comply with and to be bound by all the terms of this Stipulated Protective Order, and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Protective Order to any person or entity except as permitted by the provisions of this Protective Order.

I further agree to submit to the jurisdiction of the United Stated District Court for the Eastern District of Louisiana for the purposes of enforcing terms of this Protective Order, even if such enforcement proceedings occur after termination of these proceedings.

**Date:**_____


**City and State where sworn and signed:**_____


**Printed Name:**_____


**Signature:**_____

00290554

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE: XARELTO (RIVAROXABAN)          *     MDL NO. 2592
PRODUCTS LIABILITY LITIGATION
                                      *     SECTION L

                                      *     JUDGE ELDON E. FALLON

                                      *     MAG. JUDGE NORTH
*********************************************
THIS DOCUMENT RELATES TO ALL CASES

PRE-TRIAL ORDER NO. 13
(Plaintiff Fact Sheets and Authorizations)

In conjunction with Paragraph 4 of the Case Management Order No. 1 ("CMO No. 1"), this Order governs the form and schedule for service of Plaintiff Fact Sheets ("PFS") and executed Authorizations for the release of records to be completed by Plaintiffs in all individual cases that were: (1) transferred to this Court by the Judicial Panel on Multidistrict Litigation, pursuant to its Order of December 12, 2015; (2) subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation pursuant to Rule 7.4 of the Rules of Procedure of that Panel; and (3) originally filed in this Court or transferred or removed to this Court.

**PLAINTIFF FACT SHEETS**:

1.  Plaintiffs shall each complete and serve upon Defendants a PFS and Authorization for Release of Records of all healthcare providers and other sources of information and records (*e.g.* pharmacies, employers, etc.) using MDL Centrality in the form set forth in PFS Attachment A.  Those Plaintiffs shall also produce with their PFS all documents responsive to the document requests contained therein.

2.  As outlined in Paragraph 4(a) of the CMO No. 1, a complete and verified PFS, signed

and dated Authorizations, and all responsive documents shall be submitted to the Defendants using MDL Centrality on the following schedule: within sixty (60) days from the date that each Plaintiff's case is filed, if filed directly in this Court; within sixty (60) days of the date the case is transferred to this Court, if filed elsewhere; or within sixty (60) days from entry of this Order, whichever is longer.  The Authorizations are set forth in PFS Attachment B.

3. Plaintiffs who fail to provide complete and verified PFS, signed and dated Authorizations, and all responsive documents requested in the PFS within the time periods set forth hereinabove shall be given notice by e-mail from Defendants' Liaison Counsel ("DLC") and shall be given twenty (20) additional days to cure such deficiency. Failure to timely comply may result in a dismissal of Plaintiff's claim.

4. Authorizations shall be dated and signed.  Defendants may use the authorizations for all healthcare providers and other sources of information and records (e.g., pharmacies, employers, etc.) identified in the PFS, without further notice to Plaintiff's counsel.  DLC shall make records received pursuant to the Authorizations available to Plaintiffs' Liaison Counsel ("PLC") and Plaintiff's counsel at Plaintiff's request and at cost to Plaintiff.

5. If Defendants wish to use an authorization to obtain records from a source that is not identified in the PFS, Defendants shall provide the Plaintiff's counsel for that particular case with seven (7) days written notice (email) of the intent to use an authorization to obtain records from that source.  If Plaintiff's counsel fails to object to the request within seven (7) days, Defendants may use the authorization to request the records from the source identified in the notice.  If Plaintiff's counsel objects to the use of the authorization to obtain records from the source identified in the notice within said seven (7) day period,

Plaintiff's counsel and Defendants' counsel shall meet and confer in an attempt to resolve the objection.  If counsel are unable to resolve the objection, Plaintiff shall file a motion for a protective order within fourteen (14) days of the Defendants' notice of intent to use the authorization.

6.   Plaintiffs' responses to the PFS shall be treated as answers to interrogatories under Fed. R. Civ. P. 33 and responses to requests for production of documents under Fed. R. Civ. P. 34 and shall be supplemented in accordance with Fed. R. Civ. P. 26.

7.   Defendants' use of the PFS and Authorizations shall be without prejudice to Defendants' right to serve additional discovery.

New Orleans, Louisiana this 4th day of May, 2015.

_____
United States District Judge

Attachments

# PFS ATTACHMENT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE:  XARELTO PRODUCTS
LIABILITY LITIGATION

Master File No.: _____

MDL No. 2592

This Document Relates To:

MDL Case No. _____

Plaintiff: _____

## PLAINTIFF'S FACT SHEET

This Fact Sheet must be completed by each plaintiff who has filed a lawsuit related to the use of Xarelto® by the plaintiff or a plaintiff's decedent.  Please answer every question to the best of your knowledge.   In completing this Fact Sheet, you are under oath and must provide information that is true and correct to the best of your knowledge.  If you cannot recall all of the details requested, please provide as much information as you can.  You must supplement your responses if you learn that they are incomplete or incorrect in any material respect.  For each question, where the space provided does not allow for a complete answer, please attach additional sheets so that all answers are complete.  When attaching additional sheets, clearly label what question your answer pertains to.

In filling out this form, please use the following definitions: (1) "**health care provider**" means any hospital, clinic, medical center, physician's office, infirmary, medical or diagnostic laboratory, or other facility that provides medical, dietary, psychiatric, or psychological care or advice, and any pharmacy, weight loss center, x-ray department, laboratory, physical therapist or physical therapy department, rehabilitation specialist, physician, psychiatrist, osteopath, homeopath, chiropractor, psychologist, nutritionist, dietician, or other persons or entities involved in the evaluation, diagnosis, care, and/or treatment of the plaintiff or plaintiff's decedent; (2) "**document**" means any writing or record of every type that is in your possession, including but not limited to written documents, documents in electronic format, cassettes, videotapes, photographs, charts, computer discs or tapes, and x-rays, drawings, graphs, phone-records, non-identical copies, and other data compilations from which information can be obtained and translated, if necessary, by the respondent through electronic devices into reasonably usable form.

Information provided by plaintiff will only be used for purposes related to this litigation and may be disclosed only as permitted by the protective order in this litigation.  This Fact Sheet is completed pursuant to the Federal Rules of Civil Procedure governing discovery (or, for state court case, the governing rules of civil of the state in which the case is pending).

1

# I.    CORE CASE INFORMATION

A.    Please provide the following information for the civil action that you filed:

| | |
|---|---|
| Caption: | |
| Court and Docket No. | |
| Plaintiff's Attorney: | |

B.    Please provide the following information for the individual on whose behalf this action was filed:

| | | | |
|---|---|---|---|
| Name: | | Social Security Number : | |
| Address: | | Date of Birth: | |

C.    Please provide the following information regarding usage of Xarelto®.
**YOU MUST ATTACH COPIES OF PRESCRIPTION AND/OR PHARMACY RECORDS DEMONSTRATING USE OF XARELTO®**:

| | | | |
|---|---|---|---|
| Dates of Use: | | Dosage: | |
| Reason for Prescription: | | | |
| Name and Address of Prescribing Physician(s) | | | |
| Name and Address of Pharmac(ies): | | | |

D.    Please provide the following information regarding the event(s) you attribute to use of Xarelto®.
**YOU MUST ATTACH MEDICAL RECORDS DEMONSTRATING ALLEGED INJURY**:

1.    Please select the injury you allege in this lawsuit (check the one(s) that apply):

| | |
|---|---|
| Brain/Cerebral Hemorrhage | |
| Death | |
| Gastrointestinal Bleeding | |
| Heart Attack | |
| Kidney Bleeding | |
| Nosebleeds | |
| Rectal Bleeding | |
| Respiratory Failure | |
| Stroke (Hemorrhagic) | |
| Stroke (Ischemic) | |
| Vaginal or Uterine Bleeding | |
| Unspecified Internal Bleeding | |
| Other * | |

2

\*  If you checked other, identify all injuries that you are claiming that are not listed in the above chart.
_____

For each event above, please specify:

| Date of Diagnosis: | |
|---|---|
| Name and Address of Diagnosing Physician(s): | |
| Hospitalized?    Y/N | Date(s) of Hospitalization(s): |
| Reason for Hospitalization(s): | |
| Name and Address of Hospital(s) and Medical Provider(s): | |

E.       If you are completing this questionnaire in a representative capacity (*e.g.*, on behalf of the estate of a deceased person), please complete the following:

| Name: | |
|---|---|
| Address: | |
| Capacity in which you are representing the individual: | |
| If you were appointed as a representative by a court, state the State, Court and Case Number: | |
| Relationship to the Represented Person: | |
| State the date and place of death of the decedent (if applicable) | |

If you are completing this questionnaire in a representative capacity, please respond to the remaining questions with respect to the person whose medical treatment involved the use of Xarelto.  Those questions using the term "You" refer to the person whose treatment involved the use of Xarelto.  If the individual is deceased, please respond as of the time immediately prior to his or her death unless a different time period is specified.

## II.      **PERSONAL INFORMATION**

A.      Background Information

1.      Name: _____

2.      Maiden or other names you have used or by which you have been known: _____
_____

3.      Medicare Health Insurance Claim Number (if applicable): _____

4.      Place of Birth: _____

5.      Sex:    Male: _____ Female: _____

6.      Identify each address at which you have resided during the last ten (10) years and the approximate dates during which you lived at each address (most recent first):

| Street Address | City, State, Zip | Dates Resided | |
|---|---|---|---|
| | | From | To |
| | | | |
| | | | |
| | | | |

B.      <u>Family Information</u>

1.      Have you ever been married?  Yes: _____ No: _____

*If yes*, for each marriage in the last five years, state the spouse's name, the date of marriage, the date the marriage ended, the nature of termination (*e.g.*, death, divorce, etc.), and that spouse's present address:

| Spouse's Name | Date of Marriage | Date Marriage Ended | Nature of Termination | Spouse's Present Address (if known) |
|---|---|---|---|---|
| | | | | |
| | | | | |

2.      Has your spouse filed a loss of consortium or other claim in this lawsuit?

Yes ☐ No ☐

3.      If you have children, please identify each child's name, address, and date of birth:

| Child's Name | Address | Date of Birth |
|---|---|---|
| | | |
| | | |
| | | |

C.      <u>Educational History:</u>  Identify each high school, vocational school, college, university or other post-secondary educational institution you attended, the institution's address, the dates of attendance, and the diplomas or degrees awarded:

| Name of School | Address and Telephone Number (if known) | Dates of Attendance | Diploma/Degree Awarded |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

D.  Employment History

Whether or not you are making a lost wage claim, please respond to all questions in this section except as noted:

1.  Are you currently employed? Yes ☐ No ☐

If *yes*, identify your current employer with name, address and telephone number and your position there: _____

_____

2.  Are you making a claim for lost wages or lost earning capacity? Yes ☐ No ☐

3.  Only if you are asserting a wage loss claim: Please provide the address for each employer identified above and state the following for the last seven (7) years:

| Name of Employer | Employer Address, City, ST, Zip | Year | Annual Gross Income |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

4.  Have you ever been out of work for more than thirty (30) days for reasons related to your health in the last seven (7) years ? Yes: _____ No: _____

If *yes*, please state the dates, employer, and health condition:

_____

E.  Worker's Compensation and Disability Claims: Within the last 10 years, have you ever filed for workers' compensation, social security, and/or state or federal disability benefits? Yes ☐ No ☐

If Yes, then as to each application, separately state the following:

| Year Claim was Filed | Company and/or Court where claim was filed | Nature of claimed injury | Period of disability | Amount Award |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

F.  Military Service

1.  Have you ever served in any branch of the military? Yes ☐ No ☐

If *yes*, Branch and dates of service:

_____

*If yes*, were you discharged for any reason relating to your health (whether physical, psychiatric, or other health condition)?  Yes ☐  No☐

If yes, state the condition:

_____

G. <u>Life Insurance</u>:  Within the last 7 years, have you ever been denied life insurance?

Yes ☐  No☐

*If yes*, please state when, the name of the life insurance company, and the company's stated reason for denial (if any):

_____

_____

H. <u>Other Lawsuits</u>:  Within the last ten (10) years, have you filed a lawsuit, relating to any bodily injury, or made a claim, *other than* in the present suit?     Yes ☐  No☐

*If yes*, state:

Nature of the case:_____

Where was it filed?_____

Attorney name:_____

I. <u>Prior Convictions</u>:  Have you ever been convicted of, or pled guilty (or no contest) to, a felony and/or a crime involving an act of dishonesty or providing a false statement within the last ten (10) years?    Yes ☐  No☐

*If yes*, please provide the following: (Charge to which you plead guilty or were convicted of: _____

Court where action was pending:_____

J. <u>Computer Use:</u>  Apart from communications to or from your attorney, have you communicated via email, visited any chat rooms, or publicly posted a comment, message or blog entry on a public internet site regarding your experience with or injuries you attribute to Xarelto, other New Oral Anticoagulants, atrial fibrillation, or the risk of stroke or blood clots during the past five (5) years?  (You should include all postings on public social network sites including Twitter, Facebook, MySpace, LinkedIn, or "blogs" that address the topics above).

Yes: _____ No: _____ Do Not Recall: _____

If yes, please identify where and when you made such public posts and the substance of what was posted.

_____

K. <u>Bankruptcy</u>:  In the last 5 years, have you filed for bankruptcy?  Yes ☐  No☐

### III.     CLAIM INFORMATION

A.     Xarelto Use:

   1. Relevant History

     a.   Provide in the chart below the name(s) and address(es) of the health care provider(s) who prescribed or provided Xarelto:

| Name of health care provider(s) | Address, City, State and Zip |
|---|---|
|  |  |
|  |  |
|  |  |

     b.   When were you first diagnosed with the condition for which you were prescribed Xarelto? _____

     c.    Prior to taking Xarelto, how did you manage or treat this condition (describe - if applicable and cross-reference if answered in section VI. A.)?
_____
_____

     d.   In the chart below, please identify all healthcare providers who treated you in connection with this condition:

| Name of health care provider(s) | Address, City, State and Zip |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

   2.     Are you currently taking Xarelto?  Yes ☐ No ☐

   3.     Provide below the name(s) and address(es) of the pharmacy(ies) or other store(s) or location(s) from which you obtained Xarelto:

| Name of Pharmacy or other Store/Location | Address, City, State and Zip |
|---|---|
|  |  |
|  |  |
|  |  |

4.    Have you ever received any samples of Xarelto? Yes ☐ No ☐ Do Not Recall ☐

*If yes*, please state the following:

Who Provided?_____

When?_____

5.    Were you ever given any written instructions, including any prescriptions, packaging, package inserts, literature, medication guides, or dosing instructions, regarding Xarelto?   Yes ☐   No ☐   Do Not Recall ☐

*If yes*, please describe the documents if you no longer have them.  If you have the documents, please produce them:

_____

_____

6.    Were you given any oral instructions from a Healthcare Provider regarding your use of Xarelto? Yes ☐   No ☐   Do Not Recall ☐

*If yes*, please identify each Healthcare Provider who provided the oral instructions:

_____

_____

7.    Do you have in your possession, or does your attorney have, the packaging from the Xarelto you allege to have used?  Yes ☐    No ☐

*If yes*, who currently has custody of the Xarelto packaging? _____

_____

8.    Have you ever seen any advertisements (*e.g.*, in magazines or television commercials) for Xarelto? Yes ☐   No ☐

*If yes*, identify the advertisement or commercial, and approximately when you saw the advertisement or commercial: _____

_____

_____

9.    Other than through your attorneys, have you had any communication, oral or written, with any of the Defendants or their representatives?

Yes ☐   No ☐ Do Not Recall ☐

*If yes*, please identify:

Date of Communication: _____ Method of Communication: _____

Name of Representative: _____

Substance of communication between you and any representative(s) of the Defendants: _____

_____

8

B.  1.       Identify the primary treating physician for the injuries you claim in this case with address and dates of treatment.

_____

_____

2.       Were you treated by any health care provider or at any hospital for this/these injury(ies) who is not identified in the Core Case Information section above? Yes ☐  No ☐

If "Yes", please provide the following information:

| Name of health care provider and Hospital | Address, City, State and Zip | Approx. date(s) of treatment |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

3.       At the time you experienced the event you attribute to your use of Xarelto®, were you undergoing treatment for any other medical conditions?  If so, describe the condition, the treatment, and identify the healthcare providers treating you.

_____

_____

4.       At the time you experienced the event you attribute to your use of Xarelto® what other prescription and over the counter medications were you taking?

_____

5.       Had you ever suffered the type of bodily injury(ies) before the date set forth in your answer to Question I(D)(1) above? Yes ☐    No ☐

a.       *If yes*, state the date and healthcare provider that diagnosed the condition at the time: _____

_____

b.       Do  you  claim  that  Xarelto  worsened  a  previously  existing injury/condition? Yes ☐    No ☐

*If yes*, set forth the injury/condition, whether or not you had already recovered from that injury/condition before you first used Xarelto, and, if so, the date you recovered from the injury/condition:

_____

_____

9

C.   Do you claim that your use of Xarelto caused or aggravated any psychiatric and/or psychological condition(s) for which treatment was sought and for which damages are being sought in this lawsuit? Yes ☐   No ☐

If "Yes", please state the following as it pertains to your treatment of any psychiatric and/or psychological condition(s) in the last ten (10) years:

| Name of psychiatrist, psychologist or other mental health care provider | Address, City, State, Zip, Telephone Number | Reason for Treatment | Approx Dates/Years of Treatment/Visits |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

D.   <u>Medical Expenses:</u> If known, please list all of your medical expenses, including amounts billed or paid by insurers and other third-party payors, which are related to any condition which you claim was caused by Xarelto for which you seek recovery in the action which you have filed.

| Provider | Date | Expense |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

E.   <u>Lost Wages:</u>   If you are making a claim that you lost wages or suffered impairment of earning capacity, state the annual gross income you derived from your employment for each of the five (5) years prior to the injury or condition you claim was caused by Xarelto.

| Year | Annual gross income |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

10

State the annual gross income for every year following the injury or condition you claim was caused by Xarelto

| Year | Annual gross income |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

F.    Have you had any discussions with any doctor or other healthcare provider about whether Xarelto caused or contributed to your injury?    Yes: ☐ No: ☐ Do Not Recall: ☐

*If yes*, please identify:

Name of health care provider: _____

Address: _____

Date of discussion: _____

What were you told?  (Describe discussion regarding Xarelto):

_____

_____

[If discussed with more than one doctor, please answer for each doctor, using additional pages as necessary.]

## IV.    LIST OF HEALTHCARE PROVIDERS

A.    <u>Healthcare Providers:</u>  Identify each physician, doctor, or other health care provider who has provided treatment to you for any reason in the past twelve (12) years and the reason for consulting the health care provider or mental health care provider (attach additional sheets as necessary).

| Name | Address | Approximate Dates | Reason for Consultation, if known or recalled |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

11

B.  <u>Hospitals, Clinics, and Other Facilities:</u> Identify each hospital, clinic, surgery center, physical therapy or rehabilitation center, or other healthcare facility where you have received inpatient <u>or</u> outpatient treatment (including emergency room treatment) in the past twelve (12) years (attach additional sheets as necessary):

| Name | Address | Approximate Dates | Reason for Treatment, if known or recalled |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

C.  <u>Laboratories:</u>  Identify each laboratory at which your blood was tested in the past ten (10) years:

| Name | Address and Telephone Number | Approximate Date Taken | Reason, if known or recalled |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

D.  <u>Pharmacies:</u> Identify each pharmacy, drugstore, and/or other supplier (including mail order) where you have had prescriptions filled or from which you have ever received any prescription medication in the past ten (10) years (attach additional sheets as necessary):

| Name of Pharmacy | Address of Pharmacy | Approximate Dates |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

E.  <u>Insurance Carriers:</u> Identify each health insurance carrier which provided you with medical coverage and/or pharmacy benefits for the last ten (10) years, the named insured, the named insured's social security number, and the policy number (attach additional sheets as necessary)

| Carrier | Address | Name of Insured & SSN (if not Xarelto user) | Policy Number | Approximate Dates of Coverage |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## V.   <u>MEDICAL BACKGROUND</u>

A.   Height and weight at the time of your claimed injury: Height: _____  Weight: _____

B.   <u>Tobacco Use History</u>:  For the ten (10) year period prior to your use of Xarelto up to the present, check the answer and fill in the blanks applicable to your history of tobacco use, including cigarettes, cigars, pipes, and chewing tobacco/snuff.

☐ I have never used tobacco

☐ I used tobacco in the ten-year period prior to my use of Xarelto

Types of Tobacco Used: ☐ Cigarettes ☐ Cigars ☐ Pipes ☐ Chewing tobacco/snuff

Approximate Amount used: on average _____ per day for _____ years

I currently use tobacco:  Yes ☐   No ☐

C.   <u>Alcohol Use History</u>:  For the ten (10) year period prior to your use of Xarelto up to the present, did you drink alcohol (beer, wine, etc.)?   Yes ☐  No ☐

*If "Yes", what was your approximate average alcohol consumption during that time?*

Drinks per week/monthly/year/other:_____

If other, describe:_____

D.   <u>Marijuana and Illicit Drug Use</u>

1.   Have you used marijuana or any illicit drug of any kind (*e.g.*, cocaine, ecstasy, heroin, methamphetamines, etc.) within the last ten (10) years before, or at any time after, your alleged injuries?

Yes: _____  No: _____   Don't Recall: _____

If yes, identify each substance and state when you first and last used it:

_____

2.   Did you use marijuana or any illegal drug while taking Xarelto? Yes ☐ No ☐

3.   Have you ever frequently used marijuana or an illegal drug?  Yes ☐ No ☐

E.   Within the five (5) days leading up to your injury, had you undergone any surgery? Yes ☐ No ☐

*If yes*, please explain: _____

_____

F.     Have you ever before experienced a blood clot?  Yes☐ No☐
       *If yes*, describe (1) the site of blood clot, (2) date of clot, and (3) the treatment received:
       _____
       _____

G.     Have you ever been diagnosed with a genetic coagulopathy?  Yes☐ No☐

       *If yes*, describe (1) the type of coagulopathy, (2) date diagnosed, (3) by whom diagnosed, and (4) how treated: _____
       _____

H.     In the fifteen (15) years period prior to when you first took Xarelto, were you ever diagnosed or treated for any of the following conditions?  For each condition for which you answer yes, please provide the additional information requested below:

| Condition | Yes | No | Unknown/ Not sure |
|---|---|---|---|
| Anemia (or low blood count/low hematocrit) | | | |
| Adrenal insufficiency | | | |
| Amyloid angiopathy | | | |
| Atrial fibrillation | | | |
| Blood clots or thrombosis | | | |
| Bleeding/Clotting disorders (hemophilia, Von Willebrand's disease, others) | | | |
| Blood disorder or dyscrasia | | | |
| Blood transfusion | | | |
| Cancer of any type | | | |
| Cerebral or brain hemorrhage | | | |
| Cerebral aneurysm | | | |
| Congestive heart failure | | | |
| Crohn's Disease | | | |
| Cystitis | | | |
| Deep Vein Thrombosis (DVT) | | | |
| Diabetes | | | |
| Diverticulitis | | | |
| Gastrointestinal bleeding | | | |
| Gastrointestinal disease | | | |
| Heart attack or Myocardial Infarction (MI) | | | |

| Condition | Yes | No | Unknown/ Not sure |
|---|---|---|---|
| Hemorrhages (intestinal, vaginal, renal) | | | |
| Hypertension (High Blood Pressure) | | | |
| Hypotension (Low Blood Pressure) | | | |
| Inflammatory Bowel Disease or Irritable Bowel Syndrome | | | |
| Irregular heartbeat, arrhythmia, heart palpitations, tachycardia (rapid heartbeat), bradycardia (slow heartbeat) | | | |
| Kidney Problems (disease, infections, stones, protein in urine, etc.) | | | |
| Liver Disease (hepatitis B/C, cirrhosis, cysts, abnormal enzymes, etc.) | | | |
| Lupus | | | |
| Pulmonary Embolism / blood clot in lung | | | |
| Renal Insufficiency | | | |
| Stroke of any type (hemorrhagic, ischemic, etc.) | | | |
| Transient Ischemic Attack (TIA) | | | |
| Ulcerative Colitis | | | |
| Vascular disease of any type (including vascular malformation, vasculitis or peripheral vascular disease) | | | |

J.   For each condition for which you answered yes in the previous chart, please provide the information requested below (attach additional sheets as necessary)

| Condition | Treating Healthcare Provider or Facility | Address. City and State | Approx Date of Onset, if known |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

K.   Have you ever had any medical procedure performed in which a stent was used?

Yes ☐   No ☐   I do not recall or know: ☐

*If yes*: Type of Stent: _____   Approximate Date: _____

15

## VI.    ADDITIONAL MEDICATIONS

A.    For each anticoagulant listed below, identify if you have used it, the reason for use, the dates of use, adverse effects (if any), reason for discontinuation, and name of prescriber.

| Medication | Used? (Y/N) | Dates of Use | Dosage | Reason for Use | Adverse Effects (if any) | Reason for Discontinuation | Prescribing Physician |
|---|---|---|---|---|---|---|---|
| Coumadin (warfarin) | | | | | | | |
| Pradaxa | | | | | | | |
| Eliquis | | | | | | | |
| Savaysa | | | | | | | |
| Lovenox | | | | | | | |

B.    Do you currently take, or have you ever taken in the last ten (10) years, any of the following medications or supplements? (Generic name is followed by brand name):

| Name of Medication | Yes | No | Not Sure/ Unknown | Condition for which taken | Treating Physician | Name of dispensing pharmacy |
|---|---|---|---|---|---|---|
| Aggrenox (Aspirin and Extended Release Dipyridamole in Combination) | | | | | | |
| Amiodarone (Cordarone, Pacerone) | | | | | | |
| Anisindione (Miradon) | | | | | | |
| Aspirin once a day for more than two weeks | | | | | | |
| Cimetidine (Tagamet) | | | | | | |
| Dronaderone (Multaq) | | | | | | |
| Heparin | | | | | | |
| Mannitol | | | | | | |
| Non-Steroidal Anti-Inflammatory drugs (NSAIDs) regularly for more than four (4) weeks consecutively (including Ansaid, Pontsel, Toradol, Acular, Feldene, | | | | | | |

| Name of Medication | Yes | No | Not Sure/ Unknown | Condition for which taken | Treating Physician | Name of dispensing pharmacy |
|---|---|---|---|---|---|---|
| Naprosyn, Lodine) | | | | | | |
| Plavix (Clopidogrel) | | | | | | |
| Prasugrel (Effient) | | | | | | |
| St. John's Wort | | | | | | |

D.   Are there any prescription medications that you have taken on a regular basis in the seven (7) year period before you first took Xarelto?  For purposes of this question, "regular basis" mean that you were directed by a health care provider to take a medication for at least forty-five (45) consecutive days. Yes ☐ No ☐

If "Yes", please provide the following information for each prescription medication:

| Name of Prescription Medication Used on a Regular Basis | The health care provider(s) that Prescribed the medication | Approx. Dates/years taken |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## VII.   FACT WITNESSES

A.   Please identify all persons who you believe possess information concerning your alleged injury(ies) and current medical conditions, other than your health care providers, and state their name, address, and his/her/their relationship to you (attach additional sheets as necessary):

| Name | Address | Relationship to You |
|---|---|---|
| | | |
| | | |
| | | |

B.   If there are individuals who witnessed your injury as it occurred, other than your health care providers, and who are not listed in the chart directly above, please identify them here by name, address, and their relationship to you.

Name: _____

Address: _____ City: _____State: ____ Zip: _____

Relationship to You: _____

## VIII.  DECEASED INDIVIDUALS AND AUTOPSY INFORMATION

A.    Are you filling this out on behalf of an individual who is deceased?  Yes ☐   No ☐

If yes, please state the following from the Death Certificate of the individual, and attach a copy of the letter of administration.

(NOTE:  In lieu of the following, please attach a copy of the death certificate.)

Date of death: _____

Place of death: _____

Cause of death: _____

B.    Are you filling this out on behalf of an individual who is deceased and on whom an autopsy was performed?  Yes ☐   No ☐

If yes, please attach a copy of the autopsy report.

## IX.  DOCUMENT REQUESTS

Produce all documents in your possession, including writings on paper or in electronic form (if you have any of the following materials in your custody or possession, please indicate which documents you have and attach a copy of them to this PFS) and signed authorizations as requested herein:

1.  All non-privileged documents you reviewed that assisted you in the preparation of the answers to this Plaintiff Fact Sheet.  Yes ☐   No ☐

2.  A copy of all medical records and/or documents relating to the use of Xarelto and treatment for any disease, condition or symptom referred to in any of your responses to the questions above for the past twelve (12) years. Yes ☐   No ☐

3.  A copy of all prescription records and/or documents related to use of Xarelto. Yes ☐   No ☐

4.  All laboratory reports and results of blood tests performed on you.   Yes ☐   No ☐

5.  All documents reflecting your use of any prescription drug or medication in the past twelve (12) years, including documents sufficient to identify all anticoagulation medications that you have taken.   Yes ☐   No ☐

6.  If you have been the claimant or subject of any workers' compensation, social security or other disability proceeding within the last ten (10) years, all documents relating to such proceeding. Yes ☐   No ☐

7. All documents constituting, concerning or relating to product use instructions, product warnings, package inserts, pharmacy handouts or other materials distributed with or provided to you in connection with your use of Xarelto. Yes ☐   No ☐

8. Copies of advertisements or promotions for Xarelto and articles discussing Xarelto. Yes ☐   No ☐

9. Copies of the entire packaging, including the box and label for Xarelto (plaintiffs or their counsel must maintain the originals of the items requested in this subpart). Yes ☐   No ☐

10. All documents relating to your purchase of Xarelto including, but not limited to, receipts, prescriptions, prescription records, containers, labels, or records of purchase. Yes ☐   No ☐

11. All documents known to you and in your possession which mention Xarelto or any alleged health risks or hazards related to Xarelto in your possession at or before the time of the injury alleged in your Complaint, other than legal documents, documents provided by your attorney or documents obtained or created for the purpose of seeking legal advice or assistance. Yes ☐   No ☐

12. All documents in your possession or anyone acting on your behalf (not your lawyer) obtained directly or indirectly from any of the Defendants. Yes ☐   No ☐

13. All documents constituting any communications or correspondence between you and any representative of the Defendants. Yes ☐   No ☐

14. All photographs, drawing, journals, slides, videos, DVDs or any other media, including any "day in the life" videos, photographs, recordings or other media that you may utilize to demonstrate damages or relating to your alleged injury.  Yes ☐   No ☐

15. Any and all documentation of Plaintiff's use of social media, Internet postings, or other electronic networking website (including, but not limited to, Facebook, MySpace, LinkedIn, Google Plus, Windows Live, YouTube, Twitter, Instagram, Pinterest, blogs, and Internet chat rooms/message boards) relating to Xarelto or any of your claims in this lawsuit.  Yes ☐   No ☐

16. If you claim you have suffered a loss of earnings or earning capacity, your federal tax returns for each of the five (5) years preceding the injury you allege to be caused by Xarelto, and every year thereafter or W-2s for each of the five (5) years preceding the injury you allege to be caused by Xarelto, and every year thereafter.  Yes ☐   No ☐

17. Copies of all documents you (and not your lawyer) obtained from any source related to Xarelto or to the alleged effects of using Xarelto. Yes ☐   No ☐

18. If you claim any loss from medical expenses, copies of all bills from any physician, hospital, pharmacy or other health care providers. Yes ☐   No ☐

19

19. Copies of all records of any other expenses allegedly incurred as a result of the injuries alleged in the complaint.  Yes ☐  No ☐

20. Copies of any writings comprising or relating to any public statements made by you relating to this litigation in your possession. Yes ☐  No ☐

21. Copies of letters testamentary or letters of administration relating to your status as plaintiff (if applicable). Yes ☐  No ☐

22. Decedent's death certificate and autopsy report (if applicable). Yes ☐  No ☐

23. All bankruptcy petitions and orders of discharge (if applicable) for all bankruptcy claims made by you or your spouse since the date of your first ingestion of Xarelto. Yes ☐  No ☐

24. Signed authorizations in the forms attached hereto (where applicable).


# X.   DECLARATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that all of the information provided in this Plaintiff Fact Sheet is true and correct to the best of my knowledge, information and belief formed after due diligence and reasonable inquiry, that I have supplied all the documents requested in Part IX of this Plaintiff Fact Sheet, to the extent that such documents are in my possession or in the possession of my lawyers, and that I have supplied the Authorizations attached to this declaration.


_____          _____
Signature                                Date


79727246.2

20

# PFS ATTACHMENT B

**LIMITED AUTHORIZATION TO DISCLOSE HEALTH INFORMATION**
**Pursuant to the Health Insurance Portability and Accountability Act "HIPAA" of 4/14/03**
**(Excluding Psychiatric, Psychological, and Mental Health Treatment Notes/Records)**

TO:
Patient Name:
DOB:
SSN:

I, _____, hereby authorize you to release and furnish to: <u>Drinker Biddle & Reath LLP, Kaye Scholer LLP, Bradley Arant Boult Cummings LLP and/or their duly assigned agents,</u> copies of the following records and/or information **from the time period of twelve (12) years prior to the date on which the authorization is signed**:

* All medical records, including inpatient, outpatient, and emergency room treatment, all clinical charts, reports, documents, correspondence, test results, statements, questionnaires/histories, office and doctor's handwritten notes, and records received by other physicians. Said medical records shall include all information regarding AIDS and HIV status.
* All autopsy, laboratory, histology, cytology, pathology, radiology, CT Scan, MRI, echocardiogram and cardiac catheterization reports.
* All radiology films, mammograms, myelograms, CT scans, photographs, bone scans, pathology/cytology/histology/autopsy/immunohistochemistry specimens, cardiac catheterization videos/CDs/films/reels, and echocardiogram videos.
* All pharmacy/prescription records including NDC numbers and drug information handouts/monographs.
* All billing records including all statements, itemized bills, and insurance records.
** **Notwithstanding the broad scope of the above disclosure requests, the undersigned does not authorize the disclosure of notes or records pertaining to psychiatric, psychological, or mental health treatment or diagnosis as such terms are defined by HIPAA, 45 CFR §164.501**.

1.  To my medical provider: **this authorization is being forwarded by, or on behalf of, attorneys for the defendants for the purpose of litigation. You are not authorized to discuss any aspect of the above-named person's medical history, care, treatment, diagnosis, prognosis, information revealed by or in the medical records, or any other matter bearing on his or her medical or physical condition, unless you receive an additional authorization permitting such discussion. Subject to all applicable legal objections, this restriction does not apply to discussing my medical history, care, treatment, diagnosis, prognosis, information revealed by or in the medical records, or any other matter bearing on my medical or physical condition at a deposition or trial.**

2.  I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).

3.  I understand that I have the right to revoke this authorization at any time.  I understand that if I revoke this authorization I must do so in writing and present my written revocation to the health information management department.  I understand the revocation will not apply to information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy.  Unless otherwise revoked, this authorization will expire in one year.

4.  I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization.  I need not sign his form in order to assure treatment.  I understand I may inspect or copy the information to be used or disclosed as provided in CFR 164.524.  I understand that any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules.  If I have questions about disclosure of my health information, I can contact the releaser indicated above.

5.  A notarized signature is not required. CFR 164.508.  A copy of this authorization may be used in place of an original.

Print Name: _____ (plaintiff/representative)

Signature: _____ Date_____

**LIMITED AUTHORIZATION TO DISCLOSE EMPLOYMENT RECORDS AND INFORMATION
(HIPAA COMPLIANT AUTHORIZATION FORM PURSUANT TO 45 CFR 164.508)**

TO: _____
Name of Employer

_____
Address, City State and Zip Code

RE:   Employee Name: _____ AKA: _____

Date of Birth: _____ Social Security Number: _____

Address: _____

I authorize the <u>limited</u> disclosure of my employment records including medical information protected by HIPAA, 45 CFR 164.508, for the purpose of review and evaluation in connection with a legal claim.

**This authorization only authorizes release of records and/or information from the time period of seven (7) years prior to the date on which this authorization is signed.** I expressly request that all entities identified above disclose full and complete records from the time period of seven (7) years prior to the date on which this authorization is signed, including the following:

This will authorize you to furnish copies of all applications for employment; resumes; records of all positions held; job descriptions of positions held; wage and income statements and/or compensation records; wage increases and decreases; evaluations, reviews and job performance summaries; W-2s; employee health files, and correspondence and memoranda regarding the undersigned.

I authorize you to release the information to:

_____
Name (Records Requestor)

_____
Street Address                                          City                          State and Zip Code

I intend that this authorization shall be continuing in nature. If information responsive to this authorization is created, learned or discovered at any time in the future, either by you or another party, you must produce such information to the Records Requestor at that time.

I acknowledge the right to revoke this authorization by writing to you at the above referenced address. However, / understand that any actions already taken in reliance on this authorization cannot be reversed, and my revocation will not affect those actions. Any facsimile, copy or photocopy of the authorization shall authorize you to release the records herein.

_____
Signature of Employee or Personal Representative       Date                Name of Employee or Personal Representative

_____
Description of Personal Representative's Authority to Sign for Employee (attach documents that show authority)

## LIMITED AUTHORIZATION FOR
## RELEASE OF WORKERS'
## COMPENSATION RECORDS

To: _____

     Name

_____

     Address

_____

     City, State and Zip Code

     This will authorize you to furnish copies of any and all workers' compensation records of any sort **for any workers' compensation claims filed within the last ten (10) years**, including, but not limited to, statements, applications, disclosures, correspondence, notes, settlements, agreements, contracts or other documents, concerning:

_____

*Name of Claimant*

whose date of birth is _____ and whose social security number is

_____

     You are authorized to release the above records to the following representatives of defendants in the above-entitled matter, who have agreed to pay reasonable charges made by you to supply copies of such records.

_____

**Name of Representative**

Records Requestor _____

**Representative Capacity (e.g., attorney, records requestor, agent, etc.)**

_____

**Street Address**

_____

**City, State and Zip Code**

     This authorization only authorizes release of documents and records from the period of ten (10) years prior to the date on which this authorization is signed. This authorization does not authorize you to disclose anything other than documents and records to anyone.

This authorization shall be considered as continuing in nature and is to be given full force and effect to release information of any of the foregoing learned or determined after the date hereof. It is expressly understood by the undersigned and you are authorized to accept a copy or photocopy of this authorization with the same validity as through the original had been presented to you.

Date: _____          _____
                                        Claimant Signature
                                        *[NAME]*


Date: _____          _____
                                        Witness Signature

80189232.1

## LIMITED AUTHORIZATION FOR RELEASE OF
## DISABILITY CLAIMS RECORDS

To:    _____
       Name

       _____
       Address

       _____
       City, State and Zip Code

     This will authorize you to furnish copies of any and all records of disability claims of any sort **for any disability claim(s) filed within the last ten (10) years**, including, but not limited to, statements, applications, disclosures, correspondence, notes, settlements, agreements, contracts or other documents, concerning:

     _____
*Name of Claimant*

whose date of birth is _____ and whose social security number is

_____

     You are authorized to release the above records to the following representatives of defendants in the above-entitled matter, who have agreed to pay reasonable charges made by you to supply copies of such records.

_____
**Name of Representative**

Records Requestor
_____
**Representative Capacity (e.g., attorney, records requestor, agent, etc.)**

_____
**Street Address**

_____
**City, State and Zip Code**

     This authorization only authorizes release of documents and records from the period of ten (10) years prior to the date on which this authorization is signed. This authorization does not authorize you to disclose anything other than documents and records to anyone.

This authorization shall be considered as continuing in nature and is to be given full force and effect to release information of any of the foregoing learned or determined after the date hereof. It is expressly understood by the undersigned and you are authorized to accept a copy or photocopy of this authorization with the same validity as through the original had been presented to you.

Date: _____                _____
                                             Claimant/Guardian/Personal Representative
                                             Signature
                                             *[NAME]*

Date: _____                _____
                                             Witness Signature

## <u>LIMITED AUTHORIZATION FOR RELEASE OF<br>HEALTH INSURANCE RECORDS</u>

To:      _____
         Name

         _____
         Address

         _____
         City, State and Zip Code

     This will authorize you to furnish copies of any and all insurance claims applications and benefits,  and all medical, health, hospital, physicians, nursing or allied health professional reports, records or notes, invoices and bills, in your possession that pertain to the named insured identified below. **This authorization only authorizes release of Health Insurance records and/or information from the time period of ten (10) years prior to the date on which this authorization is signed.**

_____
*Name of Insured*

whose date of birth is _____and whose social security number is

_____

     You are authorized to release the above records to the following representatives of defendants in the above-entitled matter, who have agreed to pay reasonable charges made by you to supply copies of such records.

_____

**Name of Representative**

Records Requestor _____

**Representative Capacity (e.g., attorney, records requestor, agent, etc.)**

_____

**Street Address**

_____

**City, State and Zip Code**

This authorization only authorizes release of documents and records from the period of ten (10) years prior to the date on which this authorization is signed. This authorization does not authorize you to disclose anything other than documents and records to anyone.

This authorization is not valid unless the record requestor named above has executed the acknowledgement at the bottom of this authorization.

This authorization shall be considered as continuing in nature and is to be given full force and effect to release information of any of the foregoing learned or determined after the date hereof. It is expressly understood by the undersigned and you are authorized to accept a copy or photocopy of this authorization with the same validity as through the original had been presented to you.

Date: _____                _____
                                             Insured
                                             *[NAME]*

Date: _____                _____
                                             Witness Signature

80189232.1

**LIMITED AUTHORIZATION TO DISCLOSE PSYCHIATRIC,**
**PSYCHOLOGICAL AND/OR MENTAL HEALTH TREATMENT NOTES/RECORDS**
**(Pursuant to the Health Insurance Portability and Accountability Act "HIPAA" of 4/14/03)**

TO:
Patient Name:
DOB:
SSN:

       I, _____, hereby authorize you to release and furnish to: Drinker Biddle & Reath LLP, Kaye Scholer LLP, Bradley Arant Boult Cummings LLP and/or their duly assigned agents, copies of the following records and/or information **from the time period of ten (10) years prior to the date on which the authorization is signed:**

- All "psychotherapy notes", as such term is defined by the Health Insurance Portability and Accountability Act, 45 CFR §164.501.  Under HIPAA, the term "psychotherapy notes" means notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversations during a private counseling session or a group, joint or family counseling session and that are separated from the rest of the individual's record.  This authorization does not authorize ex parte communication concerning same.

1.  To my medical and/or mental health provider: **this authorization is being forwarded by, or on behalf of, attorneys for the defendants for the purpose of litigation. You are not authorized to discuss any aspect of the above-named person's medical history, mental health history, care, treatment, diagnosis, prognosis, information revealed by or in the medical or mental health records, or any other matter bearing on his or her medical, psychological, or physical condition, unless you receive an additional authorization permitting such discussion.  Subject to all applicable legal objections, this restriction does not apply to discussing my medical history, mental health history, care, treatment, diagnosis, prognosis, information revealed by or in the medical or mental health records, or any other matter bearing on my medical, psychological, or physical condition at a deposition or trial.**

2.  I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, and treatment for alcohol and drug abuse.

3.  I understand that I have the right to revoke this authorization at any time.  I understand that if I revoke this authorization I must do so in writing and present my written revocation to the health information management department.  I understand the revocation will not apply to information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy.  Unless otherwise revoked, this authorization will expire in one year.

4.  I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization.  I need not sign his form in order to assure treatment.  I understand I may inspect or copy the information to be used or disclosed as provided in CFR 164.524.  I understand that any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules.  If I have questions about disclosure of my health information, I can contact the releaser indicated above.

5.  A notarized signature is not required. CFR 164.508.  A copy of this authorization may be used in place of an original.

Print Name: _____ (plaintiff/representative)

Signature: _____ Date_____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | **MDL NO. 2592** |
| PRODUCTS LIABILITY LITIGATION | | |
| | * | **SECTION L** |
| | * | **JUDGE ELDON E. FALLON** |
| | * | **MAG. JUDGE NORTH** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**THIS DOCUMENT RELATES TO ALL CASES**

**PRE-TRIAL ORDER NO. 14**
**(Defendant Fact Sheets)**

In conjunction with Paragraph 4 of the Case Management Order No. 1 ("CMO No. 1"), this Order governs the form and schedule for service of Defendant Fact Sheets ("DFS") to be completed by Defendants in all individual cases that were: (1) transferred to this Court by the Judicial Panel on Multidistrict Litigation, pursuant to its Order of December 12, 2015; (2) subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation pursuant to Rule 7.4 of the Rules of Procedure of that Panel; and (3) originally filed in this Court or transferred or removed to this Court.

**<u>DEFENDANT FACT SHEETS</u>**:

1. Defendants shall complete a DFS for each received Plaintiff Fact Sheet ("PFS") using the form set forth in DFS Attachment A.

2. As outlined in Paragraph 4(a) of the CMO No. 1, Defendants shall submit a DFS to the Plaintiff using MDL Centrality within sixty (60) days of the date the Defendants receive a completed and verified PFS from a Plaintiff.  Defendants will not be required to serve a DFS in any case until Plaintiff supplies a substantially complete PFS, which must provide

all the Core Case Information requested in Section I of the PFS, including copies of prescription and/or pharmacy records demonstrating use of Xarelto as well as medical records demonstrating an alleged injury.

3. If Defendants fail to provide a complete and verified DFS within the time period set forth hereinabove, Defendants shall be given notice by e-mail from Plaintiffs' Liaison Counsel and shall be given twenty (20) additional days to cure such deficiency. Failure to timely comply may result in a dismissal of a defense.

4. Defendants' responses on a DFS shall be treated as answers to interrogatories under Fed. R. Civ. P. 33 and responses to requests for production of documents under Fed. R. Civ. P. 34 and shall be supplemented in accordance with Fed. R. Civ. P. 26.

5. Plaintiffs' use of the DFS shall be without prejudice to the right of the Plaintiffs in a specific case to serve additional discovery

New Orleans, Louisiana this 4th day of May, 2015.

_____
Hon. Eldon E. Fallon
United States District Judge

Attachments

# DFS ATTACHMENT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE:  XARELTO (RIVAROXABAN)    *        **MDL NO. 2592**
**PRODUCTS LIABILITY LITIGATION** *
                                 *        **SECTION L**
                                 *
                                 *        **JUDGE ELDON E. FALLON**
                                 *
                                 *        **MAG. JUDGE NORTH**
**********************************  *

**THIS DOCUMENT RELATES TO:**

_____

## DEFENDANT FACT SHEET

For each case, Defendants Janssen Research & Development, LLC, Janssen Ortho, LLC, Janssen Pharmaceuticals, Inc. (collectively "Janssen"); Johnson & Johnson ("J&J"); Bayer Corporation, Bayer Healthcare, AG, Bayer Pharma, AG, Bayer, AG, Bayer Healthcare, LLC, and Bayer Healthcare Pharmaceuticals, Inc. (collectively "Bayer"); must complete this Defendant Fact Sheet ("DFS") and identify or provide documents and/or data responsive to the questions set forth below to the best of their knowledge. In the event the DFS does not provide you with enough space for you to complete your responses or answers, please attach additional sheets if necessary. Please identify any documents that you are producing as responsive to a question or request by bates number.

Within 60 days of receiving a substantially completed and verified Plaintiff Fact Sheet ("PFS"), Defendants must complete and serve this DFS on each Plaintiff's counsel identified in the PFS. Defendants will not be required to serve a DFS on each Plaintiff's counsel until Plaintiff supplies a substantially complete PFS, which must provide all of the Core Case Information requested in Section I of the PFS, including copies of prescription and/or pharmacy records demonstrating use of Xarelto® as well as medical records demonstrating an alleged injury.

## DEFINITIONS

As used herein, the terms "YOU," "YOUR," or "YOURS" means the responding Defendants.

As used herein, the term "XARELTO" includes Rivaroxaban.

As used herein, the phrase "PRESCRIBING HEALTHCARE PROVIDER" means any physician, medical provider, practice, clinic, person, or entity identified in Section III.A.1(a) of the PFS who prescribed and/or dispensed Xarelto® to the Plaintiff

As used herein, the phrase "PRIMARY TREATING PHYSICIAN" means that one physician, medical provider, practice, clinic, person, or entity identified in Section III.B.1 of the PFS who treated plaintiff for the injuries claimed in this case.

## I.     Case Information

This DFS pertains to the following case:

Case caption: _____

Court in which action was originally filed: _____

Date that this DFS was completed: _____

## II.     Contacts With Prescribing Healthcare Providers & Primary Treating Physician

For each Prescribing Healthcare Provider identified in Section III.A.1(a) of the PFS and Primary Treating Physician identified in Section III.B.1 of the PFS, please state the following:

A.     Dear Doctor Letters:

1.     Please identify any "Dear Doctor," "Dear Health Care Provider," "Dear Colleague," or any other similar type of document or letter sent to the Plaintiff's Prescribing Healthcare Provider(s) and Primary Treating Physician concerning Xarelto®.

| Sender (Name and Address) | Letter or Document Date | Recipient (Name and Address) | Bates Number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

B.     Physician's Information Request Letters ("PIR"):

1.     Please indicate if any of the Prescribing Healthcare Provider(s) identified in Section III.A.1(a) of the PFS and Primary Treating Physician identified in Section III.B.1 of the PFS has (have) ever initiated a PIR by identifying the

name and address of the sender of the PIR; the date it was sent; the name and address of the recipient; and whether or not a response to the PIR or similar document was sent.

| Sender (Name and Address) | PIR Date | Recipient (Name and Address) | Response Sent? (Yes or No) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

2. For each PIR in which a response was sent as indicated by a "Yes" above, please identify the format of the response; the date the response was sent; the name and address of the sender of the response; the name and address of the recipient of the response; and provide and identify by Bates number any and all documentation, including lists or database records, which demonstrates that the responsive documents were sent.

| Original PIR or Request Document Date | Format of Response (Letter or Otherwise) | Date Response Sent | Response Sender (Name and Address | Response Recipient (Name and Address | Bates Number of Supporting Documentation |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

C.     Other Contacts:

1. For each Prescribing Healthcare Provider identified in Section III.A.1(a) of the PFS and Primary Treating Physician  identified in Section III.B.1 of the PFS, please identify by name any of the Defendants' Detail Representatives and/or any other detail person ("Representative") who called on the Prescribing Healthcare Provider and/or Primary Treating Physician and provide dates of each contact that related in any way to Xarelto®.

| Prescribing Health Care Provider(s) and/or Primary Treating Physician | Name of Representative | Current or Former Employee | Date(s) of Each Contact with Prescribing Health Care Provider |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

2. Have Defendants or their representatives ever provided any Xarelto® samples to Plaintiff's Prescribing Healthcare Provider(s) identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS?   To be answered only if Plaintiff answers in the affirmative to Section III.A.4 of the PFS.

Yes _____        No _____    Not Applicable _____

A. If the answer is "Yes," please state the Prescribing Healthcare Provider(s) identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS that received the samples; the dates in which such samples were provided; the amount, and dosage of such samples; and the name of the Representative(s) who provided the samples.

| Prescribing Health Care Provider(s) and/or Primary Treating Physician | Date Shipped to and/or Provided | Amount and Dosage | Representative Who Provided |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**III.     Consulting With Plaintiffs Prescribing Health Care Provider(s) and/or Primary Treating Physician**

        A.     Consulting and Professional Relationships

                1.     If any of Plaintiff's Prescribing Health Care Providers identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS have been retained and/or compensated by Defendants as a "key opinion leader," "thought leader," member of a speaker's bureau, or clinical investigator, consultant, relating to the subject of anticoagulants (including Xarelto®) stroke prevention, and/or the treatment/prevention of Atrial Fibrillation, PE, DVT, or strokes, please identify date(s) that each Prescribing Health Care Provider and/or Primary Treating Physician was retained or compensated; the nature of the affiliation; and the amount of any compensation and/or reimbursement for expenses.

| Prescribing Health Care Provider(s) and/or Primary Treating Physician | Date(s) that Prescribing Health Care Provider Retained or Compensated | Nature of Affiliation | Compensation and/or Reimbursement |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**IV.     Plaintiff's Prescribing Healthcare Providers' and Primary Treating Physician's Practices**

For each Prescribing Healthcare Provider identified in Section III.A.1(a) of the PFS and Primary Treating Physician identified in Section III.B.1 of the PFS, please state and produce the following:

        A.     Do you have or have you had access to any databases, documents, or other information that track or purport to track the prescribing or treating practices of Plaintiff's Prescribing Healthcare Provider(s) identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician  identified in Section III.B.1 of the PFS, with respect to Xarelto®.

           Yes _____     No _____

**V.**     **Plaintiff's Medical Condition**

A.     Have you been contacted by Plaintiff, or anyone acting on behalf of Plaintiff (other than Plaintiff's counsel) concerning Plaintiff?

Yes _____     No _____

B.     If you have been contacted by any person or entity concerning the Plaintiff (other than Plaintiff's counsel) for a reason other than reporting an adverse event, please state the name of the person(s) who contacted you and the name and address of the person(s) who responded to the contact on your behalf.

_____

_____

_____

C.     Please identify and produce all documents created before the filings of this lawsuit which reflect any communication between any person and you concerning Plaintiff.

_____

_____

D.     Please produce a copy of any MedWatch form, other than documents initiated in the course of litigation, which refers or relates to Plaintiff.  Any MedWatch form produced shall be redacted as necessary per federal law.

_____

_____

**VII**     **Documents**

A.     To the extent you have not already done so, please produce a copy of all documents and things that fall into the categories listed below.  These include documents in the possession of any of your present and former employees, including information provided to your attorneys:

1. Any document created before the filing of this lawsuit which relates to or refers to Plaintiff other than documents received or produced in discovery in this matter.

2.  Subject to limitations set forth in this fact sheet concerning timeframes and categories of relevant information, any document sent to or received from any of Plaintiff's Prescribing Health Care Providers identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS.

3.  "Dear Doctor," "Dear Health Care Provider," "Dear Colleague" letters, or PIRs sent to or received from any of Plaintiff's Prescribing Health Care Providers identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS.

4.  Subject to limitations set forth in this fact sheet concerning timeframes and categories of relevant information, any and all documents reflecting any contacts or communications between you and any of Plaintiff's Prescribing Health Care Providers identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS regarding Xarelto®.

5.  Any and all documents which purport to describe, analyze, investigate, track, and/or report the prescribing practices of any of Plaintiff's Prescribing Healthcare Providers identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS relating to Xarelto®, subject to the approval and/or agreement of the owner of the prescribing data (IMS Health) to release the data, which approval and/or agreement Defendant will request.

## <u>CERTIFICATION</u>

I am employed by _____, one of the Defendants in this litigation.  I am authorized by _____ [names of other Defendants] to execute this certification on each corporation's behalf.  The foregoing answers were prepared with the assistance of a number of individuals, including counsel for Defendants, upon whose advice and information I relied.  I declare under penalty of perjury that all of the information as to the foregoing Defendants provided in this Defendant Fact Sheet is true and correct to the best of my knowledge upon information and belief.


_____          _____          _____

Signature                                                  Print Name                                          Date

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **IN RE: XARELTO (RIVAROXABAN)** | * | **MDL NO. 2592** |
| **PRODUCTS LIABILITY LITIGATION** | * | |
| | * | **SECTION L** |
| | * | |
| | * | **JUDGE ELDON E. FALLON** |
| | * | |
| | * | **MAG. JUDGE NORTH** |

* * * * * * * * * * * * * * * * * * * *
**THIS DOCUMENT RELATES TO ALL CASES**

**PRETRIAL ORDER NO. 15**

**CONSENT ORDER REGARDING THE PRESERVATION OF DOCUMENTS AND
ELECTRONICALLY STORED INFORMATION**

The Parties having conferred, consented, stipulated and agreed to entry of the within

Consent Order, and good cause appearing therefore, Paragraph 13 of Pretrial Order No. 1

relating to preservation of evidence is modified, and it is hereby **ORDERED,** as follows:

## I.  **GENERAL**

This Order governs the preservation of potentially relevant documents, data, and

tangible things within the Parties' possession, custody and/or control relevant to claims and

defenses in the cases that have been consolidated before this Court, and with respect to every

action that may in the future be transferred to this Court that involve claims of personal injury

from use of the pharmaceutical product Xarelto® (collectively "the Litigation" or the "Action").

The preservation obligations set out herein are explicitly intended to be reasonable in scope and

to be interpreted and applied in a manner consistent with the factors set forth in Rule 26.

## II.   **DEFINITIONS**

**A.**     As used herein, "Documents, Data, and Tangible Things" shall be interpreted broadly to include electronically stored information ("ESI") on hard drives, USB or thumb drives, databases, computers,  floppy disks, CD-ROM, magnetic tape, optical disks, or other devices for digital data storage or transmittal; as well as writings, records, files, correspondence, reports, memoranda, calendars, diaries, minutes, E-mail, telephone message records, hard drives, removable computer storage media such as tapes, discs and cards, printouts, document image files, Web pages, databases, spreadsheets, books, ledgers, journals, orders, invoices, bills, vouchers, checks statements, worksheets, summaries, compilations, computations, charts, diagrams, powerpoints or other demonstrative media, graphic presentations, drawings, films, charts, digital or chemical process photographs, video, phonographic, tape or digital records and any transcripts thereof, drafts, jottings and notes, studies or drafts of studies or other similar such  material.  Information which serves to identify or locate such material, such as file inventories, file folders, indices, and metadata, are also included in this definition.

**B.**      The Parties will continue to meet and confer regarding the obligation on all parties to preserve voicemail, instant messages sent or received on an instant messaging system, or text messages sent or received on a cellular phone, smartphone, tablet or other mobile device.

**C.**     In order to not unduly interfere with business needs relating to the replacement or upgrade of equipment, no Defendant is obligated to preserve hardware on which data that is required to be preserved resides, so long as such data and associated metadata has first been preserved in an accessible form on another hardware device.  Plaintiff's obligations and options as to retention of hardware are set forth in Paragraph V.

D.      As used herein, and consistent with the factors set forth in Rule 26, preservation shall be reasonably interpreted to accomplish the goal of maintaining the integrity of documents, data, and tangible things relevant to claims or defenses in this action and shall include taking reasonable steps to prevent the partial or full destruction, alteration, shredding, or deletion of such materials.  Electronic documents and data will be maintained and preserved in their native format, except as authorized by Paragraph V below.  To the extent a party may desire to change the format of preserved materials other than format changes effected in the normal course of business or operations where the change would affect the usability or accessibility of the materials in this Litigation, such party will consult with other parties before making any change.  The parties shall be under an obligation to notify the Court and the parties should it be determined that any documents, data or tangible things subject to this order have been lost, deleted, destroyed, damaged, altered, corrupted, or otherwise affected such that preservation of such evidence either at all or in its original form has been hindered.

III.     As used herein the terms, "Xarelto®" means Defendants' anticoagulant product containing rivaroxaban marketed under the trade name Xarelto® or any other trade name that is or will be used.  Defendants are not obligated to preserve materials relating to any other products, except for the following: (a) materials relating to any reversal agent or antidote for Xarelto (or for any product containing rivaroxiban); (b) materials relating to any other products containing rivaroxaban, whether currently on the market or in development; (c) materials within the custody or control of Defendants relating to any product, device, method and/or assay, that is manufactured, designed, developed and/or discussed by any entity, including, but not limited to the defendants, that is  used, intended and/or designed to evaluate and/or measure (quantitatively and/or qualitatively) the concentration of rivaroxaban in a rivaroxaban treated patient and/or the

anticoagulant effect(s) of rivaroxaban in a rivaroxaban treated patient; and (d) materials relating to market research, comparative or competitive research or analysis, market or scientific comparison or market surveillance (including the tracking, review and analysis of medical or scientific literature) of dabigatran (Pradaxa), apixaban (Eliquis) or any other new oral anticoagulant (commonly referred to as "NOACs") and/or their reversal agents, warfarin (Coumadin), fondaparinux (Arixtara) or enoxaparin sodium (Lovenox) to the extent such data was created or collected in connection with Xarelto or any potential reversal agent or antidote for Xarelto.

**IV.      GENERAL PRESERVATION OBLIGATIONS**

Consistent with the factors set forth in Rule 26, all Parties shall take reasonable steps to ensure the preservation of documents, data, and tangible things relevant to claims or defenses in this Litigation.  For Defendants, this shall include the dissemination of Legal Hold Notices to Defendants' employees and/or departments reasonably believed to possess such material. Further, Defendants shall notify any third parties or independent contractors who Defendants are aware have custody and control over relevant information of the preservation obligations or provide notice to the Plaintiffs' Steering Committee so that appropriate subpoenas may be issued.  The PSC shall first provide to Defendants a list with reasonably specific descriptions of the subject matters as to which Defendants will investigate to determine the identity of such third parties or independent contractors.

The Parties' preservation obligations extend not just to evidence generated on or after this date but evidence in existence on this date no matter when created.  Furthermore, the Parties shall disable any auto-delete features in use as to any system or device to the extent reasonably known and necessary to preserve materials subject to this Order and, with respect to Defendants,

shall terminate or indefinitely suspend deletion policies and schedules for all employees and/or departments likely to possess information relating to Xarelto defenses and the claims at issue in this Action to the extent necessary to preserve materials subject to this Order.

## V.   OBLIGATIONS FOR INDIVIDUAL PERSONAL INJURY PLAINTIFFS

The preservation activities set forth in this section shall fully satisfy the preservation obligations of the individual personal injury Plaintiffs in the Litigation:

A.   Preserve all potentially relevant documents, data, and tangible things in their possession or control concerning Xarelto, including all Xarelto labels, bottles, product packaging, and containers, of any kind.

B.   Preserve any documents, data, and tangible things relating to their use of Xarelto or their alleged injuries at issue in this litigation that are stored on the hard drive of a computer owned or controlled by the Plaintiff.  This obligation does not require a plaintiff to copy or create a duplicate image of the hard drive.  Plaintiff's obligation is fulfilled if the relevant ESI and documents are retained on the hard drive, however, if the computer is replaced the Plaintiff will, at Plaintiff's sole option, retain the old computer hard drive, create an accessible electronic copy of the hard drive, or create and maintain complete hard copies of any such documents that were saved to the hard drive, in order to satisfy Plaintiff's preservation obligation.  If a Plaintiff chooses to create hard copies rather than maintain the hard drive, the Plaintiff will contemporaneously prepare a statement that all ESI relating to her use of Xarelto was printed to paper, that the ESI was not altered prior to printing, a description of the general nature of the documents/data that were printed, and the date(s) on which this was performed.  Plaintiff will provide the statement to her counsel.

C.   Preserve any documents relating to Plaintiff's use of Xarelto or their alleged injuries at issue in this litigation that are stored on any removable media owned or controlled by the Plaintiff.  This obligation does not require a Plaintiff to copy or create a duplicate image of the media.  Plaintiff's obligation is fulfilled if the relevant documents are retained on the media or Plaintiff creates and maintains complete hard copies of any documents on the media.  If a Plaintiff chooses to create hard copies rather than maintain the hard drive, the Plaintiff will contemporaneously prepare a statement that all ESI relating to her use of Xarelto was printed to paper, that the ESI was not altered prior to printing, a description of the general nature of the documents/data that were printed, and the date(s) on which this was performed.  Plaintiff will provide the statement to her counsel.

D.   Preserve all medical and pharmacy records in their possession or control and records of medical expenses allegedly incurred in connection with use of Xarelto.

## VI.   ACCEPTABLE METHODS OF PRESERVATION

The preservation activities set forth in this section shall fully satisfy the preservation obligations of the Defendants, and with respect to any other corporation or organization that may become a party to this Litigation in the future.  Individual personal injury plaintiffs' obligations are governed by Paragraph V, above, and this section is not applicable to such plaintiffs.  A Defendant may select any of the alternative methods set forth under each sub-section A through C as the means to preserve documents or data and the decision as to which method to use is at the sole judgment of the Defendant.

### A.  E-mail

Defendants shall preserve e-mail communications, including all associated metadata and associated attachments relevant to claims or defenses in this action (1) by maintaining such email files on a server or within an electronic archive that is not subject to a deletion schedule, or (2) by creating an electronic snapshot of implicated email on servers, or (3) by maintaining one set of backup tapes for implicated email servers.

### B.  Databases

Defendants shall preserve data relevant to claims or defenses and held in databases (1) by maintaining such data in accessible electronic systems that are not subject to a deletion schedule, or (2) by creating an electronic snapshot of relevant database servers or an export of relevant data on database servers, or (3) by maintaining one set of backup tapes for relevant database servers.

### C.  Electronic documents contained in Shared or Home Directories

Where electronic documents relevant to claims or defenses in this action and located in shared or home directories (e.g., word processing documents, spreadsheets, and PowerPoint presentations) are subject to a deletion schedule, the parties shall preserve such documents by (1) maintaining such directories and files contained therein in accessible electronic systems that are not subject to a deletion schedule, or (2) by creating an electronic snapshot of relevant shared drive or home directory servers, or (3) by maintaining one set of backup tapes for relevant servers.

## VII.   RESERVATION OF RIGHTS

The Parties do not concede that any of the information subject to this Consent Order is discoverable, relevant, or admissible, and the Parties expressly reserve the right to challenge any specific discovery request concerning any such information.  The Parties also reserve the right to challenge the competency, relevance, materiality, privilege, and/or admissibility into evidence of such documents, information, or material in these or any subsequent proceedings or at the trial of these or any other actions, in this or any other jurisdiction.

**IT IS SO ORDERED.**

New Orleans, Louisiana this 4th day of May, 2015.

_____
Honorable Eldon E. Fallon
United States District Court

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)      \*      **MDL NO. 2592**
**PRODUCTS LIABILITY LITIGATION**

                                            \*      **SECTION L**

                                            \*      **JUDGE ELDON E. FALLON**

                                            \*      **MAG. JUDGE NORTH**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**THIS DOCUMENT RELATES TO ALL CASES**

**PRE-TRIAL ORDER NO. 16**
**(Filing Requests for Summons and Summons Returns)**

The Court notes that numerous requests for summons and summons returns have recently been filed in the master docket for MDL 2592, 14-md-2592.  These filings have added an unnecessary amount of clutter in the master docket.  Accordingly,

**IT IS ORDERED** that requests for summons shall be filed in the docket for the **member case**, as opposed to the master docket.  The Clerk of Court shall make the necessary adjustments to CM/ECF to permit such filings.

**IT IS FURTHER ORDERED** that summons returns and waivers returned executed shall **not** be filed into any docket, master or member, unless filing the summons return becomes necessary (for example, in connection with a motion for default judgment).  When it is necessary to file a summons return, the attorney shall avoid filing the summons return as a separate, stand-alone document in the master docket.  Instead, the summons return shall be filed as an exhibit to the motion, etc., to which it relates.

New Orleans, Louisiana this 4th day of May, 2015.

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN) : MDL NO. 2592
  PRODUCTS LIABILITY LITIGATION :
            : SECTION L
**THIS DOCUMENT RELATES TO ALL CASES** :
            : JUDGE FALLON
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . : MAG. JUDGE NORTH

### PRETRIAL ORDER NO. 17
### (Electronic Service/MDL Centrality for Plaintiffs Only)

The Plaintiffs' Steering Committee and Plaintiffs' Liaison Counsel have agreed to use the BrownGreer MDL Centrality system to distribute pleadings and discovery documents to plaintiffs' counsel in *In re: Xarelto (Rivaroxaban) Products Liability Litigation*, MDL No. 2592 ("MDL 2592").  Defendants have not agreed to use the MDL Centrality system for pleadings or discovery documents; and, therefore, Defendants shall not, in any way, have access to or use the MDL Centrality system for pleadings or discovery documents, and thus Defendants must be served and continue to serve pursuant to the Federal Rules of Civil Procedure.

IT IS HEREBY ORDERED AS FOLLOWS:

1. In order for Plaintiffs to facilitate case management, document retrieval, case organization and expeditious, efficient and economical communication by and amongst counsel and the Court,  the Plaintiffs in MDL 2592 will utilize the services of BrownGreer MDL Centrality ("MDL Centrality") for providing electronic service, storage and delivery of court-filed and discovery related  documents through a secure website.

2. All attorneys of record for Plaintiffs in this litigation on whom service of documents must be effectuated shall, within ten days of the entry of this Order, or within ten days of the entry of appearance for a new attorney of record for any Plaintiff, or the

docketing of their transferred case, whichever occurs earliest, (1) obtain an e-mail address and access to the Internet's World Wide Web (the "Web") if they do not have an e-mail address and Web access; (2) forward to Plaintiffs' Co-Liaison Counsel (Leonard A. Davis and Gerald E. Meunier) at PLC@mdl2592.com a fully completed "MDL 2592 Counsel Contact Information Form," as required by Pretrial Orders 4 and 4(A) and forward a copy to BrownGreer at jswoody@browngreer.com, and (3) sign up for electronic service in this litigation by registering with the BrownGreer MDL Centrality system by going to https://www.mdlcentrality.com/MDL2592, clicking the "Register as a Law Firm" button, and following the instructions on how to register.

3.    Within five business days of the entry of this order, Plaintiffs' Co-Liaison Counsel shall provide MDL Centrality with the then current service list of Plaintiffs' counsel in the MDL 2592 via email to jswoody@browngreer.com.

4.    Within five business days of the entry of this order, representatives of MDL Centrality shall meet and confer with the Clerk of Court for the United States District Court, Eastern District of Louisiana, to obtain a listing of all cases filed in MDL 2592, which listing should include the case names and number, original jurisdiction where filed, party name, party type, attorneys' names, firm names and addresses, phone numbers and e-mail addresses for each case in MDL 2592.

5.    Until such time as BrownGreer advises Plaintiffs' Co-Liaison Counsel that the MDL Centrality system is in place, Plaintiffs' Co-Liaison Counsel is responsible for updating the service lists on a weekly basis and serving documents in accordance with Pretrial Order 2.

6.      The Clerk of Court shall execute the steps necessary to include BrownGreer as the MDL Centrality Administrator as an interested party for purposes of receiving emailed ECF notifications related to this matter.

7.      MDL Centrality's system will upload all documents (all references to "document" include exhibits, if any) in Adobe PDF electronic format onto an Internet website maintained by MDL Centrality, which is privately funded by the Plaintiffs' Steering Committee in MDL 2592, where Plaintiffs' counsel of record who are registered users of the MDL Centrality system may access the copy.

8.      Once a document is uploaded and submitted electronically, MDL Centrality shall send an e-mail to all registered users notifying them that the document has been posted to  its Website (unless such registered user has declined to receive e-mails).

9.      Unless another Order of this Court specifies a different method for service  upon Plaintiffs' counsel, any document electronically served via MDL Centrality pursuant to this Order shall  be deemed to have been served under the Federal Rules of Civil Procedure.

10.     Any documents served pursuant to this Order shall be deemed to be served pursuant to Federal Rule of Civil Procedure 5.

11.     Only registered users of MDL Centrality will be able to access the MDL 2592 cases hosted online with MDL Centrality. Registered users will include Plaintiffs' counsel of record for any party in the consolidated MDL 2592.  No counsel other than a counsel for a plaintiff in Xarelto MDL cases shall be allowed to register or have access to the MDL Centrality system. Upon registration, MDL Centrality will provide each registered user with a username and password to access the MDL Centrality system.

12.     MDL Centrality shall perform all administrative functions to the system. Once initially registered, MDL Centrality shall be responsible for the registration and confirmation of all contact information for registered users. After initial enrollment/registration, it shall be the responsibility of the registered users to keep current their contact information by noting any changes directly on the MDL Centrality Website.

13.     All registered users shall be bound by any Confidentiality and Protective Orders that this Court may issue, as well as the terms and conditions for the use of the MDL Centrality system which includes adherence to the terms and conditions of the MDL Centrality Administrative Agreement. MDL Centrality will also be bound by the terms of said Confidentiality and Protective Orders.

14.     The MDL Centrality system shall contain an index of all served documents for the MDL 2592 litigation that is searchable and able to be sorted according to methods that provide useful 24 hour/seven day a week access to the documents via the Web.

15.     Service of Pleadings, Orders and Motions: Once BrownGreer advises Plaintiffs' Co-Liaison Counsel that the MDL Centrality system is in place, Plaintiffs' Co-Liaison Counsel will notify all Plaintiffs' counsel that have provided Counsel Contact Forms pursuant to Pre-Trial Orders 4 and 4(A). Upon such notice by Plaintiffs' Co-Liaison Counsel, Plaintiffs' Co-Liaison Counsel is no longer required to serve and distribute pleadings, orders, and motions on attorneys of record, as required by this Pre-Trial Order.

16.     Upon notice provided in accordance with paragraph 15 above, all service of documents on Plaintiffs' counsel filed in the MDL shall be made via MDL Centrality.

Plaintiff Attorneys who fail to register will no longer receive service of documents filed in the MDL.

17.    <u>Service of Discovery in Individual Cases</u>:  Discovery requests and responses that are not to be filed with the Clerk of Court (notices of depositions[*], interrogatories, requests for documents or tangible things or to permit entry onto land, and requests for admission) pursuant to Federal Rules of Civil Procedure 5(d)(1), shall be served electronically on Defense Lead Counsel, Susan Sharko (susan.sharko@dbr.com) and Steven Glickstein (sglickstein@kayescholer.com); and Plaintiffs' Lead Counsel, Brian Barr (bbarr@levinlaw.com) and Andy Birchfield (Andy.Birchfield@BeasleyAllen.com); as well as Defendants' Liaison Counsel, James Irwin (jirwin@irwinllc.com) and John Olinde (olinde@chaffe.com), and Co-Plaintiffs' Liaison Counsel, Gerald Meunier (gmeunier@gainsben.com) and Leonard Davis (ldavis@hhklawfirm.com).  In addition, all such requests and responses shall be uploaded in the MDL Centrality system.  The documents shall be uploaded into the MDL Centrality system by the individual plaintiff counsel and shall be titled to clearly identify (1) the name of the filing/uploading party, (2) the precise title of the discovery, (3) the date the discovery was uploaded to the MDL Centrality system, (4) the date the discovery was transmitted to Defendants' counsel in accordance with the Federal Rules of Civil Procedure, and (5) shall be uploaded only to those cases related to the discovery filing.  If the uploaded discovery only relates to a single individual case, it shall only be uploaded into that individual case.  However, if the uploaded discovery relates to a multi-party lead or master case, it shall be uploaded into the master case.  Nothing herein relieves Plaintiffs from filing

---

[*] Notices of depositions are not to be filed with the Court.

and serving discovery requests and responses on defense counsel as required under Federal Rules of Civil Procedure 5(d)(1).

18.    Certificate of Service for All Plaintiffs Serving Documents:    When serving documents, all Plaintiffs' counsel must use a uniform certificate of service in the form set out herein:

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing [*insert name of document*] has contemporaneously with or before filing been served on all parties or their attorneys in a manner authorized by FRCP 5(b)(2), Local Rule 5.1 of the Eastern District of Louisiana and via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

19.    This  Order shall supplement Pre-Trial Order No. 2.

New Orleans, Louisiana this 20th day of May, 2015

_____
ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL NO. 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAG. JUDGE NORTH |

* * * * * * * * * * * * * * * * * * * * *

THIS DOCUMENT RELATES TO ALL CASES

## PRETRIAL ORDER NO. 18
### Science Day

On June 11, 2015, the Court will hold "Science Day" to provide the Court with an overview of the medical and scientific issues associated with the medicine Xarelto® in an objective format without advocacy.   Given the early stage of the litigation and discovery and to avoid duplication in presentation, the parties have agreed to the following ground rules to educate the Court on the basic issues in a non-adversarial manner and govern Science Day:

1.     The parties have agreed that the topics to be discussed at Science Day include:  a background on atrial fibrillation, a background on coagulation and anticoagulation therapy, anti-coagulation therapy before the Novel Oral Anti-Coagulants or NOACs, the approved indications and mechanism of action of Xarelto, clinical practice with Xarelto, adverse events with Xarelto, clinical trials pertaining to Xarelto, the use of blood test based dosing with Xarelto, and Xarelto pharmacology.

2.     The Science Day presentations will be "off the record" without a court reporter and shall not be used or admissible for any purpose in the litigation other than for

the Court's benefit to gather informal knowledge at Science Day.  The Parties shall provide the Court with copies of the presentations on or before June 5, 2015 but will not share the presentations with each other.

3.    The presentations shall be made by physicians and scientists.  The presenters will not be questioned by each other or opposing counsel.  The Court will have the opportunity to ask questions of the experts as the Court deems appropriate.

4.    The format will be lecture-style presentations that incorporate the use of PowerPoint presentations or other demonstrative visuals.  The Parties will be allowed to lead the experts through a modified direct format to focus the lecture presentation.

5.    The total length of time that will be allotted to Science Day shall be approximately three and a half hours, as broken down by the following schedule:

   a.    Science Day will commence at 9:00am;

   b.    Defendants will proceed on all topics from 9:00am to 10:45am;

   c.    Plaintiffs will proceed on all topics from 11:00am to 12:15pm;

   d.    Final questions from the Court – 12:15 to end

NEW ORLEANS, LOUISIANA this 20th day of May, 2015

_____

UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)     *    **MDL NO. 2592**
PRODUCTS LIABILITY LITIGATION   *

                             *    **SECTION L**

                             *
                             *    **JUDGE ELDON E. FALLON**
                             *
                             *    **MAG. JUDGE NORTH**

**********************************************

**THIS DOCUMENT RELATES TO ALL CASES**

**PRETRIAL ORDER NO. 19**
**(Protocol for Treatment of Privileged and Work Product Materials)**

       This Order shall govern the treatment of all privileged or work product materials in MDL 2592. This Order applies equally to all parties, who for the purposes of below shall be designated as either the "Producing Party" or the "Receiving Party."

**<u>Privilege Log Production</u>**

       1.     Any document falling within the scope of any request for production or subpoena that is withheld on the basis of a claim of privilege, work product, or any other ground is to be identified by the Producing Party in a privilege log, which the Producing Party shall produce in an electronic format (i.e., Excel format) that allows text searching, sorting, and organization of data. The documents that are produced with redactions based on a claim of privilege shall be Bates numbered using the same Bates numbering format agreed to by the parties for regular document productions, and shall be listed on the Producing Party's privilege log in Bates order. The documents withheld from production based on a claim of privilege will have a unique identifying number assigned to each document on the privilege log. The Producing Party shall produce a privilege log within thirty (30) days after the production of documents for which privilege is asserted to apply. A Party shall produce a master privilege log in Excel format which

1

shall be updated with each additional privilege log relating to a subsequent production.  The log shall have a field that contains the date of the production (or Production Number) to which the individual log entry relates.  The log will have two tabs, one providing information as to documents withheld from production and one providing information for documents that were produced with redactions of privileged information.

2.     For each document that a Producing Party asserts that a privilege applies, the Producing Party must include in the privilege log the information required by Federal Rule of Civil Procedure 26(b)(5) and other identifying information, including the following:

    a.   the Bates number(s) of the document claimed to be privileged if produced in a redacted form, and a unique identifying number for documents withheld on a claim of privilege;

    b.   a description of the nature of the document, communication or tangible thing not disclosed or produced in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim;

    c.   the date of the document or communication;

    d.   the subject/title and document type unless the subject/title itself contains privileged information in which case a reasonably objective "substitute" subject/title will be provided in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim;

    e.   the identity of its author and signatories and to whom it was sent and any other to whom it was disseminated;

    f.   indication (e.g., with an asterisk) of which individual(s) (authors and recipients) are attorneys or paralegals;

g.   - the name of or other identifying information as to the produced source file in which the document subject to a privilege claim was found; and

h.    the log will contain two tabs, one as to documents produced in redacted form and a separate tab as to documents withheld from production, so that each category can be readily identified;

3.      Notwithstanding the assertion of an objection, any purportedly privileged document containing non-privileged matter must be disclosed with the purportedly privileged portion redacted, with the redacted portion indicated on the document itself and listed on the privilege log to be provided pursuant to Paragraph 1 above.

4.      To assist in the prompt resolution of disputed claims of privilege, upon request by the Court, the Producing Party shall submit to the Court under seal, un-redacted copies of all documents for which it asserts a privilege.

**List of Individuals Identified on Privilege Logs**

5.       At the time it produces any privilege log, the Producing Party shall also produce a separate list of individuals identified on the privilege log.  This list shall include: a) in alphabetical order (by last name, then first name) all individuals identified on the privilege log, b) any aliases for such individuals, c) the job title of each individual listed, and d) the employer of each individual.   This list shall be produced by the Producing Party in an electronic format (e.g., excel format) that allows text searching, sorting, and organization of data, and shall be produced in a cumulative manner, so that each subsequent list includes individuals from prior lists.   The Producing Party will honor subsequent reasonable requests to identify whether a specific individual is not currently employed by the same employer as reflected on the log pertaining to employment at the time of the communication, but the Producing Party is not

required to provide such information in the log or on a wholesale basis.

**Inadvertent Production of Privileged Materials**

6.     In the event that a Producing Party claims that it inadvertently failed to designate as such any production materials or other information as privileged or work product, after discovery of the inadvertent production it shall promptly notify all parties to whom such privileged material was produced or disclosed of the Producing Party's intent to assert a claim of privilege or work product over such materials.

7.     Upon such notice, and consistent with Federal Rule of Civil Procedure 26(b)(5)(B), the Receiving Party, if it intends to challenge the designation of the document, shall promptly sequester all copies of the document, pending Court resolution of the challenge, and shall view the document only to the extent necessary to challenge the privilege claim.  The Receiving Party shall file and serve any motion challenging the claim of inadvertent production and/or the underlying claim of privilege within thirty (30) days receipt of notice of the claim of inadvertent production.

8.     If the Receiving Party agrees that the document is properly designated as privileged, consistent with the Federal Rule of Civil Procedure 26(b)(5)(B), the Receiving Party shall promptly refrain from further copying or distribution of the subject materials, return or destroy all copies of the document including reasonable steps to retrieve all copies that have been distributed to counsel or non-parties, and destroy the portion of any work product that describes or contains the content of the subject materials.

     a.     Where the parties agree, or the Court orders that, an inadvertently produced document is protected by the attorney-client, work product, or other privilege, and such document was originally produced in electronic format on

4

media containing production materials that are not subject to any exemption from production, the Producing Party shall promptly provide replacement production media to the Receiving Party.

9.     The inadvertent production by any Producing Party, whether in this Action or in any other proceedings, of materials subject to a claim of privilege or work product shall not result in a waiver of any such protection in this Action for the produced materials or for any other privileged or immune materials containing the same or similar subject matter.  Nor shall the fact of an inadvertent production by any party in this Action be used as a basis for arguing that a claim of privilege or work product has been waived in any other proceeding.

10.    Nothing in this Order shall relieve counsel for any Receiving Party of any existing duty or obligation, whether established by case law, rule of court, regulation or other source, to return, and not to review, any privileged or work product materials without being requested by the Producing Party to do so.  Rather, in the event a Receiving Party becomes aware that it is in possession of what appears to be an inadvertently produced privileged document – which the Receiving Party does not intend to challenge, then counsel for the Receiving Party shall immediately: (i) cease any further review of the Inadvertently Produced Privileged Document; (ii) notify Producing Party of the inadvertent production;  (iii) promptly return or destroy all copies of the inadvertently produced privileged document in its possession and destroy the portion of any work product that describes or contains the content of the subject materials; and (iv) take reasonable steps to retrieve all copies of the inadvertently produced privileged documents distributed to other counsel or non-parties.

**Challenges to Privilege and/or Work Product Claims**

11.    A Receiving Party may challenge a redaction or claim of privilege or work

product at any time after the document or a privilege log identifying the document subject to such redaction or claim is produced.  A Receiving Party may challenge a Producing Party's redaction or designation of privilege or work product by notifying the Producing Party in writing of its challenge to the redaction, privilege claim or work product claim.

12.     Thereafter, the Producing Party shall have ten (10) days to review the redacted or designated material, to consider the circumstances, and to meet and confer with the Receiving Party.  If no resolution can be reached after the ten (10) day period, the Receiving Party may file and serve a motion that challenges the redaction or claim of privilege or work product.  The Producing Party shall have thirty (30) days to file and serve a response to the motion unless the parties agree to a shorter time or the Court orders a different time period.  The burden of proof in connection with any such motion shall be on the Producing Party.

New Orleans, Louisiana this 3rd day of June, 2015.

**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)   MDL NO. 2592
PRODUCTS LIABILITY LITIGATION

            SECTION L
            JUDGE ELDON E FALLON
            MAG. JUDGE NORTH

<u>PRETRIAL ORDER NO. 20</u>

<u>CONSENT ORDER REGARDING THE FORMAT FOR PRODUCTION OF</u>
<u>HARDCOPY DOCUMENTS AND ELECTRONICALLY STORED INFORMATION</u>

   The Parties hereby agree to the following protocol for production of electronically stored information ("ESI") and paper ("hardcopy") documents. This protocol, subject to the Protective Order in this litigation, governs all production in this litigation. Nothing in this protocol shall limit a party's right to seek or object to discovery as set out in applicable rules or to object to the authenticity or admissibility of any hardcopy document or ESI produced in accordance with this protocol. The Parties having conferred and agreed to entry of the within Consent Order, and good cause appearing therefore, it is hereby **ORDERED,** as follows:

### A.  <u>GENERAL AGREEMENTS</u>

1.  <u>Discovery Costs</u>

   This protocol does not address who will bear the expense associated with responding to discovery requests which a party believes are unduly burdensome. If a party believes that any discovery request is unduly burdensome, the parties will meet and confer concerning the potential expense, and if they cannot resolve the matter, then each party expressly reserves their rights to seek reimbursement.

2.  <u>Designated ESI Liaison</u>

   Each Party shall designate one or more individuals as Designated ESI Liaison(s) for purposes of meeting and conferring with the other Parties and of attending Court hearings on the subject of relevant ESI. The Designated ESI Liaison or their designee shall be reasonably prepared to speak about and explain the Party's relevant electronic systems and capabilities and the technical aspects of the manner in which the Party has responded to e-discovery, including (as appropriate) relevant ESI retrieval technology and search methodology.

3.  <u>No Designation of Document Requests</u>

   Productions of hardcopy documents and ESI in the reasonably usable form set out in this protocol need not include any reference to the document requests to which a document may be

responsive.  However, upon reasonable request and on a case-by-case basis, a Producing Party will provide a Bates range and/or source file where a particular set of materials can be found in their production.

4.      Ongoing Cooperation among the Parties

The Parties agree to continue to consult and cooperate reasonably as productions occur, to discuss, as appropriate, legitimate questions that arise out of the productions, including issues (if any) pertaining to poor image quality or pages out of sequence; the existence of proprietary software or manuals, including third party software and manuals; and other issues.

5.      Avoidance of Duplicate Production

A Producing Party shall take reasonable steps to de-duplicate ESI horizontally and/or globally. "Duplicate ESI" means files that are exact duplicates based on the files' MD5 or SHA-1 hash values. Entire document families may constitute Duplicate ESI. De-duplication shall not break apart families.  A document within a family (such as an email attachment) shall not be considered a duplicate of a stand-alone document even if the hash values are the same, and a copy of both the document family and the stand-alone document will be produced. The Producing Party otherwise may produce only a single copy of responsive Duplicate ESI, and shall indicate the source files that contained the Duplicate ESI in the All Custodians field in the load file accompanying each production.  The Producing Party shall provide an overlay file to allow the Receiving Party to update the All Custodians field.  The overlay file will be provided at the time of each production and will identify all source files that contained a previously produced Duplicate ESI, including the identity of any new source files in the subject production that contained the previously produced Duplicate ESI.  The Producing Party will not use e-mail threading as a method of de-duplication.

6.      Non-Discoverable ESI.

The following categories of ESI are not subject to preservation and are not discoverable:

i.      Deleted, "slack," fragmented, or unallocated data on hard drives;

ii.     Random access memory (RAM) or other ephemeral data;

iii.    On-line access data such as (without limitation) temporary internet files, history files, cache files, and cookies;

iv.     System, network, server, or software application logs;

v.      Structural files not material to individual document contents (e.g. .CSS, .XSL, .XML, .DTD, etc.).

7.      Test Load File.

The producing party will send a small test load file at the onset of the first document production to test parameters discussed within this format of production document.

## B.   ELECTRONICALLY STORED INFORMATION

1.   <u>Production in Native and TIFF-Image Format.</u>

a.     Electronic spreadsheets (*e.g.*, Excel), electronic presentations (*e.g.*, PowerPoint), desktop databases (*e.g.*, Access), audio/video multimedia and JPEG files that have been identified as responsive shall be produced in native format, unless they are authorized to be redacted in accordance with this Protocol and PTO No. 12. After such redactions, the Producing Party either shall produce the redacted file in TIFF format, with extracted or OCR text files and the associated metadata set out in Attachment A or shall produce the redacted copy in native format as agreed to by the Parties.

b.     Word documents (*e.g.,* Microsoft Word) and PDF documents shall be produced in both native format (unless they are authorized to be redacted in accordance with this Protocol and PTO No. 12) and TIFF-image format, with extracted or OCR text files and the associated metadata set out in Attachment A, which is incorporated in full in this Protocol.  Where available, extracted text will be provided for any electronic document that does not have redactions.  Redacted files shall be produced in TIFF format with OCR text.  TIFF-image Word and PDF documents endorsed with a Bates number and protected designation, if any, shall be used by all parties at depositions, at trial, or any other proceedings, and TIFF-image Word and PDF documents shall be provided to any consultants or experts.  As to Word or PDF color documents, or Word documents with tracked changes in color, parties using such documents in depositions or other court proceedings may use the native format document, but must mark into the record both the TIFF-image format document with Bates number and protected designation, if any, as well as the native format document with attached slip sheet containing the Bates number and protected designation.

c.     E-mails and other document types not identified above shall be produced in TIFF-image format with extracted or OCR text files and the associated metadata set out in Attachment A.  Where available, extracted text will be provided for any electronic document that does not have redactions.  OCR text will be provided for paper documents or electronic documents with redactions.

d.     Except as otherwise stated in this Protocol, no other ESI need be produced in native format, unless the Receiving Party, for good cause explained in the request, seeks production of specifically identified ESI in native format and unless the Producing Party agrees to the request. The Producing Party shall respond reasonably and in good faith to any such request.

2.   <u>Additional Procedures for Native Format Files</u>

Any Party seeking to use, in any proceeding in this litigation, files produced in native format shall do so subject to the following: The slip sheet provided by the producing party containing the Bates number and confidentiality designation, if any, must be prepended to an image of the native file used. Any party using native format files for any reason during the course of the litigation, for instance as an exhibit at a deposition or at trial, as an exhibit for a motion, or documents given to any experts or consultants, is responsible for ensuring that the slip

sheet associated with each native format file is prepended to the file prior to its use.  Use of a file in native format, or use of a TIFF image or hardcopy document representing the original native-format file shall constitute a representation that the file being used is an accurate, unaltered and complete depiction of the original native-format file.

3.     Redactions.

The Producing Party may redact, from any TIFF image, metadata field, or native file, information that is protected from disclosure by applicable privilege or immunity, that is governed by the European Data Privacy Directive, German Data Privacy Law[1] or other applicable privacy law or regulation, or that contains non-responsive information concerning products or matters unrelated to Xarelto® including:

  i.     The names, street addresses, Social Security numbers, tax identification numbers, and any other personal identifying information of patients, health care providers or other voluntary reporters reporting specific adverse advents, and individual patients participating in clinical studies or referenced in adverse event reports. Other general information that does not identify the person, however, such as patient or health care provider numbers, shall not be redacted unless required by state or federal law.  To the extent a plaintiff's name is contained in any of these documents, a copy of the documents that have not had the plaintiff's information redacted may be produced directly to counsel for said plaintiff;

  ii.    Business and proprietary information relating to products manufactured or marketed by the named Defendants other than Xarelto® that does not also relate to Xarelto®.  For purposes of the preceding sentence, information concerning the following will be considered to relate to Xarelto® and shall not be redacted:  (a) materials relating to any reversal agent or antidote for Xarelto (or for any product containing rivaroxiban); (b) materials relating to any other products containing rivaroxaban, whether currently on the market or in development; (c) materials within the custody or control of Defendants relating to any product, device, method and/or assay, that is manufactured, designed, developed and/or discussed by any entity, including, but not limited to the defendants, that is  used, intended and/or designed to evaluate and/or measure (quantitatively and/or qualitatively) the concentration of rivaroxaban in a rivaroxaban treated patient and/or the anticoagulant effect(s) of rivaroxaban in a rivaroxaban treated patient; and (d) materials relating to market research, comparative or competitive research or

---

[1] Pursuant to Article 8 of the European Data Privacy Directive, "the processing of personal data revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union membership, and the processing of data concerning health or sex life" is prohibited.  This is different from production of information that has "personal data", defined in these laws as any document that identifies an individual or by recourse to other information could allow identification of an individual.  An example is an email of a German employee because it identifies individuals.  If produced as relevant and non-privileged, the content and "personal data" (e.g. sender and recipients) would not be redacted for the reason expressed above.  Rather the document would be designated Protected under the Protective Order.

analysis, market or scientific comparison or market surveillance (including the tracking, review and analysis of medical or scientific literature) of dabigatran (Pradaxa), apixaban (Eliquis) or any other new oral anticoagulant (commonly referred to as "NOACs") and/or their reversal agents, warfarin (Coumadin), fondaparinux (Arixtara) or enoxaparin sodium (Lovenox) to the extent such data was created or collected in connection with Xarelto or any potential reversal agent or antidote for Xarelto.

iii.     Social Security numbers, passwords, telephone conference line numbers, tax identification numbers and other private personal information of employees or other persons in any records.

To the extent that the Producing Party redacts documents or portions thereof, the redaction shall state on the face of the document a designation: "Redacted:  Relevance" or "Redacted: Privilege" or a similar designation setting forth the general basis of the redaction. The Producing Party shall also provide a field in the load file that reflects whether a document has any redaction and, if so, the general type(s) of redaction on the document.  Documents in families that would be entirely redacted consistent with these provisions will be replaced by a ship sheet containing a statement that the document has not been produced because it would be redacted in its entirety. To the extent practical, if information in a document is redacted because it does not relate to Xarelto®, the Producing Party will endeavor to leave in headings or similar non-substantive information concerning the redacted information to facilitate identification of the general nature of the non-relevant information.

The foregoing provisions concerning redactions are production guidelines designed to facilitate the prompt production of potentially relevant discovery material and to minimize pre-production disputes and motion practice concerning the treatment of discovery material.  Nothing in the foregoing paragraph shall be construed as a waiver by the Receiving Party of any right to seek an order for good cause shown compelling production of information redacted pursuant to this Order nor restrict a Producing Party's right to object or otherwise seek protection from the Court concerning any such request. The parties shall meet and confer before engaging in any motion practice with respect to this paragraph.

Further, nothing in this paragraph precludes the Receiving Party from challenging any redaction set out above pursuant to Paragraphs 13 and 14 of Pretrial Order No. 12.

4.     <u>Color Copies</u>

Each Party may make requests, for good cause, for production of specifically identified documents in color.

5.     <u>Enterprise Databases and Database Management Systems</u>

The Parties will meet and confer on the appropriate format to produce or to provide access to discoverable electronically stored information in an enterprise database or database management system (*e.g.*, Oracle, SQL server, DB2). It is expected that the Producing Party will produce such information in a manner that allows the Receiving Party to have the ability to search or review the data similar to that possessed by the Producing Party, such as an already

existing and reasonably available report, or an export from the original database of discoverable information in a format compatible with Microsoft Excel or Microsoft Access produced in native format.   The Parties will also meet and confer regarding whether and in what format an appropriate export of responsive data depending on the database architecture will meet these objectives, or can seek appropriate relief from the Court if necessary.

6.      Use of Search Filters

        a.      The Parties will meet and confer to discuss the use of reasonable search terms and date ranges. Defendants have provided a list to Plaintiffs' ESI Liaison of the search term filters that they have utilized to date to collect data from various sources. The Parties' ESI Liaisons will work on any revisions to search term filters understanding that this will be a collaborative process.   During such discussions, the Producing Party shall retain the sole right and responsibility to manage and control searches of its data files.

        b.      The fact that any document has been identified in agreed-upon search term filters shall not prevent any Party from withholding such document from production on the grounds that the document is not responsive, that it is protected from disclosure by applicable privilege or immunity, that it is governed by the European Data Privacy Directive or other applicable privacy law or regulation, that it contains commercially sensitive or proprietary non-responsive information, or that the Protective Order entered in this Action allows the document to be withheld.

        c.      Nothing in this section shall limit a Party's right reasonably to seek agreement from the other Parties or a court ruling to modify previously agreed-upon search terms.

## C.      DOCUMENTS THAT EXIST ONLY IN HARDCOPY (PAPER) FORM

A Party may produce documents that exist in the normal course of business only in hardcopy form scanned and produced in accordance with the procedures set out below. Scanned hardcopy documents shall be produced in accordance with the Technical Specifications set out in Attachment A. The scanning of original hardcopy documents does not otherwise require that the scanned images be treated as ESI. If a Producing Party creates objective coding for hard-copy documents, the objective coding shall be provided to the Receiving Party when the objective coding is available. The Producing Party does not guarantee the accuracy of any provided objective coding.

6

**ATTACHMENT A:**

A.1.   <u>Image Files</u>. Documents produced in *.tif image format will be single page black and white *.tif files at 300 DPI, Group IV compression. To the extent possible, original document orientation will be maintained (*i.e.*, portrait-to-portrait and landscape-to-landscape). Each *.tif file will be assigned a unique name matching the production number of the corresponding page. Such files will be grouped in folders of no more than 1,000 *.tif files each unless necessary to prevent a document from splitting across folders. Documents will not be split across folders and separate folders will not be created for each document. Document production ("Bates") numbers shall be endorsed on the lower right corner of all images. This number shall be a unique, consistently formatted identifier that will:

  a)      be consistent across the production;

  b)      contain no special characters; and

  c)      be numerically sequential within a given document.

Bates numbers should be a combination of an alpha prefix along with an 8 digit number (e.g. ABC00000001). The number of digits in the numeric portion of the Bates number format should not change in subsequent productions. Confidentiality designations, if any, will be endorsed on the lower left corner of all images and shall not obscure any portion of the original file.

A.2.   <u>Document Text</u>. Except where ESI contains text that has been redacted under assertion of privilege or other protection from disclosure, full extracted text will be provided in the format of a single *.txt file for each document (*i.e.*, not one *.txt file per *.tif image). Where ESI contains text that has been redacted under assertion of privilege or other protection from disclosure, the redacted *.tif image will be OCR'd and document-level OCR text will be provided in lieu of extracted text. Searchable text will be produced as document-level multi-page UTF-8 text files with the text file named to match the beginning production number of the document. The full path of the text file must be provided in the *.dat data load file.

A.3.   <u>Word Processing Files</u>. Word processing files, including without limitation Microsoft Word files (*.doc and *.docx), will be produced in the above format as well as native format with tracked changes and comments showing.

A.4.   <u>Presentation Files</u>. To the extent that presentation files, including without limitation Microsoft PowerPoint files (*.ppt and *.pptx), are produced in *.tif image format, such *.tif images will display comments, hidden slides, speakers' notes, and similar data in such files.

A.5.   <u>Spreadsheet or Worksheet Files.</u> To the extent that spreadsheet files, including without limitation Microsoft Excel files (*.xls or *.xlsx), are produced in *.tif image format, such *.tif images will display hidden rows, columns, and worksheets, if any, in such files.

A.6.    Parent-Child Relationships. Parent-child relationships (*e.g.*, the associations between emails and their attachments) will be preserved. Email and other ESI attachments will be produced as independent documents immediately following the parent email or ESI record. Parent-child relationships will be identified in the data load file pursuant to paragraph A.14 below.

A.7.    Dynamic Fields. Documents containing dynamic fields such as file names, dates, and times will be produced showing the field code (*e.g.*, "[FILENAME]" or "[AUTODATE]"), rather than the values for such fields existing at the time the file is processed.

A.8.    English Language. To the extent any data exists in more than one language, the data will be produced in English, if available. If no English version of a document is available, the Producing Party shall not have an obligation to produce an English translation of the data. However, any foreign language document will be so indicated in a metadata field.

A.9.    Embedded Objects. Some Microsoft Office and .RTF files may contain embedded objects. Such objects typically are the following file types: Microsoft Excel, Word, PowerPoint, Project, Outlook, and Access; and PDF. Subject to claims of privilege and immunity, as applicable, and to the extent reasonably available, objects with those identified file types shall be extracted as separate documents and shall be produced as attachments to the document in which they were embedded.

A.10.   Compressed Files. Compressed file types (i.e., .CAB, .GZ, .TAR. .Z, .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual files.

A.11.   Encrypted Files. The Producing Party will take reasonable steps, prior to production, to unencrypt any discoverable electronically stored information that exists in encrypted format (*e.g.*, because password-protected) and that can be reasonably unencrypted.

A.12.   Scanned Documents

  a)    In scanning hardcopy documents, multiple distinct documents should not be merged into a single record, and single documents should not be split into multiple records (*i.e.*, hard copy documents should be logically unitized).

  b)    Producing Party agrees to provide OCR text for scanned images of hard copy documents.  OCR is to be performed on a document level and provided in document-level *.txt files named to match the production number of the first page of the document to which the OCR text corresponds. OCR text should not be delivered in the data load file or any other delimited text file.

  c)    In the case of an organized compilation of separate documents—for example, a binder containing several separate documents behind numbered tabs—the document behind each tab should be scanned separately, but the relationship among the documents in the binder should be reflected in proper coding of the family fields set out below.

A.13. <u>Production Numbering</u>. Each *.tif image file will be named according to the production number of the page it represents. Production numbers will:

a)      be consistent across the production;

b)      contain no special characters; and

c)      be numerically sequential within a given document.

The Producing Party shall take reasonable steps to ensure that attachments to documents are assigned production numbers that directly follow the production numbers on the documents to which they were attached. If a production number or set of production numbers is skipped, the skipped number or set of numbers will be noted. In addition, wherever possible, each *.tif image will have its assigned production number electronically "burned" onto the image.

A.14. <u>Data and Image Load Files</u>.

a)      <u>Load Files Required</u>. Unless otherwise agreed, each production will include a data load file in Concordance (*.dat) format and an image load file in Opticon (*.opt) format.

b)      <u>Load File Formats</u>.

i.      Load file names should contain the volume name of the production media. Additional descriptive information may be provided after the volume name. For example, both ABC001.dat or ABC001_metadata.dat would be acceptable.

ii.     Unless other delimiters are specified, any fielded data provided in a load file should use Concordance default delimiters. Semicolon (;) should be used as multi-entry separator.

iii.    Any delimited text file containing fielded data should contain in the first line a list of the fields provided in the order in which they are organized in the file.

c)      <u>Fields to be Included in Data Load File</u>. For all documents produced, the following metadata fields will be provided in the data load file pursuant to subparagraph (a), above, for each document to the extent that such information is available at the time of collection and processing, except to the extent that a document has been produced with redactions. The term "Scanned Docs" refers to documents that are in hard copy form at the time of collection and have been scanned into *.tif images. The term "Email and E-Docs" refers to documents that are in electronic form at the time of their collection.  All date fields should be produced as MM/DD/YYYY format, paying attention to European date formats. European dates should be produced in US format to assure sorting and usability along with US based documents.

3

d)      The following metadata will be produced:

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| PRODBEG [Key Value] | ABC00000001 | Yes | Yes | Beginning production number |
| PRODEND | ABC00000008 | Yes | Yes | Ending production number |
| PRODBEGATT | ABC00000009 | Yes | Yes | Beginning production number of parent document in a family |
| PRODENDATT | ABC00001005 | Yes | Yes | Ending production number of last page of the last attachment in a family |
| CUSTODIAN(S) | Smith, John | Yes | Yes | Custodian(s) that possessed the document—multiple custodians separated by semicolon |
| NATIVEFILE | Natives\\ \00000001.xls | N/A | Yes | Path and file name for native file on production media |
| FILEDESC | Microsoft Office 2007 Document | N/A | Yes | Description of the type file for the produced record. |
| FOLDER | \My Documents\ Document1.doc | N/A | Yes | Original source folder for the record produced. |
| FILENAME | Document1.doc | N/A | Yes | Name of original electronic file as collected. |
| DOCEXT | DOC | N/A | Yes | File extension for email or e-doc |
| PAGES | 2 | Yes | Yes | Number of pages in the produced document (not applicable to native file productions). |
| AUTHOR | John Smith | N/A | Yes | Author information as derived from the properties of the document. |
| DATECREATED | 10/09/2005 | N/A | Yes | Date that non-email file was created as extracted from file system metadata |
| DATELASTMOD | 10/09/2005 | N/A | Yes | Date that non-email file was modified as extracted from file system metadata |
| SUBJECT | Changes to Access Database | N/A | Yes | "Subject" field extracted from email message or metadata properties of the document |
| FROM | John Beech | N/A | Yes | "From" field extracted from email message |
| TO | Janice Birch | N/A | Yes | "To" field extracted from email message |
| CC | Frank Maple | N/A | Yes | "Cc" or "carbon copy" field extracted from email message |

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| BCC | John Oakwood | N/A | Yes | "Bcc" or "blind carbon copy" field extracted from email message |
| DATESENT | 10/10/2005 | N/A | Yes | Sent date of email message (mm/dd/yyyy format) |
| TIMESENT | 10:33 am | N/A | Yes | Sent time of email message, time zone set to GMT |
| DATERCVD | 10/10/2005 | N/A | Yes | Received date of email message (mm/dd/yyyyformat) |
| TIMERCVD | 10:33 am | N/A | Yes | Received time of email message, time zone set to GMT |
| CONFIDENTIALITY | HIGHLY CONFIDENTIAL | Yes | Yes | Text of confidentiality designation, if any |
| TEXTPATH | Text\\\.txt | Yes | Yes | Path to *.txt file containing extracted or OCR text |
| PRODVOL | VOL001 | Yes | Yes | Name of the Production Volume |
| Redaction | Privilege | Yes | Yes | Field noting redactions applied to document |
| Foreign Language List | English: German | N/A | Yes | Field noting languages within document. |
| MD5 Hash Value | 098f6bcd 4621d 373cade4e 832627b4f6 | N/A | Yes | MD5 Hash value of document |

A.15. <u>Files Produced in Native Format</u>. Any file produced in native file format shall be given a file name consisting of a unique Bates number and, as applicable, a confidentiality designation; for example, "ABC00000002_Confidential." For each native file produced, the production will include a *.tif image slipsheet indicating the production image number of the native file and the confidentiality designation, and stating "File Provided Natively". To the extent that it is available, the original document text shall be provided in a document-level multi-page UTF-8 text file with a text path provided in the *.dat file; otherwise the text contained on the slipsheet language shall be provided in the *.txt file with the text path provided in the *.dat file.

A.16. <u>Production Media</u>. Unless otherwise agreed, documents and ESI will be produced on optical media (CD/DVD), external hard drive, secure FTP site, or similar electronic format. Such media should have an alphanumeric volume name; if a hard drive contains multiple volumes, each volume should be contained in an appropriately named folder at the root of the drive. Volumes should be numbered consecutively (ABC001, ABC002, etc.). Deliverable media should be labeled with the name of this action, the identity of the producing Party, and the following information: Volume name, production range(s), and date of delivery.

A.17. <u>Production Index</u>. With each production, the Producing Party will provide, in native excel format, a complete production log detailing the source(s) produced with Bates

range identified.  This log should also identify the number of documents produced in each set.

A.18.   <u>Encryption of Production Media</u>. To maximize the security of information in transit, any media on which documents are produced may be encrypted by the producing Party. In such cases, the producing Party shall transmit the encryption key or password to the requesting Party, under separate cover, contemporaneously with sending the encrypted media. The receiving parties in this matter are on notice that certain data produced may originate from custodians in the European Union and the receiving parties therefore agree to follow the strictest security standards in guarding access to said data.

New Orleans, Louisiana this 15th day of June, 2015.

_____
Honorable Eldon E. Fallon
United States District Court

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | ) | **MDL No. 2592** |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | **SECTION:  L** |
| _____ | ) | |
| | ) | **JUDGE FALLON** |
| THIS DOCUMENT RELATES TO: | ) | **MAG. JUDGE NORTH** |
| ALL ACTIONS | ) | |
| | ) | **CASE MANAGEMENT** |
| _____ | ) | **ORDER NO. [X]** |

**PRE-TRIAL ORDER NO. 13(A)**
**(Plaintiff Fact Sheets and Authorizations) AND**
**PRE-TRIAL NO. 14(A)**
<u>**(Defendant Fact Sheets)**</u>

The Parties have agreed to accept online submission and service of Plaintiff and Defendant Fact Sheets, ("PFS" and "DFS"), which are collectively described herein as Fact Sheets, and related documents in actions filed in or transferred to MDL No. 2592, and in the interest of efficiency and judicial economy, Pre-Trial Order Nos. 13 and 14 are amended and supplemented as follows:

IT IS HEREBY ORDERED that:

1. *Manner of Completion and Service of Fact Sheets and Authorization Forms.* Plaintiffs and Defendants shall use the online MDL Centrality System designed and provided by BrownGreer PLC and accessible at www.MDLCentrality.com to implement the provisions of Pre-Trial Order Nos. 13 and 14 regarding Fact Sheets and Records Authorization Forms, as follows:

(a) Each Plaintiff required by this Order to submit a Plaintiff Fact Sheet ("PFS"), shall, by counsel or as *pro se*, establish a secure online portal in the MDL Centrality online system and obtain authorized user names and secure login passwords to permit use of MDL Centrality by such counsel or Plaintiff.  Except as set forth herein, Counsel for a Plaintiff

1

or each *pro se* Plaintiff shall be permitted to view, search and download on MDL Centrality only those materials submitted by that Plaintiff and by Defendants relating to that Plaintiff, and not materials submitted by or relating to other Plaintiffs.

(b) The Defendants by counsel shall establish a secure online portal with the MDL Centrality online system and obtain authorized user names and secure login passwords to permit use of MDL Centrality by such counsel.

(c) The Plaintiffs' Steering Committee, Attorney Designees Appointed by the Plaintiffs' Steering Committee, Plaintiffs' Liaison Counsel, Plaintiffs' Co-Lead Counsel, Defense Co-Lead Counsel, Defense Liaison Counsel and Defendants' Attorney Designees (collectively, the "Leadership Counsel"), shall establish separate secure online portals with the MDL Centrality online system and obtain individual unique user names and secure login passwords to permit use of MDL Centrality by such Leadership Counsel, who shall have access to and be able to view, search and download all materials submitted by all Plaintiffs and by all Defendants.  Plaintiffs' Liaison Counsel and Defense Liaison Counsel shall exchange the names, firm names and addresses of those attorneys appointed as Attorney Designees.

(d) Each Plaintiff and Defendants shall use the MDL Centrality System to obtain, complete or upload data, and serve the appropriate Fact Sheet online (including the upload of PDFs or other electronic images, photographs and videos of any records required in the Fact Sheets).  Each Plaintiff and Defendants shall provide a signed verification with their Fact Sheets, which will be signed in hard copy, uploaded and served through MDL Centrality.

(e) Each Plaintiff shall use the MDL Centrality System to obtain, complete and serve online the Plaintiff's Records Authorizations.  Each Plaintiff shall sign each of the required Records Authorizations, which will then be uploaded and served through MDL Centrality.

(f) Service of a completed Fact Sheet and Records Authorizations shall be deemed to occur when the submitting party has performed each of the steps required by the MDL Centrality System to execute the online submission of the materials, and the submitting party has received confirmation on screen that the materials have been successfully submitted.  The MDL Centrality System shall provide timely notice by email and online to Leadership Counsel who have obtained user credentials in MDL Centrality of the submission of Fact Sheets and Records Authorizations and shall provide access at that time to such Leadership Counsel of the materials submitted.

(g) If a party must amend a previously served Fact Sheet, all subsequent versions must be named accordingly ("First Amended Fact Sheet", "Second Amended Fact Sheet", etc.), and all iterations of a Party's Fact Sheet must remain available and accessible to all Parties to a case through trial, appeal (if any), or other resolution of the litigation.

(h) The Court may establish a secure online portal with the MDL Centrality online system and obtain an authorized user name and secure login password to permit use of MDL Centrality by the Court.

2

**2.** ***HIPAA Authorization.*** By using MDL Centrality, each Plaintiff authorizes the disclosure of his or her medical records and other health information submitted as part of the PFS or DFS to BrownGreer PLC as the administrator of the MDL Centrality System, the Court, Leadership Counsel and Defendants, and to the authorized agents, representatives and experts of the foregoing, for purposes of this litigation.

**3.** ***No Impact on Privileges or Work Product Protection.*** The use of MDL Centrality by any party shall not alter or otherwise waive or affect any attorney-client privilege or work product doctrine protection otherwise available that would otherwise apply to a document in the absence of the use of MDL Centrality. Any notations placed on materials, comments entered, or documents stored or uploaded to MDL Centrality by a user shall be considered to be the work product of such user unless and until the material is served on or purposefully disclosed to the opposing party through the use of MDL Centrality or otherwise. Pursuant to Rule 502(d) of the Federal Rules of Evidence, this order with respect to privilege and work product doctrine protection applies to any other federal or state proceeding.

**4.** ***No Impact on the Scope of Discovery.*** Nothing in the Fact Sheets, Records Authorizations, or any use or action in MDL Centrality shall be deemed to limit the scope of inquiry at depositions and admissibility of evidence at trial. The scope of inquiry at depositions shall remain governed by the Federal Rules of Civil Procedure and the admissibility of information shall be governed by the Federal Rules of Evidence and applicable law. No objections or rights are waived as a result of any response in a Fact Sheet or the production of any documents with a Fact Sheet.

**5.** ***Extension of Deadlines.*** The Parties may agree to an extension of the deadlines set in this Order for the completion and service of Fact Sheets and Records Authorizations.

Consideration should be given to requests for extensions to stagger PFS  deadlines where a single law firm has a large number due on or near the same dates, and correspondingly for Defendants with a large number of DFS due on or near the same dates.  If the parties cannot agree on reasonable extensions of time, the requesting party may apply to the Court for such relief upon a showing of good cause and no prejudice to the other party.  With any extension agreed to by the parties or granted by the Court, the twenty (20) day cure period set forth in Paragraph 3 of Pre-Trial Order No. 13 (Plaintiff Fact Sheets and Authorizations) and in Paragraph 3 of Pre-Trial Order no. 14 (Defendant Fact Sheets) shall begin on the day after the expiration of the extension period.

New Orleans, Louisiana this 22nd day of June, 2015.

_____
Eldon E. Fallon
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)     )     MDL No. 2592
PRODUCTS LIABILITY LITIGATION  )
                                                          )     SECTION:  L
_____)
                                                          )     JUDGE FALLON
THIS DOCUMENT RELATES TO:       )     MAG. JUDGE NORTH
ALL ACTIONS                               )
                                                          )
_____)

PRETRIAL ORDER NO. 11B
(Bundling of Complaints and Answers)

This Order governs a Joined Plaintiff's responsibility for a filing fee and modifies the

second sentence of Paragraph 1(a) of Pretrial Order No. 11.[1]

IT IS HEREBY ORDERED AS FOLLOWS:

A Joined Plaintiff's (any plaintiff named in the Joint Complaint other than the Lead

Plaintiff) responsibility for a filing fee will be suspended, and such responsibility for the filing

fee shall be resolved upon the resolution of his/her respective claims as follows:

(1)     No filing fee is owed if a Joined Plaintiff voluntarily dismisses a case with

prejudice within nine (9) months of filing their complaint.  After that time, a Joined Plaintiff

shall pay a filing fee.

(2)     A filing fee is owed if a Joined Plaintiff dismisses a case without prejudice

pursuant to Fed.R.Civ.P. 41(a) (1).  The Clerk of Court is directed not to docket the voluntary

dismissal or close the case of until such filing fee has been paid.

---

[1] Second sentence of Paragraph  1(a) of Pretrial Order No. 11 presently reads as follows:  "The joined plaintiffs'
(plaintiffs named in the Joint Complaint other than the Lead Plaintiff) responsibility for a filing fee will be
suspended until the resolution of their respective claims, at which time the fee must be paid before the case can be
dismissed and closed, unless otherwise ordered by the Court."

(3)     If a Joined Plaintiff seeks to dismiss a case without prejudice other than pursuant to Fed.R.Civ.P. 41(a)(1), Defendants shall have fourteen (14) days from the filing of the motion to dismiss to oppose the motion.  No filing fee is owed if the Defendants fail to oppose the motion to dismiss within the fourteen (14) days.  A filing fee is owed by a Joined Plaintiff if Defendants oppose the motion, and the Court grants the motion to dismiss without prejudice over Defendants' objection.  The Clerk of Court is directed not to enter the voluntary dismissal or to close the case until the filing fee has been paid.  This Order is without prejudice to Defendants' right to request and a Joined Plaintiff's right to oppose, additional conditions of dismissal under Fed.R.Civ.P. 41(a)(2).

(4)     A filing fee is owed upon involuntary dismissal of a Joined Plaintiff's case by Order of Court or entry of Judgment.  The Order or Judgment of involuntary dismissal shall recite the Court's continuing jurisdiction for the purpose of collection of the filing fee.

(5)     A filing fee is owed upon the entry of a Judgment in favor of a Joined Plaintiff. The Clerk of Court has a lien on the Judgment for the purpose of collecting the filing fee.

(6)     A filing fee is owed upon a stipulated dismissal or order of dismissal after settlement of a Joined Plaintiff's case.  The Clerk of Court has a lien on the settlement for the purpose of collecting the filing fee.

(7)     All counsel for a Joined Plaintiff who are listed on the Complaint are responsible for the paying of the filing fee if owed under the provisions of this Order.  This responsibility is subject to a Joined Plaintiff's counsel's right, if permitted by applicable state law and fee arrangements, to seek reimbursement from the Joined Plaintiff.  The Joint Complaint may specify which of the Joined Plaintiff's counsel is (are) responsible for the fee if more than one counsel is listed on the Complaint; otherwise all counsel listed on the Complaint are individually

responsible for the filing fee.  By filing the Joint Complaint, all counsel listed on the Joint Complaint consent to the jurisdiction and venue of this Court for the purpose of collecting the filing fee. With respect to any Joint Complaint filed prior to entry of this Order, all Joined Counsel will be responsible for the filing fee and shall be deemed to have consented to the jurisdiction and venue of this Court for purpose of collection unless such counsel file an amended complaint within fourteen (14) days of entry of this Order specifying which of them (if fewer than all) will be responsible for paying the fee.

NEW ORLEANS, LOUISIANA this 14th day of July, 2015.

_____
Eldon E. Fallon
United States District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)    )      MDL No. 2592
PRODUCTS LIABILITY LITIGATION  )
                                                        )      SECTION:  L
_____)
                                                        )      JUDGE FALLON
THIS DOCUMENT RELATES TO:       )      MAG. JUDGE NORTH
ALL ACTIONS                              )
                                                        )
_____)

**PRETRIAL ORDER NO. 11C**

This Order shall serve as a clarification for some of the issues that have arisen since the

Court entered Pretrial Order No. 11.

IT IS HEREBY ORDERED AS FOLLOWS:

**Voluntary Dismissal of Claims without Prejudice:** Since Defendants have filed an

Omnibus Answer on June 18, 2015, a Plaintiff who seeks to dismiss her case without prejudice

must file a motion and an accompanying proposed order, pursuant to Federal Rule of Civil

Procedure 41(a)(2).

**Timing for Filing an Amended Complaint**: A Plaintiff may amend her Complaint as a

matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1)(A) within 21 days after

service of a Joint Complaint if the Plaintiff is the named Plaintiff in the Joint Complaint, and

within 21 days after service of a Severed Complaint if Plaintiff is *not* the named Plaintiff in the

Joint Complaint.  When Plaintiff files an *ex parte* motion to amend her Complaint pursuant to

Rule 15(a)(1)(A), Plaintiff shall specify the relevant date of service within the motion.

1

If Plaintiff did not file a Joint Complaint, but rather filed an individual claim, Rule 15(a)(1)(A) governs and Plaintiff may amend her complaint within 21days of service.

**Summons**: The named Plaintiff in a Joint Complaint shall file summons in the Joint Complaint case, but for all of the other listed Plaintiffs, they shall file summons in their respective, severed cases.  For example, if the Joint Complaint is titled *John Smith, et al. v. Janssen Research & Development, LLC, et al.,* 15-123, and Bob Adams is a listed Plaintiff in that Joint Complaint with his own severed case number of 15-456, John Smith would file his summons in the Joint Complaint case of 15-123 and Bob Adams would file his summons in the severed case of 15-456.

NEW ORLEANS, LOUISIANA this 14th day of July, 2015.

_____
Eldon E. Fallon
United States District Judge

**UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION            MDL No. 2592

                                           SECTION L

                                           JUDGE ELDON E. FALLON

                                           MAG. JUDGE NORTH

THIS DOCUMENT RELATES TO:
ALL CASES

### PRE-TRIAL ORDER NO. 14A

       The parties having agreed to amend Pre-Trial Order No. 14  (PTO 14) dated May 4,

2015, PTO 14 is hereby amended as follows:

       1.       In Section IV and VII.5 of the Defendant's Fact Sheet ("DFS"), Defendants have

agreed, without objection to answer certain questions and provide certain data relating to the

dispensing and prescribing practices of Plaintiffs' Prescribing and Primary Treating Health Care

Providers as it relates to Xarelto if such data is within their possession, custody or control.

       2.       Defendants license information and data responsive to Section IV and VII.5 of the

DFS from IMS Health Inc. ("IMS").  IMS has authorized Defendants to provide a copy of the

responsive data to the Plaintiffs, with no fee, upon execution of the Consent Letter attached

hereto as Exhibit 1 by the individual Plaintiff's counsel to whom the data will be produced.

       3.       Defendants shall, upon receipt of an executed Consent Letter from Plaintiff's

counsel (sent to each Defendants' counsel by E-mail to jennifer.lamont@dbr.com,

julie.tersigni@dbr.com, and rbreier@eckertseamans.com):

a)      supplement its response to Section IV and VII.5 of any DFS already provided to Plaintiff and produce all responsive documents within ten (10) days of receiving the executed Consent Letter;

b)      produce all responsive data and documents pursuant to Section IV and VII.5 of the DFS pursuant to PTO 14 in cases where a DFS has not yet been provided to Plaintiff.

c)      all responsive data and documents will be produced in excel format.

4.    All provisions of PTO 14 other than those amended herein shall remain unchanged and in full force and effect.

New Orleans, Louisiana this 10th day of August, 2015

ELDON E. FALLON
UNITED STATES DISTRICT JUDGE



*Via Email*

August 3, 2015

Jennifer La Mont, Esq.
Drinker Biddle & Reath LLP
600 Campus Dr.
Florham Park, NJ  07932-1047

Timothy S. Coon, Esq.
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219

RE: In re: Xarelto (Rivaroxaban) Products Liability Litigation, MDL No. 2592

In re: Xarelto Products Liability Litigation, Philadelphia Court of Common Pleas, No. 002349

IMS Data: For prescribing physicians and one treating physician identified by each plaintiff in the actions, the name and address of the HCP and prescribing history data such as the number of new prescriptions, the units, and the number of total prescriptions for Xarelto for 2011 to the present

Dear Ms. La Mont and Mr. Coon:

This letter will serve as a response to your requests on behalf of your respective clients: Janssen Research & Development, LLC; Jannsen Ortho, LLC; Janssen Pharmaceuticals, Inc.; Johnson & Johnson (collectively, "Janssen"); Bayer Corporation; Bayer Healthcare, AG; Bayer Pharma, AG; Bayer, AG; Bayer Healthcare, LLC; and Bayer Healthcare Pharmaceuticals, Inc. (collectively, "Bayer") (hereinafter, collectively, the "CLIENTS"), to use the above-referenced IMS Data (the "IMS Information") in connection with the above-referenced litigations (the "Litigations"). IMS represents that IMS Information is confidential and proprietary to IMS. As you may be aware, IMS Information retains its value to IMS so long as it is treated in accordance with the requirements of law affording certain protection for such information (e.g., laws governing trade secrets and copyrights). In addition, IMS has certain contractual obligations of confidentiality with its data sources and clients.

You have requested that IMS consent to CLIENTS' use of IMS Information in the Litigations, subject to the respective protective orders, particularly, Pretrial Order No. 12, Stipulated Protective Order, filed May 4, 2015, in the Eastern District of Louisiana, and Case Management Order No. 5, Stipulated Protective Order, filed May 19, 2015, in the Philadelphia Court of Common Pleas, both of which are attached hereto as Exhibits A-1 and A-2 (the "Protective Orders"). In order to provide consent to this request, it is necessary that, on behalf

of CLIENTS, you represent and agree that any such usage or disclosure of IMS Information will be treated in a manner which does not compromise the above-mentioned protections or obligations.  Further, consent to such use of any IMS Information in the Litigations is subject to your agreement to the following:

A.      Prior to disclosure of IMS Information in the Litigations, you shall designate IMS Information as HIGHLY PROTECTED and proprietary to IMS and in a manner so as to be subject to the Protective Orders.  To the extent any terms of the Protective Orders are inconsistent with the terms of this letter, the terms of this letter shall control.  Access to and use of IMS Information shall be strictly limited to purposes directly related to the Litigations.

B.      Prior to using any IMS Information in filings in the court or otherwise producing IMS Information as part of the Litigations, you shall ensure that:

1.      Production of IMS Information shall be limited to that portion of IMS Information that is relevant to the Litigations, except where the context or applicable rules of civil procedure otherwise specifically requires.  Without limiting the foregoing, IMS Information produced in the Litigations will include only the individual prescribers whose prescribing behavior is directly relevant to such Litigations and whom the plaintiffs have themselves expressly identified.

2.      Any person or entity receiving IMS Information in connection with the Litigations shall only use IMS Information for purposes directly related to reaching an outcome in the Litigations and shall not in any event use IMS Information for any business, competitive, personal, private, public, or other purpose.

3.      All documents containing IMS Information shall be marked "HIGHLY PROTECTED – SUBJECT TO PROTECTIVE ORDER," or marked in such other manner so as to be identified as a document requiring highly confidential treatment under the terms of the Protective Orders.  Any person or entity receiving IMS Information shall be apprised of the confidential and proprietary nature of such information.

4.      No person or entity that obtains access to IMS Information shall attempt to identify any person or entity (including any patient, consumer, outlet, supplier, plan, pharmacy or prescriber) that is not readily identifiable in the IMS Information.  No person or entity that obtains access to any IMS Information shall attempt to contact, for the purpose of obtaining testimony or otherwise, any person or entity (including any patient, consumer, outlet, supplier, plan, pharmacy or prescriber) identified in or identifiable from the IMS Information.  Nothing in this paragraph prohibits any person from identifying or contacting any person or entity that they have knowledge of

from sources other than IMS Information, nor does this paragraph authorize any person to contact any person or entity.

5.      When IMS Information is used in or as part of a proceeding in the Litigations, IMS will only act as an objective service provider and not as an expert on behalf of a client or any party. As more fully described in the Statement of IMS Health Regarding Use of Prescriber Data in Legal Proceedings or Government Investigations, attached hereto as Exhibit B ("IMS Statement"), IMS Information may reflect projections, estimates, forecasts, or other analyses of data which are the result of either IMS standard processes or specifications developed or approved by the client. The parties acknowledge that IMS Information, although appropriate for its intended purpose of supporting business and marketing analyses in industries such as the pharmaceutical industry, contains data that is susceptible to error or variance, and is not intended by IMS to be used to establish any fact.  Any person or entity receiving IMS Information in connection with the Litigations shall receive a copy of the IMS Statement.

6.       Any reports, documents, or exhibits prepared by CLIENTS which contain IMS Information together with information from other sources shall be identified a such, and shall not be represented as a report, document, or exhibit prepared by IMS.

7.      IMS will not offer testimony or other evidence regarding the interpretation of the results of the data provided by IMS or the services performed by IMS in connection with the Litigations. In addition, IMS will not provide any advice or engage in any advocacy with respect to witness testimony or expert analysis of any other party. Also, IMS will not provide any opinion as to the relative merits of the clients' or the other party's positions in the Litigations.

8.      The IMS Information shall not be placed in any information repository accessible to any person or entity not directly involved in the Litigations, and shall not otherwise be made available to any person or entity not directly involved in the Litigations.

9.      In no event shall any disclosure of IMS Information be made to any competitor of IMS, or to any person who, upon reasonable good faith inquiry, could be determined to be an employee of any competitor of IMS, irrespective of whether that person is retained as an expert in the Litigations.  No person or entity that obtains access to any IMS Information shall in any manner whatsoever attempt to reverse engineer or disassemble such information or attempt to ascertain the methodologies by which such information was obtained, sorted, projected, or manipulated.

10.     Prior to disclosure of IMS Information to any individual plaintiff in the Litigations, such plaintiff's counsel shall sign a copy of this letter, acknowledging and agreeing to be bound by the terms and conditions of this letter. CLIENTS shall provide to IMS a copy of such letter(s) upon request from IMS.

11.     If CLIENTS or any other party to whom disclosure may be made in the Litigations desire to use at trial or in any public court proceeding any of the above-referenced IMS Information, CLIENTS or the party seeking to use the IMS Information shall request the court to permit presentation of such material with only counsel and court personnel present or in such other manner as the court deems appropriate to maintain the confidentiality of the IMS Information.  At no time may the IMS Information be disclosed without the "Highly Protected" designation or an equivalent designation that is intended to ensure highly confidential treatment of such IMS Information.

12.     In no event shall IMS be liable for any consequential, special, exemplary, or similar types of damages, including but not limited to third party claims, whether foreseeable or not, arising in connection with the use of IMS Information in the Litigations, even if IMS has been advised of the possibility of such damages. Any reliance on or decision based on IMS Information is the sole responsibility of you and the entity that receives the IMS Information in the Litigations.

13.     Each person or entity having received IMS Information shall comply with paragraph 32 of the Stipulated Protective Order filed in the Eastern District of Louisiana (Exhibit A-1) or paragraph 31 of the Stipulated Protective Order filed in Philadelphia Court of Common Pleas (Exhibit A-2), as applicable.  Compliance with the terms of such Protective Orders shall be made within 90 days of the termination of the respective action, and written attestations that all copies of IMS Information have been destroyed or returned shall be provided to IMS upon request.

Subject to your agreement with the foregoing, and in reliance on your representation that the above terms are acceptable to all plaintiffs or parties in the Litigations, IMS will consent to your request. If the above terms are acceptable, please counter-sign a copy of this letter where indicated and returned to my attention. Thank you.

Very Truly Yours,

/s/

Maureen Nakly
Senior Attorney
IMS Health Incorporated

Acknowledged and Agreed by:

COUNSEL FOR JANSSEN

BY: _____

TITLE: _____

DATE: _____


COUNSEL FOR BAYER

BY: _____

TITLE: _____

DATE: _____


PLAINTIFFS' COUNSEL IN THE
E.D. LA. LITIGATION

BY: _____

TITLE: _____

DATE: _____


PLAINTIFFS' COUNSEL IN THE
PHILADELPHIA LITIGATION

BY: _____

TITLE: _____

DATE: _____

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)  MDL NO. 2592
PRODUCTS LIABILITY LITIGATION

SECTION L
JUDGE ELDON E FALLON
MAG. JUDGE NORTH

## PRETRIAL ORDER NO. 15A

### CONSENT ORDER REGARDING PRESERVATION OF VOICEMAIL, TEXT MESSAGES AND INSTANT MESSAGES

On December 17, 2014, the Court issued Pretrial Order No. 1 which addressed, *inter alia*, document preservation. Plaintiffs and Defendants advised the Court at status conferences of continuing discussions and negotiated a more case specific order (Pretrial Order No. 15) that the Court entered on May 4, 2015. In PTO 15, Plaintiffs and Defendants agreed that the parties "will continue to meet and confer regarding the obligation on all parties to preserve voicemail, instant messages sent or received on an instant messaging system or text messages sent or received on a cellular phone, smartphone, tablet or other mobile device." The Parties have conducted such meet and confer following depositions of Defendants. By agreement of the parties, going forward from the date of this Consent Order, the Court Orders as follows:

(1)     Plaintiffs shall provide written notice of this Consent Order to individual plaintiffs with cases pending in this MDL proceeding instructing them to either (a) refrain from initiating text messages, instant messages or voicemail for substantive communications relating to Xarelto , the Plaintiffs' medical condition or the Plaintiffs' claims for damages; or (b) preserve or transcribe all such text messages, instant messages or voicemails if the Plaintiff initiates such a substantive communication.

(b)     Defendants shall provide written notice of this Consent Order to any current U.S. employee previously identified by Defendants in their Voluntary Disclosures or requested by Plaintiffs as a document custodian instructing them to either (a) refrain from initiating text messages, instant messages or voicemail for substantive communications relating to Xarelto; or (b) preserve or transcribe all such text messages, instant messages or voicemails if the employee initiates such a substantive communication. Current U.S. employees who are requested as document custodians by Plaintiffs after the date of this order will be provided the notice following a request from Plaintiffs for their files. This paragraph will not apply to employees resident in foreign countries.

00310124

(c)     Following entry of this Order, no party shall have an obligation to preserve or produce newly created instant messages, text messages or voicemail.

(d)     The parties will continue to meet and confer on any open issues regarding voicemail, text messaging and instant messaging, and will report to the Court at the October 2015 status conference whether they have resolved their differences, and if not the Court will set a briefing and hearing schedule to resolve any disputes.

New Orleans, Louisiana this 17th day of September, 2015.


                Honorable Eldon E. Fallon
                United States District Court

82083572.1

00310124

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)         **MDL NO. 2592**
**PRODUCTS LIABILITY LITIGATION**

                                     **SECTION L**
                                     **JUDGE ELDON E FALLON**
                                     **MAG. JUDGE NORTH**

**PRETRIAL ORDER NO. 21**

**CONSENT ORDER REGARDING DOCUMENT PRODUCTION PROTOCOL**

      The Parties having conferred, consented, stipulated and agreed to entry of the within Consent Order, and good cause appearing therefore, it is hereby **ORDERED,** as follows.

      1.      Defendants will make at least on average a monthly production of 5 million pages per month (collective for all Defendants) through July 29, 2016. The page count shall be determined by the Bates number ranges produced during any respective month with the understanding that all Parties are proceeding reasonably and in good faith. Defendants will not hold back production of files ready to be produced on the basis that they have already exceeded the 5 million pages per month threshold. Documents shall be produced on a rolling basis as they are ready for production. The intent of this Order is that the Defendants collectively will produce as close to if not more than 5 million pages each month while maintaining the five million page monthly average. The Parties recognize that certain documents are produced in native form. To the extent there may be a dispute about volume produced, documents produced as native only are to be included in overall production figures.

      2.      Provided Defendants comply with Paragraph No. 1 above, Defendants do not have an obligation to produce documents after July 29, 2016 absent express written agreement between Defendants and Plaintiffs, or upon order of the Court after good cause shown by Plaintiffs.

      3.      The Plaintiffs' Steering Committee ("PSC") will coordinate document requests with the leadership in the Pennsylvania litigation with the understanding that any document requested from the Pennsylvania litigation over and above the documents requested in the MDL may impact Defendants' ability to produce 5 million pages per month in the MDL. To the extent the plaintiffs in the Pennsylvania litigation request documents that are not part of a coordinated request in the MDL, the PSC agrees that the documents produced in response to the Pennsylvania request will be counted toward the 5 million pages per month limit unless the PSC shows good cause after meet and confer, and the Court orders that such productions should not be counted against the limit.

4.      In addition to the 59 source files previously provided to the Defendants by Plaintiffs, Plaintiffs will provide a list to Defendants by September 11, 2015, of the initial non-custodial files and additional custodial files that Plaintiffs request to be produced.  Plaintiffs shall not withdraw their requests for any of the 59 source files previously identified.

5.      Thereafter, on at least the first business day of each month, starting October 1, 2015 and continuing through April 1, 2016, Plaintiffs will identify additional custodial and non-custodial files to be produced.  All such designations of files to be produced shall be made in good faith.

Within 10 days of receipt of the files designated for production by Plaintiffs, Defendants will advise Plaintiffs of the approximate size of the custodial file and the time expected for production.  Plaintiffs may withdraw their requests for no more than six files based on that advice, unless the Parties agree otherwise following a meet and confer; such withdrawals shall be reasonably divided between the Defendants.  Once Plaintiffs withdraw a request for a particular file, it may not be requested again.  The Parties will act in good faith to ensure that the withdrawal of a file will not impact the average production of 5 million pages per month.  The Parties will meet and confer as to whether the size of the file impacts the priority of the production of the file.

6.      The production of detail representative custodial files shall be subject to the provisions of Paragraph 10, which require at least 75 days' notice for production of a deponent's file.  Unless Plaintiffs notify the Defendants that a particular detail representative custodial file need not be produced, detail representative custodial files shall be considered to be requested for production by Plaintiffs within fourteen (14) days from the date the bellwether discovery pool plaintiffs are selected when only one detail representative has been identified in the Defendant Fact Sheet (DFS).  To the extent more than one detail representative was designated in the DFS, Plaintiffs shall have thirty (30) days from the date the bellwether discovery pool plaintiffs are selected to designate the detail representative custodial file to be produced so that files can be identified and produced promptly in anticipation of the detail representative depositions that will likely be taken by Plaintiffs in advance of the August 1, 2016 bellwether nomination date.

7.      Defendants will make all reasonably practicable efforts to advise Plaintiffs by May 1, 2016, but no later than May 15, 2016, whether the expected amount of work for all file requests pending as of April 1, 2016 cannot be completed by July 29, 2016 based on 5 million pages per month production, or whether Defendants would be able to produce additional files beyond those pending as of April 1, 2016 based on 5 million pages per month production.  If the Defendants have the capacity within the 5 million pages per month to process and produce additional files, then Defendants will not object to requests for additional files after April 1, 2016 as long as production is within the 5 million pages per month.  The Parties will promptly meet and confer as to files to be completed by the July 29, 2016 cutoff.

8.      The average monthly production of 5 million pages includes all pages from all of the types of source files requested by Plaintiffs in this matter – corporate custodial files, detail representative custodial files, and non-custodial files.

9.     Plaintiffs have made two requests totaling 59 specific custodial files.  Defendants will focus on completing production of those files first before moving on to other materials absent a specific agreement with Plaintiffs otherwise or as set out in paragraph 4.

10.    Absent good cause, a request for a custodial file or an update to a previously produced file must be made at least 75 days in advance of any proposed deposition of that custodian so that the file review can be completed and production made at least 30 days in advance of the deposition.

11.    Plaintiffs can make reasonable requests, and Defendants will attempt to reasonably accommodate, priorities for production among files requested.

12.    If Plaintiffs request production of a file and later withdraw that request within ten (10) days after the Defendants have advised Plaintiffs of the size of the file and the expected time to produce, all pages of that file reviewed before the withdrawal of the request will count towards the average monthly production of 5 million pages.

13.    File requests made by Plaintiffs (exclusive of detail representative files) are to be divided reasonably between the Bayer Defendants and the Janssen Defendants.  If Plaintiffs request files disproportionally between Bayer and Janssen, the Parties understand it could affect the production deadline and the Parties will meet and confer on any such issues.

14.    The files to be produced will include at least a substantial majority of the custodial and non-custodial files identified to Plaintiffs on June 27, 2015 where review work has been partially done or that were collected for review.

15.    Defendants reserve all rights to object to a file request on any grounds and will notify Plaintiffs in writing of any objections to a particular request and provide a summary of the reason for each objection.  The Parties will meet and confer on any objections and, if not resolved, either party may submit to the Court.

16.    Defendants shall notify Plaintiffs when production of a custodial or non-custodial file has been completed to Defendants' knowledge and information after reasonable inquiry and the date upon which the file was collected.

17.    The Parties will designate liaison(s) from each side to regularly communicate on discovery issues pertaining to document production.  Each party recognizes the need to cooperate and proceed in good faith.  Further, the Parties intend to keep the Court informed as to the status of document production on the bi-weekly discovery calls with the Court so that the Court can ensure that each party is providing the information necessary for document production consistent with this Order.

New Orleans, Louisiana this 17th day of September, 2015.

_____
Honorable Eldon E. Fallon
United States District Court

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | ) | MDL No. 2592 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | SECTION:  L |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |
| | ) | JUDGE FALLON |
| THIS DOCUMENT RELATES TO: | ) | MAG. JUDGE NORTH |
| ALL ACTIONS | ) | |
| | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

<u>PRETRIAL ORDER NO. 15B</u>

<u>CONSENT ORDER REGARDING PRESERVATION OF VOICEMAIL,
TEXT MESSAGES AND INSTANT MESSAGES</u>

On December 17, 2014, the Court issued Pretrial Order No. 1 which addressed, *inter alia*, document preservation.  Plaintiffs and Defendants advised the Court at status conferences of continuing discussions and negotiated a more case specific order (Pretrial Order No. 15) that the Court entered on May 4, 2015.  In PTO 15, Plaintiffs and Defendants agreed that the parties "will continue to meet and confer regarding the obligation on all parties to preserve voicemail, instant messages sent or received on an instant messaging system or text messages sent or received on a cellular phone, smartphone, tablet or other mobile device."  The Parties have conducted such meet and confer following depositions of Defendants.  The Court previously entered consent order PTO 15A on September 17, 2015.  To clarify the preservation obligations of the parties, the Court hereby enters PTO 15B by consent of the parties.  PTO 15A is hereby vacated and shall have no further effect.

By agreement of the parties, going forward from September 17, 2015, the Court Orders as follows:

(1)   Plaintiffs shall provide written notice of this Consent Order to individual plaintiffs with cases pending in this MDL proceeding instructing them to either (a) refrain from initiating text messages, instant messages or voicemail for substantive communications relating to Xarelto, the Plaintiffs' medical condition or the Plaintiffs' claims for damages; or (b) preserve or transcribe all such text messages, instant messages or voicemails if the Plaintiff initiates such a substantive communication.

(2)   Defendants shall provide written notice of this Consent Order to any current U.S. employee previously identified by Defendants in their Voluntary Disclosures or

requested by Plaintiffs as a document custodian instructing them to either (a) refrain from initiating text messages, instant messages or voicemail for substantive communications relating to Xarelto; or (b) preserve or transcribe all such text messages, instant messages or voicemails if the employee initiates such a substantive communication.  Current U.S. employees who are requested as document custodians by Plaintiffs after the date of this order will be provided the notice following a request from Plaintiffs for their files.  This paragraph will not apply to employees resident in foreign countries.

(3)    From September 17, 2015 forward, the only obligation to preserve newly created text messages, instant messages or voicemail is as required by paragraphs 1 and 2 above.

(4)    The parties will continue to meet and confer on any open issues regarding voicemail, text messaging and instant messaging, and will report to the Court at the November 2015 status conference whether they have resolved their differences, and if not the Court will set a briefing and hearing schedule to resolve any disputes.


NEW ORLEANS, LOUISIANA this 21st day of October, 2015.


Honorable Eldon E. Fallon
United States District Judge

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: XARELTO (RIVAROXABAN)**<br>**PRODUCTS LIABILITY LITIGATION** | **MDL No. 2592** |
| | **SECTION L** |
| **THIS DOCUMENT RELATES TO ALL ACTIONS** | **JUDGE ELDON E FALLON** |
| | **MAG. JUDGE NORTH** |

### Pretrial Order No. 22
### (Mailing Lists for Dear Doctor Letters)

Plaintiffs have requested from the Janssen Defendants the mailing lists that support the information provided by the Janssen Defendants in response to question II.A.1 in the Defendant Fact Sheet. The Janssen Defendants are in possession of the requested mailing lists, but the lists were created and maintained by third-party vendors. The requested mailing lists are to be provided to the Plaintiffs' Steering Committee within seven (7) business days of the date of this Order in useable electronic format subject to the following:

(1) The mailing lists will be maintained as PROTECTED INFORMATION subject to the requirements of PTO 12;

(2) The mailing lists are to be used solely for the purposes of this litigation in order to assist in discovery and the preparation for trial. The mailing lists themselves are to be maintained as strictly confidential by the Plaintiffs' Steering Committee and may not be used for any purpose other than as set out above. The Plaintiffs' Steering Committee is allowed to provide to plaintiffs' counsel in individual cases the information used to support the Defendants' response to question II.A. in the Defendant Fact Sheet.

New Orleans, Louisiana this 11th day of December, 2015.

_____
United States District Judge

**UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION          MDL No. 2592

                                        SECTION L

                                        JUDGE ELDON E. FALLON

                                        MAG. JUDGE NORTH

THIS DOCUMENT RELATES TO:
ALL CASES

<u>**PRE-TRIAL ORDER NO. 14B**</u>

The parties having agreed to amend Pre-Trial Order No. 14 (PTO 14) dated May 4, 2015

and Pre-Trial Order No. 14A (PTO 14A) dated August 10, 2015, PTO 14 and PTO 14A are hereby

amended as follows:

1.      Section VII.5 of the Defendant's Fact Sheet ("DFS") requests that Defendants

provide certain data relating to the dispensing and prescribing practices of Plaintiffs' Prescribing

and Primary Treating Health Care Providers as it relates to Xarelto® if such data is within their

possession, custody or control.  The Plaintiff Steering Committee (PSC) has requested that this

data be provided directly to the PSC, for the sole purpose of assisting the PSC in making its

bellwether case selections.

2.      Defendants license information and data responsive to Section VII.5 of the DFS

from IMS Health Inc. ("IMS Data").  IMS Health Inc. has authorized Defendants to provide a copy

of the responsive data to the PSC, with no fee, upon execution of the Consent Letter attached

hereto as Exhibit 1 by Plaintiffs' Co-Lead Counsel, who has authority to represent the interests of

the PSC in this matter.

3.      Defendants shall, upon receipt of the executed Consent Letter attached hereto as Exhibit 1 from Plaintiffs' Co-Lead Counsel, produce directly to the PSC a copy of the IMS Data provided pursuant to Section VII.5 of the DFS, in the same excel format that the IMS Data is provided with the individual DFS, for the cases which are in consideration for potential bellwether selection and where DFS's have been produced by Defendants to date.

4.      The PSC shall not provide any IMS Data to any individual plaintiffs' counsel for their individual cases.  Individual plaintiffs' counsel may obtain IMS Data for their individual cases by following the process set forth in PTO 14A.

5.      All provisions of PTO 14 and PTO 14A other than those amended herein shall remain unchanged and in full force and effect.

New Orleans, Louisiana this 6th day of January, 2016.

_____

UNITED STATES DISTRICT JUDGE



*Via Email*

January 4, 2016

Jennifer La Mont, Esq.
Drinker Biddle & Reath LLP
600 Campus Dr.
Florham Park, NJ  07932-1047

Timothy S. Coon, Esq.
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219

   RE: In re: Xarelto (Rivaroxaban) Products Liability Litigation, MDL No. 2592

   IMS Data: For prescribing physicians and one treating physician identified by each plaintiff in the actions that are eligible for the bellwether trial pool as defined by the Court Order in this matter, the name and address of the HCP and prescribing history data such as the number of new prescriptions, the units, and the number of total prescriptions for Xarelto for 2011 to the present

Dear Ms. La Mont and Mr. Coon:

This letter will serve as a response to your requests on behalf of your respective clients: Janssen Research & Development, LLC; Janssen Ortho, LLC; Janssen Pharmaceuticals, Inc.; Johnson & Johnson (collectively, "Janssen"); Bayer Corporation; Bayer Healthcare, AG; Bayer Pharma, AG; Bayer, AG; Bayer Healthcare, LLC; and Bayer Healthcare Pharmaceuticals, Inc. (collectively, "Bayer") (hereinafter, collectively, the "CLIENTS"), to provide the above-referenced IMS Data (the "IMS Information") to members of the Plaintiffs' Steering Committee (the "PSC") in connection with the above-referenced litigation (the "Litigation").  IMS represents that IMS Information is confidential and proprietary to IMS.  As you may be aware, IMS Information retains its value to IMS so long as it is treated in accordance with the requirements of law affording certain protection for such information (e.g., laws governing trade secrets and copyrights).  In addition, IMS has certain contractual obligations of confidentiality with its data sources and clients.

You have requested that IMS consent to CLIENTS' and PSC's use of IMS Information in the Litigation, subject to the respective protective order, particularly, Pretrial Order No. 12, Stipulated Protective Order, filed May 4, 2015, in the Eastern District of Louisianawhich is attached hereto as Exhibit A (the "Protective Order").  In order to provide consent to this request, it is necessary that, on behalf of CLIENTS, you represent and agree that any such usage or disclosure of IMS Information will be treated in a manner which does not compromise the

above-mentioned protections or obligations.   Further, consent to such use of any IMS Information in the Litigation is subject to your agreement to the following:

A.      Prior to disclosure of IMS Information in the Litigation, you shall designate IMS Information as HIGHLY PROTECTED and proprietary to IMS and in a manner so as to be subject to the Protective Order.   To the extent any terms of the Protective Order are inconsistent with the terms of this letter, the terms of this letter shall control.   Access to and use of IMS Information shall be strictly limited to purposes directly related to the Litigation.

B.      Prior to using any IMS Information in filings in the court or otherwise producing IMS Information as part of the Litigation, you shall ensure that:

1.      Production of IMS Information shall be limited to that portion of IMS Information that is relevant to the Litigation, except where the context or applicable rules of civil procedure otherwise specifically requires.  Without limiting the foregoing, IMS Information produced in the Litigation will include only the individual prescribers whose prescribing behavior is directly relevant to such Litigation and whom the plaintiffs have themselves expressly identified.

2.      Any person or entity receiving IMS Information on behalf of the PSC in connection with the Litigation shall only use IMS Information for purposes directly related to reaching an outcome in the Litigation and shall not in any event use IMS Information for any business, competitive, personal, private, public, or other purpose.

3.      All documents containing IMS Information shall be marked "HIGHLY PROTECTED – SUBJECT TO PROTECTIVE ORDER," or marked in such other manner so as to be identified as a document requiring highly confidential treatment under the terms of the Protective Order.   Any person or entity receiving IMS Information shall be apprised of the confidential and proprietary nature of such information.

4.      No person or entity that obtains access to IMS Information on behalf of the PSC shall attempt to identify any person or entity (including any patient, consumer, outlet, supplier, plan, pharmacy or prescriber) that is not readily identifiable in the IMS Information.  No person or entity that obtains access to any IMS Information shall attempt to contact, for the purpose of obtaining testimony or otherwise, any person or entity (including any patient, consumer, outlet, supplier, plan, pharmacy or prescriber) identified in or identifiable from the IMS Information.  Nothing in this paragraph prohibits any person from identifying or contacting any person or entity that they have knowledge of from sources other than IMS Information, nor does this paragraph authorize any person to contact any person or entity.

5.      When IMS Information is used in or as part of a proceeding in the Litigation, IMS will only act as an objective service provider and not as an expert on behalf of a client or any party. As more fully described in the Statement of IMS Health Regarding Use of Prescriber Data in Legal Proceedings or Government Investigations, attached hereto as Exhibit B ("IMS Statement"), IMS Information may reflect projections, estimates, forecasts, or other analyses of data which are the result of either IMS standard processes or specifications developed or approved by the client. The parties acknowledge that IMS Information, although appropriate for its intended purpose of supporting business and marketing analyses in industries such as the pharmaceutical industry, contains data that is susceptible to error or variance, and is not intended by IMS to be used to establish any fact.  Any person or entity receiving IMS Information in connection with the Litigation shall receive a copy of the IMS Statement.

6.       Any reports, documents, or exhibits prepared by CLIENTS or the PSC, which contain IMS Information together with information from other sources, shall be identified as such, and shall not be represented as a report, document, or exhibit prepared by IMS.

7.      IMS will not offer testimony or other evidence regarding the interpretation of the results of the data provided by IMS or the services performed by IMS in connection with the Litigation. In addition, IMS will not provide any advice or engage in any advocacy with respect to witness testimony or expert analysis of any other party. Also, IMS will not provide any opinion as to the relative merits of the clients' or the other party's positions in the Litigation.

8.      The IMS Information shall not be placed in any information repository accessible to any person or entity not part of the PSC and not directly involved in the Litigation, and shall not otherwise be made available to any person or entity not directly involved in the Litigation.

9.      In no event shall any disclosure of IMS Information be made to any competitor of IMS, or to any person who, upon reasonable good faith inquiry, could be determined to be an employee of any competitor of IMS, irrespective of whether that person is retained as an expert in the Litigation.  No person or entity that obtains access to any IMS Information shall in any manner whatsoever attempt to reverse engineer or disassemble such information or attempt to ascertain the methodologies by which such information was obtained, sorted, projected, or manipulated.

10.     Prior to disclosure of IMS Information to any member of the PSC, Brian Barr, as Co-Lead Counsel for the Plaintiffs in the Litigation, shall sign a copy of this letter, acknowledging and agreeing to be bound by the terms and

conditions of this letter. Mr. Barr, as Co-Lead Counsel for the Plaintiffs in the Litigation represents that he has authority to sign this agreement and represents the interests of the PSC in this matter.  CLIENTS shall provide to IMS a copy of such letter(s) upon request from IMS.

11.     If CLIENTS or any other party to whom disclosure may be made in the Litigation desire to use at trial or in any public court proceeding any of the above-referenced IMS Information, CLIENTS or the party seeking to use the IMS Information shall request the court to permit presentation of such material with only counsel and court personnel present or in such other manner as the court deems appropriate to maintain the confidentiality of the IMS Information. At no time may the IMS Information be disclosed without the "Highly Protected" designation or an equivalent designation that is intended to ensure highly confidential treatment of such IMS Information.

12.     In no event shall IMS be liable for any consequential, special, exemplary, or similar types of damages, including but not limited to third party claims, whether foreseeable or not, arising in connection with the use of IMS Information in the Litigation, even if IMS has been advised of the possibility of such damages. Any reliance on or decision based on IMS Information is the sole responsibility of you and the entity that receives the IMS Information in the Litigation.  The PSC agrees to hold IMS and its affiliates harmless from any claims or costs arising out of the release of IMS Information in the Litigation.

13.     Each person or entity having received IMS Information shall comply with paragraph 32 of the Stipulated Protective Order filed in the Eastern District of Louisiana (Exhibit A), as applicable.  Compliance with the terms of such Protective Order shall be made within 90 days of the termination of the respective action, and written attestations that all copies of IMS Information have been destroyed or returned shall be provided to IMS upon request.

14.     The PSC shall not provide any IMS Information to any individual plaintiffs' counsel for their individual cases.  Individual plaintiffs' counsel may obtain IMS Information following the process set forth in CMO 14A in the Litigation, after providing the signed IMS letter agreement attached as Exhibit 1 to CMO 14A.

Subject to your agreement with the foregoing, and in reliance on your representation that the above terms are acceptable to all members of the PSC, IMS will consent to your request. If the

above terms are acceptable, please counter-sign a copy of this letter where indicated and returned to my attention. Thank you.

Very Truly Yours,

Maureen Nakly
Senior Attorney
IMS Health Incorporated


Acknowledged and Agreed by:

COUNSEL FOR JANSSEN

BY: _____
        Jennifer La Mont, Esq.

TITLE: _____

DATE: _____


COUNSEL FOR BAYER

BY: _____
        Timothy S. Coon, Esq.

TITLE: _____

DATE: _____


PLAINTIFFS' STEERING COMMITTEE


BY: _____
        Brian Barr, Esq.

TITLE: _____

DATE: _____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


IN RE: XARELTO (RIVAROXABAN)          *          MDL NO. 2592
PRODUCTS LIABILITY LITIGATION         *
                                      *          SECTION L
                                      *
                                      *          JUDGE ELDON E. FALLON
                                      *
                                      *          MAG. JUDGE NORTH
* * * * * * * * * * * * * * * * * * * *
THIS DOCUMENT RELATES TO ALL CASES

**PRETRIAL ORDER NO. 11D**
**(Bundling of Complaints and Answers)**

The Court outlined the procedure for the filing of joint complaints in Pretrial

Order 11. (Rec. Doc. 893).  The Plaintiffs' Steering Committee later provided the Court

with an exemplar joint complaint and exemplar short form complaint, which the Court

issued as Pretrial Order No. 11A.  The Plaintiffs' Steering Committee has provided the

Court with an updated exemplar joint complaint (Attachment A) for the use of Plaintiffs'

counsel when filing their joint complaints.  These forms are intended to provide

guidance, but individual counsel bears the responsibilty first to decide whether this form

appplies to his or her client's case, and then to tailor this form to correspond to each

Plaintiff's claims/allegations.  Counsel shall contact Plaintiffs' Liaison Counsel,

Leonard Davis or Gerald Meunier, with any questions regarding these forms.


NEW ORLEANS, LOUISIANA this 27th day of January, 2016.

_____
UNITED STATES DISTRICT JUDGE

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ANDY APPLE, BRIAN BARNONE, CANDY CORN, DONNA DIXON, ELLEN ELKIN, FRED FINKEL, AND GEAUX GIROD | MDL NO. 2592 |
| Plaintiffs, | SECTION:   L |
| v. | JUDGE:  ELDON E. FALLON |
| JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON COMPANY BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG, | MAG. JUDGE MICHAEL NORTH  **JURY TRIAL DEMANDED** |
| Defendants. | |

No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

## JOINT COMPLAINT

Pursuant to Pretrial Order No. 11, Plaintiffs, by and through counsel, file this *Joint Complaint* against Defendants, as follows:

## I.      PLAINTIFF SPECIFIC ALLEGATIONS [NOTE:  PTO 11(1)(b)][1]

Plaintiffs herein are: [list each plaintiff alphabetically and add counts necessary and appropriate for each client specific jurisdiction, if necessary]

    1.    Andy Apple [include county & state of citizenship for each plaintiff]

        a.  Plaintiff, _____, ingested Xarelto from approximately _____ to _____ and suffered a gastrointestinal bleed on _____ as a direct result of Xarelto.  Plaintiff _____ resides in _____ County in the state of_____.

---

[1] **THROUGHOUT THIS DOCUMENT A NUMBER OF ITEMS ARE HIGHLIGHTED IN YELLOW. THESE HIGHLIGHTED AREAS ARE MEANT TO PROVIDE GUIDANCE TO INDIVIDUAL COUNSEL SO THAT INDIVIDUAL COUNSEL CAN SPECIFICALLY PREPARE ITS CLIENT'S COMPLAINT.  IN ADDITION, THE CLAIMANTS IDENTIFIED IN SECTION I.  PLAINTIFF SPECIFIC ALLEGATIONS ARE FICTIOUS NAMES THAT SHOULD BE REMOVED AND ARE PLACED WITHIN SOLELY AS EXAMPLES. COUNSEL ARE IN INSTRUCTED TO EDIT THE PLEADING THEY USE FOR THEIR PARTICULAR CLIENTS APPROPRIATELY BY REMOVING THE DISCLAIMER IN THE FOOTER BELOW, YELLOW HIGHLIGHTING AND INSTRUCTIONS.  COUNSEL ARE ALSO INSTRUCTED TO FILL-IN OR DELETE BLANKS AS APPROPRIATE.**

No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

2.  Brian Barnone [use if claim includes loss of consortium]

    a.  Plaintiff, Brian Barnone, ingested Xarelto from approximately _____ to _____ and suffered a gastrointestinal bleed on _____ as a direct result of Xarelto. Plaintiff _____ resides in _____ County in the state of_____.

    b.  In conjunction with Plaintiff Barnone's claim, Belinda Barnone, spouse of Brian Barnone, asserts a claim for loss of consortium.

3.  Candy Corn [use if minor]

    a.  Plaintiff, _____, a minor, ingested Xarelto from approximately _____ to __ and suffered severe internal bleeding on _____ as a direct result of Xarelto.  Plaintiff _____ resides in ___ County in the state of _____. Plaintiff _____ is represented herein by his guardian(s), _____.

4.  Donna Dixon [use if death case]

    a.  Plaintiff, _____, ingested Xarelto from approximately _____ to __ and suffered severe internal bleeding on _____ as a direct result of Xarelto. Plaintiff _____ ultimately died due to his injuries on _____.   Plaintiff

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

_____ was a resident of ___ County in the state of _____.  Plaintiff

_____ is represented herein by ____, the executor of his estate.

5.   Ellen Elkin [use if state of death is different from state of citizenship]

a.   Plaintiff, _____, ingested Xarelto from approximately ____ to __ and

suffered severe internal bleeding on _____ as a direct result of Xarelto.

Plaintiff _____ ultimately died due to his injuries on _____ in _____ county in

the state of _____.  Plaintiff _____ was a resident of ___ County in the state

of _____ at the time of his death.  Plaintiff _____ is represented herein

by ____, the executor of his estate.

6.   Fred Finkel [use if location of injury & ingestion are different from state of current

citizenship]

a.   Plaintiff, _____, ingested Xarelto from approximately _____ to ____ and

suffered a gastrointestinal bleed on ____ as a direct result of Xarelto.  Plaintiff

_____ resides in _____ County in the state of_____.  At the time of

the ingestion and injury Plaintiff resided in _____ County in the state of

_____.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs'
Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as
accurate as possible, no claims, promises or guarantees about the accuracy of the content of the
Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the
content and no warranty of any kind is given with respect to the content.  Counsel are encouraged
to perform their own independent research and due diligence, and the PSC disclaims any
responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

7.   Geaux Girod [use if state of injury, ingestion and current citizenship are all different]

a.   Plaintiff, _____, ingested Xarelto from approximately _____ to ____ and suffered brain hemorrhaging on ____ as a direct result of Xarelto.  Plaintiff _____ currently resides in _____ County in the state of_____.  At the time of the ingestion Plaintiff resided in _____ County in the state of _____.  At the time of injury Plaintiff resided in ____ County in the state of _____.

## II.   **<u>DEFENDANTS</u>**

8.   Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business in New Jersey. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business in New Jersey. Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

diversity under 28 U.S.C. § 1332.

9.     As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

10.    Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

11.    Upon information and belief, and at all relevant times Defendant JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. The primary purposes of Xarelto are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

12.    Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a   JANSSEN   PHARMACEUTICA   INC.   f/k/a   ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business in New Jersey.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

13.   As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

14.   Upon information and belief, and at all relevant times, Defendant JANSSEN PHARM was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

15.   Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

16. As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

17. Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

18. Defendant Johnson & Johnson (hereinafter referred to as "J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

19. As part of its business, J&J, and its "family of companies," is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

20. Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

21. As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

22. Upon information and belief, and at all relevant times, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

23. Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

24.   Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG.  Bayer Schering Pharma AG was formerly known as Schering AG and is the same corporate entity as Schering AG.

25.   Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

26.   Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

27.   As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

28.   Upon information and belief, and at all relevant times, Defendant BAYER PHARMA AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

29.   Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

30.   Upon information and belief, BAYER HEALTHCARE PHARMACEUTICALS, INC. is owned by Defendant BAYER CORPORATION.

31.   At all relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

32.   Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located at 100 Bayer Blvd, Whippany, New Jersey 07981-1544.

   a.   Upon information and belief, from on or about the early January 1, 2003 until on or about late December, 2014, BAYER HEALTHCARE LLC's sole member was Bayer Corporation, and is wholly owned by Bayer Corporation,

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

b.   Upon information and belief, from on or about early January, 2015 to on or about June 30, 2015, BAYER HEALTHCARE LLC's sole member was Bayer Medical Care, Inc., and is wholly owned by Bayer Medical Care, Inc., which is a Delaware Corporation, with its principal place of business at 1 Medrad Dr., Indianola, Pennsylvania 15051.

c.   Upon information and belief, from on or about July 1, 2015 to the present, BAYER HEALTHCARE LLC's members are:

   i.   Bayer Medical Care Inc., a Delaware corporation with its principal place of business in Pennsylvania;

   ii.  NippoNex Inc., a Delaware corporation with its principal place of business in New York;

   iii. Bayer West Coast Corporation, a Delaware Corporation with its principal place of business in California;

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

## JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

iv.    Bayer Essure Inc., a Delaware corporation with its principal place of business in California;

v.    Bayer Consumer Care Holdings, LLC, a limited liability company formed in Delaware with its principal place of business in New Jersey;

vi.    Dr. Scholl's LLC, a limited liability company, formed in Delaware with its principal place of business in California;

vii.    Coppertone LLC, a limited liability company, formed in Delaware with its principal place of business in California;

viii.    MiraLAX LLC, a limited liability company, formed in Delaware with its principal place of business in California; and,

ix.    Bayer HealthCare U.S Funding LLC, a limited liability company a limited liability company, formed in Delaware with its principal place of business in Pennsylvania.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New Jersey, New York, Indiana, Pennsylvania, and California for purposes of determining diversity under 28 U.S.C. § 1332.

33.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

34.    Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

35.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises control over Defendants BAYER CORPORATION, BAYER

No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

36.   Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

37.   Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

38.   Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

39.   Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc., Bayer

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as "Defendants."

40.   At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

41.   At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, and joint venture.

42.   At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

### III.   JURISDICTION AND VENUE

43.   Federal subject matter jurisdiction in the constituent actions is based upon 28 U.S.C. § 1332, in that in each of the constituent actions there is complete diversity among Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiffs and Defendants.

44.   Defendants have significant contacts in the vicinage of Plaintiff's residence such that they are subject to the personal jurisdiction of the court in that vicinage.

45.   A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the vicinage of Plaintiff's residence, as well as in this district.  Pursuant to 28 U.S.C. § 1391(a), venue is proper in both districts.

46.   Pursuant to the Transfer Order of the Judicial Panel on Multidistrict Litigation, *In re Xarelto (Rivaroxaban) Products Liab. Litig*., 2014 WL 7004048 (J.P.M.L. June 12, 2014), venue is also proper in this jurisdiction pursuant to 28 U.S.C. § 1407.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

**IV.    FACTUAL ALLEGATIONS**

    **A.    Nature of the Case**

47.    Plaintiffs bring this case against Defendants for damages associated with ingestion of the pharmaceutical drug Xarelto, which was designed, manufactured, marketed, sold and distributed by Defendants. Specifically, Plaintiffs suffered various injuries, serious physical pain and suffering, medical, hospital and surgical expenses, loss of consortium, and/or death and funeral expenses as a direct result of their use of Xarelto.

48.    At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

49.    Xarelto was introduced in the United States ("U.S.") on July 1, 2011, and is part of a class of drugs called New Oral Anticoagulants ("NOACs").

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

50.     This class of NOACs, which also includes Pradaxa and Eliquis, is marketed as the next generation of blood-thinning drugs to replace warfarin (Coumadin); an established safe treatment for preventing stroke and systemic embolism for the past 60 years.

51.     Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

52.     Defendants received FDA approval for Xarelto on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

53.     Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that Xarelto  was  superior (based on the Defendants' definition) to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty, accompanied by similar rates of bleeding. However, the studies also showed a greater bleeding incidence with Xarelto leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty. N. Engl. J. Med. 2008; 358:2776-86; Kakkar, A.K., et al. Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty:  a double-blind, randomized controlled trial. Lancet 2008; 372:31-39; Ericksson, B.I., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty. N. Engl. J. Med. 2008; 358:2765-75.).

54.    Despite these findings, the RECORD studies were flawed in design and conducted in a negligent manner.   In fact, FDA Official Action Indicated ("OAI")—rated inspections in 2009 disclosed rampant violations including, "systemic discarding of medical records," unauthorized unblinding, falsification, and "concerns regarding improprieties in randomization."   As a result, the FDA found that the RECORD 4 studies were so flawed that they were deemed unreliable.   (Seife, Charles, *Research Misconduct Identified by US Food and Drug Administration,* JAMA Intern. Med (Feb. 9, 2015)).

55.    Nevertheless, Defendants received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).   Approval of Xarelto for reducing the risk of stroke and

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF").

56.     The Rocket AF study showed that Xarelto was non-inferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding.  However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. Rivaroxaban versus warfarin in Nonvalvular Atrial Fibrillation. N. Engl. J. Med. 2011; 365:883-91.)

57.     The ROCKET AF study compared warfarin to Xarelto.  Thus, for the study to be well designed and meaningful, the warfarin study group would have to be well managed because warfarin's safety and efficacy is dose dependent. In other words, if the warfarin group was poorly managed, it would be easy for Xarelto to appear non-inferior to warfarin, which, in turn, would provide Defendants a study to "support" Xarelto's use.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

58.     In fact, in the ROCKET AF study, the warfarin group was not well managed.  The warfarin group in the ROCKET AF study was the worst managed warfarin study group in any previously reported clinical trial involving warfarin.

59.     The poor management of the warfarin group in the ROCKET AF study was not lost on the FDA, which noted "the data comparing [Xarelto] to warfarin are not adequate to determine whether [Xarelto] is as effective for its proposed indication in comparison to warfarin when the latter is used skillfully."  FDA Advisory Committee Briefing document. P. 10.

60.     Public Citizen also noticed the poor control in the warfarin group.  Public Citizen wrote the FDA, stating they "strongly oppose FDA approval…  The 3 ROCKET AF trial conducted in support of the proposed indication had a suboptimal control arm…" http://www.citizen.org/documents/1974.pdf.

61.     Another problem with the ROCKET AF study was Xarelto's once-a-day dosing. The FDA clinical reviewers stated that "the sponsor's rationale for evaluating only once daily dosing during Phase 3 is not strong.  Most importantly, there is clinical information from Phase 2 trials … and from clinical pharmacology studies suggesting that twice daily dosing, which would produce lower peak blood levels and higher trough blood levels of [Xarelto], might have been

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

associated with greater efficacy and/or a better safety profile."   FDA advisory Committee Briefing document p. 100.

62.     Dr. Steven E. Nissen, more sharply, stated "my concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and was a mistake…"  FDA Advisory Meeting Transcript p. 287.

63.     Furthermore, the FDA expressed desirability in monitoring Xarelto dosage within their NDA approval memo based on the ROCKET studies.  The clinical pharmacology in these studies demonstrated a linear correlation between rivaroxaban (Xarelto) levels and prothrombin time ("PT"); and subsequently a correlation between PT and the risk of bleeding.  At this time, Defendants were aware of the correlation between Xarelto dosage and bleeding risks, but had "not chosen to utilize this information."  (NDA 202439 Summary Review, p. 9).   At all relevant times, Defendants' controlled the contents of their label as demonstrated by their decision to go forward without regard to the FDA's suggestion to utilize this information.

64.     The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

65.     Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with an increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. Oral Rivaroxaban for Symptomatic Venous Thromboembolism. N.Engl.J.Med. 2010; 363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study). Expert Rev. Cardiovasc. Ther. 2011; 9(7):841-844). The EINSTEIN-PE study's findings showed that a Xarelto regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-PE Investigators. Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism. N.Engl.J.Med. 2012; 366:1287-97.)

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

## JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

66.     Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

67.     Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism.

68.     Defendants market and promote Xarelto as a single daily dose pill that does not require the need to measure a patient's blood plasma levels, touting it more convenient than warfarin, and does not limit a patient's diet.  The single dose and no blood testing requirements or dietary constraints are marked by Defendants as the "Xarelto Difference."

69.     However, Xarelto's clinical studies show that Xarelto is safer and more effective when there is blood monitoring, dose adjustments and twice a day dosing.

70.     In its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP"),  noted that, even during the approval process,

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

71.     The use of Xarelto without appropriate blood monitoring, dose adjustment and twice a day dosing can cause major, life-threatening bleeding events. Physicians using Xarelto have to be able to balance the dose so that the blood is thinned enough to reduce the risk of stroke, but not thinned so much as to increase the risk for a major bleeding event. The Defendants were aware of this risk and the need for blood monitoring but have failed to disclose this vital health information to patients, doctors and the FDA.

72.     Importantly, Xarelto's significant risk of severe, and sometimes fatal, internal bleeding has no antidote to reverse its effects, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The original U.S. label, approved when the drug was first marketed, did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdose section.

73.     The FDA's adverse event data indicates staggering, serious adverse events that have been associated with Xarelto.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

74.     In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

75.     At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA, its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

76.     The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

77.     Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

78.     Moreover, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

79.     Despite the clear signal generated by the SAE data, Defendants did not tell consumers, health care professionals and the scientific community about the dangers of Xarelto, nor did Defendants perform further investigation into the safety of Xarelto.

80.     Defendants' original, and in some respects, current labeling and prescribing information for Xarelto:

> (a)   failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;
>
> (b)   failed to provide adequate warnings, about the true safety risks  associated with the use of Xarelto;
>
> (c)   failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;
>
> (d)   failed to disclose the need for dose adjustments;
>
> (e)   failed to  disclose the need to twice daily dosing;
>
> (f)   failed to warn about the need for blood monitoring;

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

(g)  failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

(h)  failed to adequately disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

(i)  failed to advise prescribing physicians, such as the Plaintiffs' physicians, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

(j)  failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

(k)  failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

(l)  failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset stomach;

(m)  failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

(n)  failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

(o)  failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

## JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

monitoring of hepatic functioning periodically while the patient is on Xarelto;

(p) failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

(q) failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

(r) in the "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose the need for blood monitoring or to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

81. During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraph 74 (a – r).

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

## JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

82.    Despite the wealth of scientific evidence, Defendants have ignored the increased risk of the development of the aforementioned injuries associated with the use of Xarelto, but they have, through their marketing and advertising campaigns, urged consumers to use Xarelto without regular blood monitoring or instead of anticoagulants that present a safer alternative.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

**B.**      **Over-Promotion of Xarelto**

83.      Xarelto is the second most prescribed drug for treatment of atrial fibrillation, behind only Coumadin (warfarin), and achieved blockbuster status with sales of approximately $2 billion dollars in 2013.

84.      Defendants spent significant amounts of money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of fiscal 2013, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

85.      Defendants' aggressive and misrepresentative marketing of a "Xarelto Difference" lead to an explosion in Xarelto sales. The "Xarelto Difference," *i.e.*, was once a day dosing without blood monitoring.  In fact, the "Xarelto Difference" was nothing more than a marketing campaign based on flawed science.

86.      As a result of Defendants' aggressive marketing efforts, in its first full year on the market, Xarelto garnered approximately $582 million in sales globally.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

87.    Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

88.    During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than $1 billion, which is the threshold commonly referred to as "blockbuster" status in the pharmaceutical industry. In fact, Xarelto sales ultimately reached approximately $2 billion for the 2013 fiscal year, and Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

89.    As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer ("DTC") advertising campaigns that were designed to influence patients to make inquiries to their prescribing physicians about Xarelto and/or request prescriptions for Xarelto.

90.    In the course of these DTC advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to disclose the need for dose adjustments, failed to disclose the need for blood monitoring, and failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

effects of Xarelto, and, that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

91.     On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

92.     Prior to Plaintiffs' ingestion of Xarelto, Plaintiffs became aware of the promotional materials described herein.

93.     Prior to Plaintiffs' prescription of Xarelto, Plaintiffs' prescribing physician received promotional materials and information from sales representatives of Defendants claiming that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also requiring blood monitoring, dose adjustments, twice a day dosing or adequately informing

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

94.     At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

95.     At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn about the need for blood monitoring, dose adjustments, and twice a day dosing, and failed to disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto, and, that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

96.     Prior to applying to the FDA for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

97.     As a result of Defendants' claim regarding the effectiveness and safety of Xarelto, Plaintiffs' medical providers prescribed and Plaintiffs ingested Xarelto.

### C.     The Plaintiffs' Use of Xarelto and Resulting Injuries

98.     By reason of the foregoing acts and omissions, Plaintiffs were caused to suffer from life-threatening bleeding, as well as other severe and personal injuries (for some, wrongful death) which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings, among other damages.

99.     Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

100.     Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiffs' prescribing physicians or Plaintiffs that Xarelto was associated with and/or

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side-effects, specifically life-threatening bleeding.

101.    Upon information and belief, Defendants concealed and failed to completely disclose their knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as their knowledge that they had failed to fully test or study said risk.

102.    Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

103.    Upon information and belief, Defendants failed to warn Plaintiffs and their healthcare providers regarding the need for blood monitoring, dose adjustments and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto.

104.    Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

105.    Defendants' fraudulent concealment and misrepresentations were designed to prevent, and did prevent, the public and the medical community at large from discovering the risks and dangers associated with Xarelto and Plaintiffs from discovering, and/or with reasonable diligence being able to discover, their causes of action.

106.    Defendants' fraudulent representations and concealment evidence flagrant, willful, and depraved indifference to health, safety, and welfare.  Defendants' conduct showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care that raises the presumption of conscious indifference to the consequences of said conduct.

107.    By reason of the forgoing acts and omissions, Plaintiffs have suffered damages and harm, including, but not limited to, personal injury, medical expenses, other economic harm, as well as, where alleged, loss of consortium, services, society, companionship, love and comfort.

## V.    CLAIMS FOR RELIEF
### COUNT I
### (STRICT LIABILITY)

108.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense possible,

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

109. At the time of Plaintiffs' injuries, Defendants' pharmaceutical drug Xarelto was defective and unreasonably dangerous to foreseeable consumers, including Plaintiffs.

110. At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the Plaintiff.

111. Defendants' Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

112. At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiffs herein.

113. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that,

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

114.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

115.   At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

116.   Defendants knew, or should have known that at all times herein mentioned, their Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

117.   At the time of the Plaintiffs' use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

118.    Defendants, with this knowledge, voluntarily designed their Xarelto in a dangerous condition for use by the public, and in particular the Plaintiffs.

119.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

120.    Defendants created a product unreasonably dangerous for its normal, intended use.

121.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

122.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

123.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

health of consumers and to the Plaintiffs in particular; and Defendants are therefore strictly liable for the injuries sustained by the Plaintiffs.

124.    The Plaintiffs could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

125.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

126.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

127.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

128.   The Xarelto ingested by Plaintiffs was in the same or substantially similar condition as it was when it left the possession of Defendants.

129.   Plaintiffs did not misuse or materially alter their Xarelto.

130.   Defendants are strictly liable for Plaintiffs' injuries in the following ways:

    a.   Xarelto as designed, manufactured, sold and supplied by the Defendants, was defectively designed and placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

    b.   Defendants failed to properly market, design, manufacture, distribute, supply and sell Xarelto;

    c.   Defendants failed to warn and place adequate warnings and instructions on Xarelto;

    d.   Defendants failed to adequately test Xarelto;

    e.   Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew of the risk of injury associated with the use of Xarelto, and,

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

      f.   A feasible alternative design existed that was capable of preventing Plaintiffs' injuries.

131.    By reason of the foregoing, Defendants have become strictly liable in tort to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

132.    Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

133.    That said defects in Defendants' drug Xarelto were a substantial factor in causing Plaintiffs' injuries.

134.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, as well as other severe and personal injuries (in some cases death) which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

135.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs,

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT II
## (MANUFACTURING DEFECT)

136. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

137. Xarelto was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants.

138. When it left the control of Defendants, Xarelto was expected to, and did reach Plaintiffs without substantial change from the condition in which it left Defendants' control.

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

139.     Xarelto was defective when it left Defendants' control and was placed in the stream of commerce, in that there were foreseeable risks that exceeded the benefits of the product and/or that it deviated from product specifications and/or applicable federal requirements, and posed a risk of serious injury and death.

140.     Specifically, Xarelto was more likely to cause serious bleeding that may be irreversible, permanently disabling, and life-threatening than other anticoagulants.

141.     Plaintiffs used Xarelto in substantially the same condition it was in when it left the control of Defendants and any changes or modifications were foreseeable by Defendants.

142.     Plaintiffs and their healthcare providers did not misuse or materially alter their Xarelto.

143.     As a direct and proximate result of the use of Xarelto, Plaintiffs' suffered serious physical injury (and in some cases death), harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

**COUNT III**
**(DESIGN DEFECT)**

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

144.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

145.    Xarelto was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by Plaintiffs.

146.    Defendants placed Xarelto into the stream of commerce with wanton and reckless disregard for public safety.

147.    Xarelto was in an unsafe, defective, and inherently dangerous condition.

148.    Xarelto contains defects in its design which render the drug dangerous to consumers, such as Plaintiffs, when used as intended or as reasonably foreseeable to Defendants. The design defects render Xarelto more dangerous than other anticoagulants and cause an unreasonable increased risk of injury, including but not limited to life-threatening bleeding events.

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

149. Xarelto was in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known that Xarelto was defective and unsafe, even when used as instructed.

150. The nature and magnitude of the risk of harm associated with the design of Xarelto, including the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening is high in light of the intended and reasonably foreseeable use of Xarelto.

151. The risks of harm associated with the design of Xarelto are higher than necessary.

152. It is highly unlikely that Xarelto users would be aware of the risks associated with Xarelto through either warnings, general knowledge or otherwise, and Plaintiffs specifically were not aware of these risks, nor would they expect them.

153. The design did not conform to any applicable public or private product standard that was in effect when Xarelto left the Defendants' control.

154. Xarelto's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiffs expected.

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

155.    The intended or actual utility of Xarelto is not of such benefit to justify the risk of bleeding that may be irreversible, permanently disabling, and life-threatening.

156.    At the time Xarelto left Defendants' control, it was both technically and economically feasible to have an alternative design that would not cause bleeding that may be irreversible, permanently disabling, and life-threatening or an alternative design that would have substantially reduced the risk of these injuries.

157.    It was both technically and economically feasible to provide a safer alternative product that would have prevented the harm suffered by Plaintiffs.

158.    Defendants' conduct was extreme and outrageous.  Defendants risked the lives of consumers and users of their products, including Plaintiffs, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

159.    The unreasonably dangerous nature of Xarelto caused serious harm to Plaintiffs.

160.    As a direct and proximate result of the Plaintiffs' use of the Xarelto, which was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

by Defendants, Plaintiffs suffered serious physical injury, harm (and in some cases death), damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

161.    Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles regardless of whether arising under statute and/or common law.

## COUNT IV
## (FAILURE TO WARN)

162.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

163.    Defendants had a duty to warn Plaintiffs and their healthcare providers regarding the need for blood monitoring, dose adjustments, twice daily dosing and failed to warn of the risk

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto.

164.   Defendants knew, or in the exercise or reasonable care should have known, about the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening.

165.   Defendants failed to provide warnings or instructions that a manufacturer exercising reasonable care would have provided concerning the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, in light of the likelihood that its product would cause these injuries.

166.   Defendants failed to update warnings based on information received from product surveillance after Xarelto was first approved by the FDA and marketed, sold, and used in the United States and throughout the world.

167.   A manufacturer exercising reasonable care would have updated its warnings on the basis of reports of injuries to individuals using Xarelto after FDA approval.

168.   When it left Defendants' control, Xarelto was defective and unreasonably dangerous for failing to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening.

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

169.    Plaintiffs used Xarelto for its approved purpose and in a manner normally intended and reasonably foreseeable by the Defendants.

170.    Plaintiffs and Plaintiffs' healthcare providers could not, by the exercise of reasonable care, have discovered the defects or perceived their danger because the risks were not open or obvious.

171.    Defendants, as the manufacturers and distributors of Xarelto, are held to the level of knowledge of an expert in the field.

172.    The warnings that were given by Defendants were not accurate or clear, and were false and ambiguous.

173.    The warnings that were given by the Defendants failed to properly warn physicians of the risks associated with Xarelto, subjecting Plaintiffs to risks that exceeded the benefits to the Plaintiffs.  Plaintiffs, individually and through their physicians, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

174.    Defendants had a continuing duty to warn Plaintiffs and their prescriber of the dangers associated with its product.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

175.    Had Plaintiffs or their healthcare providers received adequate warnings regarding the risks associated with the use of Xarelto, they would not have used it or they would have used it with blood monitoring.

176.    The Plaintiffs' injuries (including and in some cases death), were the direct and proximate result of Defendants' failure to warn of the dangers of Xarelto.

177.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct warrants an award of punitive damages.

**COUNT V**
**(NEGLIGENCE)**

178.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case,

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

179.    Defendants had a duty to exercise reasonable care in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Xarelto including a duty to assure that the product did not cause unreasonable, dangerous side-effects to users.

180.    Defendants failed to exercise ordinary care in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Xarelto in that Defendants knew, or should have known, that the drugs created a high risk of unreasonable, dangerous side-effects and harm, including life-threatening bleeding, as well as other severe and personal injuries (including in some cases death) which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

181.    Defendants, their agents, servants, and/or employees were negligent in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Xarelto  in that, among other things, they:

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

a.    Failed to use due care in designing and manufacturing, and testing Xarelto so as to avoid the aforementioned risks to individuals;

b.    Failed to analyze pre-marketing test data of Xarelto;

c.    Failed to conduct sufficient post-marketing and surveillance of Xarelto;

d.    Failed to accompany the drug with proper warnings regarding all possible adverse side effects associated with its use, and the comparative severity and duration of such adverse effects. The warnings given did not accurately reflect the symptoms, scope or severity of the side effects;  the warnings given did not warn Plaintiffs and their healthcare providers regarding the need for blood monitoring, dose adjustments and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto;

e.    Failed to provide adequate training and instruction to medical care providers for the appropriate use of Xarelto;

f.    Falsely and misleadingly overpromoted, advertised and marketed Xarelto as set forth herein including overstating efficacy, minimizing risk and stating that blood monitoring and dose adjustments were not necessary for safe and effective use to influence patients, such as Plaintiffs, to purchase and consume such product;

g.    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

h.    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

i.   Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

j.   Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

k.   Negligently failing to adequately and correctly warn the Plaintiffs, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

l.   Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

m.   Failing to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto;

n.   Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

o.   Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

p.   Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

q.   Negligently designing Xarelto in a manner which was dangerous to its users;

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

r.    Negligently manufacturing Xarelto in a manner which was dangerous to its users;

s.    Negligently producing Xarelto in a manner which was dangerous to its users;

t.    Negligently assembling Xarelto in a manner which was dangerous to its users;

u.    Concealing information from the Plaintiffs in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

v.    Improperly concealing and/or misrepresenting information from the Plaintiffs, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery; and,

w.    Placing an unsafe product into the stream of commerce.

182.    Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

183.    Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

184.   Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

a.   Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

b.   Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

c.   Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

d.   Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

e.   Failed to warn Plaintiffs of the severity and duration of such  adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

f.   Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

g.   Failed to warn Plaintiffs, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects;

h.   Were otherwise careless and/or negligent.

185.   Despite the fact that Defendants knew or should have known that Xarelto caused unreasonable, dangerous side-effects which many users would be unable to remedy by any means, Defendants continued to market Xarelto to consumers, including the medical community and Plaintiffs.

186.   Defendants knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

187.   It was foreseeable that Defendants' product, as designed, would cause serious injury to consumers, including Plaintiffs.

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

188.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered serious physical injury, harm (and in some cases death), damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

189.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.  Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT VI
## (BREACH OF EXPRESS WARRANTY)

190.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

191.   Defendants expressly warranted that Xarelto was safe and effective to members of the consuming public, including Plaintiffs.

192.   Defendants expressly warranted that Xarelto was a safe and effective product to be used as a blood thinner, and did not disclose the material risks that Xarelto could cause serious bleeding that may be irreversible, permanently disabling, and life-threatening. The representations were not justified by the performance of Xarelto.

193.   Defendants expressly warranted Xarelto was safe and effective to use without the need for blood monitoring and dose adjustments.

194.   Defendants expressly represented to Plaintiffs, Plaintiffs' physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

195. Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

196. Plaintiffs and their healthcare providers reasonably relied on these express representations.

197. Xarelto does not conform to these express representations because Xarelto is not safe and has serious side-effects, including death.

198. Defendants breached their express warranty in one or more of the following ways:

   a. Xarelto as designed, manufactured, sold and/or supplied by the Defendants, was defectively designed and placed in to the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

   b. Defendants failed to warn and/or place adequate warnings and instructions on Xarelto;

   c. Defendants failed to adequately test Xarelto; and,

   d. Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew the risk of injury from Xarelto.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

199.    Plaintiffs reasonably relied upon Defendants' warranty that Xarelto was safe and effective when they purchased and used the medication.

200.    Defendants herein breached the aforesaid express warranties as their drug was defective.

201.    Plaintiffs' injuries (and in some cases death) were the direct and proximate result of Defendants' breach of their express warranty.

202.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.  Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct warrants an award of punitive damages.

**COUNT VII**
**(BREACH OF IMPLIED WARRANTY)**

203.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense available

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

204.    At the time Defendants marketed, distributed and sold Xarelto to Plaintiffs, Defendants warranted that Xarelto was merchantable and fit for the ordinary purposes for which it was intended.

205.    Members of the consuming public, including consumers such as Plaintiffs, were intended third party beneficiaries of the warranty.

206.    Xarelto was not merchantable and fit for its ordinary purpose, because it has a propensity to lead to the serious personal injuries described in this Complaint.

207.    Plaintiffs reasonably relied on Defendants' representations that Xarelto was safe and free of defects and was a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

208.   Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injury (including in some cases death).

209.   Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT VIII
## (NEGLIGENT MISREPRESENTATION)

210.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case,

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

211.    From the time Xarelto was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiffs, Plaintiffs' physicians and the general public, including but not limited to the misrepresentation that Xarelto was safe, fit and effective for human use.  At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale of Xarelto and willfully deceived Plaintiffs, Plaintiffs' physicians and the general public as to the health risks and consequences of the use of Xarelto.

212.    The Defendants made the foregoing representations without any reasonable ground for believing them to be true.  These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

213.    The representations by the Defendants were in fact false, in that Xarelto is not safe, fit and effective for human consumption as labeled, using Xarelto is hazardous to your

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

## JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

health, and Xarelto has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiffs.

214.   The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

215.   In reliance on the misrepresentations by the Defendants, Plaintiffs were induced to purchase and use Xarelto.  If Plaintiffs had known the truth and the facts concealed by the Defendants, Plaintiffs would not have used Xarelto.  The reliance of Plaintiffs upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know all of the facts.

216.   As a result of the foregoing negligent misrepresentations by Defendants, Plaintiffs suffered injuries (including, in some cases, death) and damages as alleged herein.

### COUNT IX
### (FRAUD)

217.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense, pursuant

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

218.     Prior to Plaintiffs' use of Xarelto and during the period in which Plaintiffs actually used Xarelto, Defendants fraudulently suppressed material information regarding the safety and efficacy of Xarelto, including information regarding increased adverse events, pre and post marketing deaths, and the high number of severe adverse event reports compared to other anticoagulants and the need for blood monitoring and dose adjustments for the safe and effective use of Xarelto.  Furthermore, Defendants fraudulently concealed the safety information about the use of Xarelto.  As described above, Xarelto has several well-known serious side-effects that are not seen in other anticoagulants. Plaintiffs believe that the fraudulent misrepresentation described herein was intentional to keep the sales volume of Xarelto strong.

219.     The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiffs, the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

220.    These representations were made by said Defendants with the intent of defrauding and deceiving the Plaintiffs, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiffs herein.

221.    At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiffs used Xarelto, the Plaintiffs were unaware of the falsity of said representations and reasonably believed them to be true.

222.    In reliance upon said representations, Plaintiffs were induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries.

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

223.    Said Defendants knew and were aware, or should have been aware, that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

224.    Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

225.    Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of Plaintiffs.

226.    Defendants fraudulently concealed the safety issues associated with Xarelto including the need for blood monitoring and dose adjustments in order to induce physicians to prescribe Xarelto and for patients, including Plaintiffs, to purchase and use Xarelto.

227.    At the time Defendants concealed the fact that Xarelto was not safe, Defendants were under a duty to communicate this information to Plaintiffs, physicians, the FDA, the healthcare community, and the general public in such a manner that they could appreciate the risks associated with using Xarelto.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

228. Defendants, at all times relevant hereto, withheld information from the FDA which they were required to report.

229. Plaintiffs and the Plaintiffs' prescribing physicians relied upon the Defendants' outrageous untruths regarding the safety of Xarelto.

230. Plaintiff's prescribing physicians were not provided with the necessary information by the Defendants, to provide an adequate warning to the Plaintiffs.

231. Xarelto was improperly marketed to the Plaintiffs and their prescribing physicians as the Defendants did not provide proper instructions about how to use the medication and did not adequately warn about Xarelto's risks.

232. As a direct and proximate result of Defendants' malicious and intentional concealment of material life-altering information from Plaintiffs and Plaintiffs' prescribing physicians, Defendants caused or contributed to Plaintiffs' injuries (and in some cases death).

233. It is unconscionable and outrageous that Defendants would risk the lives of consumers, including Plaintiffs. Despite this knowledge, the Defendants made conscious decisions not to redesign, label, warn or inform the unsuspecting consuming public about the dangers associated with the use of Xarelto. Defendants' outrageous conduct rises to the level

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

## JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

necessary that Plaintiffs should be awarded punitive damages to deter Defendants from this type of outrageous conduct in the future and to discourage Defendants from placing profits above the safety of patients in the United States of America.

234.    Defendants' fraud also acted to conceal their malfeasance which actions tolled Plaintiffs' statute of limitations because only Defendants knew the true dangers associated with the use of Xarelto as described herein.   Defendants did not disclose this information to the Plaintiffs, their prescribing physicians, the healthcare community and the general public. Without full knowledge of the dangers of Xarelto, Plaintiffs could not evaluate whether a person who was injured by Xarelto had a valid claim.

235.    Defendants widely advertised and promoted Xarelto as a safe and effective medication and/or as a safe and effective means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

236.    Defendants' advertisements regarding Xarelto falsely and misleadingly stated that blood monitoring and dose adjustments were not necessary for safe and effective use of the drug,

No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.

## JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

misrepresentations Defendants knew to be false, for the purpose of fraudulently inducing consumers, such as Plaintiffs, to purchase such product. Plaintiffs relied on these material misrepresentations when deciding to purchase and consume Xarelto.

237.    Defendants had a duty to disclose material information about serious side-effects to consumers such as Plaintiffs.

238.    Additionally, by virtue of Defendants' partial disclosures about the medication, in which Defendants touted Xarelto as a safe and effective medication, Defendants had a duty to disclose all facts about the risks associated with use of the medication, including the risks described in this Complaint. Defendants intentionally failed to disclose this information for the purpose of inducing consumers, such as Plaintiffs, to purchase Defendants' dangerous product.

239.    Had Plaintiffs been aware of the hazards associated with Xarelto, Plaintiffs would have employed appropriate blood monitoring, consumed a different anticoagulant with a better safety profile, or not have consumed the product that led proximately to Plaintiffs' injuries (including in some cases death).

240.    Upon information and belief, Plaintiffs aver that Defendants actively and fraudulently concealed information in Defendants' exclusive possession regarding the hazards

**No representations, opinions or legal advice is provided by this document. While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made. The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content. Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

associated with Xarelto, for the purpose of preventing consumers, such as Plaintiffs, from discovering these hazards.

**COUNT X**
**(VIOLATION OF CONSUMER PROTECTION LAWS/CONSUMER FRAUD LAWS)**

241.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

242.    Plaintiffs used Xarelto and suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

243.    Defendants used unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

    a.  Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    b.  Advertising goods or services with the intent not to sell them as advertised; and,

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

  c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

244. Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Xarelto.

245. Defendants violated consumer protection laws of various states.

246. Defendants uniformly communicated the purported benefits of Xarelto while failing to disclose the serious and dangerous side effects related to the use of Xarelto and of the true state of Xarelto's regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers, such as Plaintiffs, in the marketing and advertising campaign described herein.

247. Defendants' conduct in connection with Xarelto was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

248.    As a result of these violations of consumer protection laws, Plaintiffs have incurred and will incur; serious physical injury (including in some cases death), pain, suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof, for which Defendants are liable.

## COUNT XI
## (LOSS OF CONSORTIUM)

249.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

250.    At all relevant times hereto, where applicable, Plaintiffs had spouses (hereafter referred to as "Spouse Plaintiffs") and/or family members (hereafter referred to as "Family Member Plaintiffs") who have suffered injuries and losses as a result of the Plaintiffs' injuries from Xarelto.

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

251.    For the reasons set forth herein, Spouse Plaintiffs and/or Family Member Plaintiffs have necessarily paid and have become liable to pay for medical aid, treatment, monitoring, medications, and other expenditures and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

252.    For the reasons set forth herein, Spouse Plaintiffs and/or Family Member Plaintiffs have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love and affection.

253.    For all Spouse Plaintiffs, Plaintiffs allege that their marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

254.    Spouse Plaintiffs and/or Family Member Plaintiffs have suffered great emotional pain and mental anguish.

255.    As a direct and proximate result of Defendants' wrongful conduct, Spouse Plaintiffs, Family Member Plaintiffs, and/or intimate partners of the aforesaid Plaintiffs, have sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses and other damages for which they are entitled to compensatory and equitable

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

damages and declaratory relief in an amount to be proven at trial. Defendants are liable to Spouse Plaintiffs, Family Member Plaintiffs, and intimate partners jointly and severally for all general, special and equitable relief to which Spouse Plaintiffs, Family Member Plaintiffs, and intimate partners are entitled by law.

## COUNT XII
## (WRONGFUL DEATH)

256.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

257.    Plaintiffs bring this claim, where appropriate, on behalf of the Estate and for the benefit of the Plaintiff Decedents' lawful beneficiaries.

258.    As a direct and proximate result of the conduct of the Defendants and the defective nature of Xarelto as outlined above, Plaintiff Decedents suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

259.    As a direct and proximate cause of the conduct of Defendants, Plaintiff Decedents' beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedents' deaths.  Plaintiffs bring this claim on behalf of Decedents' lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

## COUNT XIII
## (SURVIVAL ACTION)

260.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

261.    As a direct and proximate result of the conduct of Defendants, where appropriate, Plaintiff Decedents, prior to their death, were obligated to spend various sums of money to treat his or her injuries, which debts have been assumed by the Estate. As a direct and proximate

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

cause of the aforesaid, Decedents were caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of his or her death; and, as a direct and proximate result of the aforesaid, Decedents suffered a loss of earnings and earning capacity. Plaintiffs bring this claim on behalf of Decedents' estates under applicable state statutory and/or common laws.

262.    As a direct and proximate result of the conduct of Defendants, Plaintiff Decedents and their spouses and heirs, including domestic partners, until the time of Decedents' deaths, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

263.    As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Plaintiff Decedents until the date of their deaths, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment.  Plaintiffs' spouses or heirs, including domestic partners, as Administrators or beneficiaries of the estate of the Decedent, bring the

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

## JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

claim on behalf of the estate for damages under applicable statutory and/or common laws, and in their own right.

**COUNT XIV**
**(STATE SPECIFIC ALLEGATIONS)**

264.  Counsel may want to include specific state specific allegations applicable to certain plaintiffs depending upon the particular jurisdiction of the particular plaintiff.  This determination is the responsibility of individually retained counsel.  Allegations should be plead as appropriate.  Also state specific allegations should be cross-referenced to the particular plaintiff identified in Section I. PLAINTIF SPECIFIC ALLEGATIONS above.

**VI.**    **JURY TRIAL DEMANDED**

Plaintiffs demand that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

**VII.**    **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.

# JOINT COMPLAINT – REVISED DRAFT (JANUARY, 2016)

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

3. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

4. Prejudgment interest;

5. Postjudgment interest;

6. Awarding Plaintiff reasonable attorneys' fees when applicable;

7. Awarding Plaintiff the costs of these proceedings; and

8. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

[INDIVIDUAL COUNSEL SIGNATURE BLOCK]

**No representations, opinions or legal advice is provided by this document.  While the Plaintiffs' Steering Committee ("PSC") strive to make the information in the draft Joint Complaint as accurate as possible, no claims, promises or guarantees about the accuracy of the content of the Joint Complaint is made.  The PSC expressly disclaims liability for errors and omissions in the content and no warranty of any kind is given with respect to the content.  Counsel are encouraged to perform their own independent research and due diligence, and the PSC disclaims any responsibility to individual counsels' clients.**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | **MDL NO. 2592** |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | **SECTION L** |
| | * | |
| | * | **JUDGE ELDON E. FALLON** |
| | * | |
| | * | **MAG. JUDGE NORTH** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
**THIS DOCUMENT RELATES TO ALL CASES**

## <u>PRETRIAL ORDER NO. 23</u>
**(Deposition Guidelines)**

This Order shall govern the conduct of depositions for (1) cases directly filed in this Court pursuant to this Court's Direct Filing Order of March 24, 2015 (Pretrial Order No. 9 (Rec. Doc. 356)); (2) cases transferred to this Court by the Judicial Panel on Multidistrict Litigation; (3) any tag-along action subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation; and (4) all related cases originally filed in this Court or transferred or removed to this Court.

The Parties will submit modified protocols for case-specific and expert depositions.

I.      **<u>GENERAL PROVISIONS</u>**

A.      **<u>Cooperation</u>**

1.      Counsel are expected to cooperate with and be courteous to each other and deponents in both scheduling and conducting depositions.

2.      Counsel are reminded that the Courts consider depositions to be official court procedures and the conduct of all participants in depositions shall be in accordance with the

1

customs and practices expected of lawyers and witnesses appearing before these Courts, as if each was appearing personally before the Courts at the time of the depositions.  Counsel shall not at any time conduct himself or herself in a manner not becoming an officer of the court and not in full compliance with the civil rules of practice and all other orders of the Courts.  Neither counsel nor witnesses shall, at any time, engage in conduct that impedes, delays, or frustrates the examination of the witness.  All counsel and the deponent must be treated with civility and respect.

      **B.**    **<u>Attendance</u>**

      3.    <u>Who May be Present</u>.  Unless otherwise ordered under Fed. R. Civ. P. 26(c), depositions may be attended by counsel of record, members and employees of their firms, attorneys specially engaged by a party for purposes of the deposition, the parties or the representative of a party (including in-house counsel), court reporters, videographers, the deponent, and counsel for the deponent.  Upon application, and for good cause shown, the Court may permit attendance by a person who does not fall within any of the categories set forth in the preceding sentence.  While the deponent is being examined about any stamped confidential document or the confidential information contained therein, persons to whom disclosure is not authorized under an MDL – 2592 Protective Order shall be excluded from the deposition.

      4.    <u>Unnecessary Attendance</u>.  Unnecessary attendance by counsel is discouraged and may not be compensated in any fee application to the Court.  Counsel who have only marginal interest in a proposed deposition or who expect their interests to be adequately represented by other counsel should elect not to attend.

      5.    <u>Notice of Intent to Attend a Deposition</u>.  In order to make arrangements for adequate deposition space, Liaison Counsel for each party shall confer regarding the expected attendance in advance of the deposition.  Ten days prior to the deposition, the noticing party shall

provide the number of attendees.  Three days prior to the deposition, the noticing party shall provide the names of the examining attorneys with the understanding that such names are provided in good faith and could be subject to change.

      **C.**      **Effectiveness**

6.      The MDL parties will use best efforts to cooperate on the entry of substantively identical deposition protocol orders in the MDL and Pennsylvania proceedings, which will become effective on the date docketed.

**II.**      **CONDUCT OF DEPOSITIONS**

      **A.**      **Examination**

7.      There shall be no more than one primary and one secondary examining attorney for Plaintiffs in MDL No. 2592. One examining attorney for Plaintiffs in the consolidated Philadelphia proceedings (Court of Common Pleas No. 2349) may also ask non-duplicative questions. Under no circumstances will plaintiffs' failure to allocate time among themselves or to enforce that allocation of time among themselves during a deposition result in an extension of the deposition.

8.      Defendants' Lead or Liaison Counsel ordinarily shall designate one primary examiner for the Bayer Defendants and one primary examiner for the Janssen Defendants.

9.      Counsel for plaintiffs who have individual or divergent positions, which cannot be resolved by good faith negotiations with Plaintiffs' Lead or Liaison Counsel, may examine a

deponent limited to matters not previously covered by MDL Counsel, provided said counsel do not have any cases in the MDL.

10.     Once a witness has fully answered a question, that same or substantially the same question shall not be asked again.

11.     The use of tobacco products by deponents or counsel during the deposition will not be permitted.

**B.     <u>Duration</u>**

12.     Counsel should consult prior to a deposition to agree upon the time required to depose a particular witness. Absent agreement of the parties or order of this Court based on a showing of good cause, a deposition should not exceed two days.  Defendants, collectively, shall be entitled to 15% of deposition time for examination of the witness.  Plaintiffs shall be allowed to reserve an equal amount of time as Defendants for re-cross examination.  However, absent agreement of the parties or an order of the Court, the deposition will not extend beyond the second day.  The parties are instructed that the Court expects counsel conducting the depositions to be reasonable and allow such reasonable time as is necessary to complete the deposition without the unnecessary involvement of the Court.   The subject matter of re-cross examination and re-direct examination, where appropriate, shall not go beyond the scope of matters previously covered.

13.     In the event that a deposition involves a translator, the deposition shall be extended as reasonably necessary to conduct the examination, but not to exceed 3.5 days except by agreement of the parties, or by Court order for good cause.  The time limits agreed to by the

parties shall be the actual time spent examining the witness.  Time spent on breaks or lunch shall not be counted toward the time limits.

### C.      **Means of Recording**

14.      Stenographic Recording.  A certified Court reporter shall stenographically record all deposition proceedings and testimony with "real time feed" capabilities.  The Court reporter shall administer the oath or affirmation to the deponent.  A written transcript by the Court reporter shall constitute the official record of the deposition for purposes of Fed. R. Civ. P. 30(e) and similar state court rules addressing filing, retention, certification and the like.

15.      Deposition notices shall state whether the deposition is to be videotaped.  All videotape depositions shall proceed pursuant to the provision of section R, *infra*.

16.      Each side shall bear its own costs in securing copies of the deposition transcript, videotape or DVD.

17.      Subject to the terms of the Protective Order entered in these proceedings, any party may at its own expense obtain a copy of the videotape and the stenographic transcript by contacting the court reporter.

### D.      **Scheduling**

18.      Each deposition notice shall include the name, address and telephone number of an attorney point of contact designated by the party noticing the deposition as well as the date, time

and place of the deposition. The deposition notice shall generally be served thirty (30) days prior to a scheduled deposition; said notice shall not be filed on the Court docket.

19.     Plaintiffs' counsel from all jurisdictions shall use best efforts to coordinate in the scheduling and taking of depositions. Prior to issuing a deposition notice, absent extraordinary circumstances, counsel should consult in advance with opposing counsel and counsel for the proposed deponents in an effort to schedule depositions at mutually convenient times and locations. Counsel are expected to cooperate and coordinate the scheduling of depositions.

20.     After counsel, through consultation, have arrived on a mutually acceptable date and location for a deposition, the Noticing Party shall serve an amended Notice (if necessary) reflecting the agreed upon date and location; said notice shall not be filed on the Court docket.

### E.     Deposition Day

21.     A deposition shall commence at 9:00 a.m. and terminate no later than 5:30 p.m. local time, unless breaks total more than one hour and 30 minutes, in which case the end time may be extended accordingly. Modest variations in this schedule may be made by agreement of counsel who noticed the deposition and counsel for the witness. There shall be at least a 15 minute morning break and a 15 minute afternoon break, with one (1) hour for lunch. Additional reasonable breaks may be taken, in which case the end time may be extended accordingly. Counsel should be efficient in depositions.

### F.     Location of Depositions

22.     The Court expects counsel to mutually agree upon deposition locations. In the absence of agreement, depositions of witnesses located in the United States will take place in the

deponent's home district.  The location of the deposition shall be as consistent as possible within each city so that videotape equipment, if being used, can be left in place.

23.     Witnesses who are domiciled in Germany, where domestic law prohibits the taking of depositions, will be deposed in Amsterdam unless all parties agree to another location.

**G.     Translators**

24.     Where a witness indicates his or her intention to respond to questions in a language other than English, neutral translators will be employed to interpret and translate between the foreign language and English.  Three translators will be employed to allow for rotation of translators.  The parties shall meet and confer to agree upon the translators prior to the deposition.  Each translator will swear under oath or affirm prior to each deposition to provide honest and truthful translations.  A monitor displaying "real time" transcription will be placed in front of the translator to assist in the translation.

25.     Counsel for Defendants will notify the plaintiffs at least 15 days in advance of the deposition of any present or former employee whose examination will require the involvement of a translator.  Subject to their being informed of the terms of this Order, counsel for third party witnesses will notify counsel for the party who noticed the deposition at least 15 days in advance of the deposition that the examination will require the involvement of a translator.  In the event the

noticing party receives such a notice from a third party or his/her counsel, then the noticing party shall inform Defendants' counsel within 24 hours of receiving such notice.

26.     Defendants and plaintiffs will share the fees and costs of the translators equally.

27.     Objections as to the accuracy of any translations of deposition testimony shall be reserved.

**H.     Custodial Files**

28.     Subject to the limitations set forth in Case Management Order No. 2 as to the number of depositions to be conducted, the custodial file of an employee, or former employee, shall be produced in advance of a deposition as set forth in the Document Production Protocol (PTO 21), including Paragraphs 10 and 16.  The parties shall meet and confer regarding the impact, if any, on the scheduled deposition if further documents are produced less than 14 days from the scheduled deposition.  If the parties cannot agree, the matter shall be resolved by the Court.

**I.     Coordination with State Actions**

29.     Plaintiffs' counsel in the MDL shall use their best efforts to coordinate the scheduling of depositions with state court plaintiffs in order to minimize the number of times that a witness shall appear for a deposition.  In a coordinated deposition, the Court expects counsel for plaintiffs in the MDL and plaintiffs' counsel in a coordinated state court proceeding to cooperate in selecting a primary examiner.  Upon conclusion of the examination by the primary examiner, other counsel may ask non-duplicative additional questions prior to the completion of the deposition, pursuant to the provisions contained in II.A. of this Order.  It is the intent of this Order

that counsel for MDL Plaintiffs shall be the primary examiner in depositions coordinated with a state court proceeding.

**J.      Cross-Noticing**

30.     The parties and all courts desire to minimize the expense and inconvenience of this litigation by, *inter alia*, providing for a single deposition of witnesses within the time limits set forth in this Order in all litigations relating to Xarelto.  Any witness deposition noticed in this MDL proceeding may be cross-noticed by any party in any related action pending in any state court.  To the extent practicable, the parties shall endeavor to allow for full participation by all jurisdictions in each deposition.

31.     If a deposition originally noticed in this MDL proceeding has been cross-noticed in another state court subject to this Order, then a party may not take a subsequent deposition of that witness over objection of the opposing party or the witness except for good cause shown.  Any disputes among the parties under this provision shall be resolved, and good cause determined by the MDL court.  Any subsequent deposition shall be restricted to such additional inquiry stipulated to by the parties or as permitted by the courts.

**K.      Postponement**

32.     Once a deposition has been scheduled, it shall not be taken off the calendar, rescheduled or relocated less than three (3) calendar days in advance of the date it is scheduled to occur, except upon agreement between Lead and/or Liaison Counsel for each side or counsel for

the witness (if the witness is not a party or a current or former employee) or by leave of Court for good cause.

### L.        Objections and Directions Not to Answer

33.    Counsel shall comply with Fed. R. Civ. P. 30(c)(2).  When a privilege is claimed, the witness should nevertheless answer questions relevant to the existence, extent, or waiver of the privilege, such as the date of the communication, who made the statement, to whom and in whose presence the statement was made, other persons to whom the contents of the statement have been disclosed, and the general subject matter of the statement, unless such information is itself privileged.  Any objection made at a deposition shall be deemed to have been made on behalf of all other parties.   All objections, except those as to form, are reserved.

34.    Counsel shall refrain from engaging in colloquy during the deposition.  The phrase "objection as to form" or similar language as contemplated by Fed. R. Civ. P. 30(c)(2) shall be sufficient to preserve all objections as to form until the deposition is sought to be used, and counsel stating such an objection shall do so concisely in a nonargumentative and nonsuggestive manner. If requested by the examining attorney, the objecting party shall provide a sufficient explanation for the objection to allow the deposing party to rephrase the question.

35.    Counsel shall not make objections or statements which might suggest an answer to a witness.

36.    Counsel shall not direct or request that a witness refuse to answer a question, unless that counsel has objected on the ground that the question seeks privileged information, information that the Court has ordered may not be discovered, or a deponent seeks to present a motion to the Court for termination or limitation of the deposition on the ground that it is being conducted in bad faith or in such a manner as to unreasonably annoy, embarrass or oppress the party or deponent.

If during a deposition a party in good faith intends to present an issue to the MDL Judge by telephone pursuant to paragraph O, and if the MDL Judge is not immediately available, the party may instruct the witness temporarily to defer answering the question until the MDL Judge is available to issue a ruling.

37.    Private consultations between deponents and their attorneys during the actual taking of the deposition are improper, except for the purpose of determining whether a privilege should be asserted.  Unless prohibited by the Court for good cause shown, consultations may be held during normal recesses, adjournments, or if there is a break in the normal course of interrogation and no questions are pending..

### M.    Disputes During or Relating to Depositions

38.    Disputes between parties should be addressed to this Court.  Disputes arising during depositions that cannot be resolved by agreement and that, if not immediately resolved, will significantly disrupt the discovery schedule or require rescheduling of the deposition, or might result in the need to conduct a supplemental deposition, shall be presented to the MDL Judge, Eldon E. Fallon by telephone (504-589-7545).  If the MDL Judge is not available, the deposition shall continue with full reservation of rights of the examiner for a ruling at the earliest possible time.  Nothing in this Order shall deny counsel the right to suspend a deposition pursuant to Fed. R. Civ. P. 30(d)(3), file an appropriate motion with the Court at the conclusion of the deposition, and appear personally before the Court.

### N.    Documents Used in Connection with Depositions

39.    Production of Documents.    Third-party witnesses subpoenaed to produce documents shall, to the extent possible, be served with the document subpoena at least thirty (30) calendar days before a scheduled deposition, with a copy of the subpoena served as required by

Fed. R. Civ. P. 45.  Depending upon the quantity of documents to be produced, some time may be needed for inspection of the documents before the examination commences.

40. <u>Copies</u>.  Extra copies of documents about which deposing counsel expects to examine a deponent should be provided to primary counsel for the parties and the deponent during the course of the deposition.

41. <u>Marking of Deposition Exhibits</u>.  Each document referred to at a deposition shall be referred to by its alpha-numeric production number except in the case of documents which have not yet received production numbering at the time of the deposition.  Documents that are produced in native format shall have the slip sheet with the Bates number affixed to the front of the document.  Once an exhibit has been numbered, it shall retain that number throughout the case. The court reporter for each deposition will include in each deposition transcript a list of the exhibits referenced in the deposition.  The court reporter shall assign exhibit number blocks for each deposition and shall make sure that duplicative or overlapping exhibit numbers are not assigned.

42. <u>Objections to Documents</u>.  Objections to the relevance or admissibility of documents used as deposition exhibits are not waived and are reserved for later ruling by the Court or by the trial judge.

43. <u>Translation of Documents</u>.  Objections as to the accuracy of any translations of documents shall be reserved unless a stipulation is reached by the parties in advance of the deposition.

44. <u>Authenticity of Exhibits</u>.  Any objection to the authenticity of an exhibit used in the deposition must be made by defendants within thirty (30) days from the conclusion of the deposition for any exhibits that were produced by Defendants.  If no objection is made to such an

exhibit, the exhibit will be deemed to be authentic.  If the Defendants subsequently obtain information that an exhibit is not authentic, it will promptly notify the PSC.

      **O.**    <u>**Video Depositions**</u>

     45.    By so indicating in its notice of a deposition, a party may record a deposition by videotape or digitally-recorded video pursuant to Fed. R. Civ. P. 30(b)(3) subject to the following rules:

         a)    <u>Video Operator</u>.  The operator(s) of the video record equipment shall be subject to the provisions of Fed. R. Civ. P. 28(c).  At the commencement of the deposition, the operator(s) shall swear or affirm to record the proceedings fairly and accurately.

         b)    <u>Index</u>.  The videotape operator shall use a counter on the recording equipment and after completion of the deposition shall prepare a log, cross-referenced to counter numbers, that identifies the depositions on the tape at which examination by different counsel begins and ends, at which objections are made and examination resumes, at which exhibits are identified, and at which an interruption of continuous tape-recording occurs, whether for recesses, "off-the-record" discussions, mechanical failure, or otherwise<u>.</u>

         c)    <u>Attendance</u>.  Each witness, attorney, and other person attending the deposition shall be identified on the record at the commencement of the deposition.

         d)    <u>Standards</u>.  Unless physically incapacitated, the deponent shall be seated at a table except when reviewing or presenting demonstrative materials for which a change in position is needed.  To the extent practicable, the deposition will be conducted in a neutral setting, against a solid background with only such lighting as is required for accurate video recording. Lighting, camera angle, lens setting, and field of view will be changed only as necessary to record accurately the natural body movements of the deponent.  Sound levels will be altered only as

necessary to record satisfactorily the voices of counsel and the deponent.  The witness shall appear in ordinary business attire (as opposed to, for instance, a lab coat) and without objects such as a bible, medical equipment, or other props.

e)      Additional Cameras.  Pursuant to the Court's Order dated January 25, 2016 [Rec. Doc. 1970], any party, at its own expense and with notice 24 hours in advance of the deposition to opposing counsel, may arrange for an additional camera to film the examining attorney.   If more than one camera is employed, the party arranging for the additional camera shall pay for the expense of synchronization of the videotapes from the additional camera if the party intends to show videotape from the additional camera at trial.  Nothing in this order shall be construed as a ruling whether the videotapes of the lawyers may be shown at trial.  Counsel's objections to showing the videotape of counsel at the time of trial are reserved.

f)      Filing.  After the deposition is completed, the video operator shall certify on camera the correctness, completeness, and accuracy of the videotape recording in the same manner as a stenographic court reporter, and file a true copy of the videotape, the transcript, and certificate with Liaison Counsel for whomever noticed the deposition.


## P.      **Telephone Depositions**

46.     By indicating in its notice of deposition that it wishes to conduct the deposition by telephone, a party shall be deemed to have moved for such an order under Fed. R. Civ. P. 30(b)(4). Unless an objection is filed and served within ten (10) calendar days after such notice is received, the Court shall be deemed to have granted the motion.  Other parties may examine the deponent telephonically or in person.  However, all persons present with the deponent shall be identified in

the deposition and shall not by word, sign or otherwise coach or suggest answers to the deponent. The court reporter shall be in the same room with the deponent.

**Q.**     **Correcting and Signing Depositions**

47.     Unless waived by the deponent, the transcript of a deposition shall be submitted to the deponent for correction and signature, and shall be corrected and signed within thirty (30) days after receiving the final transcript of the completed deposition.  If no corrections are made during this time, the transcript will be presumed accurate.

48.     Parties in jurisdictions where rules do not provide for correction and signing of a deposition transcript reserve their objections to corrections made pursuant to this procedure.

## III.     **USE OF DEPOSITIONS**

49.     Depositions of employees and former employees of Defendants taken in this MDL proceeding or in any state action relating to Xarelto in which any Defendant is a party may be used in this proceeding in accordance with the Federal Rules of Civil Procedure and Evidence and case law by or against any person (including parties later added and parties in cases subsequently filed in, removed to or transferred to this Court as part of this litigation):

     a)   who is a party to this litigation;

     b)   who was present or represented in the deposition;

     c)   who was served with prior notice of the deposition or otherwise had reasonable notice thereof, or

     d)   who, within thirty (30) calendar days after the transcription of the deposition (or, if later, within sixty (60) calendar days after becoming a party in this

Court in any action that is part of this MDL proceeding), fails to show just cause why such deposition should not be useable against such party.

50.     Depositions may be used in any Xarelto-related action in state court to the extent permitted by that state's law and rules.

## IV.     TIMING OF TRIAL PRESERVATION DEPOSITION AFTER DISCOVERY <u>DEPOSITION</u>

51.     To the extent a party wishes to conduct a preservation deposition for trial, the deposing party shall provide at least thirty (30) days' notice of the intent to take the preservation deposition and, if the witness has not previously been deposed, provide opposing counsel an opportunity to take a discovery deposition of that witness, absent agreement of the parties to shorten the time or by Court order for good cause. In the event the opposing party chooses to take a discovery deposition of the witness, the preservation deposition shall not commence any sooner than seventy-two (72) hours after the completion of the discovery deposition, unless the parties agree otherwise.

## V.     <u>FEDERAL RULES OF CIVIL PROCEDURE APPLICABLE</u>

52.     The Federal Rules of Civil Procedure and Federal Rules of Evidence shall apply in all proceedings unless specifically modified herein.

New Orleans, Louisiana this 17th day of February, 2016

_____
ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


IN RE: XARELTO (RIVAROXABAN)          *       MDL NO. 2592
PRODUCTS LIABILITY LITIGATION         *
                                      *       SECTION L
                                      *
                                      *       JUDGE ELDON E. FALLON
                                      *
                                      *       MAG. JUDGE NORTH
* * * * * * * * * * * * * * * * * * * *
THIS DOCUMENT RELATES TO ALL CASES

**PRETRIAL ORDER NO. 11E**
**(Bundling of Complaints and Answers)**

The Court outlined the procedure for the filing of Joint Complaints in Pretrial

Order 11. (Rec. Doc. 893).  As the MDL is entering a new phase of the litigation, the

Court finds it appropriate to terminate the Joint Complaint filing procedure.  All efforts to

file a Complaint in this MDL will be governed by the Federal Rules of Civil Procedure

and the Local Rules, unless otherwise provided for by this Court, as of May 20, 2016.

Therefore,

**IT IS ORDERED** that all provisions of Pretrial Order 11 pertaining to the filing

of Joint Complaints shall be **VACATED** on May 20, 2016.  After this date, no Joint

Complaints as defined in PTO 11 will be accepted by the Clerk's office.


NEW ORLEANS, LOUISIANA this 21st day of March, 2016.


_____
UNITED STATES DISTRICT JUDGE


1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN) *  MDL 2592
PRODUCTS LIABILITY LITIGATION *
            *  SECTION L
THIS DOCUMENT RELATES TO *
ALL CASES         *  JUDGE ELDON E. FALLON
            *
            *  MAG. JUDGE NORTH
* * * * * * * * * * * * * * * * * * * * * * * * *

## PRETRIAL ORDER NO. 24
### (Dismissal Guidelines)

   This joint stipulation and order shall govern the filing of Motions to Dismiss for reasons of subject matter jurisdiction.

1.  A case will be dismissed for lack of subject matter jurisdiction only upon a noticed motion or order to show cause in which the plaintiff bringing the action and the served defendants have an opportunity to be heard, or upon a stipulated order consented to by both the plaintiff bringing the action and the defendants who have been served in that action.  This paragraph does not intend to restrict the ability any plaintiff may otherwise have to voluntarily dismiss pursuant to Rule 41(a)(1);  provided however that paragraph 3 shall not apply to rule 41(a)(1) dismissals.  Further, plaintiffs continue to retain the right to individually dismiss certain named defendants without dismissing the entire action.  This stipulation pertains solely to dismissals of an entire action for lack of subject matter jurisdiction.

2.  Any dismissal of the entire action for lack of subject matter jurisdiction shall be without prejudice.  In addition, the provisions of PTO 11B shall apply to any such dismissal and the Clerk of Court shall not docket or close the case until the filing fee is paid if no such filing fee was previously paid due to the plaintiffs action being filed as part of a bundled complaint.

1

3.     Defendants stipulate that if any case filed in or transferred to this MDL is dismissed for lack of federal subject matter jurisdiction either by motion or order to show cause or stipulation as set forth in Paragraph 1, and if a new action is thereafter commenced in a court having jurisdiction in the state where plaintiff resided at the time he or she used Xarelto within 60 days of such dismissal, for statute of limitations purposes the new action shall be deemed to be commenced as of the date the dismissed federal action was commenced.  If the law of the state in which the action is re-commenced provides for a longer period than 60 days to re-file, the longer period provided by such state law shall apply.

4.   Paragraph 3 of this stipulation and order shall not apply as to any defendant that was not properly served with the summons and complaint in federal court pursuant to the federal rules and the time to complete such service has expired except that with respect to other Bayer entities as defined in PTO 10, paragraph 3 shall apply so long as Bayer Pharma AG and Bayer Pharmaceuticals Inc. were timely served.

5.   Paragraph 3 of this stipulation and order shall not apply if the plaintiff in the dismissed action fails to commence a new action in a court having jurisdiction in the state specified in paragraph 3 within 60 days of dismissal of the federal action for lack of subject matter jurisdiction;  provided, however, that if the dismissal of the federal action is timely appealed to a federal Court of Appeals, the new action may be filed within 60 days of the dismissal order becoming final following the issuance of mandate from the appellate court.

SO ORDERED

March 23rd, 2016

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


IN RE: XARELTO (RIVAROXABAN)    *    MDL NO. 2592
PRODUCTS LIABILITY LITIGATION   *
                                *    SECTION L
                                *
                                *    JUDGE ELDON E. FALLON
                                *
                                *    MAG. JUDGE NORTH
* * * * * * * * * * * * * * * * * * *
THIS DOCUMENT RELATES TO ALL CASES


<u>**PRETRIAL ORDER NO. 25**</u>
**(Production of Materials Pursuant to Subpoenas to Third Parties)**

The Parties having conferred, consented, stipulated and agreed to entry of the within

Consent Order, and good cause appearing therefore, **it is hereby ORDERED**, as follows:

When a third party produces documents or information pursuant to a subpoena issued in

this litigation, the receiving party shall ensure that copies of the responsive materials will be

produced to the other side within 48 hours of receipt.

New Orleans, Louisiana, this  14th  day of April, 2016.

_____
UNITED STATES DISTRICT JUDGE

00341943

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN) \* **MDL NO. 2592**
PRODUCTS LIABILITY LITIGATION \*
        \* **SECTION L**
        \*
        \* **JUDGE ELDON E. FALLON**
        \*
        \* **MAG. JUDGE NORTH**
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
**THIS DOCUMENT RELATES TO ALL CASES**

**PRETRIAL ORDER NO. 11F**
**(Bundling of Complaints and Answers)**

In PTO 11E, the Court announced that the Clerk's office would no longer accept Joint Complaints after May 20, 2016. (Rec. Doc. 2850). The parties have requested clarification of this Pretrial Order, and the Court now writes to eliminate any possible ambiguity.

**IT IS ORDERED** that as of May 20, 2016, no Joint Complaints as defined in PTO 11 filed in any court will be accepted by the Clerk's office.


NEW ORLEANS, LOUISIANA this 15th day of April, 2016.


_____
UNITED STATES DISTRICT JUDGE

1

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO ALL ACTIONS | JUDGE ELDON E. FALLON |
| | MAG. JUDGE NORTH |

## PRETRIAL ORDER NO. 26
### (Bellwether Deposition Protocol )

1.    **Scheduling**.  Andy Birchfield of the PSC will handle scheduling for plaintiffs.   When a critical mass of relevant medical records are collected for a particular case, Defense counsel will notify Andy Birchfield and identify the prescriber and treater that defendants want to depose.  In response, Andy Birchfield will provide dates for plaintiff, prescriber and treater with no less than two week notice.

2.    **Who gets deposed**.  Within 1 week of receiving Defendants' identification of the prescriber and treater they want to depose in each case, Andy Birchfield will notify defendants if there is any disagreement.   Andy Birchfield, Susan Sharko (Janssen) and Andrew Solow (Bayer) will attempt to resolve these disputes or will seek Court assistance, as necessary.

3.    **Location of Depositions**.  The witnesses will be deposed in the federal district where they live.

4.    **Order of Depositions**.  The order of deposition shall be plaintiff, prescriber and treater, with the detail representative going before or after the treater, as scheduling permits

00342462

5.      **Time of Depositions**. Seven hours for defense for the plaintiff deposition.

For prescribing doctor and treating doctor depositions, the time split will be 50-50

provided that plaintiff's counsel has not met with the doctor. If the plaintiff's counsel has

met with the doctor, then defense counsel will be allocated 60% of the deposition time for

that doctor's deposition.  For detail representative depositions, six hours will be allotted for

plaintiff's counsel and one hour for defense counsel.

6.      **Order of Questioning**.  For detail representatives, plaintiffs first.  For

prescribers and treaters, as set forth on table below:

| Pick | Xarelto User | Prescriber | Treater |
|------|-------------|------------|---------|
| Random Pick | Atwood, Donnie | Defense First | Plaintiff First |
| Random Pick | Bloch, Carmelita | Plaintiff First | Defense First |
| Random Pick | Cooper, Daisy | Defense First | Plaintiff First |
| Random Pick | Ervin, Joseph W. | Plaintiff First | Defense First |
| Random Pick | Fishman, Helen | Defense First | Plaintiff First |
| Random Pick | Gray, Lawrence | Plaintiff First | Defense First |
| Random Pick | Hall, Sigrid | Defense First | Plaintiff First |
| Random Pick | Hershberger, Lowell | Plaintiff First | Defense First |
| Random Pick | Ibanez, Harriet | Defense First | Plaintiff First |
| Random Pick | Louviere, Herbert J., Jr. | Plaintiff First | Defense First |
| Random Pick | Mascaro, Frances | Defense First | Plaintiff First |
| Random Pick | McDaniel, Frances | Plaintiff First | Defense First |
| Random Pick | McKee, Mary | Defense First | Plaintiff First |
| Random Pick | Mitchell, Rawleigh | Plaintiff First | Defense First |
| Random Pick | North, David | Defense First | Plaintiff First |
| Random Pick | O'Fallon, JoAnn | Plaintiff First | Defense First |
| Random Pick | Smith, Gwendolyn | Defense First | Plaintiff First |
| Random Pick | Stokes, Mary | Plaintiff First | Defense First |
| Random Pick | Voss, Marilyn | Defense First | Plaintiff First |
| Random Pick | Williams, Sidney A., Jr | Plaintiff First | Defense First |
| Defense Pick | Bass, David | Defense First | Plaintiff First |
| Defense Pick | Braswell, Christopher | Plaintiff First | Defense First |
| Defense Pick | Brien, James J., Sr. | Defense First | Plaintiff First |

| Defense Pick | Dixon, Winston D. | Plaintiff First | Defense First |
|---|---|---|---|
| Defense Pick | Dombroski, Anthony | Defense First | Plaintiff First |
| Defense Pick | Heckler, James | Plaintiff First | Defense First |
| Defense Pick | Henry, William | Defense First | Plaintiff First |
| Defense Pick | Marotte, Judy | Plaintiff First | Defense First |
| Defense Pick | Sutton, Rose | Defense First | Plaintiff First |
| Defense Pick | Weis, Janet | Plaintiff First | Defense First |
| Plaintiff Pick | Barbosa, Manuel | Defense First | Plaintiff First |
| Plaintiff Pick | Boudreaux, Joseph J., Jr. | Plaintiff First | Defense First |
| Plaintiff Pick | Ferguson, Patricia | Defense First | Plaintiff First |
| Plaintiff Pick | Griffin, Clarence, Jr. | Plaintiff First | Defense First |
| Plaintiff Pick | Guerra, Horacio | Defense First | Plaintiff First |
| Plaintiff Pick | Hannah, Tommie Lee | Plaintiff First | Defense First |
| Plaintiff Pick | Jack, Tharon | Defense First | Plaintiff First |
| Plaintiff Pick | Mingo, Dora | Plaintiff First | Defense First |
| Plaintiff Pick | Orr, Sharyn | Defense First | Plaintiff First |
| Plaintiff Pick | Yarnick, David Lynn | Plaintiff First | Defense First |

7.  **Number of Questioners**.  One for each party for each witness.

NEW ORLEANS, LOUISIANA, this 20th day of ___April___, 2016.

_____
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


IN RE: XARELTO (RIVAROXABAN)        *    **MDL NO. 2592**
PRODUCTS LIABILITY LITIGATION

                                  *    **SECTION L**

                                  *    **JUDGE ELDON E. FALLON**

                                  *    **MAG. JUDGE NORTH**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**THIS DOCUMENT RELATES TO ALL CASES**


<u>**PRE-TRIAL ORDER NO. 27**</u>
**(Plaintiff Fact Sheets and Defendant Fact Sheets)**


By agreement of the parties, this Order modifies PTO Nos. 13, 13A, 14 and 14A in

regard to Plaintiff Fact Sheets (PFS) and Defendant Fact Sheets (DFS), as follows:

<u>**PLAINTIFF FACT SHEETS**</u>

1. Plaintiffs shall provide a complete PFS, and amend their PFS if necessary, for the 40

   discovery pool cases.

2. For all other cases (not in the discovery pool) where Plaintiff's PFS were due on or after

   March 30, 2016, Plaintiffs shall be obligated to substantially complete Section 1 (as

   defined by Paragraph 2of PTO 14) of the PFS only (Core Case Information), and provide

   records of proof of use and proof of injury within 90 days from the date Plaintiff's

   complaint was filed.  Plaintiffs shall also produce medical records and pharmacy records

   responsive to Section IX of the Plaintiff Fact Sheet.

**DEFENDANT FACT SHEETS**

1. Defendants shall provide a complete DFS, and amend their DFS if necessary, for the 40 discovery pool cases.

2. For all other cases (not in the discovery pool), Defendants will complete a DFS within 90 days of this Order for cases where a substantially complete PFS (as defined by Paragraph 2 of PTO 14) has been served as of March 30, 2016.  Defendants will not be obligated to serve a DFS for any PFS served after March 30, 2016.

3. The defendant Bayer Pharmaceutical A.G. (BPAG) is not obliged to serve a DFS in any past or future cases except in the 40 discovery pool cases, and such responses need only be a formal statement that BPAG has no relevant materials required by the DFS.

Upon notification that the parties wish to terminate the foregoing agreement, the Court will establish a schedule for the service of Defendant Fact Sheets in cases where core-complaint Plaintiff Fact Sheets were served after March 30, 2016.

New Orleans, Louisiana, this ____22nd____ day of _____April_____, 2016.

_____
Honorable Eldon E. Fallon
United States District Judge

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO ALL CASES | JUDGE ELDON E. FALLON |
| | MAG. JUDGE NORTH |

### PRETRIAL ORDER NO. 28
### (Regarding Contact with Physicians)

Consistent with the Court's Order & Reasons, entered on March 9, 2016 [Doc. No. 2676] ("Order & Reasons"), the following will govern the parties' interactions with an MDL Plaintiff's prescribing and treating physicians.  As used in this order, an "MDL Plaintiff's prescribing or treating physician" is a physician who has one or more patients who have filed a lawsuit (or whose representative has filed a lawsuit) pending in this MDL proceeding alleging that the patient sustained an injury caused by Xarelto.  A "prescribing physician" is the physician identified in Plaintiffs' Fact Sheet as the physician who prescribed Xarelto to the plaintiff, as recorded in MDL Centrality; a "treating physician" is the physician who treated the injury alleged in the Plaintiffs' Fact Sheet, as recorded in MDL Centrality.

1.     Plaintiffs' counsel may engage in *ex parte* communications with any MDL Plaintiff's prescribing or treating physician.  With respect to any such *ex parte* communications, at least 48 hours before the deposition of the Plaintiff's prescribing or treating physician, Plaintiffs' counsel shall disclose to Defendants' counsel each of the following:

a.      the date(s) of each such *ex parte* communication;

b.      the approximate duration of each such *ex parte* communication;

c.      the location of each such *ex parte* communication;

d.      the participants in each such *ex parte* communication; and

e.      the identity of the documents, photographs, or other materials that were shown or provided to the treating physician by Plaintiffs' counsel in connection with each such *ex parte* communication.

2.      Defendants' counsel will not engage in *ex parte* communications with any MDL Plaintiff's prescribing or treating physician, except as permitted in paragraph 3 and its subdivisions.  Nothing herein shall bar any employee, agent or representative of the Defendants from engaging in communications with physicians in the ordinary course of business.

3.      Going forward from the date of this Order, Defendants' counsel may engage in *ex parte* communications with up to 30 MDL Plaintiffs' prescribing or treating physicians (to be divided between the Defendants, collectively) for the purpose of obtaining physician-experts with respect to the discovery pool Plaintiffs as identified in the Court's Order dated March 7, 2016 [Doc. No. 2626] (the "Discovery Pool Plaintiffs"). In addition, Defendants' counsel may retain as expert witnesses up to 15 MDL Plaintiffs' prescribing or treating physicians (to be divided between the Defendants, collectively), no matter when the physicians were initially contacted by Defendants' counsel.

a.      All *ex parte* communications by Defendants' counsel with an MDL Plaintiff's prescribing or treating physician must be limited to non-substantive

discussions until the physician has affirmatively expressed a *bona fide* interest in being considered as a retained expert.

        b.     Defendants' counsel shall not retain physician-experts who are prescribing or treating physicians, as recorded in MDL Centrality, of the Discovery Pool Plaintiffs until the trial or disposition of the first four bellwether cases.

        c.     Defendants' counsel shall disclose to Plaintiffs' counsel on the date set forth in CMO 2 for disclosure of testifying experts, the name of any testifying expert who per MDL Centrality has patients who are plaintiffs in the MDL proceeding, and the experts themselves shall have no further affirmative disclosure obligations.  No disclosures pursuant to CMO 2 are necessary for consulting experts until such time as an expert is identified as a testifying expert.  Consulting experts contacted or retained by Defendants' counsel shall be subject to all of the requirements of this Order to the same extent as testifying experts, except that the disclosure requirements set forth in this sub-paragraph 3(c) shall not apply to consulting experts until they are identified as testifying experts.

        d.     Defendants' counsel may communicate with a prospective physician-expert about his or her general clinical experiences with Xarelto, provided that Defendants' counsel shall not communicate with a physician-expert who has acted as a prescribing or treating physician about any of his or her specific patients who have taken Xarelto.

        e.     The Defendants shall not use a physician as a consulting or testifying expert in a case where that physician's present or former patient is a plaintiff in

that case.  The provisions of this subparagraph shall not apply to plaintiffs who are in a bundled complaint with Discovery Pool Plaintiffs but who are not themselves Discovery Pool Plaintiffs.

    f.  Defendants may rely on the disclosures in Plaintiffs' Fact Sheets as recorded in MDL Centrality at the time the physician-expert is retained, in determining whether a physician is an MDL Plaintiff's prescribing or treating physician.  Subsequent disclosures in Plaintiffs' Fact Sheets as recorded in MDL Centrality shall not impact the count toward the cap in paragraph 3.

   4.  The numerical limit in paragraph 3 above is subject to modification by agreement of the parties or by court order for good cause shown.  The limitation shall be subject to re-evaluation by the Court should any additional plaintiffs subsequently be selected for discovery or trial.

   5.  This order denies in part and grants in part Defendants' Motion for Entry of Proposed Order Regarding Contact with Physicians [Doc. No. 1844].  The Court overrules Defendants' and Plaintiffs' objections to the extent this order is inconsistent with the positions of either party as articulated in their written submissions or oral argument.

6.    This order denies in part and grants in part Defendants' Motion for

Reconsideration [Doc. No. 2991].  The motion is granted to the extent that this Pretrial

Order deviates from the Court's Order & Reasons Regarding Contact with Physicians

[Doc. No. 1844].  The motion is otherwise denied.


NEW ORLEANS, LOUISIANA, this 26th day of   April  , 2016.

_____
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL NO. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO ALL CASES | JUDGE ELDON E FALLON |
| | MAG. JUDGE NORTH |

### PRETRIAL ORDER NO. 24A
**(Supplemental Procedures for Voluntary Dismissal Motions)**

This Order does not replace or modify the provisions of PTO No. 24, which remains in force and effect with respect to Motions of Voluntary Dismissal based on the lack of subject matter jurisdiction. This Order does supplement PTO No. 24, however, by setting forth additional procedures that govern all Motions of Voluntary Dismissal filed by a plaintiff or plaintiffs under FRCP 41(a)(2), regardless of the basis for the voluntary dismissal.

1. Moving counsel for a plaintiff in all motions to dismiss any or all parties or claims, whether the dismissal sought is with or without prejudice, must certify in the motion that Defendants' Lead and Liaison Counsel were contacted in writing at least fourteen (14) days prior to the filing of the motion and all served Defendants have responded in writing stating either their consent or no intended opposition to the motion, or have responded in writing stating that the motion is opposed. The Clerk of Court is directed not to accept such motions for filing without this certification by moving counsel.

2. All motions filed by plaintiff to voluntarily dismiss an entire action (i.e., all claims and parties), whether with or without prejudice, must also be accompanied by a written

1

certification by counsel filing the motion that said counsel has complied with the filing fee payment provisions of PTO No. 11B (Rec. Doc. 1117) and that all applicable filing fees have been paid.

3. This Order shall apply not only to motions filed hereafter but also to previously-filed but still pending motions of plaintiff's counsel to dismiss, and counsel shall amend or supplement such motions in order to comply with the provisions of this Order.

4. If motions to dismiss previously were granted by the Court without filing fees having been paid pursuant to PTO No. 11B, Plaintiffs' Liaison Counsel will communicate in writing to the moving counsel in those actions, requesting immediate payment of the filing fee to the Clerk of Court.  Plaintiffs' Liaison Counsel shall report to the Court at each monthly status conference as necessary regarding the status of such matters.

5. All motions of plaintiffs' counsel to dismiss which are opposed by one or more Defendants shall be noticed for hearing by moving counsel on a date specified by the Court as the date for a monthly status conference in these proceedings, and any needed argument on such motions will be conducted immediately following the status conference on that date.  To be set for hearing at the monthly status conference, the motion to dismiss must be filed (at least) twenty-one (21) days before the conference.

NEW ORLEANS, LOUISIANA, this _18th_ day of _____May_____, 2016.


_____

**HONORABLE ELDON E. FALLON**
**UNITED STATES DISTRICT JUDGE**

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)                    MDL NO. 2592
PRODUCTS LIABILITY LITIGATION

                                                SECTION L

THIS DOCUMENT RELATES TO ALL CASES              JUDGE ELDON E FALLON

                                                MAG. JUDGE NORTH

## PRETRIAL ORDER NO. 29
### (Procedures for Notices of Voluntary Dismissal)

This Order applies to all Notices of Voluntary Dismissal of entire actions filed by a plaintiff or parties under FRCP 41(a)(1), and establishes the following procedures as to such Notices:

1. A Notice of the Voluntary Dismissal of an entire action may be filed pursuant to FRCP 41(a)(1) only if no Defendant has answered the Complaint which is the subject of the Notice. Omnibus Answers filed by Defendants are deemed by PTO No. 11(2)(c) [Rec. Doc. 893] to be the operative answer in each action filed in, or transferred to, the MDL, thirty (30) days after the case is docketed, assuming no individual answer was filed prior to that time. Accordingly, all Notices of Voluntary Dismissal of an entire action under FRCP 41(a)(1) must be accompanied by a written certification by counsel that the Notice has been filed less than thirty (30) days from the date the case was docketed in the MDL, and that no individual answer has been filed by any Defendant in the matter.

2. Any Notice of Voluntary Dismissal pursuant to FRCP 41(a)(1) must be accompanied by a written certification by counsel filing the Notice that said counsel has complied with

1

the filing fee payment provisions of PTO No. 11B (Rec. Doc. 1117)  and that all filing

fees which are due have been paid.

NEW ORLEANS, LOUISIANA, this __18th__ day of _____May_____, 2016.


_____

**HONORABLE ELDON E. FALLON**
**UNITED STATES DISTRICT JUDGE**

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)   MDL NO. 2592
PRODUCTS LIABILITY LITIGATION

           SECTION L

THIS DOCUMENT RELATES TO ALL CASES  JUDGE ELDON E FALLON

           MAG. JUDGE NORTH

## PRETRIAL ORDER NO.  30
### (Procedures for Withdrawal of Plaintiff's Counsel)

This Order governs the procedure for Motions for the Withdrawal of Plaintiff's Counsel.

1.  In addition to satisfying the requirements of Local Rule 83.2.11 of this Court and the applicable state Rules of Professional Conduct, a Motion for the Withdrawal of Plaintiff's Counsel which would leave the plaintiff unrepresented, even temporarily, requires leave of Court and  must be accompanied by the following to be considered by the Court:

 (a) a written certification by  moving counsel that Defendants' Lead and Liaison Counsel have been contacted in writing at least fourteen (14) days prior to the filing of the motion and all served Defendants have responded in writing either their consent or no intended opposition to the motion, or have responded in writing that the motion is opposed, without which certification the Clerk of Court is directed not to accept such motions for filing;

 (b) a written statement by moving counsel indicating whether or not each plaintiff subject to the motion has communicated to moving counsel an objection to the requested withdrawal and whether the plaintiff has communicated an intention to obtain other

1

counsel herein, and, if so, also has indicated the expected length of time required to do so.  When moving counsel has not been able to communicate with the plaintiff, moving counsel as required by Local Rule 83.2.11 must submit in an affidavit     (1) a statement that all reasonable efforts were made to communicate with the plaintiff, such as by telephone, email, text message and certified mail, return receipt requested, and (2) detailed information for each attempted communication.  Moving counsel shall attach to the affidavit copies of the return receipts of any certified letters mailed to clients in the course of efforts to communicate with them, and also shall preserve for potential Court review *in camera* copies of all text messages, emails and letters sent in the course of efforts to communicate with the plaintiff. Moving counsel's inability to communicate with the client will not necessarily result in permission to withdraw as counsel;

(c) a written statement by moving counsel indicating whether or not each plaintiff subject to the motion has complied with PTO No. 13 or, if applicable, PTO No. 27, which requires service of a Plaintiff Fact Sheet in these proceedings within sixty (60) days (ninety (90) days if PTO No. 27 applies) from the date of the filing of the Complaint, and, if so, whether this Fact Sheet has been entered into MDL Centrality. If the plaintiff does not comply with Court orders (including the submission of a completed Plaintiff Fact Sheet) as a result of being out of communication with the moving counsel, the Court may in its discretion dismiss the plaintiff's case; and

(d) a statement by moving counsel of compliance with Pretrial Order No. 11B (Rec. Doc. 1117) and a verification that any applicable filing fee has been paid.

2. This Order shall apply not only to motions filed hereafter but also to previously-filed but still pending motions of plaintiff's counsel to withdraw, and counsel shall amend or supplement such motions in order to comply with the provisions of this Order.

3. If motions to withdraw as counsel previously were granted by the Court so as to leave plaintiffs unrepresented in actions which have been dismissed without filing fees having been paid pursuant to PTO No. 11B, Plaintiffs' Liaison Counsel will communicate in writing to the last-withdrawn counsel in those actions, requesting immediate payment of the filing fee to the Clerk of Court. Plaintiffs' Liaison Counsel shall report to the Court at each monthly status conference as necessary regarding the status of such matters.

4. All motions of plaintiffs' counsel to withdraw which are opposed by one or more Defendants shall be noticed for hearing by moving counsel only on a date specified by the Court as the date for a monthly status conference in these proceedings, and any needed argument on such motions will be conducted immediately following the status conference on that date. For a motion to withdraw as counsel to be noticed for hearing at the monthly status conference, however, the motion must be filed (at least) twenty-one (21) days before the conference.

NEW ORLEANS, LOUISIANA, this __14th__ day of _____June_____, 2016.

_____
**HONORABLE ELDON E. FALLON**
**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)  &ast;  **MDL NO. 2592**
**PRODUCTS LIABILITY LITIGATION** &ast;
          &ast;  **SECTION L**
          &ast;
          &ast;  **JUDGE ELDON E. FALLON**
          &ast;
          &ast;  **MAG. JUDGE NORTH**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**THIS DOCUMENT RELATES TO ALL CASES**

**PRE-TRIAL ORDER NO. 10A**
**(Streamlined Service on Certain Bayer Defendants)**

   The Court outlined in Pretrial Order 10 the procedure for the streamlined service of certain Bayer Defendants. R. Doc. 357.  In Part II.C., the Court granted multiple classes of plaintiffs 60 days to serve their Complaint with a Summons.  R. Doc. 357 at 2. Due to an influx of Complaints in advance of the deadline for filing Bundled Complaints, the Clerk's Office is inundated with a large number of recently-filed Complaints into MDL 2592.  The quantity of these Complaints has delayed the Clerk's entry of Summons in recently-filed cases.  Therefore, to promote the interests of fairness, efficiency, and economy,

   **IT IS ORDERED** that plaintiffs identified in Part II.C. of Pretrial Order 10 whose cases have already been docketed in this MDL shall have 90 days from the entry of this Order to serve the Complaint with a Summons.

   **IT IS FURTHER ORDERED** that plaintiffs identified in Part II.C. of Pretrial Order 10 whose cases are not docketed in this MDL upon the entry of this Order but are

docketed on or before July 11, 2016, shall have 90 days from the docketing of the

Complaint in the MDL to serve the Complaint with a Summons.


NEW ORLEANS, LOUISIANA this 23rd day of June, 2016.

_____

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)     \*  MDL 2592
PRODUCTS LIABILITY LITIGATION   \*

                       \*  SECTION L

THIS DOCUMENT RELATES TO      \*
ALL CASES                     \*  JUDGE ELDON E. FALLON
                       \*
                       \*  MAG. JUDGE NORTH

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PRETRIALORDER 12(A)
**(Modification of Paragraph 19(1) of PTO 12 regarding  Disclosure of Protected Documents
to Prescribing and Treating Physicians of Bellwether Plaintiffs)**

      With the consent of all parties, Paragraph 19(l) of Pretrial Order No. 12 (Stipulated

Protective Order) be and hereby is modified to provide that information designated as

"PROTECTED" under this Order may be disclosed to the prescribing and treating physicians of

the Bellwether Pool plaintiffs if such person or persons execute the document that is attached as

Exhibit A hereto.

     New Orleans, Louisiana, this 28th day of July, 2016.

UNITED STATES DISTRICT JUDGE

00361492

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)          :
PRODUCTS LIABILITY LITIGATION         :          **MDL No. 2592**
                                      :
                                      :          **SECTION L**
                                      :          **JUDGE ELDON E. FALLON**
                                      :
                                      :          **MAGISTRATE NORTH**


**EXHIBIT A:**
**AGREEMENT FOR USE OF PROTECTED DOCUMENTS BY PHYSICIANS**

The undersigned agrees:

I  understand that the information or documents designated "PROTECTED

INFORMATION" that may be shown to me contain information which the Bayer and Janssen

Xarelto ® litigation defendants have designated as subject to  the Protective Order entered on

April 21, 2015 in that litigation.

I agree that I shall not disclose to others or discuss with them the documents designated

"PROTECTED INFORMATION" or any information contained in such "PROTECTED

INFORMATION", in any form whatsoever, and agree that I will not copy or retain such

information and documents, or notes or summaries of same.  I agree that  such "PROTECTED

INFORMATION is the confidential and proprietary information of the Janssen and Bayer

defendants.      I further understand and agree that my obligation to honor the protected nature of

such "PROTECTED INFORMATION" will continue even after this litigation concludes.

**EXHIBIT A:**
**AGREEMENT FOR USE OF PROTECTED DOCUMENTS BY PHYSICIANS**


Date: _____     By: _____
                                          (Signature)


                                     _____
                                          (Printed)


                                     _____
                                          (Street Address)


                                     _____
                                          (City, State and Zip Code)


                                     _____
                                          (Telephone)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)           \*      **MDL NO. 2592**
PRODUCTS LIABILITY LITIGATION        \*
                                     \*      **SECTION L**
                                     \*
                                     \*      **JUDGE ELDON E. FALLON**
                                     \*
                                     \*      **MAG. JUDGE NORTH**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**THIS DOCUMENT RELATES TO ALL CASES**

**PRE-TRIAL ORDER NO. 10B**
**(Streamlined Service on Certain Bayer Defendants)**

      The Court outlined in Pretrial Order 10 the procedure for the streamlined service of certain Bayer Defendants. R. Doc. 357.  In Part II.C., the Court granted multiple classes of plaintiffs 60 days to serve their Complaint with a Summons.  R. Doc. 357 at 2. Due to an influx of Complaints in advance of the deadline for filing Bundled Complaints, the Clerk's Office is inundated with a large number of recently-filed Complaints into MDL 2592.  The quantity of these Complaints has delayed the Clerk's entry of Summons in recently-filed cases.  While progress has been made in the wake of the Court's implementation of Pretrial Order 10A, many Summons have yet to be entered. Therefore, to promote the interests of fairness, efficiency, and economy,

      **IT IS ORDERED** that plaintiffs identified in Part II.C. of Pretrial Order 10 whose cases have already been docketed in this MDL shall have 90 days from the entry of this Pretrial Order to serve the Complaint with a Summons.

      **IT IS FURTHER ORDERED** that plaintiffs identified in Part II.C. of Pretrial Order 10 whose cases are not docketed in this MDL upon the entry of this Pretrial Order

1

but are docketed on or before September 16, 2016, shall have 90 days from the

docketing of the Complaint in the MDL to serve the Complaint with a Summons.

NEW ORLEANS, LOUISIANA this 17th day of August, 2016.

_____

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)   *  MDL 2592
PRODUCTS LIABILITY LITIGATION  *
               *  SECTION L
THIS DOCUMENT RELATES TO   *
ALL CASES           *  JUDGE ELDON E. FALLON
               *
               *  MAG. JUDGE NORTH
* * * * * * * * * * * * * * * * * * * * * * * * *

## PRE-TRIAL ORDER 12(B)
### (Stipulation and Order to Govern Non-Party
### Portola Pharmaceutical, Inc.'s Production of Documents)

This Pre-Trial Order 12(B) ("PTO 12(B)") will govern the production of documents made by Portola in this litigation, including those documents in response to the Plaintiffs' May 9, 2016 Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises in a Civil Action (the "Subpoena") that was served on Portola.  For good cause as shown:

WHEREAS, on August 4, 2016, at the hearing on the PSC's motion to compel, and in a telephonic hearing conducted on September 14, 2016, the Parties, Portola, and the Court discussed the need for additional protective provisions to govern Portola's production of certain confidential documents;

IT IS HEREBY ORDERED that PTO 12 and 12(B) shall govern Portola's production of documents:

1.  In addition to the provisions in PTO 12 which shall apply to any production made by Portola, Portola may also designate as "PROTECTED INFORMATION – ATTORNEYS EYES ONLY" those documents meeting the criteria for "PROTECTED INFORMATION – HIGHLY PROTECTED"  that Portola has not previously disclosed or provided to a defendant of

record in MDL No. 2592.  A document marked "PROTECTED INFORMATION – ATTORNEYS EYES ONLY" may be only be disclosed to:

        (a)      Defendants' Counsel of record, Plaintiffs' Lead and Liaison Counsel and the Plaintiffs Steering Committee;

        2.      One (1) in-house counsel for the Janssen defendants and the Bayer defendants, respectively, provided that such designee serves exclusively as in-house litigation counsel. Defendants' Counsel of record shall identify Janssen's designee and Bayer's designee to Counsel for Portola prior to the designee obtaining access to materials marked "PROTECTED INFORMATION – ATTORNEYS EYES ONLY".

        3.      The parties shall meet and confer further to discuss the sharing and use of documents designated "PROTECTED INFORMATION – ATTORNEYS EYES ONLY" under this PTO 12(B) in depositions or with others, as may be necessary.  Failing to come to an agreement, the Parties and Portola will bring unresolved matters to the Court.

        New Orleans, Louisiana, this 21st day of September, 2016.

                                       Eldon E. Fallon
                                       United States District Court Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | **MDL NO. 2592** |
| **PRODUCTS LIABILITY LITIGATION** | * | |
| | * | **SECTION L** |
| | * | |
| | * | **JUDGE ELDON E. FALLON** |
| | * | |
| | * | **MAG. JUDGE NORTH** |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**THIS DOCUMENT RELATES TO ALL CASES**

**PRETRIAL ORDER NO. 23A**
**(Expert Deposition Guidelines)**

This Order shall govern the conduct of expert depositions for experts disclosed under 26(a)(2)(B) for the first four bellwether trials.

The Parties previously submitted protocols for non-case-specific depositions, ordered by the Court in its Deposition Guidelines Order (Pretrial Order No. 23 (Rec. Doc. 2283) and for the bellwether deposition protocol, ordered by the Court in its Pretrial Order No. 26 (Rec. Doc 3093). Except where otherwise noted below, this Order hereby incorporates the protocols set forth regarding General Provisions and Conduct of Depositions in Sections I and II of Pretrial Order No. 23 (Deposition Guidelines).

I.  **CONDUCT OF DEPOSITIONS**

    A.  **Examination**

    For each expert witness in MDL No. 2592, there shall be no more than two primary examining attorneys for the Plaintiffs and no more than two primary examining attorneys for the Defendants, collectively. An expert witness or consultant of the party examining the witness may attend.

**B.     Materials to be Produced**

The parties shall produce the following materials:

(1) A list of documents and materials containing the facts or data relied upon by the witness in forming his/her opinions;

(a) The parties are not required to produce the actual documents or materials relied upon by the expert witnesses in forming his/her opinions. Rather, the parties shall provide a list of materials relied upon by each expert, and said list shall include the bates numbers for documents and materials, if available. The opposing party can request copies of documents and materials not already produced in this litigation or not reasonably available in the public domain;

(2) a list of any exhibits (including bates numbers if available) that will be used by the witness to summarize or support his/her opinions (excluding demonstratives that may be used at trial);

(3) the witness's current curriculum vitae, including a list of all publications authored by the witness in the previous 10 years;

(4) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(5) a statement of the compensation to be paid for the witness's study and testimony in the case, including the witness's invoices/bills for the work performed to date.

The materials above should be provided at the time the report is served (with the exception of the statement of the compensation to be paid for the witness's study and testimony in the case and the witness's invoices/bills for the work performed to date, which shall be

produced at the witness's deposition.).  To the extent such materials have not been provided or there are additional materials that fall within the documents listed above, they should be provided no later than ten days before the witness's deposition. Graphics or demonstratives that an expert may use at trial need not be disclosed at or prior to deposition, but shall be disclosed at least 36 hours prior to examination of the particular witness at trial.

> ### C.   Duration

It is expected that the parties will complete their examination of the expert in seven hours (excluding breaks in the deposition), and the parties will cooperate to complete the deposition in one sitting with a minimum of inconvenience to the witness and counsel.  This limitation assumes the proper cooperation and responsiveness of the witness and counsel.  Where examining counsel feel additional time is necessary, they will work cooperatively to agree on a reasonable extension of time and if are unable to agree will take the issue to the Court promptly, preferably before the deposition.

Experts providing reports for any of the initial Bellwether cases who offer generic testimony and case-specific testimony about one Bellwether plaintiff will be subject to the seven hour time limit set forth above plus three (3) hours (excluding breaks in the deposition) on a separate day.  However, it is expected that, if the same expert witness later offers case-specific testimony about additional plaintiffs, the witness will not be deposed for seven hours per plaintiff, but can be deposed in a much shorter time, presumptively three hours.  Where the expert's later reports concern more than one plaintiff, the parties will cooperate to schedule a deposition that will cover the opinions as to all the plaintiffs in the report where that is reasonable (taking into account the number of plaintiffs and when they are scheduled for trial). Where an expert provides additional or new generic opinions in a new report or along with a report about additional plaintiffs, the witness may be deposed for additional time on the new or

additional generic opinions, up to an additional three hours beyond the time allowed for the expert's case-specific opinions.

     **D.**     **Scheduling**

          At the time of the disclosure of expert reports, the disclosing party shall provide a proposed location and no less than three dates on which the witness is available for deposition. Counsel for the opposing party will notify opposing counsel expeditiously as to which of the offered deposition dates will be accepted.  In the case of disclosures by plaintiffs, counsel for both defendants must confirm the acceptable deposition date.  The parties will make every effort to accommodate one of the dates provided for the deposition; however, it is understood that conflicts can occur and that, at times, it may be necessary to request additional dates.

          Each deposition notice shall include the name, address and telephone number of an attorney point of contact designated by the party noticing the deposition as well as the date, time and place of the deposition.  The deposition notice shall generally be served seven (7) days prior to a scheduled deposition; said notice shall not be filed on the Court docket.

          The parties will meet and confer on the location of depositions, taking into consideration   the preference of the expert witness. Prior to issuing a deposition notice, absent extraordinary circumstances, counsel should consult in advance in an effort to schedule depositions at mutually convenient times and locations.  Counsel are expected to cooperate and coordinate the scheduling of depositions.

          After counsel, through consultation, have arrived on a mutually acceptable date and location for a deposition, the Noticing Party shall serve an amended Notice (if necessary) reflecting the agreed upon date and location; said notice shall not be filed on the Court docket.

### E.      Translators

In the event an expert witness requires a translator, the time limits discussed in Section C will not apply.  Rather, each witness requiring a translator is expected to be made available for double the amount of time indicated above in Section C.

Counsel will notify the opposing party of any expert witness whose examination will require the involvement of a translator at the time that deposition dates are offered.

The party offering an expert witness who requires a translator will incur all of the fees and costs of the translators.

## II.      <u>USE OF DEPOSITIONS</u>

Depositions of expert witnesses are for the purpose of discovery of the expert's opinions.  Absent an agreement between the parties, expert witnesses are expected to be available to testify live at trial.  Depositions may not be used at trial in lieu of live testimony without agreement between the parties or by Court Order. Depositions may be used for purposes of impeachment of an expert in any Xarelto-related action in which the expert has been designated, including in state court to the extent permitted by that state's law and rules.

## III.      <u>FEDERAL RULES OF CIVIL PROCEDURE APPLICABLE</u>

The Federal Rules of Civil Procedure and Federal Rules of Evidence shall apply in all proceedings unless specifically modified herein.

New Orleans, Louisiana this 7th day of November, 2016

ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)                   MDL NO. 2592
PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO                        SECTION L
ALL CASES                                                    JUDGE ELDON E FALLON
                                                                   MAG. JUDGE NORTH

**PRETRIAL ORDER NO. 28A**
**(Regarding Contact with Physicians Through Trial)**

Consistent with the Court's Order & Reasons, entered on March 9, 2016 [Doc. No. 2676], and Pretrial Order No. 28, entered on April 28, 2016 [Doc. No. 3156], the following will govern the parties' interactions with an MDL Plaintiff's prescribing and treating physicians for the four bellwether cases through the end of trial.

1.   Plaintiffs' counsel may engage in *ex parte* communications with the healthcare providers of the four bellwether plaintiffs, including but not limited to the prescribers and treaters. With respect to any such *ex parte* communications, at least 48 hours before the healthcare provider's testimony at trial,  Plaintiffs' counsel shall disclose to Defendants' counsel each of the following:

a.     The date(s) of each such *ex parte* communication;

b.     The approximate duration of each such *ex parte* communication;

c.     The location of each such *ex parte* communication;

d.     The participants in each such *ex parte* communication; and

e.     The identity of the documents, photographs, or other materials that were shown or provided to the treating physician by Plaintiffs' counsel in connection with each such *ex parte* communication.  If said communication takes place less than 48 hours before a healthcare

provider is scheduled to testify at trial, such disclosure shall be made within three hours of the communication.

2.     Plaintiffs' counsel will maintain a record of the information set forth in paragraph 1 with respect to their *ex parte* contacts with physicians for each of the other 36 discovery pool plaintiffs so that the information will be preserved when discovery is resumed in those cases.

3.     Defendants' counsel will not engage in *ex parte* communications with the healthcare providers of the four bellwether plaintiffs except as permitted in paragraph 3 of Pretrial Order No. 28 and its subdivisions.  Nothing herein shall bar any employee, agent or representative of the Defendants from engaging in communications with physicians in the ordinary course of business.

NEW ORLEANS, LOUISIANA, this 10th day of January, 2017.

_____
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | : | |
| PRODUCTS LIABILITY LITIGATION | : | **MDL No. 2592** |
| | : | |
| | : | **SECTION L** |
| THIS DOCUMENT RELATES TO | : | |
| ALL CASES | : | |
| | : | **JUDGE ELDON E. FALLON** |
| | : | |
| | : | **MAGISTRATE JUDGE NORTH** |

### PRE TRIAL ORDER NO. 31
### (Protocol to Assist in Addressing Plaintiff Fact Sheets Which
### Defendants Contend Are Not In Compliance with Court Orders)

Defendants have requested that the Court enter a Pretrial Order setting forth the protocol with respect to assistance that the Plaintiffs' Steering Committee (PSC) has agreed to provide in addressing deficiencies alleged by Defendants in a Plaintiff Fact Sheet (PFS). The Court has previously addressed PFSs in Case Management Order No. 1 [Rec. Doc. 891], Pre-Trial Order No. 13 [Rec. Doc. 895], Pre-Trial Order No. 13A [Rec. Doc. 1040] and Pre-Trial Order No. 27 [Rec. Doc. 3132] (collectively the "PFS Orders"). In an effort to resolve instances where PFS do not comply with the Court's PFS Orders, the parties have agreed, and the Court so Orders, as follows:

1.  When the Defendants allege either a failure to timely provide a PFS, or a deficiency in a timely-served PFS on the ground of non-compliance with the PFS Orders, the following procedure shall be utilized:

    a.  In cases where it is alleged the PFS has not been timely provided, Defendants will send counsel for the Plaintiff (or in the event the claimant is *Pro se*, then directly to the *Pro se* claimant) a letter requesting that a PFS be served within 20 days;

b.    In cases where a PFS is received timely but alleged by Defendants to be deficient because it does not comply with the PFS Orders, Defendants will send counsel for the Plaintiff a letter specifically outlining the deficiency at issue and requesting that the deficiency(ies) be cured within 20 days; and

c.    On or before the first business day of each month, starting February 1, 2017, Defendants shall provide Plaintiffs' Liaison Counsel and its designee with one or all of the following three lists:

    i.    A list of cases in which a PFS has allegedly not been timely served and 20 days have passed since the letter provided for in paragraph 1a was sent;

    ii.    A list of cases in which a PFS allegedly fails to provide pharmacy or medical records indicating proof of use of Xarelto® (Defendant will indicate the nature of the deficieny(ies) on the list provided to Plaintiffs' Liaison Counsel and its designee) and 20 days have passed since the letter provided for in paragraph 1b was sent; and/or

    iii.    A list of cases in which a PFS allegedly remains core deficient for reasons other than failure to provide proof of use of Xarelto® (Defendant will indicate the nature of the deficieny(ies) on the list provided to Plaintiffs' Liaison Counsel and its designee) and 20 days have passed since the letter provided for in paragraph 1b has been sent.

d.    Thirty (30) days following receipt of the list(s) provided for in paragraph c above, Plaintiffs' Liaison Counsel or its designee will provide comments and/or objections to the aforementioned lists.

e.      Five (5) days following receipt of comments from Plaintiffs' Liaison Counsel or its designee, Defendants shall file the list(s) provided for in paragraph c above as Motions for Orders to Show Cause as to why the cases should not be dismissed, to be returnable for the next schedule case management conference.

New Orleans, Louisiana, on this 24th day of January 2017.

_____
Eldon E. Fallon
United States District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)   MDL NO. 2592
PRODUCTS LIABILITY LITIGATION

              SECTION L

THIS DOCUMENT RELATES TO ALL CASES  JUDGE ELDON E. FALLON

              MAG. JUDGE NORTH

<u>PRETRIAL ORDER NO. 13B</u>

**(Amending Pretrial Order No. 13 and 13A)**

**THIS MATTER**, having been opened by the Court by counsel for the Parties, and the Parties having consented, stipulated, and agreed to entry of the within Order, and good cause appearing therefore,

**IT IS** on this 26th day of January, 2018, **ORDERED**, as follows:

Paragraph 4 of Pretrial Order No. 13 is hereby amended to add the following language:

With respect to Authorizations provided to Defendants that are dated, Defendants and their record copy vendor, The Marker Group, Inc. ("Marker"), are hereby authorized to "white-out" and re-date the Authorizations to the date that they are being sent to the Healthcare Providers and other entities that require Authorizations, provided that the date affixed is not later than November 30, 2018. Once this Order becomes effective, at the end of each month, Defendants' vendor shall supply to Liaison Counsel for Plaintiffs a list of all cases in which such authorizations have been used that month.    This order shall become effective fourteen (14) days from the date above.  If any Plaintiff does not agree to authorize the re-dating of Authorizations as provided herein, he or she shall notify lead counsel for the Defendants within ten (10) days of the date above and

simultaneously provide defense counsel with updated authorizations.

**IT IS SO ORDERED.**

**JUDGE ELDON E. FALLON**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)                    MDL NO. 2592
PRODUCTS LIABILITY LITIGATION
                                                SECTION L

THIS DOCUMENT RELATES TO ALL CASES              JUDGE ELDON E. FALLON

                                                MAG. JUDGE NORTH


PRETRIAL ORDER NO. 13C

(Amending Pretrial Order No. 13, 13A and 13B)

THIS MATTER, having been opened by the Court by counsel for the Parties, and the

Parties having consented, stipulated, and agreed to entry of the within Order, and good cause

appearing therefore,

IT IS on this 15th day of May, 2018, ORDERED, as follows:

Paragraph 4 of Pretrial Order No. 13 is hereby amended to add the following language:

With respect to Authorizations provided to Defendants that are undated, Defendants and

their record copy vendor,  The Marker Group, Inc. ("Marker"), are hereby authorized to date the

undated Authorizations as of the date of party or random selection per CMO No. 6 that are being

sent to the Healthcare Providers and other entities that require Authorizations, provided that the

date affixed is not later than November 30, 2018.  Once this Order becomes effective, at the end

of each month, Defendants' vendor shall supply to Liaison Counsel for Plaintiffs a list of all

cases in which such authorizations have been used that month.  This order shall become effective

fourteen (14) days from the date above.  If any plaintiff does not agree to authorize the dating of

undated Authorizations as provided herein, he or she shall notify lead counsel for the Defendants

within ten (10) days of the date above and simultaneously provide defense counsel with dated authorizations.

With respect to new or location specific authorizations, Plaintiffs shall cooperate with Defendants, and shall respond to Defendants' requests for signatures for new or location specific authorizations within ten (10) days of being requested to do so.

**IT IS SO ORDERED.**

**JUDGE ELDON E. FALLON**

## UNITED STATES DISTRICT COURT EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

MDL No. 2592

SECTION L

JUDGE ELDON E. FALLON

MAG. JUDGE NORTH

THIS DOCUMENT RELATES TO:
ALL CASES

## PRE-TRIAL ORDER NO. 14C

The parties having agreed to amend Pre-Trial Order No. 14  (PTO 14) dated May 4, 2015, PTO 14 is hereby amended as follows:

1.      In Section IV and VII.5 of the Defendant's Fact Sheet ("DFS"), Defendants have agreed, without objection to answer certain questions and provide certain data relating to the dispensing and prescribing practices of Plaintiffs' Prescribing and Primary Treating Health Care Providers as it relates to Xarelto if such data is within their possession, custody or control.

2.      Defendants license information and data responsive to Section IV and VII.5 of the DFS from Source Healthcare Analytics LLC ("SHA"), a wholly-owned subsidiary of Symphony Health Solutions Corporation ("SHS").  SHA has authorized Defendants to provide a copy of the responsive data to the Plaintiffs, with no fee, upon execution of the Third Party Data Use Agreement attached hereto as Exhibit 1 by the individual Plaintiff's counsel to whom the data will be produced.

3.      Defendants shall, upon receipt of an executed Third Party Data Use Agreement from Plaintiff's counsel (sent to each Defendants' counsel by E-mail to jennifer.lamont@dbr.com, julie.tersigni@dbr.com, and shane.oconnell@dbr.com):

a)      produce all responsive SHS data and documents pursuant to Section IV and VII.5 of the DFS in cases which have been designated to receive a DFS pursuant to CMO 6.

b)      supplement its response to Section IV and VII.5 of any DFS already provided to Plaintiff pursuant to CMO 6 and produce all responsive documents within ten (10) days of receiving the executed Third Party Data Use Agreement.

c)      all responsive data and documents will be produced in excel format.

4.      All provisions of PTO 14 other than those amended herein shall remain unchanged and in full force and effect.

New Orleans, Louisiana this 23rd day of May, 2018

ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

# EXHIBIT 1

## THIRD PARTY DATA USE AGREEMENT (LITIGATION)

This **THIRD PARTY DATA USE AGREEMENT (LITIGATION)** ("**Agreement**") is by and among Source Healthcare Analytics, LLC, a Delaware corporation with its principal place of business at 2390 East Camelback Road, Phoenix, Arizona 85016 ("**SHA**"), **Janssen Pharmaceuticals, Inc.**, **Janssen Research & Development, LLC, Janssen Ortho, LLC and Johnson & Johnson** (collectively, "**JANSSEN**"), Bayer Corporation, Bayer Healthcare, AG, Bayer Pharma, AG, Bayer, AG, Bayer Healthcare, LLC, and Bayer Healthcare Pharmaceuticals, Inc. (collectively, "BAYER") and **the PLAINTIFF and/or PLAINTIFF'S LAW FIRM identified on the signature page of this Agreement** ("**PLAINTIFF**") SHA, JANSSEN, BAYER and PLAINTIFF may be individually referred to herein as a "**party**" or may be collectively referred to herein as the "**parties.**" PLAINTIFF and BAYER are collectively referred to herein as "Data Users".

THE PARTIES AGREE TO THE FOLLOWING:

1.      **Effective Date.** This Agreement shall only become effective as of the earlier of: (i) the date last signed by all parties, or (ii) the date that Data Users receive access to the SHA Data ("**Effective Date**").

2.      **Scope of this Agreement.** PLAINTIFF is currently involved in litigation with JANSSEN and BAYER in one or more of the consolidated lawsuits (the "**Litigation**") titled:

> IN RE: XARELTO® PRODUCTS LIABILITY LITIGATION,
> PHILADELPHIA COURT OF COMMON PLEAS
>
> IN RE: XARELTO® (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION
> MDL 2592, as well as the various federal District Courts to which an MDL case may be remanded

As part of discovery in the Litigation, Data Users seek to receive, use and/or disclose (subject to the Court-approved Protective Orders) all or part of the following data product(s)/service(s) that JANSSEN previously licensed from SHA ("**SHA Data**" or "**Data**"):

**SHA Data** includes information or data licensed by JANSSEN from SHA relating to the number of new prescriptions and the number of total prescriptions for Xarelto® for 2011 to the present written by the prescribing healthcare providers and one primary treating healthcare provider identified by each PLAINTIFF in Section III.A.1(a) and Section III.B.1 of the Plaintiff Fact Sheet, along with the name and address of the healthcare provider.

**SHA Data** also includes any license agreement, or amendment thereto, pursuant to which JANSSEN licensed information or data from SHA, and any correspondence or communications relating to any such license agreement or amendment thereto.

**SHA Data** further includes any data or information derived from any SHA Data licensed by JANSSEN. By the signature below of an authorized representative of SHA, this Agreement constitutes SHA's prior written permission to JANSSEN to disclose such data to Data Users, subject to the terms and conditions contained in this Agreement.

3.      **Data Delivery.** JANSSEN will have sole responsibility for providing Data Users with access to the SHA Data. SHA has no obligation to deliver any SHA Data or provide support of any kind to JANSSEN or Data Users unless expressly provided in this Agreement.

4.      **Permitted Scope of Data Use.** The parties agree that the SHA Data may be used solely in accordance with this Agreement and for the purpose(s) and in the manner expressly described below ("**Permitted Use(s)**"):

SHA Data may be used in connection with discovery, motion practice, trial and appeal in the Litigation pursuant to the terms of the Protective Orders (as defined in Section 6(a) below). No report, document, or exhibit using SHA data will be represented as having been prepared by SHA.  The Permitted Uses shall terminate at the conclusion of the Litigation identified in Section 2 on the last to occur of the following dates: (1) entry of a final order and judgment disposing of all claims; (2) exhaustion of all appellate rights relating to any final order and judgment; (3) expiration of the time to appeal any final order and judgment; or (4) final settlement of all claims.

SHA's consent is limited to disclosure of the SHA Data in connection with legally required production of information or documents in the Litigation. JANSSEN and Data Users each will not disclose the SHA Data to any other party or in any other legal proceeding without SHA's prior written consent.  The American Medical Association ("AMA"), whose proprietary data is or may be included within the SHA Data that JANSSEN intends to disclose to Data Users, has consented to the disclosure of SHA data to Data Users, subject to the requirements that (1) the AMA information will be designated with the highest degree of confidentiality under the Protective Orders and (2) all other reasonable steps will be undertaken to maintain the confidentiality of the AMA information.

5.      **Restrictions on Data Users' Use of SHA Data.** The Permitted Use(s) described in the preceding Section 4 are subject to all of the following restrictions:

a. SHA will only act as an objective service provider and not as an expert on behalf of a client or any party.  SHA Data may only be used in accordance with this Agreement. SHA will not offer and will not be expected or required to provide expert testimony or other evidence regarding the interpretation of the results of the data provided by SHA or the services performed by SHA in connection with the Litigation on behalf of JANSSEN or Data Users.  In addition, SHA will not provide any advice or engage in any advocacy with respect to witness testimony or expert analysis of any other party.  Also, SHA will not provide any opinion as to the relative merits of the clients' or other party's positions in the Litigation.

b. SHA Data cannot be used to identify an individual patient or pharmacy or for any other unlawful purpose. SHA Data must be delivered to Data Users only in a format which does not identify an individual patient or pharmacy in compliance with the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations. Data Users represent and warrant that they will not attempt, directly or indirectly, to re-identify any SHA Data to identify an individual or pharmacy. SHA may require JANSSEN to immediately suspend delivery of any SHA Data to Data Users in the event that SHA has a good faith reason to believe that identifiable data will be or is included with or in any SHA Data. Data Users shall ensure that the SHA Data will not be used by or on behalf of Data Users in any way to exhibit, reference, access or generate any individual, pharmacy or hospital level data. Data Users represent and warrant that they will not attempt to link, on an individual basis, any other information to the SHA Data. Data Users further represent and warrant that they maintain, and will continue to maintain, appropriate access controls to physically, technically, and administratively separate any SHA Data. Data Users agree to notify SHA immediately if any individual or pharmacy identifiable data is received by Data Users. Data Users agree that subject to SHA's direction, they will either: (1) promptly return to SHA any SHA Data that contains identifiable data, or (2) destroy such Data and copies thereof.

c. Except for the Permitted Use(s), Data Users may not use any SHA Data for Data Users' own benefit or for the benefit of any other person or entity. Further, Data Users may not resell, sublicense, copy, duplicate or otherwise distribute, disclose or permit access to SHA Data by any third party (including affiliates of Data Users).

d. Data Users acknowledge that SHA has an obligation to handle medical information in a legally appropriate and confidential manner. In addition to any other remedy or right hereunder, SHA shall have the right to obtain equitable relief in the event that Data Users breach any obligation herein.

6.      **Confidentiality.**

a. SHA's willingness to enter into this Agreement is expressly conditioned upon JANSSEN's and Data Users' willingness to treat SHA Data as confidential information subject to the terms of a valid, Court-approved Protective Orders. A copy of the applicable Protective Orders in the Litigation, Pre-Trial Order No. 12 (Stipulated Protective Order) [Rec. Doc. 894], filed 05/04/15 in MDL No. 2592, *In re: Xarelto (Rivaroxaban) Products Liability Litigation* attached hereto as Exhibit A and Case Management Order No. 5 (Stipulated Protective Order), filed 05/19/15, First Judicial District of Pennsylvania, Philadelphia Court of Common Pleas, *In re: Xarelto Products Liability Litigation* attached hereto as Exhibit B (collectively referred to within as "**Protective Orders**"). JANSSEN and Data Users each agree that they will not disclose any SHA Data during the Litigation unless such disclosure fully complies with the terms of the attached Protective Orders.

b. Data Users shall ensure that: (i) any employees or agents who receive any SHA Data is apprised of and appreciates the confidential and proprietary nature of the SHA Data; and (ii) each such employee or agent agrees to the confidentiality obligations herein and refrains from disclosing or discussing the SHA Data with anyone other than the Court or required employees of Data Users, JANSSEN or SHA. Data Users' employees shall only receive those portions of the SHA Data necessary to fulfill Data Users' requirements in connection with the Litigation and in accordance with the Permitted Use.

c. Data Users agree not to remove or alter any SHA confidentiality, protected designation, copyright or proprietary notice appearing on any SHA Data received from JANSSEN. In addition, any documents or materials prepared by Data Users which contain information derived from any SHA Data shall be marked or designated HIGHLY PROTECTED – SUBJECT TO PROTECTIVE ORDER pursuant to the terms and procedures set forth in the Protective Orders and without regard to whether such information may or will be disclosed to any other person or party. In addition, any documents or materials prepared by Data Users which contain information derived from any SHA Data shall be marked or designated HIGHLY PROTECTED – SUBJECT TO PROTECTIVE ORDER pursuant to the terms of this Agreement and without regard to whether such information may or will be disclosed to any other person or party.

d. Except in accordance with the terms of the Protective Orders referenced above, no part of the SHA Data shall be published, quoted or reproduced by Data Users. JANSSEN will credit SHA as a source of data only for the Litigation. JANSSEN's attribution of the SHA Data to SHA does not constitute and will in no way be characterized by JANSSEN or Data Users as SHA's endorsement of the data, views, opinions or findings expressed, shared or otherwise reported by JANSSEN or Data Users.

e. No part of the SHA Data shall be published, quoted, made or reproduced by Data Users for any business, competitive, personal, private, advertising, promotional or public relations purposes.

f. Data User accepts sole responsibility for ensuring that Data users' employees and agents comply with the terms of this Section of the Agreement and the Protective Orders.   Data Users agree that they are directly and separately liable for any breach of such terms by Data Users' employees and agents.

7.      **Ownership.** JANSSEN and Data Users acknowledge that the Data provided under this Agreement are proprietary and confidential to SHA and that JANSSEN and Data Users have the right only to use such Data in accordance with the terms of this Agreement. Except as otherwise provided for herein, SHA retains all right, title and interest in, to, and under the Data.

8.     **Term and Termination.** The term of this Agreement shall begin on the Effective Date and shall end at the: (i) the expiration or termination of the Permitted Use(s); or (ii) any earlier termination as permitted under the Agreement. Upon the termination or expiration of this Agreement, Data Users shall at SHA's option destroy or return to JANSSEN or to SHA, all SHA Data, and if applicable, an authorized representative of Data Users shall certify in writing to SHA, with a copy to JANSSEN, that Data Users have destroyed or returned to JANSSEN or SHA all SHA Data.

9.     **No Warranty.** ANY SHA DATA PROVIDED TO DATA USERS IN CONNECTION WITH THIS AGREEMENT IS PROVIDED TO DATA USERS "AS-IS" AND SHA MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, TO DATA USER SOR TO JANSSEN IN CONNECTION WITH THE SHA DATA, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

10.     **Limitation of Liability.** THE PARTIES ACKNOWLEDGE AND AGREE THAT SHA SHALL HAVE NO LIABILITY TO ANY OTHER PARTY UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO, ANY LIABILITY ARISING FROM THE INACCURACY OR INCOMPLETENESS OF THE DATA. IN NO EVENT SHALL SHA BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES INCLUDING BUT NOT LIMITED TO, LOST BUSINESS, LOST PROFITS OR THIRD PARTY CLAIMS, WHETHER FORESEEABLE OR NOT, EVEN IF SHA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. The parties acknowledge and agree that a breach of Data Users or its employees of the provisions of this Agreement will cause SHA and/or its affiliates irreparable injury and damage which may not be compensable by money damages, and, therefore, Data Users agree that SHA and/or its affiliates shall be entitled to injunctive or other relief to prevent such a breach and to secure enforcement of the terms of this Agreement, in addition to any other remedies which may be available. Without limiting the availability to SHA of any other rights or remedies, if Data Users breach any of the terms of this Agreement, SHA reserve the right to immediately terminate this Agreement upon notice to JANSSEN and Data Users.

11.     **Notices.** All notices, demands or other communications required hereunder shall be given or made in writing and shall be delivered personally or sent prepaid (a) by certified or registered first class mail with return receipt requested or (b) by a nationally-recognized common carrier's overnight courier service, addressed to the receiving party at the address first written above or such other address as the receiving party may advise in writing to use hereunder. Further, in the case of SHA, the notice must be sent to the attention of the "President & CEO" with a copy to the "Legal Department."

12.     **Miscellaneous.** This Agreement sets forth the entire agreement between the parties and supersedes prior proposals, agreements and representations related to the subject matter of this Agreement, whether written or oral. No modifications, amendments or waiver of any of the provisions of this Agreement shall be binding upon the parties unless made in writing and duly executed by authorized representatives of all parties. No party may assign, transfer or sublicense any portion of this Agreement or the Data provided hereunder without the express prior written consent of SHA. Any attempt to assign, transfer or sublicense by Data Users or JANSSEN shall be void. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document. The headings of the paragraphs hereof are used for convenience only and shall not affect the meaning or interpretation of the content thereof. This Agreement and the relationship of the parties in connection with the subject matter of this Agreement shall be governed by and determined in accordance with the laws of the State of Delaware. The failure to enforce at any time the provisions of this Agreement or to require at any time performance by the other parties of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or to affect either the validity of this Agreement (or any part hereof), or the right of any of the parties thereafter to enforce each and every provision in accordance with the terms of this Agreement. If any provision of this Agreement is held to be invalid or unenforceable by any judgment of a tribunal of competent jurisdiction, the remainder of this Agreement shall not be affected by such judgment, and the Agreement shall be carried out as nearly as possible according to its original terms and intent. However, if the original intent of the parties cannot be preserved, this Agreement shall terminate upon the effective date of such judgment.

91568853.1

SHA, JANSSEN, BAYER and PLAINTIFF acknowledge their receipt and acceptance of the terms and conditions of this Agreement by the signature below of their respective authorized representatives.

PLAINTIFF:

By: _____

Printed Name: _____

Title: _____

Law Firm: _____

Address: _____

Address: _____

Telephone: _____

E-mail:_____

Date: _____

*JANSSEN*:

By: _____

Printed Name:_____

Title: _____

Law Firm: _____

Address: _____

Address: _____

Telephone: _____

E-mail:_____

Date: _____

SOURCE HEALTHCARE ANALYTICS, LLC

By: _____

Printed Name: _____

Title: _____

Date: _____

*BAYER*:

By: _____

Printed Name: _____

Title: _____

Law Firm: _____

Address: _____

Address: _____

Telephone: _____

E-mail:_____

91568853.1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)  )        MDL No. 2592
PRODUCTS LIABILITY LITIGATION  )
                                 )        **SECTION:  L**
                                 )
                                 )        **JUDGE FALLON**
THIS DOCUMENT RELATES TO:   )        **MAG. JUDGE NORTH**
ALL ACTIONS   )
                                 )
                                 )

**PRETRIAL ORDER NO. 10 C**
**(Streamlined Service on Certain Bayer Defendants.**
**New Address for Service on Bayer HealthCare Pharmaceuticals Inc.)**

Pretrial Order No. 10 (Rec. Doc. 357) is amended herein only to provide a new address for

streamlined service on Bayer HealthCare Pharmaceuticals Inc. ("BHCP").

Section II. C. 1. of PTO No. 10 is amended to read as follows:

     1.     By **CERTIFIED** Mail, Return Receipt Requested, upon the following

representative of BHCP:

> Bayer HealthCare Pharmaceuticals Inc.
> c/o SOP Department
> Corporation Service Company
> 251 Little Falls Drive
> Wilmington, DE   19808-1674

**IT IS SO ORDERED**.

     NEW ORLEANS, LOUISIANA this $\underline{10th}$ day of October, 2018.

                                       HONORABLE ELDON E. FALLON
                                       UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)     **MDL No. 2592**
PRODUCTS LIABILITY LITIGATION

     **SECTION L**

**THIS DOCUMENT RELATES TO**     **JUDGE ELDON E. FALLON**
**ALL CASES**

     **MAG. JUDGE NORTH**

**PRETRIAL ORDER NO. 28B**
(Regarding Contact with Physicians in CMO 6 Discovery Pool)

Consistent with the Court's Order & Reasons, entered on March 9, 2016 [Doc. No. 2676]

("Order & Reasons") and Pretrial Order No. 28, entered on April 28, 2016 [Doc. No. 3156], and

Case Management Order No. 6 [Doc No. 8717], entered on February 27, 2018, the following will

govern the parties' interactions with an MDL Plaintiff's prescribing and treating physicians in

the CMO 6 Discovery Pool. As used in this order, an "MDL Plaintiff's prescribing or treating

physician" is a physician who has one or more patients who have filed a lawsuit (or whose

representative has filed a lawsuit) pending in this MDL proceeding alleging that the patient

sustained an injury caused by Xarelto. A "prescribing physician" is the physician identified in

Plaintiffs' Fact Sheet as the physician who prescribed Xarelto to the plaintiff, as recorded in

MDL Centrality; a "treating physician" is the physician who treated the injury alleged in

Plaintiffs' Fact Sheet, as recorded in MDL Centrality.

     1.     Plaintiffs' counsel may engage in ex parte communications with any MDL

Plaintiff's prescribing or treating physician. With respect to any such ex parte communications,

at least 48 hours before the deposition of the Plaintiff's prescribing or treating physician, Plaintiffs' counsel shall disclose to Defendants' counsel each of the following:

      a.    the date(s) of each such ex parte communication;

      b.    the approximate duration of each such ex parte communication;

      c.    the location of each such ex parte communication;

      d.    the participants in each such ex parte communication; and

      e.    the identity of the documents, photographs, or other materials that were shown or provided to the treating physician by Plaintiffs' counsel in connection with each such ex parte communication.

2.    Defendants' counsel will not engage in ex parte communications with any MDL Plaintiff's prescribing or treating physician, except as permitted in this CMO. Nothing herein shall bar any employee, agent or representative of the Defendants from engaging in communications with physicians in the ordinary course of business.

3.    As to the 600 cases selected as part of the CMO 6 Wave 1 Discovery Process (or that lesser number of cases now remaining in the CMO 6 Wave 1 Pool), the defendants may contact a total of 250 MDL Plaintiffs' prescribing or treating physicians (to be divided between the Defendants, collectively) and retain no more than 125 MDL Plaintiffs' prescribing or treating physicians (to be divided between the Defendants, collectively). Further, as to these 250 potential contacts and 125 potential retentions, a maximum of 30 potential contacts and 20 potential retentions may be from the 200 cases selected by the Court and none from the 200 cases selected by Plaintiffs. Expert witnesses previously disclosed in the MDL or PCCP proceeding may continue to be used by Defendants and shall not be counted toward any of the above limits.

4.    As to the CMO 6 Wave 2 Pool MDL case work-ups, Defendants' counsel may engage in ex parte communications with MDL Plaintiffs' prescribing or treating physicians (to be divided between the Defendants, collectively) with the same numbers.

5.    When any MDL case is dismissed, including an MDL CMO 6 case:

a.    If the dismissed plaintiff's prescriber/treater has not treated any other MDL plaintiffs as of the date of dismissal, then contact with that physician is not subject to the limitations of PTO 28B.

b.    If the dismissed plaintiff's prescriber/treater has treated another MDL plaintiff, but not another CMO 6 Wave 1 or Wave 2 plaintiff, then contact with that physician counts toward the general limit in Paragraph 4 but does not count toward the sub-limits in - Paragraph 3.

c.    If the dismissed plaintiff's prescriber/treater has treated another non-dismissed CMO 6 MDL plaintiff, the sub-limits in Paragraph 3 remain applicable as to that prescriber/treater.

6.    The MDL Plaintiffs' prescribing or treating physicians are defined as those healthcare providers identified as prescribing or treating physicians in their PFS as of May 31, 2018.

7.    All ex parte communications by Defendants' counsel with an MDL Plaintiff's prescribing or treating physician must be limited to non-substantive discussions until the physician has affirmatively expressed a bona fide interest in being considered as a retained expert.

8.    If any CMO 6 case proceeds to expert discovery, at the time expert disclosures are made by Defendants, Defendants' counsel shall also disclose to Plaintiffs' counsel the name of

any testifying expert who per MDL Centrality has patients who are plaintiffs in the MDL

proceeding, and the experts themselves shall have no further affirmative disclosure obligations.

No disclosures are necessary for consulting experts until such time as an expert is identified as a

testifying expert. Consulting experts contacted or retained by Defendants' counsel shall be

subject to all of the requirements of this Order to the same extent as testifying experts, except

that the disclosure requirements set forth in this sub-paragraph 3(c) shall not apply to consulting

experts until they are identified as testifying experts.

9.      Defendants' counsel may communicate with a prospective physician-expert about

his or her general clinical experiences with Xarelto, provided that Defendants' counsel shall not

communicate with a physician-expert who has acted as a prescribing or treating physician about

any of his or her specific patients who have taken Xarelto.

10.     The Defendants shall not use a physician as a consulting or testifying expert in a

case where that physician's present or former patient is a plaintiff in that case.

11.     Defendants may rely on the disclosures in Plaintiffs' Fact Sheets as recorded in

MDL Centrality as of May 31, 2018, in determining whether a physician is an MDL Plaintiff's

prescribing or treating physician. Subsequent disclosures in Plaintiffs' Fact Sheets as recorded in

MDL Centrality shall not impact the count toward the cap in paragraphs 3 and 4.

12.     The numerical limit in paragraph 3 above is subject to modification by agreement

of the parties or by court order for good cause shown. The limitation shall be subject to re-

evaluation by the Court should these restrictions be deemed unduly burdensome and prejudicial

to the Defendants' ability to obtain sufficient expert witnesses based on expert availability or

expert witness deadlines in the CMO 6 Wave 1 or Wave 2 cases.

13.     This order shall govern expert retentions only with respect to CMO 6 Wave 1 and Wave 2 plaintiffs, and is neither binding nor precedential with respect to cases that are not selected in Wave 1 or Wave 2 of CMO 6.  Defendants expressly preserve their position that Pretrial Order 28 cannot continue in effect as additional cases are selected for workup, and Plaintiffs expressly preserve their contrary position.  The parties retain their respective rights with respect to any additional plaintiffs subsequently be selected for discovery or trial beyond CMO 6.  All parties' prior objections to Pretrial Order 28 are expressly preserved.

NEW ORLEANS, LOUISIANA, this 7th day of October 2016.

UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | : | |
| PRODUCTS LIABILITY LITIGATION | : | **MDL No. 2592** |
| | : | |
| | : | **SECTION L** |
| THIS DOCUMENT RELATES TO: | : | |
| ALL CASES | : | |
| | : | **JUDGE ELDON E. FALLON** |
| | : | |
| | : | **MAGISTRATE JUDGE NORTH** |

**PRETRIAL ORDER NO. 31(a)**

**(APPLICABLE TO NON-CMO 6 CASES ONLY)**

The Court has previously addressed Plaintiff Fact Sheets ("PFS") in Case Management Order No. 1 [Rec. Doc. 891], Pre-Trial Order No. 13 [Rec. Doc. 895], Pre-Trial Order No. 13A [Rec. Doc. 1040], and Pre-Trial Order No. 27 [Rec. Doc. 3132] (collectively the "PFS Orders"). In an effort to resolve instances where PFS do not comply with the Court's PFS Orders, the parties have agreed, and the Court so Orders that the procedure set forth in PTO 31, Protocol to Assist in Addressing Plaintiff Fact Sheets Which Defendants Contend Are Not In Compliance with Court Orders, is hereby amended as follows:

1.      Pursuant to PTO 13, in cases where Defendants allege the PFS has not been timely provided, Defendants' counsel will send counsel for the Plaintiff (or in the event the claimant is Pro se, then directly to the Pro se claimant) a letter requesting that a PFS be served within 20 days.

2.      Pursuant to PTO 13, in cases where a PFS is received timely but alleged by Defendants to be deficient because it does not comply with the PFS Orders, Defendants' counsel will send counsel for the Plaintiff a letter specifically outlining the deficiency at issue and requesting that the deficiency(ies) be cured within 20 days.

3.      If the 20-day cure period has passed and the Plaintiff has not submitted an allegedly overdue PFS or cured the alleged deficiencies in the PFS, as applicable, Defendants may list the case on the agenda for the next case management conference.

4.      If a case appears on the agenda for two case management conferences and the PFS issues have not been cured, Defendants may request that the case be listed on an Order to Show Cause as to why the case should not be dismissed with prejudice.  That Order to Show Cause shall be returnable at the next court conference and require the listed Plaintiff to show cause as to why the case should not be dismissed with prejudice.

New Orleans, Louisiana, on this 11th day of December, 2018.

_____
Judge Eldon E. Fallon
United States District Court Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAG. JUDGE NORTH |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

**THIS DOCUMENT RELATES TO ALL CASES**

**PRE-TRIAL ORDER NO. 10C**
**(Streamlined Service on Certain Bayer Defendants)**

Paragraph II.G. of Pre-Trial Order No. 10 is hereby amended to read as follows:

"For cases in which plaintiffs have timely served both BHCP and Bayer Pharma AG, no motion

shall be filed to dismiss any of the other Bayer entities based on a failure to serve those other

entities until after an order of the Court following a meet and confer of the parties.  For cases in

which plaintiffs have not timely served both BHCP and Bayer Pharma AG, a motion to dismiss

for failure to serve any Bayer entity may be made after a meet and confer of the parties, without

first obtaining an order of the Court."

NEW ORLEANS, LOUISIANA this 4th day of February, 2019

_____
UNITED STATES DISTRICT JUDGE

- 1 -

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)          MDL No. 2592
PRODUCTS LIABILITY LITIGATION

                                                               SECTION L

THIS DOCUMENT RELATES TO          JUDGE ELDON E. FALLON
ALL CASES

                                                               MAG. JUDGE NORTH

**PRETRIAL ORDER NO. 23B**
**PROTOCOL FOR TELEPHONIC DEPOSITIONS**
**OF CMO6 DETAIL REPRESENTATIVES**

The Parties having consented, stipulated, and agreed to entry of the within Order, and good cause appearing therefore,

IT IS on this 15th day of February 2019, **ORDERED** as follows:

FOR ANY DEPOSITIONS OF DEFENDANTS' DETAIL REPRESENTATIVES THAT PLAINTIFFS REQUEST TO BE TAKEN TELEPHONICALLY, THE FOLLOWING PROTOCOL SHALL BE FOLLOWED:

1.       Plaintiff's counsel shall give notice to Defendants' counsel no less than 72 hours before the deposition of the detail representative that Plaintiff intends to take the deposition by telephone.

2.       The handling of exhibits used in any CMO 6 detail representative deposition done by telephone must comply with the Paragraphs 40 and 41 of PTO 23.  Any counsel who notices a telephonic deposition must take the necessary steps to ensure that three (3) copies of any exhibits counsel foreseeably intends to use with the witness are available at the deposition so that the witness and defense counsel will be provided with hard copies of the exhibits.

3.       The speakerphone arranged for the deposition shall be a system allowing all participants to communicate and be heard without static or interference.  If Defendants incur costs

for obtaining a speakerphone for the deposition, Plaintiff will reimburse any such reasonable costs promptly after submission by Defendants.

4.    Any telephonic deposition must be conducted by Plaintiff's counsel from a landline and not by cellular/mobile phone, and Plaintiff's counsel shall be in a setting free of excessive background noise during the deposition.  Only counsel, or paralegal or staff assisting any counsel, may attend the deposition at the site of the deposition, and all such individuals must be identified on the record.

5.    There will be no videotaping or videoconferencing of the witness if the Plaintiff's counsel attends telephonically.

**IT IS SO ORDERED**.

NEW ORLEANS, LOUISIANA this 15th day of February 2019.

HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

*UNITED STATES DISTRICT COURT*
*EASTERN DISTRICT OF LOUISIANA*

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCT LIABILITY LITIGATION | ) ) ) ) | MDL 2592 |
| | ) | SECTION L |
| ------------------------------------------ | ) ) | HONORABLE ELDON E. FALLON |
| **This Document Relates to:** **ALL CASES** | ) ) ) | MAG. JUDGE NORTH |
| | ) ) ) ) | |

**CASE MANAGEMENT ORDER NO. 9 (STAY OF PROCEEDINGS)**

For good cause shown, the Court finds, and hereby **ORDERS** that:

**I.    STAY OF PROCEEDINGS**

Except for the specific requirements and obligations set forth herein, all further litigation activity in this MDL proceeding shall be stayed, including but not limited to all discovery obligations and deadlines under CMO 6, CMO 7 and CMO 8, absent the agreement of the parties or subsequent Order(s) of the Court.

**II.    ORDERS REQUIRING REGISTRATION OF CASES AND CLAIMS AND GOVERNING PROCEEDINGS FOLLOWING THE ENROLLMENT PERIOD AFTER THE PROPOSED SETTLEMENT**

Notwithstanding the stay entered in this Order, the Court is simultaneously entering CMO 10 (Order Regarding Registration of Xarelto-Related Cases and Claims) and CMO 11 (Docket Control Order) that sets forth requirements that shall be undertaken in this litigation on a going forward basis by all existing plaintiffs and any new plaintiffs. All parties are required to

1

fulfill their respective obligations under CMO 10 and CMO 11 and the parties may implement proceedings to enforce these orders.

### ORDERS TO SHOW CAUSE

Notwithstanding the stay entered in this Order, plaintiffs who are delinquent in fulfilling Court requirements for the maintenance of their lawsuits by either ( i) being listed as delinquent on the periodic status report proceeding the issuance of an Order to Show Cause as to why their lawsuits should not be dismissed ("OTSC"), or (ii) being subject to an OTSC, remain under an obligation to resolve the delinquency or issues giving rise to being listed on the status report or being made subject to the OTSC. The parties may implement proceedings to enforce this provision.

ENTER:

3/25/19
Date

HON. ELDON E. FALLON

**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCT LIABILITY LITIGATION | MDL 2592 |
| | SECTION L |
| -------------------------------------------- | HONORABLE ELDON E. FALLON |
| **This Document Relates to:** **ALL CASES** | MAG. JUDGE NORTH |
| | CASE MANAGEMENT ORDER NO. 10 |
| | ORDER REGARDING THE REGISTRATION OF XARELTO-RELATED CASES AND CLAIMS |

In order for this Court and the cooperating state court jurisdictions with coordinated proceedings pending in Pennsylvania (*In Re Xarelto Litigation*, No. 2349, Philadelphia County Court of Common Pleas), and in California (*Xarelto Cases*, Judicial Council Coordinated Proceeding No. 4862, Superior Court of the State of California, County of Los Angeles) to cooperatively manage this litigation and to assist the Parties to effectuate the provisions of the private Final Settlement Agreement entered into between, *inter alia*, the MDL Plaintiffs' Steering Committee ("PSC"), and Defendants Janssen and Bayer ("Defendants"), it is necessary to identify all filed and unfiled Xarelto®-related claims:

IT IS HEREBY ORDERED AND DECREED THAT:

1.      All counsel for any Xarelo®-related claim pending in this Court and/or counsel who have any clients who have claims, filed or unfiled, related to Xarelto® shall (i) identify all clients with filed and unfiled Xarelto®-related claims regardless of where the case is filed or where the claimant is located and regardless of the client's eligibility to join the settlement or

ultimate decision whether to join the settlement or not by enrolling in the Settlement Program, (ii) provide the required information set forth below within the prescribed deadlines, including identifying all Interested Counsel in each filed case or unfiled claim wherever located, and (iii) designate the Primary Law Firm and contacts as set forth below.  The Registration Declaration, the forms of Registration Lists, and the *Pro Se* Affidavit will be made available through the Claims Administrator in a form materially similar to Exhibit A to this Order.

    2.    <u>Obligations of Counsel</u>:

    A.    *Service Of Registration List*:  Counsel representing clients with claims related to Xarelto® must prepare a Registration Declaration and Registration Lists, identifying all such clients, whether with filed or unfiled claims, as set out below in 2.B. and 2.C, using the steps identified at https://www.mdlcentrality.com/mdl2592.   To comply with this Order, go to that website, click on "Registration" and follow the instructions.  The completed Registration Declaration and Registration Lists shall be submitted to the Claims Administrator (as formatted, for the accurate and efficient transfer of the required information) no later than the deadlines prescribed below. **UPLOADING THE REGISTRATION DECLARATION AND REGISTRATION LIST ON THE WEBSITE IN NO WAY SIGNIFIES A CLAIMANT'S COMMITMENT OR INTENT TO ENROLL IN THE SETTLEMENT PROGRAM.**

    B.    *Information to be Provided Regarding Unfiled Claims and Filed Cases Within 3 or 15 Days of the Entry of This Registration Order, As Specified*:

    1.   Within three (3) days of the issuance of this Registration Order (*i.e.,* March 28, 2019), Counsel shall set forth on the Registration List: (i) the

2

identity of every Xarelto®-related claim, wherever situated, in which counsel has any Interest that was not filed in court before March 11, 2019; (ii) the identity of the Primary Law Firm and Principal Responsible Attorney for such claims, and (iii) the following information about each such claim: (a) the Xarelto-user plaintiff's or claimant's name (and that of a representative or executor plaintiff if applicable), (b) state of residence, (c) unique individual identifying information as required by MDL Centrality, including date of birth and social security number, and (d) the date of the written retainer agreement with the claimant relating to a potential Xarelto-related claim.

2. Within fifteen (15) days of the issuance of this Registration Order (*i.e.*, April 9, 2019), Counsel shall set forth on the Registration List: (i) the identity of all filed Xarelto®-related cases wherever filed and all unfiled Xarelto®-related claims in which counsel has any Interest; (ii) the identity of the Primary Law Firm, Principal Responsible Attorney and all Interested Counsel for such filed and unfiled claims, and (iii) the following information about each filed and unfiled claim: (a) the Xarelto-user plaintiff's or claimant's name (and that of a representative or executor plaintiff if applicable), (b) state of residence, (c) the current court, venue and case number, if filed, and (d) unique individual identifying information as required by MDL Centrality, including date of birth and social security number..

3. For each filed case registered pursuant to the preceding two paragraphs, Counsel shall identify on the Registration List all Xarelto®-related cases that are pending in this MDL proceeding or in any other federal or state court or tribunal in the United States in which they serve as the Primary Law Firm as of the date of this Order, the identity of the Principal Responsible Attorney for each filed case and all Interested Counsel for each filed case, the date of all signed written retainer agreements relating to a potential Xarelto claim between any client who is an unfiled claimant or one whose case was filed on or after March 11, 2019 and the attorney or firm with whom the agreement was entered, and the case and claim related information on the form Registration List.

C.   *Information to be Provided Regarding Filed Cases and Unfiled Claims Within 75 Days of the Entry of This Registration Order*:

Within 75 days of the entry of this Registration Order, each Primary Law Firm shall supplement its Registration List with the following additional claim-related information for each previously registered Xarelto-related claim, whether filed or unfiled: (i) the date of the Xarelto®-user plaintiff's or claimant's first prescription of Xarelto®; (ii) the date of the first alleged injury or bleeding event claimed to be due to Xarelto® use as prescribed; (iii) whether the plaintiff or claimant at the time of injury or bleeding event was taking two other anti-coagulation medicines (prescription and/or OTC) in addition to Xarelto® (including but not limited to aspirin, Plavix (clopidogrel) or another P2Y12 platelet inhibitor (*e.g.*, prasugrel (Efient, Effient), ticagrelor (Brilinta), and cangrelor (Kengreal)) regardless of the indication for which they were taking Xarelto®; (iv)

4

whether the plaintiff or claimant was on 20 mg of Xarelto for VTE prevention for longer than six (6) months; (v) the number of consecutive days of hospitalization the plaintiff or claimant incurred allegedly due to Xarelto® use, (vi) whether the claim pertains to a Xarelto®-user who suffered a CVA (*i.e.*, stroke) while taking Xarelto®; and (vii) whether the claim pertains to a Xarelto-user who died allegedly as a result of taking Xarelto®. In providing this additional information pursuant to the Registration Order, no additional claimants may be identified or registered beyond those Plaintiffs and Claimants disclosed initially in response to the Registration Order unless agreed in advance by Defendants.

D.   The Primary Law Firm shall declare on the Registration Declaration under oath that (i) all filed cases and unfiled claims relating to Xarelto® in which they are the Primary Law Firm are identified on the Registration List, (ii) all Interested Counsel are identified, and (iii) that the claim-related information, including retention date, is accurate and complete. The Primary Law Firm shall make the same declaration under oath with respect to the supplemental claim-related information provided pursuant to Paragraph 2. C. Counsel shall further certify under oath that they have verified that all cases in which they have an Interest are, or will be, identified on other Registration Lists submitted by another Primary Law Firm. If there is any Xarelto®-related claim for any plaintiff or claimant, whether filed or unfiled in which an attorney bound by this Order has an Interest and believes is not, or will not be, listed on any Registration List submitted by any other Primary Law Firm, then such attorney shall include the plaintiff or unfiled claimant on his or her Registration Lists with the information specified in paragraph 2.B.

above, and shall state "No Primary Law Firm Designated." Further, retention agreements will be subject to inspection and review by the private Special Master and/or the Court.

E.     *Due Date For Service Of Registration List*:  The Registration Declarations and Registration Lists shall be completed in the manner provided by the Claims Administrator as specified above.

F.  *Updates Regarding Change in Status*:  The Primary Law Firm shall serve an updated Report regarding any change in status or representation of any Plaintiff or Unfiled Claimant identified on their Registration List.  The updated Report shall be in the form set by the Claims Administrator.  The Report shall be updated on September 1, 2019 and further updates as may be required by the Court, and shall be served on the Claims Administrator who will promptly distribute to Defendants and the PSC.

3.     *Pro Se* Plaintiffs:   All persons who represent themselves *pro se* in these proceedings with Xarelto®-related claims who wish to participate in the Settlement Program voluntarily (collectively "*Pro Se* Plaintiffs" shall complete the *Pro Se* Registration form which can    be    obtained    by    going    to    the    Claims    Administrator    website, https://www.mdlcentrality.com/mdl2592, clicking on "Registration" and following the instructions.   The completed *Pro Se* Registration form shall be submitted to the Claims Administrator (as formatted, for the accurate and efficient transfer of the required information) no later than thirty (30) days after the date this Order is entered.  To submit these materials, go to https://www.mdlcentrality.com/mdl2592, click on "Registration" and follow the upload instructions.

6

**UPLOADING THE *PRO SE* REGISTRATION FORM ON THE WEBSITE IN NO WAY SIGNIFIES A PRO SE PLAINTIFF'S COMMITMENT OR INTENT TO ENROLL IN THE SETTLEMENT PROGRAM.**

If the *Pro Se* Plaintiff is not able to submit the forms electronically, the *Pro Se* Plaintiff shall send the Registration Affidavit via U.S. mail postmarked no later than thirty (30) days after the date this Order is entered to:

> Claims Administrator
> XR Settlement
> P.O. Box 85006
> Richmond, VA 23285-5006

A. *Updates Regarding Change in Status*:  All *Pro Se* Plaintiffs shall serve an updated Report regarding any change in status of their Xarelto-related claim, and shall include changes in status and in any required information previously provided.  The updated Report shall be in the form set by the Claims Administrator, and shall be served on September 1, 2019 and February 1, 2020.  The updated Report shall be served on the Claims Administrator in the manner previously described

B. *Assistance*:  The PSC will be available to provide assistance with registration to *Pro Se* Plaintiffs.  The assistance provided by the PSC does not create an attorney-client relationship and any *Pro Se* Plaintiffs who obtain this assistance remain *pro se.*

4. <u>Definitions</u>:

A. *"Primary Law Firm" Defined*:  "Primary Law Firm" as used herein shall mean a single designated law firm primarily responsible for obligations relating to the

Final Settlement Agreement and compliance with any of the Court Orders entered in the jurisdiction in which the case is pending.  Such designation shall be included on the Registration Declaration and the Registration List.  The Registration Declaration  shall also include the law firm telephone number, business address, and names and emails of the Principal Responsible Attorney and an administrative contact at the law firm who will be handling the case.

      B.    *"Principal Responsible Attorney" Defined:* The Principal Responsible Attorney is the single attorney jointly identified by the Primary Law Firm and Interested Counsel by name, state bar number, business address, telephone number, and email address, who will be primarily responsible to provide notice to the Court and for day to day communications and activities related to the obligations of those cases identified on the Registration List submitted with each Registration Declaration of the Primary Law Firm relating to the Final Settlement Agreement and compliance with any of the Court Orders entered in the jurisdiction in which the case is pending.[1]

      C.    *"Interested Counsel" Defined*:  "Interested Counsel" means any Counsel (as defined) with an Interest (as defined) in a Person, or in a claim or case of a Person who has a Claim, filed or unfiled, relating to Xarelto® (as defined).  Interested Counsel and the Primary Law Firm shall jointly be responsible for compliance with any Court Orders.

---

[1] The designation of a Principal Responsible Attorney is not intended to impact in any way the rights or obligations of all counsel who represent a client, including all counsel who have any financial interest in the client's claim. ("Interested Counsel"), nor shall such designation alter the relationship among counsel. For any filed case or unfiled claim in which multiple firms have been designated as the Primary Law Firm, any dispute over representation that cannot be resolved by the law firms may be submitted to the private and independent Special Master under the settlement and affected claims will be stayed pending review and resolution .

D.     The term "Interest" as used herein shall mean any interest in any case or claim relating to Xarelto®, whether filed or unfiled, in which counsel: (a) has an engagement or retainer agreement with such claimant; (b) is listed as the counsel of record for a Plaintiff in any filed pleadings related to the Xarelto®-related claims, (c) has entered an appearance for such Plaintiff, or (d) would benefit directly or indirectly from any payment to settle any claim of such Plaintiff or Claimant related to Xarelto®; or (e) otherwise has any financial interest of any kind whatsoever in any Xarelto®-related case or claim.

E.     "Counsel" means, with respect to any particular Person, a lawyer and/or law firm who represents such Person pursuant to a written agreement, or who has an Interest in such Person's Xarelto®-related claim.

F.     "Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association (including any group, organization, co-tenancy, plan, board, council or committee), corporation, Governmental Authority, custodian, nominee or any other individual or entity (or series thereof) in its own or any representative capacity, in each case, whether domestic or foreign.

G.     "Xarelto®-related Claim" or "related to Xarelto®" means to any extent, or in any way, arising out of, relating to, resulting from and/or connected with the prescription and use of Xarelto® and/or any personal injury, wrongful death, losses, or damages caused or claimed to have been caused, in whole or in part, by any such prescription and use of Xarelto®.

9

5.    Changes In Information:

A. Attorney Obligations.  The Primary Law Firm shall serve written notice of any changes to the information provided on the Registration List, including but not limited to the acquisition or loss of Primary Law Firm status for the case, any change in information for the Primary Law Firm, the Principal Responsible Attorney, or administrative contact for the case, any change in designation of Primary Law Firm status for any case previously listed as "No Primary Law Firm Designated," and any other change of any information verified under oath.  If the change is a loss of Primary Law Firm status or loss of an Interest in the case, the notice shall also identify name of the attorney and/or law firm, telephone number, email, business address of the new representative for the Plaintiff or Unfiled Claimant or, if none, an affirmation of the Plaintiff or Unfiled Claimant's *pro se* status and the telephone number, email and address for the Plaintiff or Unfiled Claimant.  Such written notice must specify the changed circumstances and be served within 30 days of such change upon the Claims Administrator.  This obligation shall terminate on February 1, 2020.

B. *Pro Se* Plaintiffs.  All *Pro Se* Plaintiffs shall serve written notice of any changes to the information provided on the Registration List, including but not limited to any change regarding contact information or the subsequent retention of counsel.  If the change of information is the retention of counsel, the *Pro Se* Plaintiff shall provide the attorney name, address, telephone number and email address for counsel.  Such written notice must specify the changed circumstances and be served with 30 days of such change upon the Claims Administrator.  This obligation shall terminate on February 1, 2020.

10

6.    <u>Enforcement</u>:  All Counsel and *Pro Se* Plaintiffs are required to comply with this Order.

    a.  FILED CASES.  Failure to meet the requirements of this Order will subject the non-compliant plaintiff's action to dismissal with prejudice after adequate due process notice and a show cause hearing as to the reason for such failure to register cases and otherwise comply with this Order and may subject such party or counsel to other penalties at the Court's discretion.

    b.  UNFILED CLAIMS.  Unfiled claims that are required to be registered under this Order that are not registered will be subject to dismissal with prejudice if later filed.

7.    <u>Joint Database</u>:  The Claims Administrator shall maintain a database of all cases and claims identified pursuant to this Order which will be available to Defendants, the PSC, other counsel as agreed to by the Defendants and the PSC, and the Court, if requested.

8.    <u>Cooperation With Other Jurisdictions</u>:  This Order is entered in conjunction with cooperating state court jurisdictions with coordinated proceedings pending in Pennsylvania (In Re Xarelto Litigation, No. 2349, Philadelphia County Court of Common Pleas), and California (*Xarelto Cases*, Judicial Council Coordinated Proceeding No. 4862, Superior Court of the State of California, County of Los Angeles)  It is the intention of this Court to work in cooperation with these courts in a manner that promotes judicial economy and that secures as complete registration of all claims, filed and unfiled, as possible, and to share all information obtained in the registration process amongst the cooperating courts and their leadership counsel.  It is also the intention of this Court to work in cooperation with any other federal or state court or tribunal

in which Xarelto®-related claims are pending.   If there is any dispute concerning the implementation of this Order, this Court will coordinate conferral among the Courts for resolution of the issue, consistent with the law of the various jurisdictions.

**THIS ORDER REQUIRES COUNSEL TO REGISTER ALL FILED CASES AND UNFILED CLAIMS ON BEHALF OF THEIR CLIENTS WITH XARELTO-RELATED CLAIMS.  COMPLYING WITH THIS ORDER DOES NOT MEAN THAT A GIVEN CASE OR CLAIM IS ELIGIBLE TO PARTICIPATE IN THE SETTLEMENT PROGRAM OR THAT AN ELIGIBLE PLAINTIFF HAS DECIDED TO PARTICIPATE. A SEPARATE ENROLLMENT PROCESS WILL BE ESTABLISHED FOR ELIGIBLE PLAINTIFFS TO INDICATE THEIR INTENT TO PARTICIPATE.**

IT IS SO ORDERED.

Dated: 3/25/19

Hon. Eldon E. Fallon

Judge, United States District Court

***UNITED STATES DISTRICT COURT***
***EASTERN DISTRICT OF LOUISIANA***

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCT LIABILITY LITIGATION | ) ) ) ) |
| -------------------------------------------- | ) |
| **This Document Relates to:** **ALL CASES** | ) ) ) ) |
| | ) ) ) |

MDL 2592

SECTION L

HONORABLE ELDON E. FALLON

MAG. JUDGE NORTH

**CASE MANAGEMENT ORDER NO. 10 A**

**ORDER REGARDING THE FORMS TO BE USED IN REGISTERING XARELTO-RELATED CASES AND CLAIMS**

In furtherance of CMO #10 entered this Court pertaining to the registration of all filed and unfiled Xarelto®-related claims in cooperation with other courts, including the consolidated proceedings pending in Pennsylvania (*In Re Xarelto Litigation*, No. 2349, Philadelphia County Court of Common Pleas),

IT IS HEREBY FURTHER ORDERED AND DECREED THAT:

1.     The Registration Declaration, the forms of Registration Lists, and the *Pro Se* Affidavit referenced in CMO 10 are available through the Claims Administrator on the website https://www.mdlcentrality.com/mdl2592.

2.      All counsel for any Xarelto®-related claim required to register claims, filed or unfiled, related to Xarelto® pursuant to CMO 10 shall utilize the forms available at the website. *Pro se* plaintiffs also shall use the appropriate form on the website to register their claims.

IT IS SO ORDERED.

Dated:  March 26, 2019

Hon. Eldon E. Fallon

Judge, United States District Court

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCT LIABILITY LITIGATION | MDL 2592 |
| | SECTION L |
| ----------------------------------------- | HONORABLE ELDON E. FALLON · |
| **This Document Relates to:** **ALL CASES** | MAG. JUDGE NORTH |

**CASE MANAGEMENT ORDER NO. 11 (DOCKET CONTROL ORDER)**

For good cause shown, the Court hereby **ORDERS** as follows:

**ALL OBLIGATIONS PURSUANT TO THIS ORDER SHALL BE THE RESPONSIBILITY OF INDIVIDUAL PLAINTIFF'S COUNSEL, OR PLAINTIFF IF SELF-REPRESENTED, AND NOT THE RESPONSIBILITY OF THE PLAINTIFFS' STEERING COMMITTEE.**

I.   **OBLIGATIONS OF PLAINTIFFS WHO DO NOT PARTICIPATE IN THE SETTLEMENT PROGRAM AND PLAINTIFFS WHO ARE NOT ELIGIBLE TO ENROLL IN THE SETTLEMENT PROGRAM**

A. DEFINITIONS:

i.   "Existing Plaintiff": Plaintiffs who filed suit on or before March 11, 2019.

ii.  "New Plaintiff": Plaintiffs who filed suit after March 11, 2019.

1

B. All Existing Plaintiffs who do not participate in the Settlement Program (either voluntarily or because they are not eligible to participate) and all New Plaintiffs who are not eligible to participate in the Settlement Program must:

  i. Pay any unpaid MDL filing fees within 14 days after the conclusion of the Settlement Program enrollment period.

  ii. File and serve a completed Short Form PFS and PPCF (both as defined in CMO 8) within later of 60 days following the conclusion of the Settlement Program enrollment period or 30 days of the case being docketed in this Court.

  iii. File and serve updated Short Form PFS and PPCF forms within 60 days of the conclusion of the Settlement Program enrollment period if one is an Existing Plaintiff who does not participate in the Settlement Program or who is ineligible to participate in the Settlement Program for any reason and who previously filed and served their PFS and PPCF.

  iv. Serve on Defendants a case-specific Rule 26(a)(2) report from a licensed physician qualified to render a specific causation opinion and who offers a specific causation opinion to a reasonable degree of medical probability that the plaintiff's alleged injury or event was caused by taking Xarelto® as directed, which opinion is based on a review of such plaintiff's medical records contemporaneous to the prescription and use of Xarelto® and any claimed Xarelto®-related injury and which report shall attach the contemporaneous medical records of that plaintiff.

  v. Pay for the cost of prescriber/treater medical records collected by the Marker Group unless the Parties agree or the Court determines that the entirety of the prescriber and treater's medical records pertaining to such plaintiff have previously been produced to Defendants by that Plaintiff.

B. The case-specific reports required pursuant to Section II(A)(iv) shall be served on Defendants within the following timeframes:

  i. Existing Plaintiff shall serve within one hundred twenty (120) days of the conclusion of the Settlement Program enrollment period.

  ii. New Plaintiff shall serve within the earlier of one hundred twenty (120) days of their case being docketing in this Court or the transmission of this Order by Defendants to New Plaintiffs.

2

C. Any further proceedings will remain stayed until the filing fees, PFS, PPCF, expert

reports, and medical record payment obligations of such Plaintiffs are satisfied as set

forth herein.

## II.  PRESERVATION NOTICE REQUIREMENT

A.     Within forty-five (45) days of the transmission of this Order by Defendants to a

New Plaintiff, or within thirty (30) days of the lifting of the stay as it applies to an Existing

Plaintiff, counsel for an Existing Plaintiff and/or New Plaintiff shall notify the following

individuals or entities, by registered mail, that they may have records relevant to the claim of each

Existing Plaintiff and/or New Plaintiff in this MDL Proceeding ("Claim") that they represent, and

that any records relating to the Existing Plaintiff or New Plaintiff must be preserved, pending

collection by the Existing Plaintiff or New Plaintiff ("Notice" or "Notices"):

     i.    All Pharmacies that dispensed any medications to the Plaintiff for the period from January 1, 2012 to the present;

    ii.    All Physicians, Medical Facilities, other Healthcare Providers and/or other persons ("Other Providers") who Plaintiff claims provided samples of Xarelto to the Plaintiff;

   iii.    All Physicians, Medical Facilities and/or other Healthcare Providers who prescribed Xarelto for the Plaintiff; and

   iv.    All Physicians and/or other Healthcare Providers who treated Plaintiff for the period from January 1, 2012 to the present.

B.     Within fifty (50) days of the transmission of this Order by Defendants to a New

Plaintiff, or within thirty-five (35) days of the lifting of the stay as it applies to Existing Plaintiffs,

counsel for an Existing Plaintiff or New Plaintiff shall serve a statement listing the names and

addresses of all individuals or entities to which Notices were sent, along with copies of the Notices

and a representation that the Notices were sent as required by this Order.

C.     Plaintiffs who fail to fully comply with the requirements of this Order shall be given notice by e-mail (or regular mail to only those individuals representing themselves pro se) from Defendants' Liaison Counsel or his designee, and shall be provided thirty (30) additional days from the date of notice to cure such deficiency ("Cure Period").  No other extensions will be granted, except upon application to the Court for good cause shown.  If a Plaintiff fails to cure the deficiency within the Cure Period, Defendant's Liaison Counsel shall identify on the monthly case management conference agenda all Plaintiffs with deficiencies.  Any Plaintiff so identified shall be required to Show Cause why the claim should not be dismissed with prejudice for failure to prosecute.  The Plaintiff shall thereupon have until the next conference to cure the deficiencies or respond to the request to Show Cause.  Any failure to respond within the required period of time shall lead to the dismissal for failure to prosecute of the claim with prejudice, except upon Motion and for good cause shown.

D.     A Plaintiff may be prohibited from seeking to introduce into evidence at trial, or in any opposition to summary judgement or pre- or post-trial motions, any document or information asserting that Xarelto  was dispensed by a pharmacy or that Xarelto was provided to the Plaintiff as a sample if a Notice was not sent as directed herein, subject to determination by the Court at a later date.  Similarly, a Plaintiff may be prohibited from seeking to introduce into evidence at trial, or in any opposition to summary judgement or pre- or post-trial motions, any document or information concerning a Plaintiff's treatment history, symptoms, condition, injuries or damages if a Notice was not sent as directed herein, subject to determination by the Court at a later date.

E.     A Plaintiff who fails to act in good faith in complying with this Order may also be subject to other sanctions or orders deemed appropriate by this Court.

4

F.      Defendants may elect to waive the foregoing Notice requirement for any Plaintiff who has already submitted records for Defendants' resolution consideration.

## III.    CERTIFICATION OF COMPLIANCE WITH DISCOVERY REQUIREMENTS

A.      In connection with fulfilling the discovery obligations of this Order, Existing Plaintiffs who do not participate in the Settlement Program or who are ineligible to participate in the Settlement Program for any reason, and all New Plaintiffs, must provide to Defendants, an affidavit of each Plaintiff attesting to the following facts:  (i) all records have been collected from all pharmacies that dispensed drugs to, or for, the Plaintiff and have been produced; and (ii) all medical records and reports required to be produced pursuant to this Order have been produced. If any of the documents described herein do not exist, Plaintiff shall state that fact in his or her affidavit and the reason, if known, why they do not exist and provide a "No Records Statement" from the pharmacy or healthcare provider.

B.      Existing Plaintiffs shall produce this affidavit to Defendants within forty-five (45) days of the lifting of the stay of their case, and New Plaintiffs shall produce this affidavit within sixty (60) days of the transmission of this Order by Defendants.

C.      With the exception of the PFS, Plaintiffs shall serve all items set forth above in accordance with the service procedures outlined in Exhibit [___] to this Order.

D.      Notwithstanding the foregoing deadlines, Defendants' obligation to produce Defense Fact Sheets is hereby stayed pending further order of the Court.

E.      The submission of false or intentionally misleading information to satisfy the documentation requirements of this Order shall be subject to appropriate sanctions.

ENTER:

3/25/19
Date

HON. ELDON E. FALLON

**UNITED STATES DISTRICT JUDGE**